## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Yvonne Gipson**<br>**1404 Chesapeake Avenue**<br>**Annapolis, MD 21403,**<br>**and all others similarly situated,** | **CASE NUMBER 1:07-CV-01970-JDB** |
| **Plaintiffs,** | |
| **v.** | **MOTION TO DISMISS FOR**<br>**IMPROPER VENUE OR IN THE**<br>**ALTERNATIVE TO TRANSFER** |
| **Wells Fargo & Company, Wells Fargo**<br>**Bank, N.A., Employee Benefit Review**<br>**Committee, and John Does 1 - 20, et al.,** | **ORAL ARGUMENT REQUESTED** |
| **Defendants.** | |

Defendants Wells Fargo & Company ("Wells Fargo"), Wells Fargo Bank, N.A. ("Wells Fargo Bank"), and the Employee Benefit Review Committee (the "Review Committee") (collectively the "Wells Fargo Defendants") hereby move to dismiss the Complaint for improper venue under Fed. R. Civ. P. 12(b)(3) or, in the alternative, to transfer this case to the District of Minnesota pursuant to 28 U.S.C. § 1404(a).

This motion will be based upon Wells Fargo Defendants' Memorandum of Points and Authorities, the supporting affidavits, all of the files, records, and proceedings therein, such evidence and argument as may be presented to the Court prior to the decision on this Motion, and the arguments of counsel.

The Wells Fargo Defendants believe that oral argument would materially assist the Court and therefore request a hearing on this motion.

Dated:  January 31, 2008

DORSEY & WHITNEY LLP

By:    s/Creighton R. Magid
     Creighton R. Magid (DC#1071807)
1050 Connecticut Avenue NW
Suite 1250
Washington, D.C. 20036
(202) 442-3000
magid.chip@dorsey.com

AND

     Stephen P. Lucke *(admitted pro hac vice)*
     Andrew J. Holly *(admitted pro hac vice)*
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
(612) 340-2600 (telephone)
(612) 340-2868 (facsimile)
lucke.stephen@dorsey.com
holly.andrew@dorsey.com

```
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
```

Yvonne Gipson
1404 Chesapeake Avenue
Annapolis, MD 21403,
and all others similarly situated,

                              Plaintiffs,

v.

Wells Fargo & Company, Wells Fargo
Bank, N.A., Employee Benefit Review
Committee, and John Does 1 - 20, et al.,

                              Defendants.

CASE NUMBER 1:07-CV-01970-JDB

MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
MOTION TO DISMISS FOR
IMPROPER VENUE OR IN THE
ALTERNATIVE TO TRANSFER

ORAL ARGUMENT REQUESTED

Defendants Wells Fargo & Company ("Wells Fargo"), Wells Fargo Bank, N.A. ("Wells

Fargo Bank"), and the Employee Benefit Review Committee (the "Review Committee")

(collectively the "Wells Fargo Defendants") submit the following Memorandum of Points and

Authorities in support of their motion to dismiss for improper venue under Fed. R. Civ. P.

12(b)(3) or, in the alternative, to transfer this case to the District of Minnesota pursuant to 28

U.S.C. § 1404(a).

The Wells Fargo Defendants believe that oral argument would materially assist the Court

and therefore request a hearing on this motion.

I.    INTRODUCTION

Yvonne Gipson ("Gipson") filed this ERISA action against certain alleged fiduciaries of

the Wells Fargo & Company 401(k) Plan (the "Plan") in the United States District Court for the

District of Columbia.

The Plan, however, includes a forum selection clause that requires that all Plan-related

claims be filed in the District of Minnesota, where the Plan is administered.  Courts routinely

enforce similar forum selection clauses in ERISA plans, and should do so here as well.  Under well-established Supreme Court precedent, this action must be dismissed (or transferred) for improper venue.

Even without the forum selection clause, Gipson had no basis to file this case in the District of Columbia.  She does not reside in this district, her previous employment at Wells Fargo was not in this district, and none of the Wells Fargo Defendants are citizens in this district.  Further, none of the Plan's fiduciaries, administrators, or investment advisors live or work in this district.  In fact, apart from the fact that Gipson's counsel offices in this district, this case does not have a *single* connection to the District of Columbia.  Transfer of this case to the District of Minnesota – where the Plan is administered and where the majority of the witnesses and documents are – is therefore also appropriate under 28 U.S.C. § 1404(a).

## II.    BACKGROUND

### A.    Wells Fargo Sponsors A 401(k) Plan, Which Is Administered In The District Of Minnesota.

Wells Fargo sponsors the Plan.  See Complaint, ¶ 23.  The Plan is a defined contribution pension plan subject to ERISA, 29 U.S.C. § 1001 *et. seq*.  See Complaint, ¶ 21.  As its name implies, it is also qualified under IRC § 401(k).  Id. ¶ 21.  Like other 401(k) plans, the Plan allows participants to invest a portion of their salaries on a tax-deferred basis in one of several investment options of their choosing.[1]  Funds include offerings from Dodge & Cox and the

---

[1]    See Complaint, ¶ 35-36.  See also Affidavit of Paula Roe ("Roe Affidavit") at Exhibit A, § 8.1 (hereinafter referred to as the "Plan").  Because the plan document is referenced in the Complaint, it is within the pleadings and can be reviewed on a Rule 12 motion.  See Gustave-Schmidt v. Chao, 226 F. Supp. 2d 191, 196 (D.D.C. 2002).  It is also appropriate for the Court to examine information outside the pleadings on a motion for improper venue or to transfer.  E.g., Rerner v. Burlington Area School Dist., 205 F.3d 990, 996 (7th Cir. 2000).

2

American Funds, as well as mutual funds and collective funds[2] managed by Wells Fargo Fund Management, LLC a subsidiary of Wells Fargo, and subadvised by Wells Capital Management, State Street Bank & Trust, Barclays Global Investors and a variety of other institutions.  See Complaint, ¶ 2.  Roe Affidavit, ¶ 16-19.  See also Roe Affidavit, Ex. B. (hereinafter referred to as the "SPD") pp. 12-20.  Although the Complaint fails to mention it, Department of Labor regulations and guidelines specifically allow company-sponsored 401(k) plans to include funds managed by affiliates.  See Prohibited Transaction Exemption 77-3, 42 Fed. Reg. 18734 (April 8, 1977).  Participants may transfer their Plan investments to different investment options within the plan at any time.  See SPD, p. 13-15.

As identified in the SPD, the Plan is administered in Minnesota.  Specifically, participants are notified that they can contact the Plan Administrator in Minneapolis, Minnesota, which is also the location where it can be served with process.  See SPD pp. 36-37.  It is also where claims for benefits must be filed and where copies of documents can be obtained.  Id. pp. 36-37.  In addition, the SPD indicates that the Plan Trustee can be found in Minnesota.  Id. p. 37.

The Plan also includes a forum selection clause that requires that all claims or causes of action related to the Plan be filed in the United States District Court for the District of Minnesota.  It states:

> **All controversies, disputes, and claims arising hereunder shall be submitted to the United States District Court for the District of Minnesota.**

See Plan Document at § 1.4 (emphasis added).  This venue provision has been a provision of the Plan (and prior versions of the Plan) since at least 1976.  See Roe Affidavit, ¶ 15.

---

[2]    Regulated by the Comptroller of the Currency rather than the SEC, collective funds are nevertheless similar to mutual funds insofar as they pool investments in a diversified portfolio.

**B.    Gipson's ERISA Claims.**

Despite this forum selection clause, in November 2007, Yvonne Gipson filed a putative class action against the Wells Fargo Defendants in the District of Columbia.  See Complaint p. 1. The Complaint alleges that for the period from 2001 to the present, the Wells Fargo Defendants improperly selected (and aided and abetted the selection of) mutual funds managed by affiliates of Wells Fargo (the "Wells Fargo Funds") as investment options for the Plan in order to "generate[] substantial revenues for Wells Fargo."  Id., ¶ 3.  The Complaint further alleges that these funds charged "significantly higher fees than comparable, unaffiliated funds, while offering mediocre returns.  Id., ¶ 8.[3]  Notwithstanding the Supreme Court's recent ruling in Bell Atlantic v. Twombly, 127 S. Ct. 1955 (2007) that, rather than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action," a complaint must allege "enough factual matter" to "plausibly suggest[]" that each element of the claim has been met, id. at 1966-67, the Complaint does not allege a single, concrete fact that supports Gipson's conclusory allegations of wrongdoing.  See Complaint ¶¶ 8, 27, 38, 40.

**C.    The Plan Is Administered In Minnesota, With No Connection To The District Of Columbia.**

Although Gipson filed her Complaint in the United States District Court for the District of Columbia, the facts and witnesses in this case have no relationship to this district.  Rather, the

---

[3]    Specifically, the Complaint alleges that the transactions between the Wells Fargo entities and the Plan were a breach of fiduciary duty under ERISA § 404(a) (29 U.S.C. § 1104(a)), because the Plan fiduciaries failed to select mutual funds in the best interests of the participants. Likewise, it also alleges that these transactions violated ERISA's prohibited transaction rules, see ERISA § 406(a) (29 U.S.C. § 1106(a)), because they involved a transfer of property between the Plan and a "party in interest." (Gipson does not attempt to allege, however, why the inclusion of the Wells Fargo Mutual Funds was outside Prohibited Transaction Exemption 77-3 allowing such investments).  Finally, the Complaint alleges that Wells Fargo and Wells Fargo Bank participated in and aided and abetted the wrongdoing of other fiduciaries.  See Complaint ¶ 64.

Plan's Minnesota forum selection clause, together with the underlying allegations and key witnesses, leave Minnesota as the only appropriate venue for this action.

As noted, Gipson's Complaint alleges that the Wells Fargo Funds were selected as Plan investment options not to benefit the participants, but to benefit the Wells Fargo Defendants. See supra n.3.  Thus, most of the witnesses in this matter will be those with responsibilities for administering the Plan, including researching, selecting,  monitoring, and accounting for the Plan's investment options (and associated fees), as well as carrying out trustee services that are alleged to be implicated in the alleged fiduciary breaches.  See Complaint ¶ 1-4; 7-11.  The great majority of that activity takes place in Minnesota.

The Plan's sponsor, Wells Fargo, was formerly known as Norwest Corporation and was headquartered in Minnesota until it acquired former Wells Fargo & Company and moved its headquarters to California.  Roe Affidavit, ¶ 3.  Following the merger, substantial business operations have remained in Minnesota, including the delivery of institutional trust services and the administration of the Plan.  See Roe Affidavit, ¶ 3, 9.  See also SPD at p. 36-38.  The Plan provides that the Wells Fargo's Director of Human Resources and the Director of Compensation and Benefits will serve as the Plan Administrator and as the "named fiduciary" under the Plan.[4] See Plan Document § 12.1.  Throughout the alleged class period, the Director of Compensation and Benefits (and one of the Plan Administrators under the terms of the Plan), Paula Roe, lived and worked in Minnesota.  Roe Affidavit, ¶ 1[5].  Most of the staff whose duties involve the

[4]    ERISA requires that every employee benefit plan "name" a fiduciary that will be responsible for the administration of the Plan.  See ERISA § 402.

[5]    Wells Fargo's Executive Vice President and Director of Human Resources Julie White, to whom Roe reports, is a resident of Iowa and works in Iowa and San Francisco.  Roe Affidavit, ¶ 4.

administration of the Plan work in Minnesota, and most of the actual administration of the Plan (*e.g.* providing information to Plan participants and beneficiaries, processing distribution requests, and interfacing with Wells Fargo's Payroll Department and the Plan's trustee) occurs in Minnesota. Id. ¶ 5-6. See also SPD p. 36, 38. Among others, Wells Fargo's Manager of Retirement Plans (currently Robert Brausen and formerly Debbie Harvieux[6]), as well as the Manager of the Plan (Melanie Miller), reside and work in Minnesota. Id. ¶ 5.

In addition, the investment manager with respect to the Plan (Tom Hooley) and his staff live and work in Minnesota. Id. ¶ 6. They assist in the research, selection, and ongoing review of the Plan's investment options, including the fees and expenses associated with those options. Id. Hooley reports and makes recommendations to the Employee Benefit Review Committee (the "Review Committee") (whose past and present members reside throughout the country) regarding Plan investment decisions. Id. ¶ 6, 10. Prior to Mr. Hooley, David Lunt, who also lives and works in Minnesota, served as investment manager. Id., ¶ 7. All of the records compiled by Hooley, Lunt, and their staffs are located in Minnesota, as are all of the records of the Review Committee whom they advise. Id. ¶ 8.

Further, Wells Fargo Bank, which the Complaint alleges, "knowingly participated" in the breaches of fiduciary duty, serves as the trustee of the Plan under ERISA § 403. See Complaint ¶ 18. See also SPD p. 37. A Wells Fargo Bank employee (Craig Peiffer) and other members of the Institutional Trust Services division of the Bank perform all of the trustee services for the Plan (such as daily calculation of plan assets and participants' account balances, processing distributions and participant loans, and the administration of participant's trading activities). Roe Affidavit ¶ 9. All of the employees of the Institutional Trust Services division who perform

---

[6]    Debbie Harvieux no longer works for Wells Fargo. See Roe Affidavit, ¶ 5.

these trustee services work in Minnesota.  Id.  The trustee also provides a call center for Wells

Fargo employees to provide assistance with Plan issues, which is located in Minnesota.  Id.

In contrast, there is no connection between this lawsuit and the District of Columbia.

Gipson does not live in this district.  See Complaint ¶ 16.  Even when she worked for Wells

Fargo Bank, she worked in Maryland, not the District of Columbia.  Roe Affidavit, ¶ 13.

Further, of the 184,459 participants of the Plan, only 47 live in the District of Columbia.  Id.

¶ 11.  In contrast, 21,360 participants live in Minnesota, the state having the second largest

concentration of Plan participants.  Id.

Notably, none of the Wells Fargo Defendants have any significant presence in the District

of Columbia.  Wells Fargo is a Delaware corporation with its principal place of business in

California.  Id. ¶ 3.  It has only three employees in the District of Columbia, all of whom work

on government relations issues.  Id. ¶12.  Wells Fargo Bank is a national bank chartered in South

Dakota, with its principal place of business in California.  Id. ¶ 9.  Of its 133,590 employees,

fewer than 70 work in the District of Columbia.  Id. ¶ 12.  None of the Wells Fargo or Wells

Fargo Bank employees who work in the District of Columbia has any relationship to the

administration of the Plan.  Id.  Finally, none of the Review Committee's business occurs in the

District of Columbia, and none of its members live or work in this district.  Id. ¶ 10.

Similarly, none of the funds that Gipson alleges yield mediocre returns and charge

excessive fees have any connection to the District of Columbia.  Specifically, Dodge & Cox,

Capital Research and Management Company, State Street Bank & Trust, and Barcalys (all of

which either manage or provide advisory services to Plan funds) are all based in places other

than the District of Columbia.  Roe Affidavit, ¶ 18-20.  Similarly, the managers and subadvisors

affiliated with Wells Fargo (e.g., Wells Fargo Funds Management LLC, Wells Capital

Management, Peregrine Capital Management, Inc. and Galliard Capital Management) are all headquartered in California or Minnesota. <u>See</u> Roe Affidavit, ¶ 16-17. Similarly, none of the Plan's administrative service providers are located in the District of Columbia; the Plan's record-keeper, SunGard, for example, is based in Arkansas. <u>Id</u>., ¶ 14. In sum, the only connection between this case and the District of Columbia is that Gipson's counsel has an office in this district. Neither Gipson nor any of the Wells Fargo Defendants or their employees with responsibility for the selection or maintenance of the Plan's investment subfunds has any connection to the District of Columbia.

### III.    ANALYSIS

####    A.    The Forum Selection Clause Mandates Dismissal Of This Action Or A Transfer To The District Of Minnesota.

Because the Plan requires that all disputes regarding the Plan be filed in the District of Minnesota, this Court should dismiss this action under Fed. R. Civ. P. 12(b)(3) for lack of proper venue. <u>See</u> <u>Commerce Consultants Int'l, Inc. v. Vetrene Riunite, S.P.A.</u>, 867 F.2d 697, 700 (D.C. Cir. 1989) (affirming Rule 12(b)(3) dismissal based upon forum selection clause); <u>Nat'l Dev. Corp. v. Fenetres MQ, Inc.</u>, 1998 WL 34313581, at * 3 (D.D.C. 1998) (dismissing for improper venue based on forum selection clause). Alternatively, this Court has the authority to transfer this matter to the District of Minnesota pursuant to 28 U.S.C. § 1406, which authorizes a court to transfer a case to a district with proper venue, rather than dismiss it.

The Supreme Court has repeatedly held that forum selection clauses are appropriate and that federal courts should liberally enforce them. <u>See</u> <u>Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 10 (1972) (federal courts must enforce forum selection clauses unless "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or

overreaching."); <u>Carnival Cruise Lines, Inc., Shute</u>, 499 U.S. 585, 593-94 (1991) (enforcing

forum selection clause in non-negotiated, boilerplate, contract).

Consistent with this directive, Courts routinely enforce forum selection clauses in ERISA

plans.  <u>E.g.</u>, <u>Bernikow v. Xerox Corp.</u>, 2006 WL 2536590 * 2 (C.D. Cal. 2006) (enforcing

ERISA forum selection clause contained in plan document); <u>Klotz v. Xerox Corp.</u>, 519 F. Supp.

2d 430 (S.D.N.Y. Oct. 22, 2007) (same).  These courts recognize that in the "absence of a clear

directive from Congress, there is no reason to disturb the general presumption in favor of

enforcing forum selection clauses."  <u>Bernikow</u>, 2006 WL 2536590 at * 3.  Enforcing such

clauses is also consistent with the well-established rule enforcing arbitration provisions – a

"specialized type of forum selection clause"[7] – in ERISA plans.[8]

For example, in <u>Bernikow</u>, the plaintiff raised claims against a long-term disability plan.

The defendant moved to dismiss the case for improper venue (or, in the alternative, to transfer

the matter).  In granting the defendants' motion, the court noted that forum selection clauses

have widely been enforced, and that there was no basis under ERISA to ignore the general

presumption in their favor.  Because there was no evidence that the clause was procured by fraud

or overreaching, or that ERISA prohibited such clauses, the motion to dismiss was granted and

the case was transferred under 28 U.S.C. § 1406.  <u>Bernikow</u>, 2006 WL 2536590 at * 2.

Under this authority, Gipson was required to bring her claim in the District of Minnesota.

Section 1.5 of the Plan broadly applies to all "controversies, disputes and claims arising under

---

[7]    <u>Roby v. Corporation of Lloyd's</u>, 996 F.2d 1353, 1363, n.2 (2d Cir. 1993).

[8]    <u>Bird v. Shearson Lehman/Am./ Express, Inc</u>. 926 F.2d 116, 117-22 (2d Cir. 1991)
(enforcing arbitration clause in ERISA plan) ; <u>Chappel v. Labatory Corp. of Am.</u>, 232 F.3d 719,
725 (9th Cir. 2000) (same); <u>Arnulfo P. Sulit, Inc. v. Dean Witter Reynolds, Inc.</u>, 847 F.2d 475,
478 (8th Cir. 1988) (same).

the Plan." The allegations in the Complaint clearly allege a "controvers[y]" under the Plan, as it alleges that the Wells Fargo Defendants' behavior violates the standards set forth in the Plan. For example, the Plan bars any fiduciary from engaging in "any prohibited transaction within the meaning of ERISA." See Plan Document § 12.8. As noted earlier, Gipson's Complaint alleges that the Wells Fargo Defendants violated this standard by causing the Plan to engage in various prohibited transactions. See Complaint ¶¶ 62-66. Likewise, the Plan requires that all fiduciaries exercise their duties with the "care, skill, prudence, and diligence . . . that a prudent person acting in like capacity and familiar with such matters would use." See Plan Document, § 12.7. The Complaint alleges that the Wells Fargo Defendants violated this standard, insofar as the selection of the Wells Fargo Funds was not taken with the "care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters would use . . ." Complaint ¶ 43. Thus, because Gipson's Complaint alleges that the Wells Fargo Defendants took actions that violated the Plan's standard of conduct, her claim clearly arises "under" the Plan.

Similarly, Gipson's claim that the Wells Fargo Defendants violated various provisions of ERISA also arises under the Plan. Courts have uniformly held that a contractual provision referring all "controver[sies] or claim[s]" arising under an agreement to a particular venue includes claims based upon a violation of an underlying or related statute. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 508-09 (1974) (holding that claim under Securities Exchange Act was covered by arbitration clause in international contract governing "any controversy or claim [arising] out of this agreement or the breach thereof"); Phillips v. Audio Active, Ltd., 494 F.3d 378 (2nd Cir. 2007) (finding that claim arising under Copyright Act could also "arise out of" contract for purposes of interpreting forum selection clause); Abbott Labs, 476 F.3d 421, 424

(7th Cir. 2007) (rejecting plaintiff's argument that breach of fiduciary duty claim arising under Delaware tort law did not arise from the contract); <u>Bense v. Interstate Battery System of America</u>, 683 F.2d 718 (1st Cir. 1982) (finding complaint brought under federal antitrust law arose from distribution agreement between parties).

In light of these authorities, it is appropriate to require that Gipson bring her claims in Minnesota in compliance with the Plan's forum selection clause.  With the clause a part of the Plan for decades, there can be no claim that its inclusion in the Plan was in bad faith or otherwise improper.  Moreover, as provided by ERISA § 104(b), Gipson had been entitled as a participant to receive (and was thus on notice of) the Plan language containing the venue clause, <u>see</u> Complaint ¶ 16, and based upon the allegations in her Complaint, it appears that she did, in fact, have a copy prior to filing.  <u>See</u> <u>e.g.</u>, <u>id.</u>, ¶¶ 1-4, 22-27, 30-34.  In any event, even if Gipson had not requested Plan documents or had otherwise overlooked the forum selection clause, it is still enforceable.  <u>See</u> <u>Schoemann</u> , 447 F. Supp. 2d at 1007 (even though the "typical beneficiary does not even know that the forum-selection clause exists," such clauses should still be enforced).  <u>Cf.</u> <u>Klotz</u>, 2007 Wl 3100220 at * 1 (noting that plaintiff did not "seriously allege" that the forum selection clause had not been communicated to her where it was included in  the Plan document.).[9]

---

[9]    This law is consistent with cases holding that forum selection clauses are enforceable even when included in boilerplate, non-negotiated contracts between parties of unequal bargaining power.  <u>See</u> <u>e.g.</u>, <u>Carnival Cruise Lines, Inc., Shute</u>, 499 U.S. 585, 593-94 (1991) (enforcing forum selection clause even though it was not a bargained-for term of the contract); <u>Sivla v. Encyclopedia Britannica, Inc.</u>, 239 F.3d 385, 389 (1st Cir. 2001) ("Finally, Britannica's alleged bargaining power is not relevant [to the enforcement of a forum selection clause]. Britannica used its bargaining power to do nothing more than offer an appealing employment opportunity to appellant, and no evidence suggests that he was coerced into entering the agreement.").

Nor can Gipson claim that litigating in Minnesota would cause hardship on her or her counsel. Gipson's lawyers have agreed to fund the litigation, see Complaint ¶ 59, and consistent with their advertised status as a large class action firm that "litigate[s] cases throughout the United States,"[10] they can readily litigate this matter in Minnesota. See Complaint ¶ 59. In fact, Plaintiff's counsel is currently litigating various ERISA claims throughout the United States,[11] including a case with similar allegations against 401(k) plan fiduciaries in Iowa.[12] Thus, given that Gipson cannot show that she will experience "manifest[] and grave[]" inconvenience as a result of the enforcement of this clause, existing Supreme Court authority requires its enforcement. See Bremen, 407 U.S. at 10; Commerce Consultants Intern., Inc. v. Vetrerie Riunite, S.p.A., 867 F.2d 697 (D.C. Cir. 1989).[13]

Therefore, because the Plan's forum selection clause is clear and unambiguous and there is no reason to disregard it, the Complaint should be dismissed for improper venue or, alternatively, transferred to the District of Minnesota pursuant to 28 U.S.C. § 1406.

---

[10]    See http://www.mctiguelaw.com/.

[11]    See http://www.mctiguelaw.com/news/.

[12]    See McCullough v Aegon U.S.A., Inc., -- F. Supp. 2d --, 2007 WL 3232202 (N.D. Iowa, Oct. 30, 2007). See also Leber v. Citigroup, 1:07-CV-09329 (S.D.N.Y.).

[13]    Courts, in fact, have been willing to transfer ERISA claims requesting small benefit amounts filed by disabled participants to far away districts, ruling that the participants' attorney could litigate the matter in the distant forum without any significant hardship to the plaintiff. E.g., Bernikow, 2006 WL 2536590 * 2; Klotz v. Xerox Corp., 519 F. Supp. 2d 430 (S.D.N.Y. Oct. 22, 2007); Schoemann ex rel. Schoemann, 447 F. Supp. 2d at 1007. Here, Gipson is seeking to litigate on behalf of a class of over 180,000 participants, over 23,000 of whom live in Minnesota.

**B.      Alternatively, This Matter Should Be Transferred To The District Of Minnesota Pursuant To Section 28 U.S.C. § 1404(a).**

Even if venue were not improper under Section 1406, this case should be transferred to Minnesota pursuant to 28 U.S.C. § 1404(a).  That statute states that "[f]or the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  See Van Dusen v. Barrack, 376 U.S. 612, 626 (1964).

Under existing § 1404 case law, transfer of venue is appropriate if:  (1) venue is proper in the court to which transfer is sought; (2) it is for the convenience of the parties and witnesses; and (3) it is in the interest of justice.  E.g., Berenson v. National Financial Services, Inc., 319 F. Supp. 2d 1 (D.D.C. 2004).  Minnesota is the appropriate forum for this action under each of these factors.  Venue would unquestionably be appropriate in the District of Minnesota, where the Plan is administered and where all of the Defendants have a presence.  See Roe Affidavit, ¶¶ 1, 3-10, 19.  Moreover, one of the Plan's Administrators, the investment manager, the trustee, their staffs, and various Wells Fargo employees and executives who administer its benefit plans live and work in that district as well.  Id. ¶¶ 1, 5, 6, 9.  There is, in contrast, no connection between this case and the District of Columbia:  not a single Wells Fargo employee with responsibility for the Plan or its investment decisions lives or works here.  Indeed, not even Gipson has a meaningful connection to this jurisdiction.

In analogous cases courts have readily transferred ERISA claims under § 1404(a).  For example, in Nat'l Traffic Controllers Ass'n v. Dental Plans, Inc., 407 F. Supp. 2d 1, 3 (D.D.C. 2005), the court granted defendants' motion to transfer an ERISA claim.  It noted that there was little basis for giving plaintiffs' choice of forum any deference as only one of the many plaintiffs lived there.  Id.  Since the Plan was administered in another district, – the Nat'l Traffic

13

Controllers Court readily transferred the ERISA claim to the district where the Plan was administered.  Id.  See also Brotherhood of Painters and Allied Trades Union v. Rose Brothers Home Decorating Center, Inc., 1992 WL 24036, at *2 (D.D.C. Jan. 14, 1992) (granting motion to transfer in ERISA case where witnesses and records were all located in transferee district); Campbell v. Consolidated Building Specialties, 683 F. Supp. 271, 273 (D.D.C. 1987) (granting motion to transfer in ERISA case where the daily administration of the pension fund did not take place in the district); McCullough v. AEGON U.S.A., -- F. Supp. 2d --, 2007 WL 3232202 (N.D. Iowa, Oct. 30, 2007) (transferring 401(k) case brought by firm that represents Gipson from California to Iowa).

Similarly, in George v. Kraft Global Foods, Inc., 2007 WL 853998 (S.D. Ill., March 16, 2007), participants brought a claim on behalf of a putative class alleging that their employer's 401(k) plan had imprudently chosen investing in investment options with excessive fees.  The Court found the initial forum to be inconvenient under 1404(a) given the complete lack of any connection between the case and the forum and transferred the case to the district where the majority of witnesses lived.  Kraft, 2007 WL 853998 at *8.  See also Ruppert v. Principal Life Ins. Co., 2007 WL 2025233, at *6 (S.D. Ill. July 9, 2007) (case transferred where transactions underlying lawsuit had no nexus with district, and all witnesses with material knowledge of transactions were located in transferee forum).  Here, consistent with McCullough, Kraft, Nat'l Traffic Controllers Ass'n, and Ruppert, each of the criteria for a 1404(a) transfer favors Minnesota over the District of Columbia as the appropriate forum for this action.

1.    This Action Could Have Been Brought In The District Of Minnesota.

Initially, venue would be proper in the District of Minnesota.  Under ERISA's venue provision, an action can be brought in the district where "the plan is administered, the breach

took place, or where a defendant resides or may be found." See ERISA § 502(e)(2) (29 U.S.C. §

1132(e)(2)).  Because the Plan is administered in Minnesota, see Roe Affidavit, ¶ 3-4; SPD p. 36,

38, venue would be appropriate in the District of Minnesota under ERISA § 502(e)(2).  Further,

Defendants Wells Fargo and Wells Fargo Bank (as well as the Review Committee) can be

"found" in the District of Minnesota; each Defendant regularly conducts business in that district

and has "minimum contacts" with that forum.  See Roe Affidavit ¶¶ 3, 5-9, 12; SPD p. 36-38.

See also e.g., I.A.M. Nat'l Pension Fund benefit Plan v. Wakefield Indus., Inc., 699 F.2d 1254,

1257 (D.C. Cir. 1983) (noting that a defendant may be "found" under ERISA's venue provisions

anywhere it has "minimum contacts" such that personal jurisdiction is appropriate); Varsic v.

United States District Court, 607 F. 2d 245, 248 (9th Cir. 1979) (same).

There is, therefore, no serious dispute that venue would be proper in the District of

Minnesota under ERISA § 502(e)(2).

> 2.    The Convenience Of The Parties And Witnesses Support Transfer
>        To The District Of Minnesota

Likewise, the convenience of the parties and witnesses support transferring this matter to

the District of Minnesota.

Courts examine the following factors to determine the most convenient district for the

parties and the witnesses: (1) the plaintiff's choice of forum; (2) the defendant's choice of forum;

(3) where the claim arose; (4) the convenience of the parties; (5) the convenience of the

witnesses; and (6) the ease of access to sources of proof.  See Berenson v. National Financial

Services, Inc., 319 F. Supp. 2d 1 (D.D.C. 2004); McClamrock v. Eli Lilly & Co., 267 F. Supp.

2d 33 (D.D.C. 2003); Trout Unlimited v. United States Dep't of Agric., 944 F. Supp. 13, 16

(D.D.C. 1996).  All of these factors support transferring this case to the District of Minnesota.

a.    Gipson's Choice Of Forum Is Entitled To No Deference

Although a plaintiff's choice of forum is sometimes accorded some deference, no such

deference applies here because Gipson has no connection to this forum.  She resides in

Maryland, not the District of Columbia.  See Complaint ¶ 16 (noting that Gipson "resides in

Annapolis, MD").  When she was employed by Wells Fargo, it was in Maryland, not the District

of Columbia.  See Roe Affidavit, ¶13.  Although she alleges that she has been employed in the

District of Columbia after she left Wells Fargo's employment, this is not a sufficient contact to

create a recognizable interest in the forum.  See Foster v. Nationwide Mut. Ins. Co., 2007 WL

4410408, at *3 (N.D. Cal. Dec. 14, 2007) (where plaintiff did not live in chosen forum, his

choice was given little weight, even though he worked part-time in the district).  Since she has no

connection to the District of Columbia, this Court should not provide any deference to Gipson's

choice of forum.  E.g., Miracle Blade, LLC v. Ebrands Commerce Group, 207 F. Supp. 2d 1136,

1155 (D. Nev. 2002) ("A Plaintiff's choice of forum is normally only given substantial deference

if the plaintiff is a resident of the district in which the action is brought.  Otherwise, this bears

little significance on determining whether to grant a discretionary transfer."); Rupert, 2007 WL

2025233 at * 5.[14]

Gipson's choice of forum should also be given "diminished consideration" because her

chosen "forum has no meaningful ties to the controversy and no particular interest in the parties

_____

[14]    See also Lou v. Belzberg, 834 F. 2d 730, 734 (9th Cir. 1987) ([i]f the operative facts have
not occurred within the forum and the forum has no interested parties or subject matter,
[plaintiff's] choice of forum is entitled to only minimal consideration."); Lajaunie v. L & M Bo-
Truc Rental, Inc., 261 F. Supp. 2d 751 (D. Tex. 2003) ("Court[s] look with great scrutiny at the
choices of plaintiffs who file where they do not reside.").  See also e.g., Wright, Miller &
Cooper, Federal Practice & Procedure, v. 15, § 3484, p. 130 (2007) ("[I]f the plaintiff is not a
resident of the forum, then the plaintiff's forum choice is entitled to less deference from the
district judge.") (citing cases).

or the subject matter." <u>Sheldon v. National R.R. Passenger Corp.</u>, 355 F. Supp. 2d 174 (D.D.C.

2005). <u>See</u> <u>also</u> <u>In re Consolidated Parlodel Litigation,</u> 22 F. Supp. 2d 320 (D.N.J. 1998)

(refusing to grant deference to plaintiff's choice of forum because "although a plaintiff's choice

of forum is ordinarily afforded significant weight, that factor diminishes where the plaintiff

chooses a foreign forum rather than his or her home forum. The plaintiff's interest decreases even

further where the central facts of a lawsuit occur outside the chosen forum.") (quotations and

citations omitted).[15]  As discussed elsewhere, there is no connection between this case and the

District of Columbia:  none of the decisions regarding the selection or retention of investment

options occurred here, none of the investments at issue are managed or sub-advised here, and

none of the parties or relevant witnesses lives or works here.[16]  <u>See</u> <u>infra</u> p. 21.  While Gipson's

counsel is located here, the location of her counsel is *not* a significant consideration under

Section 1404(a).  <u>E.g.</u>, <u>Sornberger v. First Midwest Bancorp., Inc</u>., 2002 WL 1182121 (N.D. Ill.

June 4, 2002).

Finally, Gipson's choice of forum should be accorded little if any deference because she

has brought this action as a putative class action on behalf of over 180,000 individuals.  As the

<u>Berenson</u> court held, "in a class action suit in which the plaintiffs propose to represent a class of

potential plaintiffs who reside throughout the country, the plaintiffs' choice of forum deserves

less weight than it is typically given" simply because the true "plaintiff" is spread throughout the

---

[15]    <u>See</u> <u>also</u> <u>e.g.</u>, <u>Lou</u>, 834 F. 2d at 734; <u>McGovern v. Burrus</u>, 2005 WL 670273 (D.D.C.
2005); <u>Airport Working Group of Orange Co. Inc. v. U.S. Department of Defense</u>, 226 F. Supp.
2d 227 (D.D.C. 2002); Wright, Miller, & Cooper, *Federal Practice & Procedure,* v. 15, § 3848
p. 134 n. 14 (2007) (citing cases).

[16]    In fact, for the last two years Gipson has not even been a participant in the Plan,
substantially diminishing any claim that the wrongdoing she alleges occurred in this district.
Roe Affidavit, ¶ 13.

country.  E.g., Berenson, 319 F. Supp. 2d at 3; Rupert. 2007 WL 2025233 at * 5.[17]  This is particularly true where, as here, virtually all of the putative class members live in locations outside of plaintiff's chosen forum.  See Supco v. Automotive Parts, Inc. v. Triangle Auto, Spring Co., 538 F. Supp. 1187, 1191 (E.D. Pa. 1982) (stating that when "the plaintiff seeks to represent a class of many potential plaintiffs scattered across the country, plaintiff's choice of forum deserves less weight.").  Indeed, the differential between the number of putative class members in Minnesota and the District of Columbia shows that the District of Minnesota is the natural venue for this action:  of the current 184,459 Plan participants, only 47 live in the District of Columbia, while 21,360 live in Minnesota.  See Roe Affidavit, ¶ 12.  See also Berenson, 319 F. Supp. 2d at 3-4 (rejecting plaintiffs' choice of forum in part because a small percentage of class members lived in the District of Columbia).  Even the interests of the class that Gipson hopes to represent favor transferring this case to Minnesota.[18]

---

[17]    See also Lou v. Belzberg, 834 F. 2d 730, 734 (9th Cir. 1987); Williams v. Sears Roebuck & Co. 1998 WL 61307 at * 1 (N.D. Cal. Jan. 29, 1998) (stating that "[t]here is little deference given to choice of forums by plaintiff[s] representing a nationwide class.") (citing Blake Const. Co. Inc. v. Int'l Harvester Co., 521 F. Supp. 1268, 1271-72 (N.D. Ill.1981); Steiner v. Hercules, Inc., 1990 WL 97811 at *2 (E.D.Pa. July 9, 1990) (stating that "courts typically give plaintiffs' choice of forum less weight in class action cases.") (citation omitted).

[18]    Thus, this case is distinguishable from Flynn v. Veazey Construction Group., 310 F. Supp. 186 (D.D.C. 12004).  In Flynn, the district court refused to transfer an ERISA case, concluding that the relevant transfer factors were split between the two forums, and therefore deciding that the ERISA plaintiff's choice of forum should be respected.  See Flynn, 310 F. Supp. at 192-93.  In contrast to Flynn and similar cases, however, there is a forum selection clause in this case, which is to be given substantial deference in ERISA actions.  See supra p. _.  In addition, unlike the facts presented in Flynn, there is no connection between this jurisdiction and the claim or the relevant witnesses; not even Gipson lives here.  Indeed, contrary to Flynn, courts dealing with motions to transfer ERISA cases "in this district . . . have come down on either side depending on the particular facts presented to them."  Int'l Brotherhood of Painters and Allied Trades Union v. Rose Brothers Home Decorating Center, Inc., 1992 WL 24036, at *2 (D.D.C. Jan. 14, 1992) (granting motion to transfer in ERISA case where witnesses and records were all located in transferee district).  See also e.g., Nat'l Traffic Controllers Ass'n v. Dental

Gipson simply has no connection to this district or interest in prosecuting this action here. She does not live here, none of the alleged wrongdoing took place here, and more than 99.975% of the class members she seeks to represent live elsewhere. Absent any connection to this district, her choice of forum should not be given any weight.

        b.        Defendants' Choice Of Forum Favors Transfer

As cases such as <u>Berenson</u> noted, the Defendants' interests in an alternative forum supports a motion to transfer. <u>See</u> <u>Berenson</u>, 319 F. Supp. 2d at 3-4. In contrast to Gipson's interest in her choice of forum, the Wells Fargo Defendants have a substantial and reasonable interest in litigating this matter in the District of Minnesota.

Initially, even if this Court does not grant the Wells Fargo Defendants' motion to dismiss under Rule 12(b)(3),[19] the Plan's forum selection clause still weighs strongly in favor of a transfer. Courts regularly enforce forum selection clauses in the context of a § 1404 motion. <u>E.g.</u>, <u>L & L Construction Associates, Inc. v. Slattery Skansaka, Inc.</u>, 2006 WL 1102814, at * 5 (D.D.C. 2006) (holding within the framework of § 1404, a forum selection clause becomes "the dominant factor in the determination."); <u>2215 Fifth Street Assoc., LP v. U-Haul Int'l, Inc.</u>, 148 F. Supp. 2d 50, 57 n.3 (D.D.C. 2001) ("when parties have agreed to a forum selection clause, the

---

<u>Plans, Inc.</u>, 407 F. Supp. 2d 1, 3 n.2 (D.D.C. 2005) (granting motion to transfer in ERISA case because the District of Columbia lacked sufficient ties to the parties, facts, and claims in the controversy); <u>Campbell v. Consolidated Building Specialties</u>, 683 F. Supp. 271, 273 (D.D.C. 1987) (granting motion to transfer in ERISA case where the daily administration of the pension fund did not take place in the district).

[19]    <u>See</u> <u>2215 Fifth Street Assoc., LP v. U-Haul Int'l, Inc.</u>, 148 F. Supp. 2d 50, 57 n.3 (D.D.C. 2001) (declining to dismiss action, but transferring under § 1404 based on forum selection clause); <u>L & L Construction Associates, Inc. v. Slattery Skansaka, Inc.</u>, 2006 WL 1102814, at * 5 (D.D.C. 2006) (dismissing action under doctrine of forum non conveniens based on forum selection clause); <u>Atlantic Tele-Network, Inc. v. Inter-American Dev. Bank</u>, 251 F. Supp. 2d 126, 137 (same).

traditional analysis is altered and . . . the clause should control absent a strong showing that it should be set aside").  See also e.g., Breeden v. Tricom Business Sys., Inc., 244 F. Supp. 2d 5, 9 (N.D.N.Y. 2003) (holding valid forum selection clause places the burden on party opposing transfer to demonstrate why transfer is not appropriate).[20]

For example, in Schoemann, the court was asked to transfer or dismiss an ERISA claim for benefits to another district pursuant to a forum selection clause.  While the Court did not reach the issue of whether this forum selection clause mandated dismissal of the action under Rule 12, it did conclude that a transfer was appropriate under § 1404(a).  It noted that the forum selection clause mandated a transfer of the action, even though the traditional transfer factors (e.g., location of witnesses, etc.) suggested that the case should remain in the plaintiff's chosen forum.  Schoemann, 447 F. Supp. 2d at 1007.  See also e.g., Cent. States Southeast and Southwest Area Pension Fund v. O'Brien & Nye Cartillage, Co., 2007 WL 625430 at * 3 (N.D. Ill. Feb. 3, 2007) (noting that forum selection clause is a crucial factor in a 1404(a) analysis in ERISA case); Rogal v. Skilstaf, Inc., 446 F. Supp. 2d 334, 338 (E.D. Pa. 2006) (same).  Explaining the importance of observing forum selection clauses, the Klotz court commented that when a forum selection clause enables "one federal court [to] oversee the administration of the Plan," it "will benefit [Plan] participants who will have the advantage of one court's consistent oversight of [Plan] administration.  Efficiency results when the plan administrator can conform his administration of the Plan to the dictates of judges sitting in one courthouse rather than a multitude of judges sitting in a wide variety of jurisdictions."  See Klotz, 2007 WL 1370374 at *3.  See also e.g., Schoemann, 447 F. Supp. 2d at 1007 (noting the efficiencies that result from

---

[20]     See also Jumara v. State Farm Ins. Co., 55 F.3d 873, 880 (3d Cir. 1995); Siegel v. Homestore, Inc., 255 F. Supp. 2d 451, 456-57 (E.D. Penn. 2003); Mower Communications, Corp. v. Voipld.com, Inc., 304 F. Supp. 2d 473, 475 (W.D.N.Y. 2004).

having claims adjudicated in a single forum). Such considerations are particularly important in cases arising under ERISA, which was enacted to allow plans to be administered under uniform legal standards. Bird v. Shearson Lehman/American Express, Inc., 926 F.2d 116, 122 (2d Cir. 1991) (quoting H.R. Rep. No. 533, 93rd Cong. 1st Sess. 12 (1973)).

In addition, apart from the Plan's forum selection clause, Defendants' choice of a Minnesota forum is appropriate because the Plan is administered in Minnesota, because Minnesota is the home of the second largest number of Plan participants, and because, as noted before, a large number of the relevant witnesses reside and work in Minnesota.

This factor therefore supports transferring this matter to the District of Minnesota.

c.    The Claim Arose In The District Of Minnesota

This case should also be transferred because the claim Gipson alleges arose in the District of Minnesota, not the District of Columbia. Berenson, 319 F. Supp. 2d at 4 (noting that where the allegedly wrongful action takes place is factor in determining § 1404(a) motion).

Fundamentally, Gipson's allegations that the Wells Fargo Defendants breached their fiduciary duties and engaged in prohibited transactions by offering allegedly poorly performing funds at excessive costs involve claims of plan administration, see Boyer v. J.A. Majors Co. Employee Profit Sharing Plan, 481 F. Supp. 454 (N.D. Ga. 1979), and the Plan is administered in Minnesota. See Roe Affidavit ¶ 3. As detailed above, one of the two Plan Administrators, the investment manager, the trustee, and their staffs all live and work in Minnesota, and Gipson's claims that the Plan was imprudently managed would arise in Minnesota. See supra pp. 4-6. Further, Gipson's claim that the Institutional Trust Services Division of Wells Fargo Bank, which is also located in Minnesota, "knowingly participated" in the various breaches of fiduciary duty, see Complaint ¶ 69, also arises in Minnesota. See Roe Affidavit, ¶ 9.

In contrast, the decision to select and maintain the Wells Fargo Funds as Plan investments has no connection to the District of Columbia. None of the Fund's investment advisors, sub-advisors, or the members of the Review Committee have any connection to this forum, and the management of those funds clearly did not occur in the District of Columbia. Indeed, because she is a Maryland resident, even Gipson's alleged losses cannot be said to have occurred in this district. See supra pp. 6-8.

This factor strongly supports transferring this matter to the District of Minnesota.

d.    The Convenience of the Parties

The convenience of the parties also weighs in favor of transferring this case to Minnesota. Certainly a Minnesota venue would make sense for numerous employees of Wells Fargo who work and administer the Plan in the District of Minnesota. Further, other employees of Wells Fargo affiliates, including Review Committee members, who work in San Francisco, Los Angeles, Iowa, and other locations in the Western United States, can appear more conveniently in Minnesota (where the Plan is administered and where Wells Fargo has substantial operations) than in the District of Columbia, where they have no connection. Thus, because it is "sensible to consider the residence of witnesses employed by the parties and to consider related travel costs and lost-work issues attendant to a distant trial, when trying to make a pragmatic assessment of whether a venue transfer is warranted," this factor supports a transfer to Minnesota. Barela v. Experian Information Solutions, 2005 WL 770629, * 4 (N.D. Ill. 2005).[21]

---

[21]    See Trans-United Indus. v. Renard Linoleum & Ruc Co., 212 F. Supp. 373 (D.C. Pa. 1962) (transferring case to avoid disrupting defendant's business by requiring a prolonged absence of executives).

In contrast, Gipson's interest in a District of Columbia venue is minimal. Given the nature of this action, she will spend little time on this matter, and transferring the case to the District of Minnesota will have little impact upon her. Further, because Plaintiffs' counsel (which has agreed to fund this class action litigation) litigates cases throughout the United States, it can readily litigate this matter in Minnesota. See supra p.11. Transferring this matter will thus have little to no adverse effect on plaintiff, as well 99.975% of future class members who do not live in the District of Columbia. See Rupert, 2007 WL 2025233 * 6 (noting that where a firm has agreed to represent a large putative class of ERISA plan participants on contingency, transfer will work no harm on the plaintiffs).

The convenience of the parties therefore supports transferring this matter to the District of Minnesota.

e.       The Convenience Of The Witnesses

The convenience of the non-party witnesses also supports transferring this matter to Minnesota. Litigating this matter in Minnesota will be most convenient for the former Wells Fargo employees who worked with the administration of the Plan or provided investment advice to the Review Committee. For example, Debbie Harvieux, a Minnesota resident, who was previously the manager of Wells Fargo's retirement plans, no longer works for Wells Fargo, see Roe Affidavit, ¶ 5, and is thus within the subpoena power of the Minnesota court. Although the conclusory allegations in the Complaint make it difficult to forecast exactly who will have pertinent information, the former Wells Fargo employees who may emerge as witnesses will most likely live in Minnesota where the Plan is administered. Thus, transferring this case also serves the convenience of non-party witnesses. Petersen v. Union Pacific RR Co. 2006 U.S.

Dist. LEXIS 25061 at *7-8 (N.D. Ill. April 19, 2006) (noting that ability to compel third-party witnesses to testify at trial is a crucial factor supporting transfer of a case).

Litigating this matter in Minnesota will also be more convenient for other witnesses, such as SunGard, which operates out of Arkansas, as well as employees of the managers and sub-advisors of the Wells Fargo Funds which operate out of California and Minnesota.  See Roe Affidavit, ¶ 12, 14, 16-19.  Although these and other witnesses do not reside in Minnesota, they can more conveniently appear there than in Washington, D.C.  This factor therefore also supports transferring this case to the District of Minnesota.

f.     The Ease Of Access To Sources Of Proof.

As noted, not only is the vast majority of the relevant witnesses in the District of Minnesota, but the vast majority of the documentary evidence (including electronic data) is in that district as well.  See Roe Affidavit, ¶ 3, 8.  See Berenson, 319 F. Supp. 2d at 4 ("Turning to the last private consideration, *i.e.,* ease of access to the sources of proof, the Court finds that Massachusetts is the preferable forum because key witnesses and most of the documentary evidence is located there.").  This factor therefore also supports transferring this matter to the District of Minnesota.

3.     The Interests Of Justice Also Support Transferring This Matter To The District Of Minnesota.

In examining whether the "interests of justice" support a transfer, Courts in this district examine three so-called "public factors":  (1) the transferee court's familiarly with the governing law; (2)  the relative congestion of the calendars of the potential transferor and the transferee

courts; and (3) the local interest in deciding local controversies at home. See Liban v. Churchey Group II, LLC, 305 F. Supp. 2d 136, 136 (D.D.C. 2004) (citing Trout Unlimited, 944 F. Supp. at 16). While factors (1)[22] and (2)[23] support neither party, Minnesota has a strong local interest in deciding this local controversy in the district where the plan is administered and a substantial number of its participants reside.

For the reasons discussed above, the interests of justice support transferring this matter to the District of Minnesota. Because the Plan is administered in Minnesota and because such a large contingent of Wells Fargo employees live in Minnesota (second only to California), there is a strong local interest in litigating this matter in Minnesota. Also, as noted earlier, the Plan's forum selection clause also provides a strong basis for a transfer. As the Klotz and Schoemann cases noted, the Plan and its participants have a strong interest in having all Plan-based disputes settled in a single forum, under the same circuit's law. See supra p. 20.

## IV.    CONCLUSION

For the above reasons, the Wells Fargo Defendants request that this Court grant its motion to dismiss (or transfer) this action for improper venue pursuant to Fed. R. Civ. P. 12(b)(3)

---

[22]    Because this matter seeks relief under ERISA, which is a uniform federal law, the familiarity of the two courts with the governing law should not be a factor to be analyzed. See Sanders v. State St. Bank & Trust Co. 813 F. Supp. 529, 536-37 (S.D. Tex. 1993).

[23]    Based on statistics produced by the Federal Judiciary, the median time from filing to disposition has historically been similar in both the District of Minnesota and the District of the District of Columbia over the past five years. See http://www.uscourts.gov/cgi-bin/cmsd2006.pl. Although statistics reflect an increase in the disposition time for Minnesota in 2006, that appears to be an anomaly resulting from the dismissal of several thousand multi-district litigation cases originally filed in 2001. See http://www.mnd.uscourts.gov/Baycol_Mdl/transcripts/121306TeleConf.PDF.

or, in the alternative, transfer this case to the District of Minnesota pursuant to either 28 U.S.C. § 1404(a) or § 1406.

Dated: January 31, 2008

DORSEY & WHITNEY LLP

By: ___s/Creighton R. Magid_____
Creighton R. Magid (DC#1071807)
1050 Connecticut Avenue NW
Suite 1250
Washington, D.C. 20036
(202) 442-3000
magid.chip@dorsey.com

AND

Stephen P. Lucke *(admitted pro hac vice)*
Andrew J. Holly *(admitted pro hac vice)*
Suite 1500, 50 South Sixth Street
Minneapolis, MN 55402-1498
(612) 340-2600 (telephone)
(612) 340-2868 (facsimile)
lucke.stephen@dorsey.com
holly.andrew@dorsey.com

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**Yvonne Gipson**
**1404 Chesapeake Avenue**
**Annapolis, MD 21403,**
**and all others similarly situated,**

**AFFIDAVIT OF PAULA S. ROE**

     **Plaintiffs,**

**v.**

**Wells Fargo & Company, Wells Fargo**
**Bank, N.A., Employee Benefit Review**
**Committee, and John Does 1 - 20, et al.,**

     **Defendants.**

STATE OF FLORIDA   )
        )  SS.
COUNTY OF LEE    )

   Paula S. Roe, being properly sworn, deposes and states as follows:

   1.  I am currently the Executive Vice President and Director of Compensation and

Benefits of Wells Fargo & Company ("Wells Fargo").  I serve as one of two Plan Administrators

for the Wells Fargo & Company 401(k) Plan (the "Plan") pursuant to the terms of the Plan.  I am

a resident of Minnesota and work at Wells Fargo's offices in Minnesota.

   2.  This affidavit is submitted in support of Wells Fargo's Motion to Dismiss for

Improper Venue Or In The Alternative to Transfer.  The information herein is of my own

personal knowledge or based upon information obtained from persons with knowledge within the

company or the books and records of the company as kept and maintained in the ordinary course

of business.

   3.  Wells Fargo is a Delaware Corporation with its principal place of business in

California.  Wells Fargo was formerly known as Norwest Corporation, and was headquartered in

Minnesota until November 1998 when Norwest Corporation acquired former Wells Fargo & Company and moved its headquarters to California. A substantial portion of Norwest Corporation's business operations have remained in Minnesota following the acquisition, including the administration of its employee benefit plans, and in particular, the Plan.

4.    In addition to myself, the other Plan Administrator under the terms of the Plan is Julie White, who serves as Wells Fargo's Executive Vice President and Director of Human Resources. Ms. White resides in Des Moines, Iowa and works out of Wells Fargo's offices in Des Moines and San Francisco.

5.    The employees responsible for administering the Plan mostly work in Minnesota. For example, Melanie Miller, who is the current Manager of the Plan, and her staff live and work in Minnesota. Ms. Miller and her staff's duties include, but are not limited to, the day-to-day administration of the Plan, providing information to Plan participants and beneficiaries, processing distribution requests, and interfacing with Wells Fargo's Payroll Department and the Plan's trustee (both of which are in Minnesota). Ms. Miller's supervisor is Robert Brausen. Mr. Brausen is also the overall manager of all Wells Fargo retirement plans. He lives and works in Minnesota. Mr. Brausen's predecessor was Debbie Harvieux, who left employment with Wells Fargo in September 2007, but still lives in Minnesota.

6.    In addition, Tom Hooley's current employment duties include acting as investment manager with respect to the Plan. He and his staff assist in the research, selection, and ongoing review of the Plan's investment options, including the fees and expenses associated with those options. He reports and makes recommendation to the Employee Benefit Review Committee (the "Review Committee") regarding investment decisions. Mr. Hooley and his staff all live and work in Minnesota.

7.    Prior to Mr. Hooley, David Lunt served as the investment manager with respect to the Plan..  Mr. Lunt currently lives in Minnesota, and also worked there when he was the investment manager.

8.    All of the records compiled by Mr. Hooley, Mr. Lunt, their staffs, and the Review Committee are located in Minnesota.

9.    The trustee for the Plan is Wells Fargo Bank, National Association ("Wells Fargo Bank"). Wells Fargo Bank is a national bank chartered in South Dakota, with its principal place of business in California.  The Institutional Trust Services division of Wells Fargo Bank that provides the trustee services is headquartered in Minnesota.  Employees of the Institutional Trust Services division (including primarily Craig Peifer and his staff) perform  all of the trustee services for the Plan (including, but not limited to, daily calculation of plan assets and participants' account balances, processing distributions and participant loans, and the administration of participant's trading activities.)   All of the employees who perform these trustee services work in Minnesota.  The trustee also provides assistance to Plan participants and beneficiaries regarding Plan issues through a Call Center, which is located in Minnesota.

10.    The current members of the Employee Benefit Review Committee live and work in Iowa and California.  None of the Committee's business occurs in the District of Columbia.

11.    As of the end of 2007, the Plan had 184,459 participants.  Of these, 21,360 live in Minnesota, which is the second highest number of participants of all of the states.  Only 47 participants live in the District of Columbia.

12.    Based on information  from the Wells Fargo Payroll Department that Wells Fargo & Company keeps in the ordinary course of business regarding its employees, of Wells Fargo and Wells Fargo Bank's 133,873 current employees, 16,259 work in Minnesota.  Further, of

Wells Fargo Bank's 133,590 employees, less than 70 work in the District of Columbia. Similarly, Wells Fargo has only 3 employees in Washington D.C., all of whom work on government relations issues. None of the District of Columbia employees of Wells Fargo or Wells Fargo Bank perform any functions related to the administration of the Plan.

13.     Yvonne Gipson worked for Wells Fargo Home Mortgage and/or its predecessors in Maryland from 1996 to 2002. She was a participant in the Plan until she received a full distribution of her Plan account in 2005.

14.     The Plan's record-keeper, Sungard, is based in Arkansas. To the best of my knowledge, none of the Plan's service providers have any operations in the District of Columbia.

15.     Attached at Exhibit A is a true and correct copy of the Plan as amended, which at page 2 (Section 1.4) contains a forum selection clause. This forum selection clause was a provision of the Plan (and prior versions of the Plan) since at least as early as 1976, and has remained a constant provision of the Plan ever since.

16.     The various investment options that are currently available to participants are set forth in the Plan's Summary Plan Description, a true and correct copy of which is attached at Exhibit B. As detailed in the prospectuses that are made available to Plan participants, these investment options include mutual funds and collective funds, including those managed and sub-advised by affiliates of Wells Fargo. Specifically, Wells Fargo Funds Management, LLC manages the Plan's Advantage Funds. Its principal place of business is San Francisco, California. With respect to the Advantage Funds in the Plan, Wells Fargo Fund Management, LLC is sub-advised by Wells Capital Management, Inc. and Peregrine Capital Management, Inc, which are based in California and Minnesota, respectively.

17.    Further, the Plan's Stable Value Fund is managed by Galliard Capital Management, which is based in Minnesota.

18.    In addition, State Street Bank & Trust which I understand is based in Boston, and Barclays Global Investors, which I understand is based in California, provide advisory services to the collective funds that Wells Fargo Bank manages.

19.    The employees of the Wells Fargo Treasury Department that are involved in the purchase and sale of employer stock in the Plan are located in Minnesota.

20.    Finally, the Dodge & Cox Stock Fund (another investment option available to participants) is managed by Dodge & Cox, which, according to the prospectus distributed to employees, is based in California.   Likewise, Capital Research and Management Company serves as investment advisor to the Plan's EuroPacific Growth fund, and according to the prospectus, is based in Los Angeles, California.


Dated: January 31, 2008

                                                                          s/Paula S. Roe
                                                                        Paula S. Roe

                                                                        Executive Vice President and Director of
                                                                        Compensation and Benefits


Subscribed and sworn to before me
this  31st ay of  January     , 2008.


 s/Gregory Rosengarten
Notary Public

**EXHIBIT A PART 1**

11-07-05

**WELLS FARGO & COMPANY**
**401(k) PLAN**

**(As Amended and Restated Effective January 1, 2006)**

**EXHIBIT A**

# WELLS FARGO & COMPANY
## 401(k) PLAN

## TABLE OF CONTENTS

| | | |
|---|---|---|
| **ARTICLE I** | **GENERAL** | |
| Sec. 1.1 | Name of Plan | 1 |
| Sec. 1.2 | Purpose | 1 |
| Sec. 1.3 | History of Plan | 1 |
| Sec. 1.4 | Construction and Applicable Law | 2 |
| Sec. 1.5 | Benefits Determined Under Provisions in Effect at Termination of Employment | 2 |
| Sec. 1.6 | Effective Date of Document | 2 |
| | | |
| **ARTICLE II** | **MISCELLANEOUS DEFINITIONS** | |
| Sec. 2.1 | Account | 4 |
| Sec. 2.2 | Active Participant | 4 |
| Sec. 2.3 | Affiliate | 4 |
| Sec. 2.4 | Beneficiary | 4 |
| Sec. 2.5 | Board | 6 |
| Sec. 2.6 | Certified Compensation | 6 |
| Sec. 2.7 | Code | 7 |
| Sec. 2.8 | Common Control | 7 |
| Sec. 2.9 | Company | 8 |
| Sec. 2.10 | Company Stock | 8 |
| Sec. 2.11 | Disabled or Disability | 8 |
| Sec. 2.12 | Employer Matching Contributions | 8 |
| Sec. 2.13 | Employment Commencement Date | 8 |
| Sec. 2.14 | Entry Date | 8 |
| Sec. 2.15 | ERISA | 8 |
| Sec. 2.16 | Excess Deferrals | 8 |
| Sec. 2.17 | Exempt Loan | 8 |
| Sec. 2.18 | Highly Compensated Employee | 8 |
| Sec. 2.19 | Hours of Service | 9 |
| Sec. 2.20 | Leased Employee | 9 |
| Sec. 2.21 | Named Fiduciary | 9 |
| Sec. 2.22 | Non-Highly Compensated Employee | 9 |
| Sec. 2.23 | Normal Retirement Age | 9 |
| Sec. 2.24 | Participant | 9 |
| Sec. 2.25 | Participating Employer | 10 |
| Sec. 2.26 | Plan Administrator | 10 |
| Sec. 2.27 | Plan Year | 10 |
| Sec. 2.28 | Predecessor Employer | 10 |
| Sec. 2.29 | Qualified Employee | 10 |
| Sec. 2.30 | Retirement | 11 |
| Sec. 2.31 | Salary Deferral Contributions | 12 |
| Sec. 2.32 | Successor Employer | 12 |
| Sec. 2.33 | Termination of Employment | 12 |
| Sec. 2.34 | Trustee or Master Trustee | 13 |
| Sec. 2.35 | Trust Agreement | 13 |
| Sec. 2.36 | Trust Fund | 13 |
| Sec. 2.37 | Unallocated Reserve | 13 |
| Sec. 2.38 | Valuation Date | 13 |
| Sec. 2.39 | Vesting Service | 13 |
| Sec. 2.40 | Definitions Relating to Marital Status | 13 |

| ARTICLE III | SERVICE DEFINITIONS | |
|---|---|---|
| Sec. 3.1 | Employment Commencement Date | 15 |
| Sec. 3.2 | Hours of Service | 15 |
| Sec. 3.3 | Vesting Service | 16 |
| Sec. 3.4 | Service With Wells Fargo Financial | 17 |
| Sec. 3.5 | Periods of Military Service | 17 |

| ARTICLE IV | SALARY DEFERRALS AND OTHER EMPLOYEE CONTRIBUTIONS | |
|---|---|---|
| Sec. 4.1 | Eligibility for Participation in Salary Deferral Contributions | 18 |
| Sec. 4.2 | Duration of Participation | 19 |
| Sec. 4.3 | Amount of Salary Deferral Contributions | 19 |
| Sec. 4.4 | Employee Unmatched Contributions | 20 |
| Sec. 4.5 | Employee Basic Contributions | 20 |

| ARTICLE V | EMPLOYER CONTRIBUTIONS | |
|---|---|---|
| Sec. 5.1 | Employer Matching Contributions | 21 |
| Sec. 5.2 | Employer Discretionary Contributions | 22 |
| Sec. 5.3 | Qualified Nonelective Contributions | 22 |

| ARTICLE VI | CONTRIBUTION ADJUSTMENTS AND LIMITATIONS | |
|---|---|---|
| Sec. 6.1 | Adjustment of Salary Deferral Contributions | 24 |
| Sec. 6.2 | Distribution of Excess Deferrals | 27 |
| Sec. 6.3 | Adjustment of Employer Matching Contributions | 28 |
| Sec. 6.4 | Limitation on Allocations | 31 |
| Sec. 6.5 | Forfeitures Credited Against Employer Matching Contributions | 33 |

| ARTICLE VII | INDIVIDUAL ACCOUNTS | |
|---|---|---|
| Sec. 7.1 | Accounts for Participants | 34 |
| Sec. 7.2 | Valuation of Accounts | 35 |
| Sec. 7.3 | Participant Statements | 36 |
| Sec. 7.4 | Rollover Contributions | 36 |
| Sec. 7.5 | Transfers from Other Plans | 37 |

| ARTICLE VIII | INVESTMENT OF FUNDS | |
|---|---|---|
| Sec. 8.1 | Description of Funds | 38 |
| Sec. 8.2 | Reinvestment | 40 |
| Sec. 8.3 | Uninvested Cash | 40 |
| Sec. 8.4 | Investment Fund Designations | 40 |
| Sec. 8.5 | Change in Investment Fund Designation | 40 |
| Sec. 8.6 | ESOP Diversification | 41 |
| Sec. 8.7 | Voting of Company Common Stock | 41 |
| Sec. 8.8 | Tender or Exchange Offers Regarding Company Stock | 42 |
| Sec. 8.9 | Certain Administrative Matters | 43 |

| ARTICLE IX | BENEFIT REQUIREMENTS | |
|---|---|---|
| Sec. 9.1 | Benefit Upon Retirement or Disability | 44 |
| Sec. 9.2 | Other Termination of Employment | 44 |
| Sec. 9.3 | Death | 46 |
| Sec. 9.4 | Loans to Participants | 47 |

| ARTICLE X | DISTRIBUTION OF BENEFITS | |
|---|---|---|
| Sec. 10.1 | Time and Method of Payment | 51 |
| Sec. 10.2 | Form of Payment | 58 |
| Sec. 10.3 | Accounting Following Termination of Employment | 59 |
| Sec. 10.4 | Reemployment | 59 |
| Sec. 10.5 | Withdrawals From Accounts While Employed—General Rules | 59 |
| Sec. 10.6 | Withdrawals While Employed -- Non-Taxable | 60 |

| | | |
|---|---|---|
| Sec. 10.7 | Withdrawals While Employed -- Regular In-Service Withdrawals | 60 |
| Sec. 10.8 | Withdrawals While Employed—After Age 59½ | 61 |
| Sec. 10.9 | Withdrawals While Employed—Financial Hardship | 61 |
| Sec. 10.10 | Source of Benefits | 63 |
| Sec. 10.11 | Incompetent Payee | 63 |
| Sec. 10.12 | Benefits May Not Be Assigned or Alienated | 63 |
| Sec. 10.13 | Payment of Taxes | 63 |
| Sec. 10.14 | Conditions Precedent | 63 |
| Sec. 10.15 | Plan Administrator Directions to Trustee | 64 |
| Sec. 10.16 | Effect on Unemployment Compensation | 64 |
| Sec. 10.17 | Transfers and Direct Rollovers to Other Plans | 64 |
| Sec. 10.18 | Payment of Dividends on Company Stock to Participants | 65 |
| Sec. 10.19 | Inability to Locate Distributee | 66 |

**ARTICLE XI    MANAGEMENT OF FUNDS**

| | | |
|---|---|---|
| Sec. 11.1 | Trust Fund | 67 |
| Sec. 11.2 | Trustee and Trust Agreement | 67 |
| Sec. 11.3 | Compensation and Expenses of Trustee | 67 |
| Sec. 11.4 | Funding Policy | 67 |
| Sec. 11.5 | No Diversion | 67 |

**ARTICLE XII    ADMINISTRATION OF PLAN**

| | | |
|---|---|---|
| Sec. 12.1 | Plan Administration | 69 |
| Sec. 12.2 | Certain Fiduciary Provisions | 69 |
| Sec. 12.3 | Discrimination Prohibited | 70 |
| Sec. 12.4 | Evidence | 70 |
| Sec. 12.5 | Correction of Errors | 70 |
| Sec. 12.6 | Records | 70 |
| Sec. 12.7 | General Fiduciary Standard | 70 |
| Sec. 12.8 | Prohibited Transactions | 70 |
| Sec. 12.9 | Claims Procedure | 70 |
| Sec. 12.10 | Bonding | 70 |
| Sec. 12.11 | Waiver of Notice | 71 |
| Sec. 12.12 | Agent For Legal Process | 71 |
| Sec. 12.13 | Indemnification | 71 |

**ARTICLE XIII    AMENDMENT, TERMINATION, MERGER**

| | | |
|---|---|---|
| Sec. 13.1 | Amendment | 72 |
| Sec. 13.2 | Discontinuance of Joint Participation in Plan by a Participating Employer | 72 |
| Sec. 13.3 | Reorganizations of Participating Employers | 73 |
| Sec. 13.4 | Permanent Discontinuance of Contributions | 74 |
| Sec. 13.5 | Termination | 74 |
| Sec. 13.6 | Partial Termination | 74 |
| Sec. 13.7 | Merger, Consolidation, or Transfer of Plan Assets | 74 |
| Sec. 13.8 | Deferral of Distributions | 75 |
| Sec. 13.9 | Transfer of Certain Accounts to RELS | 75 |

**ARTICLE XIV    MISCELLANEOUS PROVISIONS**

| | | |
|---|---|---|
| Sec. 14.1 | Discontinuance of Employment | 76 |
| Sec. 14.2 | Insurance Company Not Responsible for Validity of Plan | 76 |
| Sec. 14.3 | Headings | 76 |
| Sec. 14.4 | Capitalized Definitions | 76 |
| Sec. 14.5 | Gender | 76 |
| Sec. 14.6 | Use of Compounds of Word "Here" | 76 |
| Sec. 14.7 | Construed as a Whole | 76 |
| Sec. 14.8 | Benefits Under Certain Appendices | 77 |

**ARTICLE XV     TOP-HEAVY PLAN PROVISIONS**
Sec. 15.1          Key Employee Defined ................................................................................. 82
Sec. 15.2          Determination of Top-Heavy Status .......................................................... 82
Sec. 15.3          Minimum Contribution Requirement ......................................................... 84
Sec. 15.4          Exception For Collective Bargaining Unit .................................................. 84

**ARTICLE XVI    EMPLOYEE STOCK OWNERSHIP PROVISIONS**
Sec. 16.1          Exempt Loan ................................................................................................. 85
Sec. 16.2          Unallocated Reserve ..................................................................................... 86
Sec. 16.3          Leveraged Acquisitions ................................................................................ 87
Sec. 16.4          Repayment of Exempt Loans ....................................................................... 87
Sec. 16.5          Allocation of Company Stock ...................................................................... 87

WELLS FARGO - 401(k) Plan effective 1-1-06 + Apps.doc

**WELLS FARGO & COMPANY**
**401(k) PLAN**

## ARTICLE I

### GENERAL

**Sec. 1.1  Name of Plan.** The name of this plan is "Wells Fargo & Company 401(k) Plan."
Prior to July 1, 1999, the name was "Norwest Corporation Savings Investment Plan". It is sometimes
referred to in this document as the "Plan". Prior to 1996, the Plan was a single plan consisting of a profit
sharing portion and a stock bonus portion, with the stock bonus portion being an employee stock
ownership plan which was designed to invest primarily in Company Stock. Between January 1, 1996 and
December 31, 2005, the entire plan was an employee stock ownership plan which was designed to invest
primarily in Company Stock. Commencing January 1, 2006, the Plan is a single plan consisting of two
parts: (i) a profit sharing portion consisting of those Accounts or portions of Accounts which at that point
in time are invested in assets other than Company Stock, and (ii) a stock bonus portion consisting of those
Accounts or portions of Accounts which at that same point in time are invested in Company Stock, with
the stock bonus portion being an employee stock ownership plan which is designed to invest primarily in
Company Stock.

**Sec. 1.2  Purpose.** The Plan has been established for the purpose of providing eligible
employees with a share in the profits of the Participating Employers, encouraging employees to adopt a
regular savings program, and providing employees with an opportunity to acquire an ownership interest in
the Company.

**Sec. 1.3  History of Plan.** The Plan was originally adopted by Northwest Bancorporation
and certain affiliated corporations effective for the year 1953. As originally adopted and during the
period prior to January 1, 1972, the name of the Plan was "Northwest Bancorporation Deferred
Compensation Profit Sharing Plan". Effective January 1, 1972, the Plan was completely restated and the
name of the Plan was changed to "Northwest Bancorporation Profit Sharing Plan". Effective January 1,
1976, the Plan was changed to a form of employee savings plan. To implement that change, the Plan was
amended and restated in its entirety and renamed as indicated herein, effective as of January 1, 1976. The
January 1, 1976 restatement of the Plan also included the changes in the Plan required as of that date by
the Employee Retirement Income Security Act of 1974. Effective April 1, 1981, the Plan was amended
and restated in its entirety. Effective January 1, 1984, the Plan was amended and restated in its entirety to
comply with the Tax Equity and Fiscal Responsibility Act. That restatement also provided for
contributions pursuant to Code Section 401(k) commencing April 1, 1984. The Plan was again amended
and restated effective January 1, 1985 to comply with the Deficit Reduction Act and the Retirement
Equity Act. Effective January 1, 1987, the Plan was amended and restated in its entirety to reflect
requirements of the Tax Reform Act of 1986. Effective July 1, 1988, the Plan was amended to provide
Participants an opportunity to invest Salary Deferral Contributions in Company Stock and to provide for a
portion of Employer Matching Contributions to be invested in Company Stock. Effective April 1, 1989,
the Plan was amended to add stock bonus and employee stock ownership plan features. Effective
January 1, 1991, the Plan was amended and restated to make changes in eligibility, vesting and matching
contribution requirements. Effective January 1, 1992, the Plan was amended to allow Salary Deferral
Contributions up to 12%, allow investment directions to be made in 5% increments, and provide that the
Employer Matching Contribution would be made 100% in Company Stock. Effective January 1, 1993,
the Plan was amended to add provisions regarding transfers and direct rollovers to other plans. Effective
October 1, 1993, the Plan was amended to designate certain compensation as Unmatched Certified

Compensation. Effective January 1, 1994, the Plan was amended to provide for a compensation cap required by law and to define Company Stock to mean common or preferred stock of Norwest Corporation. Effective January 1, 1995, the Plan was amended to make certain changes, including changes in the provisions for eligibility, participation, distribution, and loans. Effective January 1, 1996, the Plan was amended and restated to make various administrative amendments, to designate the entire Plan as an employee stock ownership plan, to provide for the pass-through to participants of dividends on Company Stock and to provide for daily valuation and investment option elections. Effective January 1, 1998, the Plan was amended and restated to reflect changes in the applicable laws, to make various administrative changes, to provide for advance deposits of employer contributions, and to revise the procedures for pass-through of dividends on Company Stock. Effective from January 1,1999 to September 30, 2003, the Plan included certain pay during a salary continuation leave of absence as Certified Compensation. Effective July 1, 1999, the Plan was amended and restated to reflect the merger of Norwest Corporation and Wells Fargo & Company, to reflect the merger of the Wells Fargo & Company Tax Advantage and Retirement Plan into this Plan, and to make changes in contribution limits and in the rules for loans, withdrawals and distributions. From July 1, 1999 to December 31, 2005, the Plan was amended on numerous occasions. Effective January 1, 2006, the Plan was amended and restated to divide it into two separate portions which are and are not an employee stock ownership plan, to permit Participants to diversify their investments in Company Stock at any time, and to make various changes to conform to changes in applicable laws and regulations.

Sec. 1.4 **Construction and Applicable Law.** The Plan is intended to meet the requirements for qualification under Code Section 401(a), the requirements for a qualified cash or deferred arrangement under Code Section 401(k), and in the case of the portion of the Plan invested in Company Stock, the requirements for a stock bonus plan under Code Section 401(a) and the requirements for an employee stock ownership plan under Code Section 4975(e)(7) which is designed to invest primarily in qualifying employer securities meeting the requirements of Code Sections 4975(e)(8) and 409(l). The Plan is also intended to be in full compliance with applicable requirements of ERISA. The Plan shall be administered and construed consistent with said intent. It shall also be construed and administered according to the laws of the State of Minnesota to the extent that such laws are not preempted by the laws of the United States of America. All controversies, disputes, and claims arising hereunder shall be submitted to the United States District Court for the District of Minnesota, except as otherwise provided in the Trust Agreement.

Sec. 1.5 **Benefits Determined Under Provisions in Effect at Termination of Employment.** Except as may be specifically provided herein to the contrary, with respect to a Participant or former Participant whose Termination of Employment has occurred, benefits under the Plan attributable to service prior to the Termination of Employment shall be determined and paid in accordance with the provisions of the Plan as in effect on the date the Termination of Employment occurred unless he or she again becomes an Active Participant after said date and such active participation causes a contrary result under the provisions hereof.

Sec. 1.6 **Effective Date of Document.** Unless a different date is specified for some purpose in this document, the provisions of this Plan document are generally effective as of January 1, 2006. However, any provision necessary to comply with a requirement of federal legislation or a Treasury regulation, which requirement has an earlier effective date, shall be effective retroactively to the date required by the applicable law or regulation. In addition, any provision of this Plan or of an amendment of this Plan which is necessary to bring a plan which has been merged into this Plan into compliance with a requirement of federal legislation or a Treasury regulation which has an effective date prior to the date

such other plan was merged into this Plan shall be applicable to the merged plan as of the required effective date as if the merged plan had been specifically amended to include the required provision.

## ARTICLE II

## MISCELLANEOUS DEFINITIONS

**Sec. 2.1 Account.** "Account" means a Participant's or Beneficiary's interest in the Trust Fund of any of the types described in Sec. 7.1. Where more than one Account of any type has been established for a Participant or Beneficiary, references to "Account" shall include each Account of that type, except where the context clearly indicates to the contrary.

**Sec. 2.2 Active Participant.** An employee is an "Active Participant" only while the employee is both a "Participant" and a "Qualified Employee".

**Sec. 2.3 Affiliate.** "Affiliate" means any trade or business entity under Common Control with a Participating Employer, or under Common Control with a Predecessor Employer while it is such.

**Sec. 2.4 Beneficiary.** A "Beneficiary" is the person or persons, natural or otherwise, designated by a Participant to receive any benefit payable under the Plan in the event of the Participant's death. A Participant who has designated a Beneficiary may, without the consent of such Beneficiary, alter or revoke such designation. To be effective, any such designation, alteration, or revocation shall be in writing, in such form as the Plan Administrator may prescribe, and shall be filed with the Plan Administrator prior to the Participant's death.

(a)    If at the time of a Participant's death there is not on file with the Plan Administrator a fully effective designation of his Beneficiary, or if the designated Beneficiary does not survive the Participant, the Participant's Beneficiary shall be the person or persons surviving in the first of the following classes in which there is a survivor, share and share alike:

(1)    The Participant's spouse.

(2)    The Participant's same-sex spouse.

(3)    The Participant's domestic partner.

(4)    The Participant's children, except that if any of the Participant's children predecease him or her but leave descendants surviving, such descendants shall take by right of representation the share their parent would have taken if living,

(5)    The Participant's parents.

(6)    The Participant's brothers and sisters.

(7)    The Participant's personal representative (executor or administrator).

(b)    Notwithstanding the foregoing, if a Participant is married at the time of his or her death, the Beneficiary shall be the Participant's spouse unless the spouse has consented in writing to the designation of a different Beneficiary, the spouse's consent acknowledges the effect of such designation, and the spouse's consent is witnessed by a representative of the Plan or a notary public. The previous sentence shall not apply if it is established to the satisfaction of the Plan Administrator that such consent cannot be obtained because there is

no spouse, because the spouse cannot be located, or because of such other circumstances as may be prescribed by federal regulations.

(1)    Any such consent shall be valid only with respect to the spouse who signed the consent, or in the case of a deemed consent, the designated spouse. The Participant may revoke a prior election at any time without the consent of the spouse. The number of such revocations shall not be limited. Any consent by a spouse cannot be revoked by the spouse.

(2)    Any designation of a Beneficiary or a form of benefits which has received spousal consent may be changed without spousal consent only if the consent by the spouse expressly permits subsequent designations by the Participant without any requirement of further consent by the spouse.

The provisions of this subsection shall apply only to Participants who have at least one Hour of Service on or after August 23, 1984.

(c)    Determination of the identity of the Beneficiary in each case shall be made by the Plan Administrator.

(d)    Notwithstanding anything in the Participant's Beneficiary designation to the contrary, if (i) the Participant has a Frozen Transferred Account which is subject to the qualified joint and survivor and preretirement survivor annuity requirements of Code sections 401(a)(11) and 417, (ii) the Participant's spouse has consented to a designation of a different person as a primary Beneficiary, (iii) such consent was given both prior to the first day of the Plan Year in which the Participant would reach age 35 and prior to the Participant's Termination of Employment, and (iv) the Participant is married on the first day of the Plan Year in which the Participant reaches age 35, then the Participant's spouse shall be the sole primary Beneficiary with respect to the Frozen Transferred Account commencing on the first day of the Plan Year in which the Participant reaches age 35, unless the Participant files a new Beneficiary designation form that complies with the spousal consent requirements of this section on or after the first day of said Plan Year (or after the Participant's Termination of Employment, if earlier).

(e)    <u>Disclaimers</u>.  A Beneficiary entitled to all or a portion of a deceased Participant's Accounts may disclaim his or her interest therein, subject to the following:

(1)    To be eligible to disclaim, the Beneficiary must not have received a distribution of all or any portion of the Participant's Accounts and must have attained at least age 21 at the time such disclaimer is signed and delivered. A disclaimer shall state that the Beneficiary's entire interest in the Participant's Accounts is disclaimed or shall specify what portion thereof is disclaimed. The Plan Administrator shall be the sole judge of the content, interpretation and validity of a purported disclaimer.

(2)    Any disclaimer must be in writing and must be signed by the Beneficiary making the disclaimer and acknowledged by a notary public. The Plan Administrator may establish rules for the use of electronic signatures and acknowledgements. Until such rules are established, electronic signatures and acknowledgements shall not be effective. To be effective, an original signed copy of the disclaimer must be actually delivered to the Plan Administrator after the date of the Participant's death but not later than nine

months after the date of the Participant's death. A disclaimer shall be irrevocable when delivered to the Plan Administrator. A disclaimer shall be considered to be delivered to the Plan Administrator only when actually received by the Plan Administrator.

(3) Upon the filing of a valid disclaimer, the Beneficiary shall be considered not to have survived the Participant as to the interest disclaimed. A disclaimer shall not be considered to be a transfer of an interest in violation of the provisions of Sec. 10.12, and shall not be considered to be an assignment or alienation of benefits in violation of any federal law prohibiting the assignment or alienation of benefits under this Plan.

(4) No form of attempted disclaimer which does not meet the requirements of this subsection will be recognized by the Plan Administrator.

**Sec. 2.5 Board.** The "Board" is the board of directors of the Company, and includes any executive committee thereof authorized to act for such body.

**Sec. 2.6 Certified Compensation.** "Certified Compensation" of a Participant from a Participating Employer for a particular calendar quarter, Plan Year or other specified period means all compensation paid to the Participant by the Participating Employer on payroll dates occurring during that period for service as an Active Participant which is reportable on Form W-2, subject to the following:

(a) Certified Compensation shall include any Salary Deferral Contributions on behalf of a Participant under this Plan, and any contributions by salary reduction to any cafeteria plan under Code section 125 or any qualified transportation fringe benefit plan under Code section 132(f)(4) maintained by a Participating Employer, whether or not such contributions are actually excludable from the Participant's gross income for tax purposes. Any other payments or contributions to or for the benefit of the employee under this Plan or a cafeteria plan shall not be included in Certified Compensation. Payments under any short term disability plan and normal vacation payments shall be included in Certified Compensation. Certified Compensation includes all compensation for the payroll period in which an individual becomes an Active Participant, including compensation related to service performed during any portion of that payroll period before the date on which the individual became an Active Participant.

(b) Relocation expenses and other allowances or reimbursements for expenses, perquisites, gross-ups, severance pay, salary continuation pay (whether paid in installments or a lump sum), payments under income continuation agreements, payments or contributions to or for the benefit of the employee under any other deferred compensation, pension, profit sharing, insurance, or other employee benefit plan, stock option and equity or equity-like gains, amounts paid in lieu of vacation, any compensation paid after the payroll date for the payroll period in which the Participant's Termination of Employment occurred, or compensation in the form of property other than cash or the use of such property shall not be included in computing Certified Compensation, except as provided to the contrary in subsection (a) or to the extent such amounts are required to be included in determining the employee's regular rate of pay under the Federal Fair Labor Standards Act for purposes of computing overtime pay thereunder. Certified Compensation does not include any compensation paid to the Participant by an Affiliate that is not a Participating Employer, whether such compensation is attributable to service for a Participating Employer or for the Affiliate.

(c)    Effective for Plan Years commencing during or after 2006, Certified Compensation of a Participant for a Plan Year shall not exceed $220,000, adjusted for each Plan Year to take into account any increase provided for that year in accordance with the Code and regulations prescribed by the Secretary of the Treasury.

(d)    Notwithstanding the foregoing provisions of this section, solely for purposes of allocating Employer Matching Contributions under Sec. 5.1 and Sec. 16.5, any Certified Compensation paid to a Participant while the Participant is employed in a position subject to this subsection (d) shall be disregarded to the extent such Certified Compensation exceeds $50,000 for a Plan Year.

(1)    This subsection (d) applies to any Participant who is employed by Wells Fargo Home Mortgage, Inc. or any of its subsidiaries in any of the following job categories: Mortgage Consultant, Mortgage Consultant In-House, Mortgage Consultant Subprime, Mortgage Consultant Emerging Markets, Mortgage Consultant Reverse, Mortgage Consultant Renovation, Mortgage Consultant Junior, Mortgage Consultant Team, Retail Sales Supervisor, Subprime Sales Supervisor, Renovation Sales Supervisor, Escrow Sales Representative, Renovation Staff Consultant, Marketing Representative, Wholesale Account Executive, Wholesale Account Executive Subprime or any other job category which Wells Fargo Home Mortgage, Inc. classifies as equivalent to the job categories listed above. In addition, this subsection (d) applies to any Participant who is employed by Wells Fargo Home Mortgage, Inc. or any of its subsidiaries in one of the job categories listed above (or in any other job category that the Plan Administrator classifies as equivalent to one of the job categories listed above for purposes of this subsection (d)) and who is also simultaneously employed by Wells Fargo Investments, LLC.

(2)    If a Participant is transferred into a position that is subject to this subsection (d) during a Plan Year, the $50,000 limit under this subsection for that Plan Year shall be reduced (but not below $0) by the amount of Certified Compensation credited to the Participant for service during that Plan Year prior to the date the transfer occurred.

(3)    Any amounts of compensation disregarded under this subsection (d) shall be designated as "Unmatched Certified Compensation" for purposes of Sec. 16.5.

Notwithstanding anything in the foregoing provisions of this section to the contrary, Certified Compensation does not include any amount received by a Participant which is related to the settlement of the litigation described as "Johanna Osinga, et al vs. Wells Fargo & Company, et al (Los Angeles Superior Court Case No: BC305453)." This paragraph shall be repealed automatically following the receipt of all such settlement payments by Participants in this Plan.

Sec. 2.7  **Code.**  "Code" means the Internal Revenue Code of 1986 as from time to time amended.

Sec. 2.8  **Common Control.**  A trade or business entity (whether corporation, partnership, sole proprietorship or otherwise) is under "Common Control" with another trade or business entity (i) if both entities are corporations which are members of a controlled group of corporations as defined in Code Section 414(b), (ii) if both entities are trades or businesses (whether or not incorporated) which are under common control as defined in Code Section 414(c), (iii) if both entities are members of an "affiliated service group" as defined in Code Section 414(m), or (iv) if both entities are required to be aggregated

pursuant to regulations under Code section 414(o). Service for all entities under Common Control shall be treated as service for a single employer to the extent required by the Code; provided, however, that an individual shall not be a Qualified Employee by reason of this section. In applying the preceding sentence for purposes of Sec. 6.4, the provisions of subsections (b) and (c) of Code Section 414 are deemed to be modified as provided in Code Section 415(h).

**Sec. 2.9  Company.** The "Company" is Wells Fargo & Company, a Delaware corporation, and any Successor Employer thereof. Prior to the merger of Norwest Corporation and Wells Fargo & Company, the Company was named Norwest Corporation. Prior to April 29, 1983, the Company was Northwest Bancorporation.

**Sec. 2.10  Company Stock.** "Company Stock" means common or preferred stock of the Company, including any preferred stock which is convertible into common stock. The provisions of this Plan shall be applied separately to different types or classes of Company Stock, or to shares acquired on different dates or pursuant to different Exempt Loans, to the extent the Plan Administrator determines that such treatment is appropriate.

**Sec. 2.11  Disabled or Disability.** A Participant is "Disabled" or has incurred a "Disability" if the Plan Administrator determines, based on medical evidence satisfactory to the Plan Administrator, that the Participant has become unable due to injury or illness to perform the duties of any occupation for which the Participant is qualified and such condition is expected to last for at least 12 months or to result in death. A Participant who is determined to be eligible for Social Security disability benefits will be deemed to be Disabled for purposes of this Plan.

**Sec. 2.12  Employer Matching Contributions.** "Employer Matching Contributions" are contributions made pursuant to Sec. 5.1.

**Sec. 2.13  Employment Commencement Date.** "Employment Commencement Date" is defined in Sec. 3.1.

**Sec. 2.14  Entry Date.** "Entry Date" means the first day of each calendar month.

**Sec. 2.15  ERISA.** "ERISA" means the Employee Retirement Income Security Act of 1974 as from time to time amended.

**Sec. 2.16  Excess Deferrals.** "Excess Deferrals" are those amounts described in Sec. 6.2(a).

**Sec. 2.17  Exempt Loan.** An "Exempt Loan" is a loan described in Sec. 16.1.

**Sec. 2.18  Highly Compensated Employee.** "Highly Compensated Employee" for any calendar year means an individual described as such in Code section 414(q).

(a)     Unless otherwise provided in Code section 414(q), each employee who meets one of the following requirements is a Highly Compensated Employee:

(1)     The employee at any time during the current or prior year was a more than 5-percent owner as defined in Code section 414(q)(2).

-8-

(2)    The employee received compensation from the employer in excess of $95,000 for the prior year.

(b)    The dollar amount specified in paragraph (2) of subsection (a) shall be indexed for cost of living increases for each calendar year after 2005 as provided in the applicable Treasury regulations.

(c)    For purposes of this section, "employer" includes all Participating Employers and all Affiliates, and "employee" includes Leased Employees.

(d)    For purposes of this section, "compensation" means the amount defined as such under Sec. 6.4(d)(2).

**Sec. 2.19    Hours of Service.**  The term "Hours of Service" is defined in Sec 3.2.

**Sec. 2.20    Leased Employee.**  "Leased Employee" means any person defined as such by Code section 414(n).  In general, a Leased Employee is any person who is not otherwise an employee of a Participating Employer or an Affiliate (referred to collectively as the "recipient") and who pursuant to an agreement between the recipient and any other person ("leasing organization") has performed services for the recipient (or for the recipient and related persons determined in accordance with Code section 414(n)(6)) on a substantially full-time basis for a period of at least one year and such services are performed under primary direction or control by the recipient.  For purposes of the requirements listed in Code section 414(n)(3), any Leased Employee shall be treated as an employee of the recipient, and contributions or benefits provided by the leasing organization which are attributable to services performed for the recipient shall be treated as provided by the recipient.  However, if Leased Employees constitute less than 20% of the Participating Employers' non-highly compensated work force within the meaning of Code section 414(n)(5)(C)(ii), those Leased Employees covered by a plan described in Code section 414(n)(5) shall be disregarded.  Notwithstanding the foregoing, no Leased Employee shall be a Qualified Employee or a Participant in this Plan unless specifically provided to the contrary herein.

**Sec. 2.21    Named Fiduciary.**  For purposes of ERISA, the following are "Named Fiduciaries" within the meaning of Section 402 of ERISA:  the Director of Human Resources or the Director of Compensation and Benefits of the Company, acting individually as the Plan Administrator, is each a "Named Fiduciary" with authority to control or manage the operation and administration of the Plan; the Employee Benefit Review Committee designated pursuant to Sec. 12.1 is a "Named Fiduciary" with authority to control or manage the assets of the Plan; and the Human Resources Committee of the Board is a "Named Fiduciary" with the authority to appoint individuals to serve on the Employee Benefit Review Committee.  The Human Resources Committee may from time to time designate a Named Fiduciary to act in connection with the employee stock ownership provisions described in Article XVI and in connection with the voting, tender, or exchange of shares of Company Stock.

**Sec. 2.22    Non-Highly Compensated Employee.**  "Non-Highly Compensated Employee" means an employee of the Participating Employer who is not a Highly Compensated Employee.

**Sec. 2.23    Normal Retirement Age.**  "Normal Retirement Age" is age 65.

**Sec. 2.24    Participant.**  A "Participant" is an individual described as such in Article IV.

**Sec. 2.25 <u>Participating Employer</u>.** The Company is a Participating Employer in the Plan. Any entity which is under Common Control with the Company shall become a Participating Employer in the Plan upon being designated as such by the Company, by written action of the Director of Human Resources or Director of Compensation and Benefits of the Company. The Participating Employer's participation in the Plan shall be effective as of the date specified in such written action. With the consent of the Company, by action of the Board, any employer which is not under Common Control with the Company may also become a Participating Employer in the Plan effective as of a date specified by it in its adoption of the Plan. The Plan Administrator shall maintain the official list of the Participating Employers currently covered by the Plan and the effective date of each such employer's participation, and shall update that list annually during December of each year and at such other times as may be appropriate.

**Sec. 2.26 <u>Plan Administrator</u>.** The "Plan Administrator" for purposes of this Plan is the Director of Human Resources or the Director of Compensation and Benefits of the Company. Either of those officers, acting individually, can take action as the Plan Administrator.

**Sec. 2.27 <u>Plan Year</u>.** A "Plan Year" is a calendar year.

**Sec. 2.28 <u>Predecessor Employer</u>.** Any corporation, partnership, firm, or individual (referred to in this section as an "entity") is a "Predecessor Employer" if assets and/or employees of the entity are acquired by a Participating Employer, an Affiliate, or another Predecessor Employer and if the entity is so designated by written action of the Director of Human Resources or Director of Compensation and Benefits of the Company (which action may be in the form of the adoption of an Appendix to the Plan recognizing service with the Predecessor Employer for one or more purposes), subject to any conditions and limitations with respect thereto imposed by this section or an applicable Appendix. However, an entity may be named as a Predecessor Employer only if all of its employees who become employees of the acquiring employer at the time of the acquisition are treated uniformly and the use of service with it does not produce discrimination in favor of officers, shareholders, or highly compensated employees. Service with such a Predecessor Employer shall be recognized to the extent provided in the Appendix applicable to the entity or other provisions of the Plan that are applicable to rehired employees and that are required by applicable law or regulation to recognize service with a Predecessor Employer. Any other employer shall be a Predecessor Employer if so required by regulations prescribed by the Secretary of the Treasury.

**Sec. 2.29 <u>Qualified Employee</u>.** "Qualified Employee" means any employee of a Participating Employer, subject to the following:

(a)    An employee is not a Qualified Employee prior to the date as of which his or her employer becomes a Participating Employer.

(b)    A nonresident alien is not a Qualified Employee either (i) while not receiving earned income (within the meaning of Code Section 911(b)) from a Participating Employer which constitutes income from sources within the United States (within the meaning of Code Section 861(a)(3)), or (ii) if his or her services are performed outside the continental United States (including Alaska) or Hawaii, and the principal base of operations to which the employee frequently returns is outside the continental United States (including Alaska) or Hawaii; provided, however, that such an individual shall be a Qualified Employee if the Plan Administrator designates in writing that nonresident aliens employed by the individual's Participating Employer are eligible for this Plan commencing as of the date specified in such

written action and subject to any limitations contained in such written action regarding the location of the employment, the citizenship of the individuals to be covered, the covered job classifications, or the type or amount of compensation paid to such an individual that will be recognized as Certified Compensation.

(c)     A United States citizen or resident alien is not a Qualified Employee unless his or her services are performed within the continental United States (including Alaska) or Hawaii, or the principal base of operations to which the employee frequently returns is within the continental United States (including Alaska) or Hawaii; provided, however, that such an individual employed outside the United States shall be a Qualified Employee if the Plan Administrator designates in writing that such persons employed by the individual's Participating Employer are eligible for this Plan commencing as of the date specified in such written action and subject to any limitations contained in such written action regarding the location of the employment, the covered job classifications, or the type or amount of compensation paid to such an individual that will be recognized as Certified Compensation.

(d)     Eligibility of employees in a collective bargaining unit to participate in the Plan shall be subject to negotiations with the representative of that unit.  During any period in which an employee is covered by the provisions of a collective bargaining agreement between a Participating Employer and such representative, the employee shall not be considered a Qualified Employee for purposes of this Plan unless such agreement expressly so provides.

(e)     An employee shall be deemed to be a Qualified Employee during a period of absence from active service which does not result from a Termination of Employment, provided the employee is a Qualified Employee at the commencement of such period of absence.

(f)     An employee who is classified by a Participating Employer as a flexible employee is not a Qualified Employee during the period while so classified.  A "flexible employee" is an employee who may work any number of hours on given projects, may fill in when needed regardless of hours, is on call, may work only certain times of the month or year, or works regularly in a flexible schedule, and is not classified as a part-time or regular employee by a Participating Employer.

(g)     Notwithstanding anything herein to the contrary, an individual is not a Qualified Employee during any period during which the individual is classified by a Participating Employer as an independent contractor or as any other status in which the person is not treated as a common law employee of a Participating Employer for purposes of withholding of taxes, or is treated as an employee of another entity who is leased to a Participating Employer, regardless of the correct legal status of the individual.  The previous sentence applies to all periods of such service of an individual who is subsequently reclassified as an employee of a Participating Employer, whether the reclassification is retroactive or prospective.

    **Sec. 2.30  Retirement.**  For purposes of this Plan, "Retirement" means that the Participant's Termination of Employment for a reason other than death occurred on or after the earliest of (i) the date the Participant attained age 65, (ii) the date the Participant had both attained age 55 and completed at least 10 years of Vesting Service, or (iii) the date the sum of the Participant's attained age plus completed years of Vesting Service (disregarding any fraction of a year of age or service) equaled 80.

**Sec. 2.31 <u>Salary Deferral Contributions</u>.** "Salary Deferral Contributions", formerly known as "Pay Conversion Contributions", are described in Sec. 4.1 and 4.3 of the Plan, and are contributions to the Plan made by the Employer on the Participant's behalf in an amount deferred from salary as elected by each Participant. Such contributions are held in the Participant's Salary Deferral Account.

**Sec. 2.32 <u>Successor Employer</u>.** A "Successor Employer" is any entity that succeeds to the business of a Participating Employer through merger, consolidation, acquisition of all or substantially all of its assets, or any other means and which elects before or within a reasonable time after such succession, by appropriate action evidenced in writing, to continue the Plan; provided, however, that in the case of such succession with respect to any Participating Employer other than the Company, the acquiring entity, shall be a Successor Employer only if consent thereto is granted by the Company, by action of the Board.

**Sec. 2.33 <u>Termination of Employment</u>.** The "Termination of Employment" of an employee for purposes of the Plan shall be deemed to occur upon resignation, discharge, retirement, death, failure to return to active work at the end of an authorized leave of absence or the authorized extension or extensions thereof, failure to return to work when duly called following a temporary layoff, or upon the happening of any other event or circumstance which, under the policy of a Participating Employer, Affiliate, or Predecessor Employer as in effect from time to time, results in the termination of the employer-employee relationship; provided, however, that a Termination of Employment shall not be deemed to occur upon a transfer between any combination of Participating Employers, Affiliates, and Predecessor Employers.

(a)  If an employee ceases to be a Qualified Employee as a result of a sale of some or all of the assets, operations or stock of his or her Participating Employer, and if the employee's Accounts are not transferred to a separate plan pursuant to Sec. 13.2, the Termination of Employment shall be deemed to occur on the date the employee ceased to be a Qualified Employee for purposes of allowing distribution of benefits, to the extent permitted under Code section 401(k)(10). Commencing January 1, 2002, a Participant who has had a "severance from employment" for purposes of Code section 401(k)(2)(B)(i)(I) shall be deemed to have had a Termination of Employment for purposes of entitlement to distribution of benefits from this Plan, unless the Participant's Accounts have been transferred to a separate plan pursuant to Sec. 13.2 or Sec. 13.7. The previous sentence also applies effective January 1, 2002 to a Participant who had a "severance from employment" prior to that date, such a Participant shall be eligible to receive benefit payments pursuant to Sec. 10.1 on or after that date, and any mandatory lump sum distribution pursuant to Sec. 10.1(c) shall be made to such a Participant as soon as administratively feasible after that date.

(b)  If a Participant is determined by the Plan Administrator to be Disabled, the Participant's Termination of Employment for purposes of this Plan shall be deemed to have occurred as of the date such Disability commenced.

(c)  If a Participant is placed on a leave of absence that is classified by his or her Participating Employer as a salary continuation leave of absence, the Participant's Termination of Employment shall not occur until the end of the leave, and shall occur at that time only if the Participant does not return to work for a Participating Employer at the end of the leave.

**Sec. 2.34  Trustee or Master Trustee.** The "Trustee" or "Master Trustee" is Wells Fargo Bank, National Association, a national banking association with its principal place of business at Minneapolis, Minnesota, and any duly appointed successor trustee.

**Sec. 2.35  Trust Agreement.** "Trust Agreement" means the agreement referred to in Sec. 11.2 between the Company and the Trustee as in effect from time to time.

**Sec. 2.36  Trust Fund.** The "Trust Fund" is the fund or funds provided for in Sec. 11.1.

**Sec. 2.37  Unallocated Reserve.** An "Unallocated Reserve" consists of amounts held pursuant to Sec. 16.2. Separate Unallocated Reserves may be maintained for each Exempt Loan.

**Sec. 2.38  Valuation Date.** "Valuation Date" means the date on which the Investment Funds and Accounts are valued as provided in Article VII. Each business day on which the New York Stock Exchange is open for trading is a Valuation Date.

**Sec. 2.39  Vesting Service.** "Vesting Service" is defined in Sec. 3.3.

**Sec. 2.40  Definitions Relating to Marital Status.** For all purposes under this Plan, the following terms have the meanings assigned to them below:

(a)   Except to the extent a specific provision of this Plan imposes additional requirements, the term "spouse" means a person of the opposite gender from the Participant who is legally married to the Participant at the relevant time under the laws of the state in which they reside and who satisfies the requirements under 1 U.S. Code Section 7 for being treated as a spouse for purposes of federal law.

(b)   The term "same-sex spouse" means a person of the same gender as the Participant who at the relevant time either (i) is recognized as being legally married to the Participant under the laws of the state or country in which the relationship was created, or (ii) is a person who has joined with the Participant in a civil union that is recognized as creating some or all of the rights of marriage under the laws of the state or country in which the relationship was created.

(c)   The term "domestic partner" means a person who is not the spouse or same-sex spouse of the Participant as defined in subsections (a) and (b) of this section, but who at the relevant time is the Participant's significant other (together referred to as "partners") with whom the Participant lives and shares financial responsibility. A domestic partner may be the same gender or opposite gender. A person will be considered a domestic partner of the Participant if the Participant or other person can provide a domestic partnership certificate to the Plan Administrator from a city, county or state which offers the ability to register a domestic partnership. If the Participant and domestic partner reside in an area where such a certificate is not available, a person will not be considered a domestic partner unless the Participant and/or domestic partner provides sufficient evidence to the Plan Administrator that all of the following requirements are satisfied:

(1)   The partners have had a single, dedicated relationship for at least six months and intend to remain in the relationship indefinitely.

(2)   The partners share the same permanent residence and have done so for at least six months.

-13-

(3)    The partners are not related by blood or a degree of closeness which would prohibit marriage under the law of the state in which they reside.

(4)    Neither partner is married to another person under either statutory or common law, and neither has a same-sex spouse or is a member of another domestic partnership.

(5)    Each partner is mentally competent to consent or contract.

(6)    Both partners are at least 18 years of age.

(7)    The partners are financially interdependent, are jointly responsible for each other's basic living expenses, and are able to provide documents proving at least three of the following situations to demonstrate such financial interdependence:

    (A)    Joint ownership of real property or a common leasehold interest in real property.

    (B)    Common ownership of an automobile.

    (C)    Joint bank or credit accounts.

    (D)    A will which designates the other as primary beneficiary.

    (E)    A beneficiary designation form for a retirement plan or life insurance policy signed and completed to the effect that one partner is a beneficiary of the other.

    (F)    Designation of one partner as holding power of attorney for health care needs of the other.

# ARTICLE III

## SERVICE DEFINITIONS

**Sec. 3.1 Employment Commencement Date.** "Employment Commencement Date" means the date on which an employee first performs an Hour of Service for a Participating Employer (whether before or after the Participating Employer becomes such), an Affiliate, or a Predecessor Employer.

**Sec. 3.2 Hours of Service.** "Hours of Service" are determined according to the following subsections with respect to each applicable computation period. For purposes of testing for contribution limitations and adjustments to be performed under Sec. 6.1(g) and 6.3(g), an employee's first computation period is the 12-consecutive-month period beginning on his or her Employment Commencement Date. The second computation period is the calendar year commencing in said 12-consecutive-month period. Each subsequent calendar year is a computation period. The Plan Administrator may round up the number of Hours of Service at the end of each computation period or more frequently as long as a uniform practice is followed with respect to all employees who the Plan Administrator determines are in the same, or a similar, job classification, reasonably defined.

    (a)    Hours of Service are computed only with respect to service with Participating Employers (for service both before and after the Participating Employer becomes such), Affiliates, and Predecessor Employers and are aggregated for service with all such employers.

    (b)    For any portion of a computation period during which a record of hours is maintained for an employee, Hours of Service shall be credited as follows:

        (1)    Each hour for which the employee is paid, or entitled to payment, for the performance of duties for his or her employer during the applicable computation period is an Hour of Service.

        (2)    Each hour for which the employee is paid, or entitled to payment, by his or her employer on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty, or leave of absence, is an Hour of Service. No more than 501 Hours of Service shall be credited under this paragraph for any single continuous period (whether or not such period occurs in a single computation period). Hours of Service shall not be credited under this paragraph with respect to payments under a plan maintained solely for the purpose of complying with applicable workers' compensation, unemployment compensation, or disability insurance laws or with respect to a payment which solely reimburses the individual for medical or medically related expenses incurred by the employee.

        (3)    Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the employer is an Hour of Service. Such Hours of Service shall be credited to the computation period or periods to which the award or agreement for back pay pertains, rather than to the computation period in which the award, agreement, or payment is made. Crediting of Hours of Service for back pay awarded or

agreed to with respect to periods described in paragraph (2) shall be subject to the limitations set forth therein.

(4)    Hours under this subsection shall be calculated and credited pursuant to section 2530.200b-2 of the Department of Labor Regulations, which are incorporated herein by this reference.

(5)    The Plan Administrator may use any records to determine Hours of Service which it considers an accurate reflection of the actual facts.

(c)    For any portion of a computation period during which an employee is within a classification for which a record of hours for the performance of duties is not maintained, the employee shall be credited with 190 Hours of Service for each month for which the employee would otherwise be credited with at least one Hour of Service under subsection (b).

(d)    Nothing in this section shall be construed as denying an employee credit for an Hour of Service if credit is required by any federal law other than ERISA. The nature and extent of such credit shall be determined under such other law.

(e)    In no event shall duplicate credit as an Hour of Service be given for the same hour.

Sec. 3.3 **Vesting Service.** An individual's "Vesting Service" is equal to the aggregate time elapsed between his or her Employment Commencement Date and most recent Termination of Employment or any other date as of which a determination of Vesting Service is to be made, expressed in years and days (with 365 days constituting one year), subject to the following:

(a)    If the individual has a Termination of Employment and was not reemployed by a Participating Employer, an Affiliate or a Predecessor Employer within 12 months, the period of time from the Termination of Employment until the date he or she next performs an Hour of Service shall be subtracted from the individual's Vesting Service. If an individual remains absent from service without pay for a period of one year or more for any reason other than quit, retirement, discharge or death (such as sickness, disability, leave of absence or layoff), the Termination of Employment for purposes of this subsection (a) shall be deemed to occur not later than the first anniversary of the first day of the period of absence, notwithstanding the definition of Termination of Employment in Sec. 2.33 hereof as it relates to Participants who are Disabled. The previous sentence does not apply to a leave of absence that is classified by the Participant's Participating Employer as a salary continuation leave of absence.

(b)    In the case of acquisitions occurring on or after January 1, 2001, unless otherwise provided in an Appendix to this Plan, an individual's service with a Predecessor Employer shall be taken into account for purposes of determining Vesting Service. In the case of acquisitions occurring prior to January 1, 2001, any service prior to the earlier of (i) the year in which the individual's Participating Employer first maintained the Plan or a predecessor plan, or (ii) the earliest year in which any trade or business entity at that time under Common Control with the Participating Employer first maintained the Plan or a predecessor plan, shall be disregarded for purposes of determining Vesting Service unless otherwise provided in an Appendix to this Plan.

(c)    For purposes of determining Vesting Service, service before January 1, 1976 shall be disregarded if such service would have been disregarded under the provisions of the Plan with regard to breaks in service as in effect from time to time prior to said date, whether or not such provisions were expressly designated as relating to "breaks in service".

(d)    If the Participant has had a break in service of at least 12 months duration ending prior to January 1, 1985, or a break in service of at least 60 months duration ending on or after that date, for purposes of determining the vested percentage of his or her Employer Contribution Accounts attributable to employer contributions which accrued before such break, any Vesting Service after the break in service shall not be taken into account.

(1)    For purposes of this subsection (d), a "break in service" is a period beginning on the earlier of (i) the Participant's Termination of Employment or (ii) the first anniversary of the first day of a period of absence from service without pay for any reason other than quit, retirement, discharge or death (such as sickness, disability, leave of absence or layoff), and ending on the date on which the individual next performs an Hour of Service.

(2)    If an individual is absent for maternity or paternity reasons, a break in service under paragraph (1) shall not commence until the first anniversary of the first day of such absence.  For purposes of this paragraph, an absence from work for maternity or paternity reasons means an absence which began on or after January 1, 1985 (i) by reason of the pregnancy of the individual, (ii) by reason of the birth of a child of the individual, (iii) by reason of the placement of a child with the individual in connection with the adoption of such child by such individual, or (iv) for purposes of caring for such child for a period beginning immediately following such birth or placement.

Sec. 3.4  **Service With Wells Fargo Financial.**  If an employee of Wells Fargo Financial, Inc. (formerly named Norwest Financial, Inc., and before that named Dial Corporation) is transferred to employment with a Participating Employer as a Qualified Employee, and if the employee's service with Wells Fargo Financial includes a period of service before Dial Corporation became an Affiliate hereunder, the employee shall be credited with service as a Qualified Employee as if Dial Corporation had been an Affiliate during that period.

Sec. 3.5  **Periods of Military Service.**  Notwithstanding any provision of this Plan to the contrary, contributions, benefits and service credit with respect to qualified military service will be provided in accordance with Code section 414(u).

# ARTICLE IV

## SALARY DEFERRALS AND OTHER EMPLOYEE CONTRIBUTIONS

### Sec. 4.1 Eligibility for Participation in Salary Deferral Contributions.

(a)    An employee of a Participating Employer shall become a Participant in the Plan eligible to have Salary Deferral Contributions made on his or her behalf on the earliest Entry Date following completion of one full calendar month of service, on or after the effective date of the Plan with respect to the employee's Participating Employer, provided that the employee is a Qualified Employee on that Entry Date.

(b)    An Active Participant shall be eligible to have Salary Deferral Contributions made on his or her behalf commencing on the Entry Date on which the individual becomes a Participant or on any subsequent Entry Date, provided that the individual has submitted the proper applications to the Plan Administrator or its agent prior to the Entry Date pursuant to procedures established by the Plan Administrator.

(c)    Rehired and transferred employees shall enter or reenter the Plan as follows:

(1)    If a former Participant is rehired as a Qualified Employee, he or she shall become a Participant again on the date of reemployment, and shall be eligible to make Salary Deferral Contributions again as soon as administratively feasible following the entry of reemployment information in the records of the Plan and the employee making an election for Salary Deferral Contributions pursuant to procedures established by the Plan Administrator.

(2)    If a former employee who was not previously a Participant is rehired as a Qualified Employee and would have met the requirements of this Article on a prior Entry Date but for the fact that the employee was not a Qualified Employee on such Entry Date, he or she shall become a Participant for purposes of this section on the date of rehire, and shall be eligible to make Salary Deferral Contributions as soon as administratively feasible following the entry of reemployment information in the records of the Plan and the employee making an election for Salary Deferral Contributions pursuant to procedures established by the Plan Administrator.

(3)    If an employee of a Participating Employer or Affiliate who is neither a Participant nor a Qualified Employee is transferred to a position in which he or she is a Qualified Employee, and if the employee would have met the eligibility requirements of this Article on the Entry Date preceding the transfer had he or she been a Qualified Employee on that Entry Date, the employee shall become a Participant for purposes of this section on the date of the transfer and shall be eligible to make Salary Deferral Contributions on the first Entry Date following the entry of transfer information in the records of the Plan and the employee making an election for Salary Deferral Contributions pursuant to procedures established by the Plan Administrator, or as soon as administratively feasible thereafter.

-18-

**Sec. 4.2  Duration of Participation.**  A Participant shall continue to be such until the later of (i) his or her Termination of Employment, or (ii) the date all benefits, if any, to which the Participant is entitled hereunder have been distributed from the Trust Fund.

**Sec. 4.3  Amount of Salary Deferral Contributions.**  Each Active Participant who meets the requirements of Sec. 4.1 may elect to have his or her Certified Compensation reduced by any whole percentage from 1% to 25%. However, the Plan Administrator may from time to time in its sole discretion limit or reduce the maximum reduction percentage for the year for those Participants who are Highly Compensated Employees with respect to that year (or for a specified subset of such Participants) to a percent that is less than the maximum percent permitted under the previous sentence. The Participant's Participating Employer shall make a Salary Deferral Contribution to the Plan equal to the amount by which the Participant's Certified Compensation is reduced.

(a)  The salary reduction election shall be made in a written agreement filed with the Plan Administrator or its agent, or in any other form that complies with procedures established by the Plan Administrator, and shall apply only to Certified Compensation which becomes payable after the election is made.

(b)  An Active Participant may elect to increase or decrease the rate of Salary Deferral Contributions made on his or her behalf to any rate permitted by this Sec. 4.3, or may elect to discontinue such contributions at any time. Such change will be effective as of a payroll date that is as soon as administratively feasible following receipt of the Participant's election. An Active Participant who has elected to contribute less than 6% of Certified Compensation may also elect to have the contribution percent automatically increased by 1% effective as of the March 1st following the date the election is filed (provided such election is filed with the Plan Administrator or its agent by the deadline established for that March 1st), and as of each subsequent March 1st, until the Participant's contribution percent reaches 6% of Certified Compensation. Such automatic increases shall be effective for the payroll period that contains the applicable March 1st, and shall continue until the Participant files a new election discontinuing such increases or designating a contribution percent of 6% or more.

(c)  To be effective, an election to begin, change or discontinue Salary Deferral Contributions must be made in the form and according to the procedures prescribed by the Plan Administrator and must be submitted to the Plan Administrator or its agent prior to the payroll cut-off date established by the Plan Administrator for the Participant's Participating Employer.

(d)  All Salary Deferral Contributions shall automatically be discontinued if the Participant ceases to be a Qualified Employee. If a Participant begins a leave of absence that is classified by his or her Participating Employer as a salary continuation leave of absence, all Salary Deferral Contributions by the Participant will be discontinued as of the first payroll period that begins on or after the date the leave began.

(e)  Effective January 1, 2006, Salary Deferral Contributions by a Participant for any calendar year may not exceed $15,000, and shall cease at the point that limit is reached during the year. The limit in the previous sentence shall be adjusted for any increases provided for any calendar year after 2006 in accordance with the Code or regulations issued by the Secretary of the Treasury. The limit in this subsection does not apply to any catch-up contributions permitted by the Plan which are subject to Code section 414(v).

-19-

(f)     Salary Deferral Contributions shall be paid to the Trustee not later than the 15th business day of the month following the month containing the payroll date to which they relate. Salary Deferral Contributions for a calendar year shall be allocated to Salary Deferral Accounts not later than as of the last day of such year and shall be reflected in such Accounts as provided in Article VII within a reasonable period of time, as determined by the Plan Administrator, following the payroll date to which they relate. However, Salary Deferral Contributions which are deposited with the Trustee after the end of the calendar year to which they relate may instead be treated by the Plan Administrator as being Salary Deferral Contributions for the year in which they are deposited to the extent necessary to satisfy the requirements of Sec. 6.1.

(g)     Each Participant who is eligible to make Salary Deferral Contributions under this section during a calendar year and who will have attained age 50 on or before the last day of that year may elect to make Catch-up Contributions in accordance with, and subject to the limitations of, Code section 414(v) and any applicable Treasury regulations or IRS Notices or Announcements. Catch-up Contributions by a Participant shall be limited to $5,000 for 2006, as adjusted for subsequent calendar years to reflect any increases provided in accordance with the Code or regulations issued by the Secretary of the Treasury.

(1)     All such Catch-up Contributions made by a Participant shall be disregarded for purposes of determining the Employer Matching Contributions for the Participant under Sec. 5.1.

(2)     Such Catch-up Contributions shall be disregarded for purposes of the limitations under Code sections 401(a)(30) and 415(c), and for purposes of applying Sections 4.3(e), 6.1, 6.2 and 6.4 of this Plan. The Plan shall not be treated as failing to satisfy the requirements of Code sections 401(a)(4), 401(k)(3), 410(b) or 416, Sec. 6.1 or Article XV of this Plan, or any other provision of this Plan implementing said Code provisions, by reason of the making of such Catch-up Contributions.

(3)     Catch-up Contributions shall be made pursuant to such rules and procedures as the Plan Administrator may establish from time to time, which shall be consistent with the Code and any applicable regulations. Except as otherwise specifically provided in this subsection (g), Catch-up Contributions shall be treated the same as Salary Deferral Contributions for purposes of applying the provisions of this Plan. Any election to make Catch-up Contributions by a Participant shall continue to apply as an election to make the same dollar amount of Catch-up Contributions in future calendar years until the Participant files a new election with the Plan Administrator or its designated agent to change the dollar amount or to discontinue making Catch-up Contributions.

**Sec. 4.4 Employee Unmatched Contributions.** Any Employee Unmatched Contributions made prior to January 1, 1987 shall be held in the Participant's Employee After-Tax Contribution Account. Any Salary Deferral Contributions made by a Participant pursuant to Sec. 4.3 but not matched under the terms of Sec. 5.1 shall be held in the Participant's Salary Deferral Account.

**Sec. 4.5 Employee Basic Contributions.** Prior to April 1, 1984, Employee Basic Contributions were made pursuant to the provisions of the Plan in effect on December 31, 1983. No Employee Basic Contributions have been made on or after April 1, 1984. All such contributions that were made are held in the Participant's Employee After-Tax Contribution Account.

## ARTICLE V

### EMPLOYER CONTRIBUTIONS

**Sec. 5.1 <u>Employer Matching Contributions</u>.** Salary Deferral Contributions for calendar quarters after December 31, 2005 shall be matched as follows:

(a)     Employer Matching Contributions shall be made in the form of Company Stock available under Sec. 16.5, and shall be allocated to the Matching Contribution Accounts of Participants who meet the requirements of this Sec. 5.1 for each calendar quarter. The amount so allocated to a particular Participant's Matching Contribution Account shall have a value, as of the Valuation Date at the end of the quarter on which the allocation occurs, equal to 100% of the Participant's Salary Deferral Contributions on payroll dates occurring during that calendar quarter, disregarding (i) any Salary Deferral Contributions to the extent they exceed 6% of the Participant's Certified Compensation for the quarter, (ii) any Salary Deferral Contributions that are attributable to Unmatched Certified Compensation as defined in Sec. 2.6(d), and (iii) any Catch-up Contributions under Sec. 4.3(g). Additional matching allocations to the Participant's Matching Contribution Accounts may occur as provided in Sec. 16.5(e).

(b)     Each Participant who is credited with at least one year of Vesting Service as of the first day of a particular calendar quarter shall be eligible to receive Employer Matching Contributions from his or her Participating Employer for that calendar quarter, provided that the Participant (i) must have been an Active Participant at some time during the calendar quarter, (ii) must be employed by a Participating Employer or an Affiliate on the last day of the calendar quarter, and (iii) must have made a Salary Deferral Contribution on one or more payroll dates occurring during the calendar quarter. A Participant will be deemed to have satisfied clause (ii) of the preceding sentence for a quarter if the Participant's Termination of Employment occurred during that quarter due to the Participant's Retirement or Disability or due to the Participant's death. A Participant will also be deemed to have satisfied clause (ii) of the first sentence of this subsection for a calendar quarter if the Participant began a leave of absence that is classified by his or her Participating Employer as a salary continuation leave of absence during that quarter and said leave has not ended prior to the last day of that quarter. Except as provided in the preceding sentence, a Participant who is on a salary continuation leave of absence on the last day of a calendar quarter is not eligible to receive Employer Matching Contributions for that quarter.

(c)     If the Plan Administrator allows Active Participants to elect reduction percentages in excess of 6% of Certified Compensation, and a Participant is subject to the limit on Salary Deferral Contributions set forth in Sec. 4.3(e), the Employer Matching Contributions made pursuant to this section for such Participant shall continue at the rate stated in this section and Sec. 16.5(b) for the remainder of the year, to a maximum dollar contribution which is equal to the lesser of 6% of the Participant's Certified Compensation or the limit set forth in Sec. 4.3(e). However, if the Participant became eligible to receive Employer Matching Contributions during but after the first day of the calendar year, this subsection (c) shall not apply.

(d)    No Employer Matching Contribution shall be made with respect to any amount by which the Participant's Salary Deferral Contributions must be reduced pursuant to Sec. 6.1 or Sec. 6.2.

(e)    The Participating Employers shall pay Employer Matching Contributions to the Trustee not later than the due date for the Company's federal income tax return (including extensions) for the Plan Year to which the contributions relate, subject to the provisions of Sec. 6.3 and Article XVI. The amount paid shall be sufficient to make all payments and allocations provided under Article XVI, after taking into account credits under Sec. 6.5 and Sec. 7.2(i), if any.

Sec. 5.2 **Employer Discretionary Contributions.** For calendar years commencing on or after January 1, 2004, the Participating Employers may make discretionary contributions on behalf of eligible Participants in accordance with the following provisions:

(a)    For each calendar year, the Chairperson of the Human Resources Committee of the Board will determine in his or her sole discretion whether the Participating Employers will make a contribution under this section for that year. If such a contribution is to be made for a particular year, the Chairperson will determine the percent of Certified Compensation for the year to be contributed for each eligible Participant (not to exceed 1% of Certified Compensation), and the maximum dollar amount of the contribution for each eligible Participant (not to exceed $750.00). However, if a contribution is to be made under this section for a particular year, the contribution for each eligible Participant shall not be less than the smaller of (i) $100.00, or (ii) the maximum contribution permitted for the Participant for that year under Sec. 6.4.

(b)    To be eligible for an allocation of Employer Discretionary Contributions under this section for a particular calendar year, the Participant (i) must be an Active Participant on December 31st of that year, (ii) must not be on a leave of absence that is classified by his or her Participating Employer as a salary continuation leave of absence on that December 31st, and (iii) must not have received stock options or other awards under the Long Term Incentive Compensation Plan for that year.

(c)    Contributions for a Participant under this section shall be allocated to the Participant's Wells Fargo Share Award Account as provided in Sec. 7.1. The Participating Employers shall pay Employer Discretionary Contributions for a calendar year to the Trustee not later than the due date for the Company's federal income tax return (including extensions) for that year, subject to the provisions of Sec. 6.4. Such contributions may be made at the discretion of the Plan Administrator in cash or in the form of Company Stock of equivalent value as of the date of the transfer to the Trustee.

Sec. 5.3 **Qualified Nonelective Contributions.** The Company may in its sole discretion determine that the Participating Employers will make Qualified Nonelective Contributions to the Plan for a particular Plan Year in order to enable the Plan to satisfy the requirements of Sec. 6.1 and avoid refunds, or reduce the amounts to be refunded, to Participants under Sec. 6.1(d) for that Plan Year. If Qualified Nonelective Contributions are to be made for a Plan Year, the Company will determine in its sole discretion the amount of such contributions to be made.

(a)    Any Qualified Nonelective Contributions which are allocated to a Participant for a Plan Year will be included in Sec. 6.1(a)(1) for purposes of calculating the Participant's deferral

-22-

percentage for the Plan Year, except to the extent the Plan Administrator elects instead to include part or all of such contributions for a Plan Year in Sec. 6.3(a)(1) for purposes of calculating the Participant's contribution percentage for the Plan Year. For Plan Years commencing on or after January 1, 2006, such contributions will be included in Sec. 6.1(a)(1) only to the extent they comply with the requirements of Treasury Regulation § 1.401(k)-2(a)(6). Any such contributions will be credited to a separate QNEC Account for the Participant. Any Qualified Nonelective Contributions must be contributed to the Plan within 12 months following the end of the Plan Year to which they relate.

(b)     The Qualified Nonelective Contribution for a Plan Year will be allocated among those Participants (i) who are Active Participants included in the testing under Sec. 6.1 for the Plan Year (whether or not the individual remains an Active Participant at the time the contribution is allocated), (ii) who are Non-Highly Compensated Employees for the Plan Year, and (iii) who are Qualified Employees on December 31 of the Plan Year. The allocation to each such Participant for a Plan Year will be in the proportion that the Certified Compensation of such Participant for the Plan Year bears to the total Certified Compensation of all Participants who meet the requirements of the previous sentence for that Plan Year.

(c)     If Sec. 6.1 is being applied for the Plan Year by disaggregating the Plan into separate plans pursuant to Sec. 6.1(g), the Company will determine the amount of Qualified Nonelective Contributions (if any) to be made for each disaggregated plan, and the allocations under subsection (b) will be done separately for purposes of each disaggregated plan.

(d)     Any QNEC Account established for a Participant pursuant to this section shall be treated the same as the Participant's Salary Deferral Account for all purposes under the Plan. All QNEC Accounts are 100% vested and nonforfeitable at all times. No withdrawals may be made from any QNEC Account pursuant to Sec. 10.7.

(e)     Determinations to be made by the Company under this section will be made by the Chair of the Human Resources Committee of the Board.

## ARTICLE VI

### CONTRIBUTION ADJUSTMENTS AND LIMITATIONS

   **Sec. 6.1   Adjustment of Salary Deferral Contributions.**  If necessary to satisfy the requirements of Code section 401(k) and the regulations thereunder, Salary Deferral Contributions shall be adjusted in accordance with the following:

   (a)   Each calendar year, the "deferral percentage" will be calculated for each Active Participant. Each Participant's deferral percentage is calculated by dividing the amount referred to in paragraph (1) by the amount referred to in paragraph (2):

   (1)   The total Salary Deferral Contributions (including Excess Deferrals of Highly Compensated Employees distributed under Sec. 6.2 but excluding Excess Deferrals of Non-Highly Compensated Employees that arise solely from contributions made under plans of the Participating Employers or Affiliates, and also excluding any Catch-up Contributions under Sec. 4.3(g)), if any, allocated to the Participant's Accounts with respect to the year. The amount under this paragraph (1) also includes any Qualified Nonelective Contributions allocated to the Participant's QNEC Account pursuant to Sec. 5.3 with respect to the year, but only to the extent that such amount complies with the requirements of Treasury Regulation § 1.401(k)-2(a)(6) in the case of Plan Years commencing on or after January 1, 2006. However, any Qualified Nonelective Contributions which the Plan Administrator elects to include in determining contribution percentages under Sec. 6.3(a)(1) will be disregarded for purposes of this paragraph.

   (2)   The Participant's compensation with respect to the calendar year. For purposes of this section, a Participant's "compensation" for the year means compensation determined according to a definition selected by the Plan Administrator for that year which satisfies the requirements of Code section 414(s). The same definition of compensation shall be used for all Participants for a particular year, but different definitions may be used for different years. The Plan Administrator shall also determine whether compensation includes or does not include the Salary Deferral Contributions to this Plan and any contributions made pursuant to a salary reduction agreement by or on behalf of the Participant to any other plan which meets the requirements of Code sections 125, 132(f)(4), 401(k), 402(h)(1)(B), or 403(b), and whether or not it includes amounts paid prior to the date an individual became a Participant. Compensation shall be subject to the limit provided under Sec. 2.6(c).

   (b)   Each calendar year, the average deferral percentage for Active Participants who are Highly Compensated Employees and the average deferral percentage for Active Participants who are Non-Highly Compensated Employees will be calculated. A separate average deferral percentage shall be calculated for Active Participants in all collective bargaining units who are required to be disaggregated pursuant to Treasury Regulation §§ 1.401(k)-1(b)(4)(iv) and 1.410(b)-7(c). Such Participants shall be disregarded in calculating the average deferral percentage for Active Participants who are not in such collective bargaining units.

   (1)   In each case, the average is the average of the percentages calculated under subsection (a) for each of the employees in the particular group. The deferral percentage for each

Participant and the average deferral percentage for a particular group of employees shall be calculated to the nearest one-hundredth of one percent.

(2)     The average deferral percentage for Active Participants who are Non-Highly Compensated Employees that is used in applying this section for a particular calendar year shall be the percentage determined for the current year.

(c)     If the requirements of either paragraph (1) or (2) are satisfied, then no further action is needed under this section:

(1)     The average deferral percentage for Participants who are Highly Compensated Employees is not more than 1.25 times the average deferral percentage for Participants who are Non-Highly Compensated Employees.

(2)     The excess of the average deferral percentage for Participants who are Highly Compensated Employees over the average deferral percentage for Participants who are Non-Highly Compensated Employees is not more than two percentage points, and the average deferral percentage for such Highly Compensated Employees is not more than 2 times the average deferral percentage for such Non-Highly Compensated Employees.

The requirements of this subsection (c) shall be applied separately with respect to Participants in collective bargaining units who are required to be disaggregated pursuant to Treasury Regulation §§ 1.401(k)-1(b)(4)(iv) and 1.410(b)-7(c).

(d)     If neither of the requirements of subsection (c) is satisfied, then the Salary Deferral Contributions with respect to Highly Compensated Employees shall be reduced under the method set forth below.

(1)     Determine the Total Reduction Amount, which for purposes of this subsection shall mean, with respect to any calendar year, the excess of the aggregate amount of Salary Deferral Contributions actually taken into account in computing the deferral percentages of Highly Compensated Employees for such year, over the maximum amount of such contributions permitted under subsection (c) (determined by hypothetically reducing Salary Deferral Contributions made on behalf of Highly Compensated Employees in order of the deferral percentages, beginning with the highest of such percentages).

(2)     Reduce the Salary Deferral Contributions of the Highly Compensated Employee(s) with the greatest dollar amount of Salary Deferral Contributions to the dollar amount of the Highly Compensated Employee(s) with the next greatest dollar amount of Salary Deferral Contributions, unless a lesser reduction will be sufficient to equal the remaining Total Reduction Amount.

(3)     Repeat paragraph (2) until the Salary Deferral Contributions of the Highly Compensated Employees have been reduced by an amount equal to the Total Reduction Amount.

For purposes of this subsection, the "greatest dollar amount" is determined after distribution of any Excess Deferrals under Sec. 6.2..

(e)  At any time during the calendar year, the Plan Administrator may make an estimate of the amount of Salary Deferral Contributions by Highly Compensated Employees that will be permitted under this section for the year and may reduce the percent specified in Sec. 4.3 for such Participants, or for a specified subset of such Participants, to the extent the Plan Administrator determines in its sole discretion to be necessary to satisfy at least one of the requirements in subsection (c).

(f)  If Salary Deferral Contributions with respect to a Highly Compensated Employee are reduced pursuant to subsection (d), the excess Salary Deferral Contributions shall be distributed, subject to the following:

(1)  For purposes of this subsection, "excess Salary Deferral Contributions" mean the amount by which Salary Deferral Contributions for Highly Compensated Employees have been reduced under subsection (d).

(2)  Excess Salary Deferral Contributions (adjusted for income or losses allocable thereto as specified in paragraph (3), if any) shall be distributed to Participants on whose behalf such excess contributions were made for the calendar year no later than December 31st of the following year. Furthermore, the Plan Administrator shall attempt to distribute such amount by March 15th of the year following the year for which the excess contributions were made to avoid the imposition on the Participating Employers of an excise tax under Code section 4979.

(3)  Income or losses allocable to excess Salary Deferral Contributions shall be equal to the amount of income or loss allocable to such excess amount for the year for which such amount was contributed and the gap period after the close of that year and prior to the date as of which the distribution is made. The amount of such allocable income or loss shall be determined for all affected Participants for each year using a reasonable method selected by the Plan Administrator which satisfies the requirements of Treasury Regulation § 1.401(k)-2(b)(2)(iv) and any other applicable regulations.

(4)  The amount of excess Salary Deferral Contributions and income or losses allocable thereto which would otherwise be distributed pursuant to this subsection shall be reduced, in accordance with regulations, by the amount of Excess Deferrals and income or losses allocable thereto previously distributed to the Participant pursuant to Sec. 6.2 for the calendar year.

(5)  Notwithstanding the foregoing provisions of this subsection (f), if the Participant was eligible to make Catch-up Contributions pursuant to Sec. 4.3(g) for the calendar year for which the excess Salary Deferral Contributions were made, but did not otherwise make the maximum Catch-up Contribution permitted for that year, the Participant's excess Salary Deferral Contributions (or, if less, the portion of such excess equal to the amount by which the Participant's actual Catch-up Contributions for the year are below the maximum Catch-up Contribution allowed for the year) shall instead be treated as Catch-up Contributions for the year and retained in the Participant's Account. The portion of any income or losses which are allocable under paragraph (3), above, to the excess Salary Deferral Contributions that are treated as Catch-up Contributions shall also be retained in the Participant's Account.

(g)    In the sole discretion of the Plan Administrator, the provisions of this Sec. 6.1 may be applied on an aggregate basis to all Participants and their Salary Deferral Contributions, or the Plan may be treated as disaggregated into separate plans under the provisions of Code section 410(b) and Treasury Regulations §§ 1.410(b)-6(b)(3) and 1.410(b)-7(c)(3), with each such plan separately satisfying the provisions of this Sec. 6.1.

(h)    The deferral percentage for any Participant who is a Highly Compensated Employee for the calendar year, and who is eligible to participate in two or more plans with cash or deferred arrangements described in Code section 401(k) to which any Participating Employer or Affiliate contributes, shall be determined as if all employer contributions were made under a single arrangement unless mandatorily disaggregated pursuant to regulations under Code section 401(k). This subsection shall be applied by treating all cash or deferred arrangements with Plan Years ending within the same calendar year as a single arrangement.

(i)    If two or more plans which include cash or deferred arrangements are considered as one plan for purposes of Code section 401(a)(4) or Code section 410(b), the cash or deferred arrangements shall be treated as one for the purposes of applying the provisions of this section unless mandatorily disaggregated pursuant to regulations under Code section 401(k).

(j)    If the entire Account balance of a Highly Compensated Employee has been distributed during the calendar year in which an excess arose, the distribution shall be deemed to have been a corrective distribution of the excess and income attributable thereto to the extent that a corrective distribution would otherwise have been required under subsection (f) of this section, Sec. 6.2 or Sec. 6.3(f).

(k)    A corrective distribution of excess contributions under subsection (f) of this section, excess Employer Matching Contributions under Sec. 6.3(f), or Excess Deferrals under Sec. 6.2 may be made without regard to any notice or Participant or spousal consent required under Article VIII or X.

(l)    In the event of a complete termination of the Plan during the Plan Year in which an excess arose, any corrective distribution under subsection (f) of this section or Sec. 6.3(f) shall be made as soon as administratively feasible after the termination, but in no event later than 12 months after the date of termination.

    **Sec. 6.2 <u>Distribution of Excess Deferrals</u>.** Notwithstanding any other provisions of the Plan, Excess Deferrals for a calendar year and income or losses allocable thereto shall be distributed no later than the following April 15 to Participants who claim such Excess Deferrals, subject to the following:

(a)    For purposes of this section, "Excess Deferrals" means the amount of Salary Deferral Contributions for a calendar year that the Participant claims pursuant to the procedure set forth in subsection (b) because the total amount deferred for the calendar year, disregarding any catch-up contributions subject to Code section 414(v), exceeds $15,000 for 2006, adjusted as provided in Code section 402(g) or applicable Treasury regulations for subsequent calendar years, or such other limit imposed on the Participant for that year under Code section 402(g).

(b)   The Participant's written claim, specifying the amount of the Participant's Excess Deferral for any calendar year, shall be submitted to the Plan Administrator no later than the April 1 following such calendar year. The claim shall include the Participant's written statement that if such amounts are not distributed, such Excess Deferrals, when added to amounts deferred under other plans or arrangements described in Code section 401(k), 403(b), or 408(k), exceed the limit imposed on the Participant by Code section 402(g) for the year in which the deferral occurred. A Participant shall be deemed to have submitted such a claim to the extent the Participant has Excess Deferrals for the calendar year taking into account only contributions under this Plan and any other plan maintained by a Participating Employer or an Affiliate.

(c)   Excess Deferrals distributed to a Participant with respect to a calendar year shall be adjusted to include income or losses allocable thereto using the same method specified for excess Salary Deferral Contributions under Sec. 6.1(f)(3).

(d)   The amount of Excess Deferrals and income allocable thereto which would otherwise be distributed pursuant to this section shall be reduced, in accordance with applicable regulations, by the amount of excess Salary Deferral Contributions and income allocable thereto previously distributed to the Participant pursuant to Sec. 6.1 for the calendar year, and by the amount of any deferrals properly distributed as excess annual additions under Sec. 6.4.

**Sec. 6.3  Adjustment of Employer Matching Contributions.** After the provisions of Sec. 6.1 and Sec. 6.2 have been satisfied, the requirements set forth in this section must also be met. If necessary to satisfy the requirements of Code section 401(m), Employer Matching Contributions shall be adjusted in accordance with the following:

(a)   Each calendar year, the "contribution percentage" will be calculated for each Active Participant (other than an Active Participant who is in a collective bargaining unit required to be disaggregated pursuant to Treasury Regulation § 1.401(m)-1(b)(4)). Each Participant's contribution percentage is calculated by dividing the amount referred to in paragraph (1) by the amount referred to in paragraph (2):

(1)   The total Employer Matching Contributions under Sec. 5.1, if any, allocated to the Participant's Accounts with respect to the year. The Plan Administrator may also elect to include all or part of the Salary Deferral Contributions to be allocated to the Participant's Accounts with respect to that year, and/or all or part of any Qualified Nonelective Contributions to be allocated to the Participant's QNEC Account pursuant to Sec. 5.3 with respect to that year, provided that the requirements of Treasury Regulation §1.401(m)-2(a)(6) are satisfied and provided that the requirements of Sec. 6.1 are met before such Salary Deferral Contributions are used under this section and continue to be met after the exclusion for purposes of Sec. 6.1 of those contributions that are used to satisfy the requirements of this section. However, any Employer Matching Contributions that are forfeited, either to correct excess contributions under subsection (f) of this section, or because the contributions to which they relate are excess Salary Deferral Contributions under Sec. 6.1, Excess Deferrals under Sec. 6.2 or excess contributions under subsection (f) of this section, shall be disregarded.

(2)   The Participant's compensation with respect to the year  For purposes of this section, "compensation" has the same meaning as provided in Sec. 6.1(a)(2).

(b)    Each year, the average contribution percentage of Active Participants who are Highly Compensated Employees and the average contribution percentage for Active Participants who are Non-Highly Compensated Employees will be calculated.  In each case, the average is the average of the percentages calculated under subsection (a) for each of the employees in the particular group.  In calculating average contribution percentages, Participants employed in a collective bargaining unit required to be disaggregated pursuant to Treasury Regulation § 1.401(m)-1(b)(4) shall be disregarded.

    (1)    The contribution percentage for each Participant and the average contribution percentage for a particular group of employees shall be calculated to the nearest one-hundredth of one percent.

    (2)    The average contribution percentage for Active Participants who are Non-Highly Compensated Employees that is used in applying this section for a particular calendar year shall be the percentage determined for the current year.

(c)    If the requirements of either paragraph (1) or (2) are satisfied, then no further action is needed under this section:

    (1)    The average contribution percentage for Participants who are Highly Compensated Employees is not more than 1.25 times the average contribution percentage for Participants who are Non-Highly Compensated Employees.

    (2)    The excess of the average contribution percentage for Participants who are Highly Compensated Employees over the average contribution percentage for Participants who are Non-Highly Compensated Employees is not more than two percentage points, and the average contribution percentage for such Highly Compensated Employees is not more than 2 times the average contribution percentage for such Non-Highly Compensated Employees.

(d)    If neither of the requirements of subsection (c) is satisfied, then the Employer Matching Contributions with respect to Highly Compensated Employees shall be reduced under the method set forth below.

    (1)    Determine the Total Reduction Amount, which for purposes of this subsection shall mean, with respect to any calendar year, the excess of the aggregate amount of Employer Matching Contributions actually taken into account in computing the contribution percentages of Highly Compensated Employees for such year or portion of a year, over the maximum amount of such contributions permitted under subsection (c) (determined by hypothetically reducing Employer Matching Contributions made on behalf of Highly Compensated Employees in order of the contribution percentages, beginning with the highest of such percentages).

    (2)    Reduce the Employer Matching Contributions of the Highly Compensated Employee(s) with the greatest dollar amount of Employer Matching Contributions to the dollar amount of the Highly Compensated Employee(s) with the next greatest dollar amount of Employer Matching Contributions, unless a lesser reduction will be sufficient to equal the remaining Total Reduction Amount.

(3)    Repeat paragraph (2) until the Employer Matching Contributions of the Highly Compensated Employees have been reduced by an amount equal to the Total Reduction Amount.

(e)    At any time during the year, the Plan Administrator may make an estimate of the amount of Employer Matching Contributions on behalf of Highly Compensated Employees that will be permitted under this section for the year.  If the Plan Administrator determines in its sole discretion that reductions are necessary to assure that at least one of the requirements in subsection (c) are satisfied, the Plan Administrator may take written action to reduce or eliminate Employer Matching Contributions for Highly Compensated Employees (or a subset of such employees) with respect to Certified Compensation to be paid from the date such action is taken to the end of the year.

(f)    If contributions with respect to a Highly Compensated Employee are reduced pursuant to subsection (d), the excess Employer Matching Contributions shall be treated as follows:

(1)    For purposes of this subsection, "excess Employer Matching Contributions" mean the amount by which Employer Matching Contributions must be reduced under subsection (d).

(2)    Excess Employer Matching Contributions (adjusted for income or losses allocable thereto) shall be forfeited (if otherwise forfeitable under the provisions of Sec. 9.2 if the Participant were to terminate employment on December 31st of the year for which the contribution was made).  Excess Employer Matching Contributions which are non-forfeitable (adjusted for income or losses allocable thereto) shall be distributed to Participants on whose behalf such excess contributions were made for the year no later than December 31st of the following year.  Furthermore, the Plan Administrator shall attempt to distribute such amount by March 15th of the year following the year for which the excess contributions were made to avoid the imposition on the Participating Employers of an excise tax under Code section 4979.

(3)    Income or losses allocable to excess Employer Matching Contributions shall be determined in the same manner specified for excess Salary Deferral Contributions under Sec. 6.1(f)(3).

(4)    Amounts forfeited by Highly Compensated Employees pursuant to paragraph (2) shall be applied to reduce future Employer Matching Contributions as provided in Sec. 6.5.

(g)    In the sole discretion of the Plan Administrator, the provisions of this Sec. 6.3 may be applied on an aggregate basis to all Participants and their Salary Deferral Contributions, or the Plan may be treated as disaggregated into separate plans under the provisions of Code Sec. 410(b) and Treasury Regulation §§ 1.410(b)-6(b)(3) and 1.410(b)-7(c)(3), with each such plan separately satisfying the provisions of this Sec. 6.3.

(h)    The contribution percentage for any Participant who is a Highly Compensated Employee for the year, and who is eligible to make nondeductible employee contributions or to receive matching contributions under two or more plans described in Code section 401(a) that are maintained by the Participating Employers or any Affiliate, shall be determined as if all such

contributions were made under a single arrangement unless mandatorily disaggregated pursuant to regulations under Code section 401(m).

(i)    If two or more plans maintained by the Participating Employers or Affiliates are treated as one plan for purposes of satisfying the eligibility requirements of Code section 410(b), those plans must be treated as one plan for purposes of applying the provisions of this section unless mandatorily disaggregated pursuant to regulations under Code section 401(m).

Sec. 6.4 **Limitation on Allocations.** Notwithstanding the foregoing provisions of this Article V, allocations to Participants shall not exceed the limits provided under Code Section 415. For purposes of the preceding sentence:

(a)    The Annual Additions with respect to a Participant for any Plan Year shall not exceed the lesser of:

(1)    $44,000 for Plan Years commencing in 2006 or later, adjusted for each subsequent Plan Year to reflect cost of living increases for that Plan Year provided under Code section 415(d) or published by the Secretary of the Treasury. However, for any year that the requirements of subsection (e) are met, the limitation in this paragraph shall be increased as provided by Code section 415(c)(6).

(2)    100% of the Compensation of such Participant. This paragraph (2) shall not apply to any contribution for medical benefits after separation from service within the meaning of Code sections 401(h) or 419A(f)(2) which is otherwise treated as an Annual Addition.

(b)    All defined contribution plans of the Company or of any trade or business entity under Common Control with the Company shall be treated as one defined contribution plan for purposes of applying the limitations of this section. If a limitation on the contributions to be allocated to a Participant's Accounts hereunder for a calendar year is required because of contributions or forfeitures under another such plan, the allocations under this Plan and each such other plan shall be reduced pro rata to the end that the limitation shall not be exceeded, except that reductions to the extent necessary shall be made in allocations under profit sharing and stock bonus plans before any reductions in allocations are made under money purchase pension plans.

(c)    If for any calendar year the limitations described in subsection (a) are exceeded with respect to any Participant, the Participant's Salary Deferral Contributions for the year, if any, shall be refunded to the Participant to the extent necessary to satisfy the limits. Any remaining excess amount shall be disposed of as follows:

(1)    If the Participant is covered by the Plan at the end of the year, then any remaining excess amount must be used to reduce future employer contributions for such Participant under this Plan for the next year, and for each succeeding year, as necessary.

(2)    If the Participant is not covered by the Plan at the end of the year, the excess amount will be held unallocated in a suspense account. The suspense account will be

-31-

applied to reduce future employer contributions for all remaining Participants in the next year, and in each succeeding year, if necessary.

(3)    If a suspense account is in existence at any time during the year pursuant to this subsection, it will not participate in the allocation of the investment gains and losses of the Trust Fund.

(4)    Any Salary Deferral Contributions refunded under this subsection shall be disregarded for purposes of applying the limits under Sec. 6.1, Sec. 6.2 and Sec. 6.3.

(d)    The following definitions shall be applicable for purposes of this section:

(1)    "Annual Additions" means the sum of the following amounts allocated to a Participant:

(A)    Employer contributions, including Salary Deferral Contributions made under this Plan. Excess Salary Deferral Contributions, and excess Employer Matching Contributions which are distributed under the provisions of this Article VI are included in Annual Additions, but Excess Deferrals which are distributed under Sec. 6.2 are not included in Annual Additions.

(B)    The portion of the Employer Matching Contribution which is allocated to the Participant under Sec. 5.1.

(C)    Principal payments made on an ESOP loan under Article XVI to the extent such payments result in allocation of Company Stock to the Participant's Matching Contribution Account.

(D)    Employer contributions, employee contributions, and forfeitures, if any, under any other qualified defined contribution plan maintained by a Participating Employer.

(E)    For any year that the requirements of subsection (e) are not met, interest on Exempt Loans shall be an Annual Addition.

(F)    Amounts attributable to medical benefits as described in Code sections 415(1)(2) and 419A(d)(2).

An Annual Addition with respect to a Participant's Accounts shall be deemed credited thereto with respect to a year if it is allocated to the Participant's Accounts under the terms of the Plan as of any date within that year. Annual Additions do not include any rollover contributions as defined in Code sections 402(c), 403(a)(4), 403(b)(8) or 457(e)(16), or in any other provision of the Code which may allow rollover contributions to be made to this Plan from time to time. Any catch-up contributions under Code section 414(v) shall be disregarded in determining Annual Additions.

(2)    "Compensation" means a Participant's earned income, wages, salaries, fees for professional services and other amounts received (without regard to whether or not an

-32-

amount is paid in cash) for personal services actually rendered in the course of employment with the Participating Employers and Affiliates to the extent that the amounts are includible in gross income (including, but not limited to, commissions, compensation for services on the basis of a percentage of profits, tips, bonuses, fringe benefits, and reimbursements or other expense allowances under a nonaccountable plan described in Treasury Regulation § 1.62-2(c)), subject to the following:

    (A)    Compensation includes the Salary Deferral Contributions to this Plan and any elective salary reduction contributions to any other plan which are not includible in the gross income of the employee under Code sections 125, 132(f)(4), 401(k), 402(h)(1)(B), 403(b) or 457.  Compensation excludes any other employer contributions to a plan of deferred compensation which are not includible in the employee's gross income for the taxable year in which contributed, any distributions from a plan of deferred compensation, and any other amounts which receive special tax benefits.  However, any amounts received by an employee pursuant to an unfunded non-qualified plan of deferred compensation may be considered as Compensation in the year such amounts are includible in the employee's gross income

    (B)    Compensation excludes amounts realized from the exercise of a non-qualified stock option, or when restricted stock (or property) either becomes transferable or is no longer subject to a substantial risk of forfeiture.

    (C)    Compensation for purposes of this section includes any salary continuation pay paid to the Participant during a salary continuation leave of absence.

(e)    The requirements of this subsection (e) are met with respect to a particular year if no more than one third of the allocations to Matching Contribution Accounts under Sec. 16.5 for that year are allocated to Matching Contribution Accounts of Highly Compensated Employees.

**Sec. 6.5 <u>Forfeitures Credited Against Employer Matching Contributions.</u>**  Forfeitures arising during a calendar year under the provisions of Sec. 9.2(c) which have not previously been applied to reinstate Accounts pursuant to Sec. 9.2(d), and forfeitures of excess Employer Matching Contributions for the previous year under Sec. 6.3(f), shall be applied not later than the last day of the year as a credit against the Employer Matching Contributions to be made for the current year by the Participating Employers, with the allocation of such amounts among the Participating Employers to be determined by the Plan Administrator in its sole discretion.  Such forfeitures shall thereafter be treated hereunder as contributions by the Participating Employers.

**ARTICLE VII**

**INDIVIDUAL ACCOUNTS**

Sec. 7.1 **Accounts for Participants.** The following Accounts may be established under the Plan for a Participant:

(a)    A Salary Deferral Account shall be established for each Participant who elects to have Salary Deferral Contributions made on his or her behalf pursuant to Sec. 4.1 and Sec. 4.3. These Accounts were previously known as Pay Conversion Contribution Accounts. These Accounts are subject to the Participant's investment directions pursuant to Sec. 8.4 and Sec. 8.5.

(b)    An Employee After-Tax Contribution Account shall be maintained for each Participant who made such contributions under provisions of the Plan previously in effect. These Accounts were previously known as Employee Unmatched Contribution Accounts, Employee Basic Contribution Accounts or Employee Contribution Accounts. These Accounts are subject to the Participant's investment directions pursuant to Sec. 8.4 and Sec. 8.5.

(c)    The following Employer Contribution Accounts shall be established for Participants:

(1)    An Employer Directable Contribution Account shall be maintained for each Participant who has any employer contributions, made under provisions of the Plan previously in effect, that are subject to the Participant's investment directions pursuant to Sec. 8.4 and Sec. 8.5. These Accounts include Accounts previously known as Transferable Employer Matching Contribution Accounts and Employer Annual Contribution Accounts.

(2)    A Matching Contribution Account shall be maintained for each Participant who has any employer contributions made under the provisions of the Plan, now or previously in effect, that are required to be initially invested in the Company Stock Fund or the ESOP Fund. These Accounts are subject to the Participant's investment directions as provided in Sec. 8.6. Prior to January 1, 2006, these Accounts were known as Employer Non-Directable Contribution Accounts. These Accounts include Accounts previously known as ESOP Accounts and Non-transferable Employer Matching Contribution Accounts.

(3)    A Wells Fargo Share Award Account shall be maintained for each Participant who receives any allocation of Employer Discretionary Contributions under Sec. 5.2. These Accounts shall be invested in the Company Stock Fund and are not subject to the Participant's investment directions, except as otherwise provided in Sec. 8.6(b) in the case of a qualified Participant.

(d)    A Rollover Account shall be established as provided in Sec. 7.4 for any Participant who makes a Rollover Contribution or as provided in Sec. 7.5 for any Participant who makes certain types of transfers from other plans. Such Accounts are subject to the Participant's investment directions as provided in Sec. 8.4 and Sec. 8.5.

(e)    A Frozen Transferred Account shall be established for any Participant who was a participant in a plan of an employer listed in Sec. 14.8 which has been merged into this Plan to hold any accounts under the merged plan which are required by the applicable Appendix to be kept separate in order to preserve optional settlements, joint and survivor annuity requirements, or other features required to be preserved under the Code or ERISA.  Such Accounts are subject to the Participant's investment directions as provided in Sec. 8.4 and Sec. 8.5.

(f)    More than one of any of the above types of Accounts may be established for a Participant if required by the Plan or if considered advisable by the Plan Administrator in the administration of the Plan.  Except where a Frozen Transferred Account is required by an applicable Appendix, each account of a Participant under any plan which has been merged into this Plan shall be held in the most comparable type of Account under this Plan.  Except as expressly provided herein to the contrary, the Trust Fund shall be held and invested on a commingled basis, Accounts shall be for bookkeeping purposes only, and the establishment of Accounts shall not require any segregation of Trust Fund assets.

(g)    Prior to April 1, 1981, certain Participants had one or more Accounts relating to their participation in the Plan prior to 1976 (previously referred to as "Profit Sharing Accounts"). Effective as of April 1, 1981, these Accounts were combined with other Accounts as follows: a Participant's Profit Sharing Voluntary Deposit Account was combined with the Employee Unmatched Contribution Account, and the Profit Sharing Regular Account and Profit Sharing Cash Option Account were combined with the Employer Annual Contribution Account.

Sec. 7.2  **Valuation of Accounts.**  As of each Valuation Date, the value of each Account shall be adjusted to reflect the effect of distributions, transfers, withdrawals, income, realized and unrealized profits and losses, contributions, and all other transactions with respect to the Trust Fund since the next preceding Valuation Date, as follows:

(a)    In accordance with a method consistently followed and uniformly applied, the Trustee shall determine the fair market value of each Investment Fund.  The Trustee shall advise the Plan Administrator of the values.  If fair market value of an asset is not available, the value of such asset shall be deemed to be its fair value as determined in good faith by the Trustee.

(b)    From the value of each Account determined as of the next preceding Valuation Date, there shall be deducted the amount of all distributions and withdrawals, if any, made from the Account since the preceding Valuation Date.

(c)    The fair market value of each Investment Fund determined as of the Valuation Date by the Trustee pursuant to subsection (a) shall be adjusted by adding the amount allocated to the Investment Fund from any contribution of a Participating Employer for a year that ended prior to the Valuation Date (which contribution has not been paid to the Trust as of the Valuation Date).

(d)    The value of each Account as determined in subsection (b) above shall be adjusted pro rata so that the aggregate value of the Accounts invested in each Investment Fund equals the fair market value of the Investment Fund as adjusted in subsection (c) above.

(e)    There shall be added to the adjusted value of each Account (other than a Matching Contribution Account) determined in subsection (d) the amount of any contributions made on the Participant's behalf which were allocated to the Participant's Account during the period subsequent to the preceding Valuation Date and ending on the current Valuation Date.

(f)    To each Matching Contribution Account there shall be added all amounts allocated thereto pursuant to Sec. 16.5.

(g)    Any transfers between the various Investment Funds pursuant to Sec. 8.5 and Sec. 8.6 shall then be made and Accounts shall be adjusted accordingly.

(h)    If a Participant's Termination of Employment occurred at a time when the Participant was not 100% vested in his or her Employer Contribution Accounts, the unvested portion of the respective Account which is treated as a Forfeiture pursuant to Sec. 9.2 shall be allocated to a separate sub-account which shall be held as part of the Participant's Account and invested as determined by the Trustee until applied pursuant to Sec. 6.5.

(i)    In the event that amounts are accumulated in the Trust Fund which are not allocable to the Accounts of particular Participants, such amounts (and any earnings on those amounts) may be applied by the Plan Administrator to restore Accounts to conform to Participant investment designations, to make other restorative allocations, or to pay expenses chargeable to the Trust Fund. Any such amounts remaining in the Trust Fund as of the last day of the Plan Year which have not been so applied shall be allocated among the Investment Funds established under Sec. 8.1 as additional investment earnings in proportion to the balance of each Investment Fund as soon as administratively feasible in the following Plan Year.

**Sec. 7.3  Participant Statements.** The Plan Administrator may from time to time issue statements to Participants advising them of the status of their Accounts, but shall not be required to do so. The issuance of such statements shall not in any way affect the rights of Participants hereunder.

**Sec. 7.4  Rollover Contributions.** With the consent of the Plan Administrator, which shall be granted in its sole discretion and only if it is certain that the amount to be transferred constitutes a Rollover Contribution, a Qualified Employee may transfer to the Trust Fund an amount that constitutes a Rollover Contribution. Notwithstanding any provisions of the Plan to the contrary, the following shall apply with respect to a Rollover Contribution:

(a)    A Rollover Account shall be established for each individual who makes a Rollover Contribution. From the date the assets of the Rollover Contribution are transferred to the Trust Fund through the first Valuation Date following such transfer, the Rollover Account shall be valued at the fair market value of said assets on the date of such transfer.

(b)    A Rollover Account shall be treated in all respects the same as an Employer Directable Contribution Account except as provided in subsection (a) above, and any references in the Plan to an Employer Directable Contribution Account shall apply equally to a Rollover Account, except that (i) no employer contributions shall ever be added to a Rollover Account, and (ii) the Participant shall always be 100% vested in the Rollover Account.

-36-

(c)     The individual shall be treated the same as a Participant hereunder from the time of the transfer, but shall not actually be a Participant and shall not be eligible to receive an allocation of employer contributions until he or she has satisfied the requirements of Article IV.

(d)     For purposes of this section, "Rollover Contribution" means a contribution of an amount which may be rolled over to this Plan pursuant to Code section 401(a)(31), 402(c), 403(a)(4), or 408(d)(3), or pursuant to Code section 403(b)(8) or 457(e)(16). However, no Rollover Contribution will be permitted to this Plan to the extent it consists of amounts attributable to after-tax contributions, regardless of the provisions of Code section 402(c)(2), or amounts held in an individual retirement account or individual retirement annuity which does not meet the requirements for being a "conduit IRA" as in effect on December 31, 2001.

**Sec. 7.5  Transfers from Other Plans.**  With the consent of the Plan Administrator, which shall be granted in its sole discretion and only if it determines that the transfer is consistent with the provisions of the Code, the Plan may accept a direct transfer from another plan of assets credited to a Qualified Employee under such other plan (provided such plan is a qualified plan under Code Section 401 to which the survivor annuity requirements of Code Section 401(a)(11) do not apply).

(a)     Any assets so received that are attributable to employer contributions (other than under Code Section 401(k)) shall be placed in a Rollover Account for the individual, any assets attributable to employer contributions made pursuant to an employee's salary deferral election under Code Section 401(k) shall be placed in the individual's Salary Deferral Account, and any assets attributable to employee after-tax contributions shall be placed in an Employee After-Tax Contribution Account. Thereafter, the assets transferred shall be treated in all respects as the corresponding type of contributions under this Plan. However, no additional contributions shall ever be credited to any Rollover Account established under this section, and Sec. 10.7(b) shall apply to any such Rollover Account.

(b)     The individual shall be treated the same as a Participant from the time of the transfer, but shall not be eligible to share in employer contributions until he or she actually becomes a Participant by satisfying the requirements of Article IV.

EXHIBIT A PART 2

## ARTICLE VIII

### INVESTMENT OF FUNDS

**Sec. 8.1 Description of Funds.** The Employee Benefit Review Committee shall from time to time establish Investment Funds for the investment of contributions by Participants and Participating Employers described in Articles IV and V. The types of Investment Funds are described in subsections (a) through (f) of this section. The Plan may offer more than one fund of the types described in subsection (a), (b), (c) or (d), or may offer no funds of the type described in a particular one of such subsections. Investment directions by Participants will be subject to such rules, procedures and limits as may be established by the Plan Administrator from time to time.

(a) Fixed Income Funds. Each Fixed Income Fund shall be invested primarily in bonds, debentures, bills, notes, certificates of indebtedness, acceptances, commercial paper, variable payment master notes, government securities, contracts for deed, and similar investments of a fixed-income type (excluding any securities or obligations of any Participating Employer or any trade or business entity directly or indirectly controlling, controlled by, or under Common Control with a Participating Employer); part interest in any of the foregoing; and savings accounts, savings certificates, and similar instruments or accounts bearing a reasonable rate of interest available through the Trustee in its banking capacity.

(b) Equity Funds. Each Equity Fund shall consist primarily of equity investments, including any property, real or personal, or part interest therein, including, but without being limited to, shares of common and preferred stocks, interests in gas or oil properties, and royalty and similar interests in property; governmental, corporate, or personal obligations, trust and participation certificates, leaseholds, fee titles, mortgages, and other interests in improved or unimproved realty; notes and other evidences of indebtedness or ownership, secured or unsecured (excluding any securities or obligations of any Participating Employer or any trade or business entity directly or indirectly controlling, controlled by or under Common Control with a Participating Employer). It is intended that each Equity Fund shall be invested predominantly in equities, including as equities securities with rights to convert into or purchase or subscribe for common stock or other equity interests, and may be invested up to 100% in equities.

(c) Money Market Funds. Each Money Market Fund shall be invested primarily in bonds, notes, and other evidences of indebtedness (including government securities, commercial paper, certificates of deposit, and master notes or variable amount notes) that are payable on demand or have a relatively short maturity (excluding any securities or obligations of any Participating Employer or any trade or business entity directly or indirectly controlling, controlled by, or under Common Control with a Participating Employer); savings accounts, savings certificates and similar instruments or accounts bearing a reasonable rate of interest available through the Trustee in its banking capacity; or any contract or contracts with one or more insurance companies pursuant to which funds of the Trust are transferred to the insurance company and invested by it and under which the insurance company pays a guaranteed minimum rate of return.

(d) Balanced Funds. Each Balanced Fund shall be invested in a balanced portfolio of fixed income and equity securities. Each Balanced Fund shall seek to provide a combination of current income and capital appreciation by diversifying investment of assets among stocks,

bonds and other fixed income instruments through investment in several equity and fixed income investment styles. Each Balanced Fund will blend a combination of fixed-income funds, equity funds and money market funds. The blending of different equity styles is intended to reduce the price and return volatility of the equity portion whereas the blending of different fixed income investment styles is intended to reduce the risk associated with relying on a single fixed income investment style. The base allocation among investment styles for each Balanced Fund may differ. As market values of the assets in a Balanced Fund change, the percentage of assets invested in any style may temporarily deviate from the base allocations.

(e)     Company Stock Fund. The Company Stock Fund shall consist primarily of shares of Company Stock. Investment in such shares shall be made from time to time by the Trustee through brokers or by purchase from securities dealers or by private purchase from the Company or other seller at such prices and in such amounts as the Trustee may determine in its absolute and uncontrolled discretion; provided, however, that no commissions may be charged to the Plan for the private purchase of such shares, and no private purchase of shares of Company Stock shall be made at a total cost greater than the total cost of purchasing such shares on the New York Stock Exchange at the closing price on the date of such private purchase or, if shares of Company Stock are not traded on such date, the next previous date on which such shares are traded. Any rights, warrants, or options issued with respect to Company Stock held in the Trust Fund shall be exercised or sold as the Trustee may determine. The Trustee may, in its discretion, limit the daily volume of its purchases or sales of shares of Company Stock to the extent such action is deemed by it to be in the best interest of the Participants.

(1)     Contributions under the Plan by Participating Employers may consist of shares of Company Stock valued at the closing price thereof on the New York Stock Exchange on the date of delivery of such shares to the Trustee or, if shares of Company Stock are not traded on such date, the next previous date on which shares of Company Stock are traded. Shares of Company Stock contributed by the Company may either be authorized but previously unissued shares or shares held by the Company as treasury shares.

(2)     It is contemplated that from time to time the Trustee may hold funds in the Company Stock Fund temporarily awaiting investment in shares of Company Stock. Such funds may, pending such investment, be invested in short term securities issued or guaranteed by the United States of America or any agency or instrumentality thereof, or any other investment of a short term nature, including collective funds, mutual funds, corporate obligations or participations therein.

(3)     Commencing January 1, 2001, the "closing price" for purposes of this subsection (e) is the closing price on the New York Stock Exchange only on the relevant trading date.

(4)     Notwithstanding anything in the Plan to the contrary, the Trustee may account for the Fund in terms of units rather than in terms of shares of stock and interests in other investments held in the Fund.

(f)    ESOP Fund. Amounts allocated to Matching Contribution Accounts pursuant to Sec. 16.5 shall initially be held in the ESOP Fund, which is a separate Investment Fund but is subject to the provisions of subsection (e).

(g)    Any of the Investment Funds described in subsections (a), (b), (c) and (d) may be maintained through investment in any common or collective fund maintained by the Trustee for the investment of funds of qualified retirement plans which has the appropriate investment objectives.

(h)    The Employee Benefit Review Committee may at any time establish new Investment Funds, terminate, suspend, merge or consolidate existing Funds, change the specific categories of investments held in an Investment Fund, or take any other action necessary for the operation and administration of Investment Funds. If additional Investment Funds are created within a category as replacements of one or more existing Investment Funds, the assets of the existing Funds and future contributions to such Funds shall be divided equally among the new Funds unless the Employee Benefit Review Committee establishes a different allocation or the Participant selects a different investment designation pursuant to Sections 8.4 and 8.5. If an Investment Fund is eliminated, the Employee Benefit Review Committee shall determine the disposition of its assets, subject to Participant investment designations under Sections 8.4 and 8.5.

Sec. 8.2 **Reinvestment.** Income on and proceeds of sales of investments of each Investment Fund shall be reinvested by the Trustee in the same Fund, except to the extent that dividends paid on Company Stock in the Company Stock Fund or the ESOP Fund are paid directly to Participants or their beneficiaries pursuant to Sec. 10.18 hereof.

Sec. 8.3 **Uninvested Cash.** The Trustee may, in its discretion maintain in cash, without obligation to credit interest thereon, such part of the assets of each Investment Fund as it considers necessary or desirable for the proper administration of such Fund and may deposit any uninvested funds with itself or other banks.

Sec. 8.4 **Investment Fund Designations.** Amounts allocated to a Participant's Accounts, other than any Matching Contribution Account or Wells Fargo Share Award Account, shall be invested in one or more of the Investment Funds pursuant to the Participant's direction. A Participant may direct that 100% of such contributions be invested in any one of said Funds, or may direct that such contributions be apportioned between two or more Funds in multiples of 1%. Each Qualified Employee as a part of the application for participation shall designate the allocation applicable to such contributions to be made on his or her behalf.

Sec. 8.5 **Change in Investment Fund Designation.** Effective as of any payroll date, an Active Participant may change the designation of the Investment Funds in which future contributions on his or her behalf (other than amounts allocated to a Matching Contribution Account or Wells Fargo Share Award Account) shall be invested. The new designation must be from among those described in Sec. 8.4, and the apportionment between the Investment Funds shall be in multiples of 1%.

Effective as of any Valuation Date, a Participant may also direct that all or part of the funds held in his or her Accounts (other than a Matching Contribution Account or Wells Fargo Share Award Account, or amounts outstanding as a loan to the Participant) which are invested in any of the Investment Funds shall be transferred to one or more of said Funds.

Any direction by the Participant under this section must be received by and on record with the Plan Administrator or its agent prior to the cut-off date and time established by the Plan Administrator for the effective date of the direction.

**Sec. 8.6 ESOP Diversification.** Participants may elect to change the investment of Company Stock held in their Matching Contribution Accounts and Wells Fargo Share Award Accounts pursuant to the following:

(a)   Each Participant may elect that all or a portion of the Company Stock held in the Participant's Matching Contribution Account shall instead be invested in Investment Funds other than the ESOP Fund. In the case of Company Stock allocated to that Account on December 31, 2005, such an election may be effective as of a Valuation Date occurring as soon as administratively feasible after January 1, 2006, or any subsequent Valuation Date. In the case of Company Stock allocated to that Account on a date on or after January 1, 2006, such an election may be effective as of a Valuation Date that occurs as soon as administratively feasible after the date the Company Stock is allocated to or acquired by the Account or as of any subsequent Valuation Date. After any such election has been implemented, the Participant may thereafter elect to change the investment of that portion of the Account to any other Investment Fund, including the Company Stock Fund, pursuant to Sec. 8.5 and such rules as the Plan Administrator may establish from time to time.

(b)   Each qualified Participant may elect that all or a portion of the Company Stock held in the Participant's Wells Fargo Share Award Account shall instead be invested in Investment Funds other than the Company Stock Fund. An individual is a "qualified Participant" eligible to make such an election only if the individual either (i) has attained age 55, or (ii) has certified to the Plan Administrator in writing, including such information as the Plan Administrator may reasonably require, that the investment or continued investment of the Participant's Wells Fargo Share Award Account in Company Stock would result in serious adverse consequences to the Participant or a member of the Participant's immediate family as a result of a prohibition on the direct or indirect investment by or on behalf of the Participant in Company Stock under the provisions of a federal law, rule or regulation and the interpretation of such federal law, rule or regulation. Any certification under clause (ii) of the previous sentence shall apply to the investment of the Participant's entire Wells Fargo Share Award Account and to the investment of all amounts that are to be allocated to that Account in the future until the Participant files with the Plan Administrator a certification that such prohibition no longer applies. After any such election has been implemented, the Participant may thereafter elect to change the investment of that portion of the Wells Fargo Share Award Account to any other Investment Fund, pursuant to Sec. 8.5 and such rules as the Plan Administrator may establish from time to time.

(c)   Elections under this section shall be made as provided in Sec. 8.5. However, a separate record of such elections shall be made by the Participant under procedures established by the Plan Administrator.

**Sec. 8.7 Voting of Company Common Stock.** Before each annual or special meeting of the stockholders of the Company, the Plan Administrator shall cause to be sent to each Participant a copy of the proxy solicitation material therefor, together with a form requesting confidential instructions to be sent to a third party designated by the Plan Administrator (which may but need not be the Trustee) on

-41-

how the Trustee is to vote the shares of Company Stock held in the Trust Fund. Instructions received from Participants shall be held in the strictest confidence and shall not be divulged or released to any person, including officers or employees of the Company.

The Trustee shall vote all shares of Company Stock held in the Company Stock Fund, the ESOP Fund and the Unallocated Reserve in proportion to "votes" cast by Participants, as follows:

(a) The number of votes the Participant may cast shall be the total number of shares allocated to the Participant's Accounts in the Company Stock Fund and the ESOP Fund.

(b) The Trustee shall determine the number of votes for and against each proposition and shall vote, in person or by proxy, all of the shares of Company Stock held in the Company Stock Fund, the ESOP Fund and the Unallocated Reserve in proportion to the votes received.

The determinations in (a) shall be as of a Valuation Date selected by the Plan Administrator which is not more than 90 days preceding the record date for the meeting. It is intended that by reason of the foregoing provisions, unallocated shares held in the Unallocated Reserve, and allocated shares held for the benefit of Participants who do not give voting instructions, will be voted by the Trustee in proportion to the instructions actually received. Any non-voting shares of Company Stock held in the Trust Fund shall be disregarded for purposes of applying this section.

**Sec. 8.8 Tender or Exchange Offers Regarding Company Stock.** As soon as practicable after the commencement of a tender or exchange offer (an "Offer") for shares of Company Stock, the Plan Administrator shall use its best efforts to cause each Participant to be advised in writing of the terms of the Offer, and to be provided with forms which the Participant may return to a third party designated by the Plan Administrator (which may or may not be the Trustee) instructing the Trustee, or revoking such instruction, to tender or exchange shares of Company Stock, to the extent permitted under the terms of such Offer. The Trustee shall follow the directions of each Participant. In advising Participants of the terms of the Offer, the Plan Administrator may include statements from the Board setting forth its position with respect to the Offer. The giving of instructions by a Participant to tender or exchange shares and the tender or exchange thereof shall not be deemed a withdrawal or suspension from the Plan solely by reason of the giving of such instructions and the Trustee's compliance therewith. Instructions by Participants pursuant to this section shall apply both to allocated shares held in the Company Stock Fund and ESOP Fund and to unallocated shares held in the Unallocated Reserve. The number of shares as to which a Participant may provide instructions shall be determined as follows:

(a) The Participant may provide instructions on the offer with respect to the total number of shares of Company Stock allocated to the Participant's Accounts in the Company Stock Fund and the ESOP Fund. If the Participant directs tender or exchange of the shares for which the Participant may provide instructions, the Trustee shall follow that instruction. The Trustee shall not tender or exchange the shares for which a Participant may provide instructions if the Participant (i) directs against their tender or exchange or (ii) gives no direction.

(b) Said determination shall be as of the close of business on the day preceding the date on which the Offer is commenced or such earlier date as shall be designated by the Plan Administrator as the Plan Administrator, in its sole discretion, deems appropriate for reasons of administrative convenience. Any securities received by the Trustee as a result of a tender or exchange of shares of Company Stock shall be held, and any cash so received shall be

-42-

invested, in short-term investments pending any reinvestment by the Trustee, as it may deem appropriate, consistent with the purposes of the Plan.

**Sec. 8.9 Certain Administrative Matters.** Notwithstanding anything in the Plan to the contrary:

(a)     The Plan Administrator may establish rules and procedures delaying the effective date of investment elections, loans, withdrawals while employed, distributions or other transactions, or establishing blackout periods during which such elections or transactions will not be processed, as the Plan Administrator determines is advisable for the administration of the Plan; provided, however, that no such delay or blackout period may exceed any maximum period permitted under any applicable regulations, and will be preceded by any required notice to affected persons.

(b)     If the Plan Administrator determines that one or more Participants or Beneficiaries have been engaging in, or could engage in, investment transactions which are having, or could potentially have, an adverse impact on other Participants or on the Plan as a whole, the Plan Administrator may in its sole discretion establish rules and procedures to restrict or preclude such transactions, including but not limited to delaying the implementation of investment elections, limiting the dollar amount of permitted transactions, restricting the number of elections that can be made within a specified period, or requiring that elections be made a certain period prior to the occurrence of specified events. Any such rules and procedures may apply to all Participants and Beneficiaries, to specific groups of individuals, or to individuals who engage in particular types of transactions.

## ARTICLE IX

### BENEFIT REQUIREMENTS

**Sec. 9.1 Benefit Upon Retirement or Disability.** Each Participant shall become 100% vested if the Participant either (i) attains Normal Retirement Age while employed by a Participating Employer or an Affiliate, or (ii) is determined to have incurred a Disability while employed by a Participating Employer or an Affiliate. If a Participant's Termination of Employment occurs (for a reason other than death) on or after the date the Participant attains Normal Retirement Age, or as a result of the Participant's Disability, the Participant shall be entitled to a benefit equal to 100% of the value of all of his or her Accounts. Benefits under this section shall be paid at the times and in the manner determined under Article X.

**Sec. 9.2 Other Termination of Employment.** If a Participant's Termination of Employment occurs (for any reason other than death) and the Participant is not entitled to a benefit under Sec. 9.1, the Participant shall be entitled to a benefit equal to 100% of the value of his or her Employee After-Tax Contribution Account and Salary Deferral Account and also a benefit equal to the vested percentage of the value of the Participant's Employer Contribution Accounts, subject to the following:

(a)     If no withdrawals have been made by the Participant from Employer Contribution Accounts pursuant to Article X, the vested portion of said Accounts shall be the vested percentage determined according to the number of the Participant's years of Vesting Service prior to the Termination of Employment, as follows:

| Full Years of Vesting Service | Vested Percentage |
|---|---|
| Less than 1 year | 0% |
| 1 but less than 2 years | 25% |
| 2 but less than 3 years | 50% |
| 3 but less than 4 years | 75% |
| 4 years or more | 100% |

Notwithstanding the foregoing:

(1)     If the Participant was employed on December 31, 1990 by the Company or by an entity that was a Participating Employer or an Affiliate on that date, or if the Participant's Termination of Employment occurred after 1986 and prior to 1991, the vested percentage shall be 100%.

(2)     A Frozen Transferred Account containing employer contributions will be subject to the above vesting schedule unless otherwise provided in the applicable Appendix. However, the Participant's vested percentage in a Frozen Transferred Account shall not be less than the vested percentage that would have been determined under the provisions of the merged plan from which the Frozen Transferred Account originated as in effect immediately prior to the merger had such provisions continued in effect.

(3)     If the Participant (i) was employed on June 30, 1999 on a payroll that covered a location that was a Wells Fargo & Company location on the closing date of the merger of Norwest Corporation and Wells Fargo & Company, and (ii) was in a job

-44-

classification that was considered an "eligible employee" classification under the Wells Fargo and Company Tax Advantage and Retirement Plan on June 30, 1999, the vested percentage shall be 100% (except as otherwise provided in the applicable Appendix for a Frozen Transferred Account that was a "Retirement Account" under the Wells Fargo & Company Tax Advantage and Retirement Plan).

(4)     The vested portion of the Participant's Wells Fargo Share Award Account shall be the vested percentage determined according to the number of the Participant's years of Vesting Service prior to the Termination of Employment, as follows:

| Full Years of Vesting Service | Vested Percentage |
|---|---|
| Less than 5 years | 0% |
| 5 years or more | 100% |

(b)     If the Participant has made one or more withdrawals from Employer Contribution Accounts pursuant to Article X, the vested portion of the respective Account shall be determined as follows:

(1)     There shall be added to the value of the Account the aggregate amount of withdrawals made from that Account.

(2)     The amount determined under paragraph (1) shall be multiplied by the vested percentage determined in subsection (a).

(3)     The amount determined under paragraph (2) shall be reduced by the amount added to the value of the Account under paragraph (1). The result (but not less than zero in any case) shall be the vested portion of the Account.

(c)     The portion of each Employer Contribution Account that is not vested shall be designated as a Forfeiture amount as of the Valuation Date coincident with or next following the Termination of Employment, as provided in Sec. 7.2. The sub-account of each Account holding the Forfeiture amount shall become a Forfeiture on the Valuation Date coincident with or next following the earlier of (i) the date the Participant's entire vested benefit has been distributed, or (ii) the first day of the calendar quarter beginning after the date the Participant incurs a break in service as defined in subsection (e). The Forfeiture shall then be applied either to reinstate Accounts pursuant to subsection (d)(2)(A) of this section, or else as a credit against Employer Matching Contributions for the year in which the Forfeiture occurred as provided in Sec. 6.5. This subsection applies to all amounts that become Forfeitures on or after January 1, 2003, including amounts becoming Forfeitures on that date pursuant to the prior version of this subsection.

(d)     If the Participant is reemployed and completes an Hour of Service before a break in service as defined in subsection (e) occurs, the respective Forfeiture amount shall be reinstated as a separate Employer Directable Contribution Account, Matching Contribution Account and/or Wells Fargo Share Award Account (corresponding to the original source of the Forfeiture amount) to which the Participant shall be entitled in accordance with the provisions of this Article IX upon a subsequent Termination of Employment.

-45-

(1)   The reinstatement shall occur as soon as reasonably possible after the individual becomes a Participant again pursuant to Sec. 4.1(c), but not later than as of the December 31st Valuation Date for the calendar year in which the Participant completed the Hour of Service after the reemployment. If the Forfeiture amount has become a Forfeiture under subsection (c), the amount of the reinstatement shall be equal to the Forfeiture amount as of the January 1 on which it became a Forfeiture. Otherwise, the separate sub-account shall be reinstated to the Participant.

(2)   The amount required for the reinstatement of a forfeited amount pursuant to this subsection shall be provided from the following sources in the priority indicated:

   (A)   Amounts which have become Forfeitures under subsection (c) and which are available to be allocated on the date the reinstatement is to occur.

   (B)   Additional contributions by the Participant's present Participating Employer, in amounts specified by the Plan Administrator.

(3)   If the Participant is not 100% vested in such Accounts upon the subsequent Termination of Employment, the benefit to which he or she shall be entitled therefrom shall be determined as of the Valuation Date coincident with or next following such Termination of Employment, as follows:

   (A)   To the value of the Account determined as of said Valuation Date there shall be added the amount of the benefit from the respective prior Account to which the Participant became entitled as a result of the prior Termination of Employment valued as of the Valuation Date coincident with or next following that Termination of Employment.

   (B)   The applicable vested percentage from subsection (a) shall be applied to such sum.

   (C)   From the result obtained in (B), there shall be subtracted the amount added in (A).

(e)   For purposes of this section, a "break in service" means a period of at least 60 months duration ending on or after January 1, 1985 which meets the requirements of Sec. 3.3(d)(1) and (2).

(f)   The benefit under this section shall be paid at the times and in the manner determined under Article X.

Sec. 9.3 **Death.** If a Participant's Termination of Employment is the result of the Participant's death, the Beneficiary shall be entitled to a benefit equal to 100% of the value of all of the Participant's Accounts. If a Participant's death occurs after Termination of Employment, the Beneficiary shall be entitled to whatever benefit the Participant would have been entitled to receive if the Participant had lived. Such benefits shall be paid at the times and in the manner determined under Article X.

**Sec. 9.4 Loans to Participants.** The Plan Administrator may authorize a loan to a Participant who is an employee of a Participating Employer or an Affiliate and who makes application therefor. Each loan shall be subject to the following provisions:

(a)    The amount of any loan to a Participant, when added to the outstanding balance of all other loans to the Participant under this Plan on the date the loan is made, shall not exceed the smaller of:

(1)    $50,000 reduced by the outstanding balance on all loans to the Participant under all related plans on the date the loan is made, and also by the difference between (i) the highest outstanding loan balance under this Plan and all related plans during the 1-year period ending on the day before the date on which the loan is made, and (ii) the outstanding loan balance under this Plan and all related plans on the date the loan is made, or

(2)    50% of the amount to which the Participant would be entitled from this Plan in the event his or her Termination of Employment were to occur on the date the loan is made.

For the purpose of this section, a related plan is any "qualified employer plan", as defined in Code Section 72(p)(3), sponsored by the Company or any related employer, determined according to Code Section 72(p)(2)(C).

(b)    The minimum amount a Participant may borrow in any loan is $500.

(c)    Each loan shall be evidenced by the Participant's promissory note payable to the order of the Trustee. Each loan shall be adequately secured as determined by the Plan Administrator. A loan shall be considered adequately secured whenever the outstanding balance does not exceed the amount to which the Participant would be entitled in the event of his or her Termination of Employment.

(d)    The Plan Administrator shall determine the rate of interest to be paid with respect to each loan, which shall be a reasonable rate of interest within the meaning of Code Section 4975.

(e)    Each loan shall provide for payment of principal and interest in equal installments over whichever of the following periods applies:

(1)    Except as provided in paragraph (2), each loan shall be for a stated term determined by agreement of the Participant and the Plan Administrator which shall not exceed five years from the date the loan is made. If the first installment payment is due within two months after the date the loan was made, the five-year repayment period will be measured from the due date of that first payment.

(2)    If a loan is used to acquire any dwelling unit which within a reasonable time is to be used as the principal residence of the Participant, the maximum term shall be 20 years from the due date for the first payment on the loan.

-47-

(3)   Notwithstanding the foregoing provisions of this subsection, loans made from this Plan prior to January 1, 1996, and any loans from plans of employers listed in Sec. 14.8 which have been merged into this Plan that were made prior to the merger date, may continue to be repaid according to the original payment schedule.

A maximum of two loans may be outstanding to a Participant at any time, no more than one of which may be a principal residence loan under paragraph (2). No more than two loans may be received by the Participant during any calendar year.

(f)   A loan made to a Participant under this section shall be deemed to be effective on the date that the loan proceeds are issued to the Participant from the Trust. Loans will be repaid through payroll deductions beginning with the pay period following the effective date of the loan and continuing in each pay period through the term of the loan until paid in full according to the terms of the loan note agreement. The Participant may make a partial prepayment or a lump sum total prepayment of an outstanding loan at any time by personal check, cashiers check or other means of payment acceptable to the Trustee.

(1)   After a Participant ceases to be an employee of a Participating Employer due to Termination of Employment or death, a loan made prior to January 1, 1996 will be due and payable in accordance with the original payment schedule, and a loan made on or after January 1, 1996 will be due and payable 90 days after the Termination of Employment or death occurred. In the event the Participant's salary on any payroll date is not sufficient to make a required loan payment, the Participant shall make the required loan payment, or the balance of such payment, directly to the Trustee. Notwithstanding the foregoing, if an individual ceases to be an employee of a Participating Employer as a result of the sale or discontinuance of some or all of the operations of such employer, or as a result of the sale of the Company's interest (direct or indirect) in such Participating Employer, and if the Plan Administrator determines that the individual is not eligible to receive a distribution of his or her Plan benefit under the applicable law, regulations or IRS rulings, any outstanding loan to the individual shall not become due and payable as provided in this paragraph until the date the Plan Administrator determines that the individual has become eligible to receive a distribution of his or her benefit; provided the individual continues to make the required loan payments as originally scheduled by delivering each payment directly to the Trustee.

(2)   If any loan payment due under the provisions of this subsection is not made within 90 days after the date it is due, the entire loan will be declared to be in default, and the Participant will be deemed to have received a distribution of the loan for tax purposes. Foreclosure on the note and application of the Participant's Accounts to satisfy the note will not occur until the earliest date on which the Participant or Beneficiary is eligible to receive payment of benefits under the Plan. A default authorizes the Trustee to treat the Participant as having received an actual distribution of the note from the Plan on the earliest date thereafter on which such a distribution is permitted consistent with Sec. 9.4(g) and Article X.

(3)   After a loan has been declared in default under Sec. 9.4(f)(2) but prior to the date foreclosure on the note and application of the Participant's Accounts to satisfy the note occurs, the outstanding principal and accrued interest on the loan may be repaid in full in a lump sum, but partial repayments are not allowed.

-48-

(4)    Notwithstanding anything in this section to the contrary, the amount of the repayment due on each payroll date occurring on or after January 1, 2006 for any loan outstanding on that date will be adjusted to reflect the change from semi-monthly to bi-weekly payroll periods; provided, however, that the final payment of the loan under the adjusted repayment schedule shall occur on or before the due date for the final payment under the original schedule.

(g)    If a loan to a Participant is outstanding on the date the Participant becomes entitled to a distribution from the Trust Fund with respect to the portion of the Participant's Account or Accounts attributable to the loan, the balance of the loan, or a portion thereof equal to the amount to be distributed, if less, shall on such date become due and payable. The portion of the loan due and payable shall be satisfied by offsetting such amount against the amount to be distributed to the Participant. Alternatively, the Plan Administrator may in its discretion direct that the portion of the Participant's Account or Accounts equal to the outstanding balance on the loan be distributed in kind by distribution of the Participant's note.

(h)    If a loan to a Participant is outstanding at the time of the Participant's death, and if the loan is not repaid by the Participant's executor or administrator, the note shall be distributed in kind to the Participant's Beneficiary.

(i)    The Plan Administrator shall direct the Trustee with respect to the making of loans to Participants, the collection thereof, and all other matters pertaining thereto, and the Trustee shall follow such directions to the extent possible and shall not take any independent action with respect to such loans. The Trustee shall have no responsibility whatsoever with respect to loans to Participants except to follow the directions of the Plan Administrator to the extent possible.

(j)    In accordance with the foregoing standards and requirements, loans shall be available to all Participants on a reasonably equivalent basis.

(k)    All loans shall be governed by such rules and regulations as the Plan Administrator may adopt, including any written rules governing loans which are necessary to comply with federal regulations and which shall be deemed to be incorporated in the Plan by this reference. Applications for loans shall be made in such form and pursuant to such procedures as the Plan Administrator may establish from time to time.

(l)    The Plan Administrator shall cause to be furnished to any Participant receiving a loan any information required to be furnished pursuant to the Federal Truth In Lending Act, if applicable, or pursuant to any other applicable law.

(m)    Loans shall be made from the Participant's Accounts in the following order of priority:

(1)    The Participant's Salary Deferral Account (formerly known as the Pay Conversion Contribution Account).

(2)    The Participant's Rollover Account.

(3)    The Participant's Employer Directable Contribution Account.

-49-

    (4)    The Participant's Matching Contribution Account.

    (5)    The Participant's Wells Fargo Share Award Account.

(6)    The Participant's Employee After-Tax Contribution Account, in the following order:

    (A)    Pre-1987 employee after-tax contributions and earnings on such contributions (pro rata between contributions and earnings).

    (B)    Post-1986 employee after-tax contributions and earnings on such contributions (pro rata between contributions and earnings).

(7)    The Participant's Frozen Transferred Account. If a Frozen Transferred Account has multiple subaccounts, the Plan Administrator will determine the order of priority among the subaccounts.

If a Participant's Account from which a loan is to be made is invested in more than one Investment Fund, to provide the Trust Fund with cash equal to the loan principal, the investments shall be liquidated pro rata based on the investment in each Investment Fund as of the most recent Valuation Date for which the valuation has been completed.

(n)    For purposes of Sec. 7.2, the portion of a Participant's Account or Accounts represented by the outstanding loan principal shall be segregated and shall not share in the income or losses of the Trust Fund. In lieu thereof, all interest paid by the Participant on the loan shall be allocated to the Participant's Account or Accounts. The Trustee may charge to the Participant's Accounts any expenses attributable to the loan (including any loan origination or maintenance fees) and such portion of the general expenses of the Trust Fund as the Trustee determines in its discretion to be reasonable.

(o)    For purposes of the investment provisions of Article VIII, payments of principal and interest on loans shall be invested in the same manner as Salary Deferral Contributions to the Participant's Accounts, except in the case of repayments allocated to a Matching Contribution Account or Wells Fargo Share Award Account, which shall instead be reinvested in Company Stock to the extent that Company Stock held in such Account was liquidated to provide the loan principal.

(p)    For purposes of this section, Account values shall be determined as of the most recent Valuation Date for which the valuation has been completed at the time the Participant's loan request is received or as of any subsequent Valuation Date selected by the Plan Administrator in its discretion.

(q)    Solely for purposes of receiving loans under this section, a former Active Participant (or any Beneficiary of a deceased Participant) who is entitled to a benefit from the Plan, and who is a "party in interest" as defined in section 3(14) of ERISA, is considered to continue to be an employee of a Participating Employer.

## ARTICLE X

### DISTRIBUTION OF BENEFITS

**Sec. 10.1 Time and Method of Payment.** The benefit to which a Participant or Beneficiary may become entitled under Article IX shall be distributed as described in this section. Distributions may commence at any time after the Participant or Beneficiary has become entitled to a benefit.

(a)     Distributions to Participants. Participants shall receive distributions from their Accounts after Termination of Employment as follows:

(1)     Distributions from the Participant's Accounts shall be made by one or a combination of the following methods, as the Participant may select:

    (A)     Payment in a single lump sum, or in one or more partial lump sums.

    (B)     Payment in a series of annual, semi-annual, quarterly or monthly installments.

(2)     In all events, the distribution to a Participant must be made, or installments must commence, by April 1 following the later of (i) the calendar year in which the Participant attains age 70½, or (ii) the calendar year in which the Participant's Termination of Employment occurs. However, clause (ii) of the preceding sentence does not apply to any Participant who is a 5-percent owner of the Participating Employers (as defined in Code Section 416) with respect to the Plan Year ending in the calendar year in which the Participant attains age 70½.

    (A)     If the Participant's Accounts are distributed in installment payments, the minimum amount that must be distributed to the Participant for each distribution calendar year is determined under subsection (d).

    (B)     If no election has been made by the Participant by the date payments are required to begin under this paragraph (2), the Participant shall receive installments payable over a period certain, with the amount to be distributed for each distribution calendar year equal to the Participant's Account balance on the most recent Valuation Date preceding the distribution calendar year divided by the distribution period in the Uniform Lifetime Table set forth in Treasury Regulation § 1.401(a)(9)-9, using the Participant's age as of the Participant's birthday in the first distribution calendar year (as defined in subsection (d)), reduced by one for each subsequent calendar year (except as otherwise provided in subsection (m) in the case of a Frozen Transferred Account).

(b)     Distributions to Beneficiaries. Beneficiaries shall receive payment of benefits after the death of the Participant as follows:

(1)     If a Participant who has begun to receive payments in installments over a period-certain dies after the date distributions were required to commence pursuant to subsection (a)(2), the remaining payments shall be made to the Beneficiary at least as rapidly as under the method of distribution selected by the Participant. The Beneficiary may elect

to receive any payment earlier than the date it otherwise would have been paid, or to receive a full or partial lump sum distribution of the remaining vested Account balances, by submitting a request to the Plan Administrator or its agent pursuant to such procedures and prior to such deadlines as the Plan Administrator may establish. The minimum amount that must be distributed to the Beneficiary for each distribution calendar year after the year of the Participant's death is determined under subsection (d).

(2) If the Participant died while employed by a Participating Employer, or died after Termination of Employment but before the date distributions were required to commence pursuant to subsection (a)(2) (whether or not the Participant had begun to receive distributions), the Participant's remaining vested Account balances shall be distributed to the Beneficiary as follows:

    (A) The Beneficiary may elect to receive distributions in one or a combination of the following methods:

        (I) Payment in a single lump sum, or in one or more partial lump sums.

        (II) Payment in a series of annual, semi-annual, quarterly or monthly installments.

    (B) If the Beneficiary is the surviving spouse of the Participant, the Participant's Accounts shall be distributed to the Beneficiary not later than December 31st of the year containing the fifth anniversary of the Participant's death. However, distributions may extend beyond that deadline if they are in the form of installment payments over a period-certain not exceeding the Beneficiary's life expectancy, provided the spouse elects installment payments prior to that deadline and such payments begin not later than December 31st of the year in which the Participant would have reached age 70½ (or the December 31st of the year following the year in which the Participant's death occurred, if later).

    (C) If the Beneficiary is not the surviving spouse of the Participant, the Participant's Accounts shall be distributed to the Beneficiary not later than December 31st of the year containing the fifth anniversary of the Participant's death. However, if the Beneficiary is the surviving same-sex spouse or domestic partner of the Participant, distributions may extend beyond that deadline if they are in the form of installment payments over a period-certain not exceeding the Beneficiary's life expectancy, provided such payments begin not later than December 31st of the year following the year in which the Participant's death occurred.

    (D) The minimum amount that must be distributed to the Beneficiary for each distribution calendar year after the year of the Participant's death is determined under subsection (d).

(3) If a Beneficiary who survived the Participant and was receiving installment payments under Sec. 10.1(b)(1) dies before receiving all of the remaining payments, the remaining benefit shall be paid to the Beneficiary's estate in installments at least as rapidly as under the method of distribution selected by the Participant, subject to any

-52-

earlier distribution permitted or required by Sec. 10.1(b)(1), (d) and (e), and by applicable regulations.

(4)    If a Beneficiary who survived the Participant and was entitled to a benefit under Sec. 10.1(b)(2) dies before receiving the entire benefit to which the Beneficiary was entitled, the remaining benefit shall be paid to the Beneficiary's estate. If the Beneficiary was the surviving spouse of the Participant, the distribution to the Beneficiary's estate shall be completed by December 31 of the fifth calendar year following the year in which the Beneficiary's death occurred. If the Beneficiary was not the surviving spouse of the Participant, the distribution to the Beneficiary's estate shall be completed by the later of (i) December 31st of the fifth calendar year following the year in which the Participant's death occurred, or (ii) December 31st of the calendar year following the year in which the Beneficiary's death occurred

(c)    Mandatory Cash-Outs. Notwithstanding anything in subsection (a), (b) or (m) to the contrary, commencing March 28, 2005, if the total value of the Accounts of a Participant (or of a Beneficiary following the Participant's death) is $1,000 or less, the individual shall receive a lump sum payment of the individual's entire benefit as soon as administratively feasible, but in no event later than one year following the Participant's Termination of Employment (or death, if applicable).

(1)    This subsection (c) does not apply if the Participant's Termination of Employment or death occurred prior to January 1, 1998 and the Participant (or Beneficiary, where applicable) elected installment distributions on or before December 31, 1997 under the terms of the Plan in effect on that date.

(2)    In any case not described in paragraph (1), this subsection (c) applies commencing March 28, 2005 whether the Participant's Termination of Employment or death occurred before, on or after that date; provided, however, that if the Participant or Beneficiary had elected a distribution of his or her benefits prior to March 28, 2005, said distribution shall be made pursuant to the provisions of the Plan in effect prior to March 28, 2005.

(d)    Installment Distributions. If distributions are made in installments to a Participant under subsection (a) or to a Beneficiary under subsection (b)(2), the amount to be distributed each year, beginning with the first year for which payments are required to be made under subsection (a)(2) or (b)(2), must be at least equal to the quotient obtained by dividing the entire interest of the individual on the preceding December 31st by the number of years of life expectancy which remain, determined as provided in subsection (e).

(1)    Any installment method under this section shall specify the method for determining life expectancies under subsection (e). The installment method shall be irrevocable after the date payments are required to commence under subsection (a)(2) or (b)(2), except that the individual entitled to payments may thereafter elect to receive a full lump sum distribution of his or her remaining vested Account balances. A Participant who had elected installment payments may also elect to receive a partial lump sum distribution of his or her remaining vested Accounts or to increase the amount of the remaining installments. The balance remaining following a partial lump sum distribution will continue to be distributed in installments according to the

-53-

individual's existing election. An election to increase the amount of the remaining installments cannot be revoked, but subsequent elections to further increase the amount are allowed.

(2)    Prior to the date payments are required to commence under subsection (a)(2) or (b)(2), an individual who has elected installment payments may elect to increase or decrease the amount of the installments, to stop or restart installments, to change the frequency of installments, or to receive a full or partial lump sum distribution. An individual making such a change must also make any election related to the change regarding withholding of income taxes which is required by applicable regulations.

(3)    For purposes of determining the amount which must be distributed in any year, excess Salary Deferral Contributions, Excess Employer Matching Contributions and Excess Deferrals distributed in accordance with Article VI (including income on such amounts) shall be disregarded.

(4)    For purposes of this section, the "first distribution calendar year" is the year preceding the calendar year which contains the Participant's required beginning date.

(e)    Determination of Life Expectancies. For purposes of subsection (d), life expectancies are determined as follows:

(1)    If distributions to the Participant beginning with respect to the first distribution calendar year are made in installments, life expectancies used to calculate the minimum amount to be distributed during the Participant's lifetime and after the Participant's death shall be determined in accordance with the following:

    (A)    The minimum amount to be distributed during the Participant's lifetime for each distribution calendar year, beginning with the first distribution calendar year, is determined by using whichever of the following numbers is applicable:

        (I)    In the case of distributions to a Participant whose designated Beneficiary for the distribution calendar year is not solely the Participant's spouse, the number equal to the distribution period in the Uniform Lifetime Table set forth in Treasury Regulation § 1.401(a)(9)-9, using the Participant's age as of the Participant's birthday in the distribution calendar year

        (II)    In the case of distributions to a Participant whose sole designated Beneficiary for the distribution calendar year is the Participant's spouse, the number equal to the greater of (i) the distribution period in the Uniform Lifetime Table set forth in Treasury Regulation § 1.401(a)(9)-9, using the Participant's age as of the Participant's birthday in the distribution calendar year, or (ii) if the spouse is more than 10 years younger than the Participant, the number in the Joint and Last Survivor Table set forth in Treasury Regulation § 1.401(a)(9)-9, using the Participant's and spouse's attained ages as of the Participant's and spouse's birthdays in the distribution calendar year.

-54-

(B) If the Participant dies on or after the date required distributions begin and there is a designated Beneficiary for purposes of Code section 401(a)(9), the minimum amount to be distributed to the designated Beneficiary for each distribution calendar year after the year of the Participant's death is determined by using whichever of the following numbers is applicable:

    (I) In the case of distributions to a designated Beneficiary who is not the Participant's surviving spouse, the number equal to the greater of (i) the Participant's remaining life expectancy, calculated from the Single Life Table in Treasury Regulation § 1.401(a)(9)-9 using the age of the Participant in the year of death and reduced by one for each subsequent year, or (ii) the remaining life expectancy of the designated Beneficiary, calculated from the Single Life Table in Treasury Regulation § 1.401(a)(9)-9 using the age of the designated Beneficiary in the year following the year of the Participant's death and reduced by one for each subsequent year.

    (II) In the case of distributions to a designated Beneficiary who is the Participant's surviving spouse, the number equal to the greater of (i) the Participant's remaining life expectancy, calculated from the Single Life Table in Treasury Regulation § 1.401(a)(9)-9 using the age of the Participant in the year of death and reduced by one for each subsequent year, or (ii) the remaining life expectancy of the surviving spouse, calculated for each distribution calendar year after the year of the Participant's death from the Single Life Table in Treasury Regulation § 1.401(a)(9)-9 using the surviving spouse's age as of the spouse's birthday in that year; provided, that for distribution calendar years after the year of the spouse's death, the remaining life expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death and reduced by one for each subsequent calendar year.

(C) If the Participant dies on or after the date distributions begin and there is no designated Beneficiary for purposes of Code section 401(a)(9) as of September 30 of the year after the year of the Participant's death (for example, if the Beneficiary is a trust), the minimum amount to be distributed to the Beneficiary for each distribution calendar year after the year of the Participant's death is determined by using the Participant's remaining life expectancy, calculated from the Single Life Table in Treasury Regulation § 1.401(a)(9)-9 using the age of the Participant in the year of death and reduced by one for each subsequent year.

(2) If the Participant dies before the Participant's required beginning date, life expectancies for purposes of distributions to the Beneficiary shall be computed by use of the Single Life Table in Treasury Regulation § 1.401(a)(9)-9 in accordance with the following:

(A) If the Beneficiary is the Participant's surviving spouse, the remaining life expectancy of the surviving spouse is calculated for each distribution calendar year using the surviving spouse's age as of the spouse's birthday in that year; provided, that for distribution calendar years after the year of the spouse's death,

the remaining life expectancy of the surviving spouse is calculated using the age of the surviving spouse as of the spouse's birthday in the calendar year of the spouse's death and reduced by one for each subsequent calendar year.

(B) If the Beneficiary is not the Participant's surviving spouse, the remaining life expectancy of the designated Beneficiary is calculated using the age of the designated Beneficiary in the year following the year of the Participant's death and reduced by one for each subsequent year.

(f)     Requests for Distributions. The Participant (or Beneficiary, where applicable) must submit all requests or elections relating to distributions under this section to the Plan Administrator or its agent pursuant to such procedures and prior to such deadlines preceding the date on which a lump sum is to be paid, installments are to commence, or any other election is to take effect, as the Plan Administrator may establish.

(g)     Distributions from Multiple Accounts or Investment Funds. Installment distributions or partial lump sum distributions shall be withdrawn from Accounts in the order of priority specified in Sec. 10.5(b) and shall be made pro rata from the Investment Funds in which the Accounts being distributed are invested, based on the investment in each Investment Fund as of the most recent Valuation Date for which the valuation has been completed.

(h)     Beneficiaries. For purposes of this section, "designated Beneficiary" means any individual who (i) is a Beneficiary pursuant to Sec. 2.4, and (ii) is the designated beneficiary under Code section 401(a)(9) and Treasury Regulation § 1.401(a)(9)-1, Q&A-4. If more than one Beneficiary is entitled to benefits following the Participant's death, the interest of each Beneficiary shall be segregated pro rata into separate Accounts for purposes of applying this section, and this section shall thereafter be applied separately to each Beneficiary without regard to other Beneficiaries.

(i)     Compliance with Code Requirements. Notwithstanding the foregoing, distributions required by this section will be made in accordance with Code section 401(a)(9), including subparagraph (G) of that section, and the regulations thereunder. No distribution option otherwise permitted under this Plan will be available to a Participant or Beneficiary if such distribution option does not meet the requirements of Code section 401(a)(9).

(j)     Compliance with Minimum Required Distribution Regulations. With respect to distributions under this section made for calendar years beginning on or after January 1, 2003, the Plan will apply the minimum distribution requirements of Code section 401(a)(9) in accordance with the final regulations that were published on April 17, 2002, notwithstanding any provision of the Plan that may permit smaller distributions or distributions over a longer period. Notwithstanding anything in the foregoing provisions of this subsection to the contrary, nothing in this subsection in any way modifies or expands the methods of payment permitted under subsection (a) or in any way expands the provisions of subsection (b) regarding payments to Beneficiaries, and a Participant who has designated a trust as the Beneficiary shall be treated as having no designated Beneficiary following the Participant's death for purposes of determining the period over which payments will be made to the Beneficiary. Installment distributions which commenced prior to January 1, 2004 and which are at least equal to the minimum amounts required by said final regulations will not be

adjusted unless and until the recipient specifically elects to have the installments redetermined pursuant to this section as amended effective January 1, 2003.

(k) Certain Pre-1984 Elections. Notwithstanding the foregoing, distributions may be made to any Participant or Beneficiary pursuant to any designation made prior to January 1, 1984 which satisfied all the requirements of Section 242(b)(2) of the Tax Equity and Fiscal Responsibility Act of 1982, as in effect on January 1, 1984, and the regulations thereunder.

(l) Transfers Among Affiliates. Under the definition of Termination of Employment in Sec. 2.33, a Participant's transfer of employment between any combination of Participating Employers, Affiliates (whether or not such Affiliate is a Participating Employer), or Predecessor Employers is not a Termination of Employment for purposes of this Article X and will not entitle the Participant to a distribution of his or her benefit from the Plan.

(m) Special Rules for Certain Frozen Transferred Accounts. Distribution of benefits from Frozen Transferred Accounts shall be subject to the following additional requirements:

(1) If a Frozen Transferred Account attributable to a merged plan holds any assets that were transferred, directly or indirectly, from a defined benefit plan or a money purchase pension plan, and therefore is subject to the qualified joint and survivor annuity requirements of Code sections 401(a)(11) and 417, the form of distribution from that Account will comply with such requirements. In any case where such a Frozen Transferred Account is subject to the qualified joint and survivor annuity requirements, the following shall apply to distributions from that Account commencing on or after July 1, 2001, subject to any specific rules specified in the Appendix related to that Account.

   (A) The spouse of the Participant must consent to the election of any payment from a Frozen Transferred Account subject to this paragraph (1) in a form other than by purchase of a qualified joint and survivor annuity to the extent required by the Code or ERISA. The Plan Administrator will provide such notices and explanations of the qualified joint and survivor annuity and the rights of the Participant and the spouse as may be required by applicable regulations, subject to any provisions of law or regulations permitting waiver of a notice period. However, spousal consent is not required in any case where the form of distribution elected by the Participant is purchase of a qualified joint and survivor annuity.

   (B) Notwithstanding any provision of the applicable Appendix or of a merged plan to the contrary, the only forms of distribution (in addition to the methods permitted under the preceding subsections of this Sec. 10.1) available with respect to a Frozen Transferred Account subject to this paragraph (1) shall be (i) in the case of the Participant, purchase of a life-only annuity or a qualified joint and 50% survivor annuity with the Participant's spouse as the joint annuitant, and (ii) in the case of a Beneficiary who is the Participant's surviving spouse, purchase of a life-only annuity.

(2) Distributions commencing on and after July 1, 2001 from any Frozen Transferred Account which existed on January 1, 2001 and which is not described in paragraph (1)

-57-

of this subsection (m) shall be made only in the methods permitted under the preceding subsections of this Sec. 10.1, and any contrary provisions of any applicable Appendix or of a merged plan shall be disregarded.

(3)     If a Frozen Transferred Account is established on or after January 1, 2001, the Plan will make available any optional form of settlement for distributions from such Frozen Transferred Account which may be required by Code section 411(d)(6).

    (A)     The merged plan shall be automatically amended on the date it is merged into this Plan by virtue of this paragraph (3) to delete all additional optional forms of settlement that existed under the merged plan prior to the merger which are permitted to be deleted by regulations under Code section 411(d)(6). Such amendment shall be effective with respect to distributions to Participants (and to Beneficiaries of deceased Participants) commencing after the merger date.

    (B)     Commencing on the effective date determined under subparagraph (A), distributions from such a Frozen Transferred Account which meets the requirements of paragraph (1) shall be made in accordance with the provisions of this Sec. 10.1 as modified by paragraph (1), and distributions from any other such Frozen Transferred Account shall be made only in the methods permitted under the preceding subsections of this Sec. 10.1. Following said effective date, any contrary provisions of the merged plan or any applicable Appendix shall be disregarded.

(n)     Election Periods. In general, except as provided in subsection (a)(2), the distribution to a Participant shall not occur, or installments shall not commence, until at least 30 days after the Participant has been given all notices and other information required by applicable regulations. However, except in the case of a distribution from any portion of a Frozen Transferred Account that is subject to the requirements of Code sections 401(a)(11) and 417, the distribution may occur or commence less than 30 days after the notice required under Treasury Regulation §1.411(a)-11(c) and any other applicable notices are given, provided that:

(1)     The Plan Administrator clearly informs the Participant that the Participant has a right to a period of at least 30 days after receiving the notice to consider the decision of whether or not to elect a distribution (and, if applicable, a particular distribution option), and

(2)     The Participant, after receiving the notice, affirmatively elects a distribution.

In the case of a distribution from any portion of a Frozen Transferred Account that is subject to the requirements of Code sections 401(a)(11) and 417, the Participant may elect (with any applicable spousal consent) to waive the applicable 30-day periods pursuant to Code section 417(a)(7)(B) provided that the distribution occurs or commences more than seven days after the explanation is provided.

**Sec. 10.2 Form of Payment.** All distributions and withdrawals under this Article X shall be made in cash, except as follows:

(a)     The Participant (or Beneficiary following the Participant's death) may elect that distributions from the portion of the Participant's (or Beneficiary's) Accounts invested in Company Stock shall be in full shares of Company Stock, with the value of any remaining fractional share paid in cash. In the case of distributions in installments, any election under this subsection to receive Company Stock must be made prior to the date installments commence, and is irrevocable thereafter.

(b)     In kind distributions of notes pursuant to Sec. 9.4 shall occur as provided therein.

**Sec. 10.3  Accounting Following Termination of Employment.** Following the Participant's Termination of Employment, the undistributed portion of any Account shall continue to be revalued as of each Valuation Date as provided in Article VII. Distributions under Sec. 10.1 shall be based on the Account values determined as of a Valuation Date (determined under procedures established by the Plan Administrator) which is after the date the distribution request is received by the Plan Administrator or its agent, and shall be paid to the Participant as soon as reasonably possible following the completion of the valuation for that Valuation Date.

**Sec. 10.4  Reemployment.** Except as provided to the contrary in Sec. 10.1, distributions from the Trust Fund shall cease upon reemployment of a Participant in a regular position by a Participating Employer, or upon reemployment in any position with a Participating Employer or an Affiliate prior to age 59½, and shall recommence in accordance with Sec. 10.1 upon a subsequent Termination of Employment.

**Sec. 10.5  Withdrawals From Accounts While Employed—General Rules.** A Participant who is an employee of a Participating Employer or an Affiliate may request a withdrawal from his or her Accounts of any of the types of withdrawal described in Sec. 10.6 through Sec. 10.9, subject to the following:

> (a)     A request for a withdrawal while employed shall be made pursuant to applicable rules and regulations adopted by the Plan Administrator and shall be submitted to the Plan Administrator or its agent in such manner as the Plan Administrator prescribes for this purpose. A withdrawal shall be paid from the Trust Fund as soon as reasonably possible after the Participant's request based on a Valuation Date (determined under procedures established by the Plan Administrator) following the date the request is received by the Plan Administrator or its agents (referred to in this section as the "applicable Valuation Date"). For purposes of Article VII, the withdrawal shall be deemed to have been made on the applicable Valuation Date.

> (b)     Subject to any specific rules provided in Sec. 10.6 through 10.9, the amount to be withdrawn shall be charged against the Participant's various Accounts as of the applicable Valuation Date in the following order of priority:

>> (1)     Any pre-1987 employee after-tax contributions held in the Participant's Employee After-Tax Contribution Account.

>> (2)     The remaining balance in the Participant's Employee After-Tax Contribution Account, including post-1986 contributions and earnings on all contributions.

>> (3)     The Participant's Rollover Account.

    (4)    The Participant's Employer Directable Contribution Account.

    (5)    The Participant's Matching Contribution Account.

    (6)    The Participant's Wells Fargo Share Award Account.

(7)    The Participant's Salary Deferral Account.

(8)    The Participant's Frozen Transferred Account, subject to any limits specified in the Appendix relating to that Account. If a Frozen Transferred Account has multiple subaccounts, the Plan Administrator will determine the order of priority among the subaccounts.

However, no withdrawal may be made under Sections 10.6 through 10.9 (i) from the portion of any Account attributable to an outstanding loan under Sec. 9.4, or (ii) from any Account or portion of an Account that is attributable to amounts transferred to this Plan from a money purchase pension plan or a defined benefit pension plan.

(c)    There is no limit on the number of withdrawals that may be made under Sections 10.6 through 10.9, or any combination of those sections, during any calendar year or other period.

(d)    If a withdrawal is to be made from an Account that is invested in more than one Investment Fund, the amount of the withdrawal shall be made up of pro rata amounts withdrawn from each Investment Fund. Payments shall be made in cash or Company Stock, as provided in Sec. 10.2.

(e)    For purposes of this Sec. 10.5 and Sec. 10.6 through 10.9, if an individual ceases to be an employee of a Participating Employer as a result of the sale or discontinuance of some or all of the operations of such employer, or as a result of the sale of the Company's interest (direct or indirect) in such Participating Employer, and if the Plan Administrator determines that the individual is not eligible to receive a distribution of his or her Plan benefit under the applicable law, regulations or IRS rulings as a result of the termination of the individual's employment, the individual shall be deemed to continue as an "Active Participant" for purposes of making in-service withdrawals during the period while the individual continues to be employed by the applicable buyer or successor.

**Sec. 10.6 Withdrawals While Employed -- Non-Taxable.** A Participant who is an employee of a Participating Employer or an Affiliate may make a withdrawal of all or part of any pre-1987 employee after-tax contributions held in his or her Employee After-Tax Contribution Account, subject to the general rules in Sec. 10.5.

**Sec. 10.7 Withdrawals While Employed -- Regular In-Service Withdrawals.** A Participant who is an employee of a Participating Employer or an Affiliate may make a regular in-service withdrawal under this section from his or her Accounts, subject to the general rules in Sec. 10.5 and the following additional restrictions;

    (a)    No withdrawal may be made under this section from the Participant's Salary Deferral Account, or from any portion of a Frozen Transferred Account that is attributable to elective

-60-

deferrals subject to Code section 401(k) or earnings on such deferrals. In addition, no withdrawals under this section may be made from any separate Employer Contribution Account or other Account which is attributable to contributions that were used to calculate deferral percentages under Sec. 6.1 and earnings attributable to such contributions.

(b)    If the Participant has not completed five years of active participation in the Plan (measured from the most recent date on which he or she became eligible to make contributions pursuant to Article IV of the Plan), the amount that may be withdrawn from the Participant's Matching Contribution Account or Wells Fargo Share Award Account shall be limited so that immediately after the withdrawal the value of said Account is not less than the amount allocated to said Account from employer contributions received by the Trustee during the 24 months prior to the withdrawal.

   Sec. 10.8  **Withdrawals While Employed—After Age 59½.** A Participant who is an employee of a Participating Employer or an Affiliate who is age 59½ or older may make a withdrawal of all or part of his or her Accounts, subject to the general rules in Sec. 10.5.

   Sec. 10.9  **Withdrawals While Employed—Financial Hardship.** A Participant who is an employee of a Participating Employer or an Affiliate may make a withdrawal from the Participant's Accounts to meet a financial hardship, subject to the general rules in Sec. 10.5 and the following additional requirements:

   (a)    A hardship withdrawal will be permitted only if the Plan Administrator determines that both of the following requirements are met:

            (1)    The withdrawal must be made on account of one of the following reasons:

            (A)    Expenses for (or necessary to obtain) medical care that would be deductible by the Participant under section 213(d) of the Code (without regard to whether the expenses exceed 7.5% of adjusted gross income).

            (B)    Costs directly related to the purchase of the principal residence of the Participant (excluding mortgage payments).

            (C)    Payment of tuition, related educational fees, and room and board expenses, for up to the next 12 months of post-secondary education for the Participant, or for the Participant's spouse, children, or dependents (as defined in section 152 of the Code, but without regard to section 152(b)(1), (b)(2) and (d)(1)(B)).

            (D)    The need to prevent the eviction of the Participant from his or her principal residence or foreclosure on the mortgage of the Participant's principal residence.

            (E)    Expenses for the funeral or burial of the Participant's parent, spouse, child or dependent (as defined in section 152 of the Code, but without regard to section 152(d)(1)(B)).

-61-

(F)   Expenses for the repair of damage to the Participant's principal residence that would qualify for the casualty deduction under section 165 of the Code (determined without regard to whether the loss exceeds 10% of adjusted gross income).

(2)   All of the following requirements must be satisfied:

(A)   The amount of the withdrawal cannot exceed the amount of the immediate and heavy financial need of the Participant. The Plan Administrator may reasonably rely on the Participant's representation as to that amount. However, the amount of the withdrawal may include any amounts determined by the Plan Administrator to be necessary to pay any federal, state or local income taxes or penalties reasonably expected to result from the withdrawal.

(B)   The Participant must have obtained all distributions, other than hardship withdrawals, and all nontaxable loans currently available under this Plan and all other plans maintained by the employer. For purposes of this paragraph (2), "employer" includes all Participating Employers and any entity under Common Control with a Participating Employer.

(C)   The Participant's elective contributions and employee contributions under the Plan and all other qualified and nonqualified plans of deferred compensation maintained by the employer will be suspended pursuant to the terms of the plan or an otherwise legally enforceable agreement for at least six months after the receipt of the hardship distribution. In the case of any hardship withdrawal occurring on or after January 1, 2005, any dividends on Company Stock held in the Plan which are allocated to the vested portion of the Accounts of the Participant during the six-month period after the receipt of the hardship withdrawal will be distributed in cash to the Participant as provided in Sec. 10.18, notwithstanding any election by the Participant or any provision of Sec. 10.18 which would otherwise cause such dividends to be credited to the Participant's Accounts and reinvested in Company Stock.

(D)   Notwithstanding the foregoing provisions of this paragraph (2), this paragraph (2) will be satisfied if the IRS issues a regulation, revenue ruling, notice, or other document of general applicability which establishes an alternative method under which distributions will be deemed to be necessary to satisfy an immediate and heavy financial need and all of the requirements of such alternative method are met.

(b)   With respect to any such hardship withdrawal, earnings credited after December 31, 1988 to the Participant's Salary Deferral Account, or to any portion of a Frozen Transferred Account that is attributable to elective deferrals subject to Code section 401(k), cannot be withdrawn under this section. In addition, no withdrawals under this section may be made from any separate QNEC Account, Employer Contribution Account or any other Account which is attributable to contributions that were used to calculate deferral percentages under Sec. 6.1 and earnings attributable to such contributions.

-62-

**Sec. 10.10 Source of Benefits.** All benefits to which persons become entitled hereunder shall be provided only out of the Trust Fund and only to the extent that the Trust Fund is adequate therefor. No benefits are provided under the Plan except those expressly described herein.

**Sec. 10.11 Incompetent Payee.** If in the opinion of the Plan Administrator a person entitled to payments hereunder is disabled from caring for his or her affairs because of mental condition, physical condition, or age, payment due such person may be made to such person's guardian, conservator, or other legal personal representative upon furnishing the Plan Administrator with evidence satisfactory to the Plan Administrator of such status. Prior to the furnishing of such evidence, the Plan Administrator may cause payments due the person under disability to be made, for such person's use and benefit, to any person or institution then in the opinion of the Plan Administrator caring for or maintaining the person under disability. The Plan Administrator shall have no liability with respect to payments so made. The Plan Administrator shall have no duty to make inquiry as to the competence of any person entitled to receive payments hereunder.

**Sec. 10.12 Benefits May Not Be Assigned or Alienated.** Except as otherwise expressly permitted by the Plan or required by law, the interests of persons entitled to benefits under the Plan may not in any manner whatsoever be assigned or alienated, whether voluntarily or involuntarily, or directly or indirectly, subject to the following:

(a)     The Plan shall comply with the provisions of any court order entered on or after January 1, 1985 which the Plan Administrator determines is a qualified domestic relations order as defined in Code Section 414(p). Notwithstanding any provisions in the Plan to the contrary, an individual who is entitled to payments from the Plan as an "alternate payee" pursuant to a qualified domestic relations order may receive a lump sum payment from the Plan as soon as administratively feasible after the Valuation Date coincident with or next following the date of the Plan Administrator's determination that the order is a qualified domestic relations order, unless the order specifically provides that payment is to be made at a later time.

(b)     The procedures for determining whether an order is a qualified domestic relations order are contained in Exhibit I. of this Plan. Exhibit I. can be amended at any time by written action of any of the officers listed in Sec. 13.1 or by any other person to whom that responsibility has been delegated by such an officer.

(c)     Any expense related to the review of a purported qualified domestic relations order, or to the administration of such an order which has been determined to be qualified, which is not paid by the Company shall be charged against the Accounts of the Participant and/or the alternate payee. The expense shall be allocated among such Accounts in such proportions as the Plan Administrator determines in its discretion, unless an allocation of expenses between those parties is specified in the court order.

**Sec. 10.13 Payment of Taxes.** The Trustee may pay any estate, inheritance, income, or other tax, charge, or assessment attributable to any benefit payable hereunder which in the Trustee's opinion it shall be or may be required to pay out of such benefit. The Trustee may require, before making any payment, such release or other document from any taxing authority and such indemnity from the intended payee as the Trustee shall deem necessary for its protection.

**Sec. 10.14 Conditions Precedent.** No person shall be entitled to a benefit hereunder until the person's right thereto has been finally determined by the Plan Administrator nor until the person has

-63-

submitted to the Plan Administrator relevant data reasonably requested by the Plan Administrator, including, but not limited to, proof of date of birth or death.

**Sec. 10.15 Plan Administrator Directions to Trustee.** The Plan Administrator shall issue such directions to the Trustee as are necessary to accomplish distributions to the Participants and Beneficiaries in accordance with the provisions of the Plan.

**Sec. 10.16 Effect on Unemployment Compensation.** For purposes of any unemployment compensation law, a distribution hereunder in one sum attributable to an Employer Contribution Account shall be considered to be a severance payment and shall be allocated over a period of weeks equal to the one sum payment divided by the employee's regular weekly pay while employed by the Participating Employers, which period shall commence immediately following the employee's Termination of Employment.

**Sec. 10.17 Transfers and Direct Rollovers to Other Plans.** To the extent required by Code section 401(a)(31), this Sec. 10.17 applies to distributions made on or after January 1, 1993.

> (a)    Notwithstanding any provision of the Plan to the contrary that would otherwise limit a distributee's election under this section, a distributee may elect, at the time and in the manner prescribed by the Plan Administrator, to have any portion of an eligible rollover distribution paid directly to an eligible retirement plan specified by the distributee in a direct rollover.

> (b)    For purposes of this section:

>> (1)    An "eligible rollover distribution" is any distribution of all or any portion of the balance to the credit of the distributee, except that an eligible rollover distribution does not include any distribution that is one of a series of substantially equal periodic payments (not less frequently than annually) made over the life expectancy of the distributee or the joint life expectancies of the distributee and the distributee's designated beneficiary, or for a specified period of ten years or more; any distribution to the extent such distribution is required under Code Section 401(a)(9); and the portion of any distribution that is not includible in gross income (determined without regard to the exclusion for net unrealized appreciation with respect to employer securities). A distribution under Sec. 10.18(a) or (b) of any dividends subject to Code section 404(k) is not an eligible rollover distribution.

>> (A)    Any withdrawal from any of the Participant's Accounts due to financial hardship prior to age 59½ pursuant to Sec. 10.9 is not an eligible rollover distribution.

>> (B)    A portion of a distribution shall not fail to be an eligible rollover distribution merely because the portion consists of after-tax employee contributions which are not includible in gross income. However, such portion may be transferred only to an individual retirement account or annuity described in Code section 408(a) or (b), or to a qualified defined contribution plan described in Code section 401(a) or 403(a) that agrees to separately account for the amounts so transferred, including separately accounting for the portion of such distribution which is includible in gross income and the portion of such distribution which is not so includible.

-64-

(2) An "eligible retirement plan" is an individual retirement account described in Code section 408(a), an individual retirement annuity described in Code section 408(b), an annuity plan described in Code section 403(a), or a qualified trust described in Code section 401(a) with respect to a defined contribution plan, that accepts the distributee's eligible rollover distribution. An eligible retirement plan also means an annuity contract described in Code section 403(b) and an eligible plan under Code section 457(b) which is maintained by a state, a political subdivision of a state, or any agency or instrumentality of a state or political subdivision of a state, and which agrees to account separately for amounts transferred into such plan from this Plan.

(3) A "distributee" includes an employee or former employee. In addition, the employee's or former employee's surviving spouse and the employee's or former employee's spouse or former spouse who is the alternate payee under a qualified domestic relations order, as defined in Code Section 414(p), are distributees with regard to the interest of the spouse or former spouse.

(4) A "direct rollover" is a payment by the Plan to the eligible retirement plan specified by the distributee.

**Sec. 10.18 Payment of Dividends on Company Stock to Participants.** To the extent permitted by and consistent with Code section 404(k), any dividends on the Company Stock held in the Plan which are allocated to the vested portion of the Accounts of a Participant will, pursuant to the election of the Participant (i) be credited to the Participant's Accounts and reinvested in additional shares of Company Stock, or (ii) be either paid in cash to the Participant or paid to the Plan and distributed in cash to the Participant, as determined by the Plan Administrator.

(a) Pursuant to procedures established by the Plan Administrator from time to time, a Participant may file with the Plan Administrator or its designated agent an election to reinvest dividends or to receive cash payment of dividends, or to change such an election made previously, any time prior to the close of the New York Stock Exchange on the "dividend record" date for each dividend. Any such election shall remain in effect for subsequent dividends until the Participant files a different election prior to the applicable deadline.

    (1) If no such election has been filed by the Participant at any time on or prior to the record date for a particular dividend, that dividend will be credited to the Participant's Accounts and reinvested in additional shares of Company Stock; provided, however, that if such a Participant had received cash payment of any dividend prior to May 1, 2003 under the provisions of the Plan in effect prior to that date due to failure to make an election, that Participant shall be deemed to have elected to receive cash payment of future dividends until the Participant files an election to reinvest dividends pursuant to this section.

    (2) Following the Participant's death, each Beneficiary will have the same rights to elect the treatment of dividends on Company Stock allocated to the Beneficiary's Accounts as the Participant had prior to death. Any dividends allocable to the Accounts of each Beneficiary will be subject to the election (or default election) in effect on the date of the Participant's death until the Beneficiary files a new election under this section.

-65-

(b)    Any installment distributions paid to a Participant or Beneficiary which do not qualify as "eligible rollover distributions" under the first sentence of Sec. 10.17(b)(1) may be treated by the Plan Administrator as dividends paid pursuant to Code section 404(k), and any amounts so treated will be used to satisfy the minimum distribution requirements under Sec. 10.1 and Code section 401(a)(9).

(c)    Notwithstanding the foregoing:

   (1)    If the amount of a dividend that would be paid to a Participant or Beneficiary is less than $5.00, the dividend shall instead be credited to the applicable Accounts of the individual and reinvested in Company Stock.

   (2)    Any dividend that would be payable during the period between the date the Plan Administrator receives notice of a Participant's death and the date Accounts are established in the name of the Participant's Beneficiary or Beneficiaries pursuant to Sec. 10.1 shall be credited to the applicable Accounts of the Participant for reinvestment in Company Stock, and shall not be distributed pursuant to this Sec. 10.18.

(d)    Notwithstanding any of the foregoing provisions of this section to the contrary, any dividends on Company Stock held in the Plan which are allocated to the vested portion of the Accounts of the Participant during the six-month period described in Sec. 10.9(a)(2)(C) after the receipt of a hardship withdrawal will be distributed in cash to the Participant.

**Sec. 10.19 Inability to Locate Distributee.** If all or any portion of the Accounts of a Participant or Beneficiary cannot be distributed because of the inability of the Plan Administrator to determine the whereabouts of the distributee, after mailing a letter by first class mail to the last known address of the distributee, and after such further diligent efforts as the Plan Administrator determines are appropriate, and either (i) the Participant has attained age 62, has had a break in service of at least 60 months duration as described in Sec. 3.3(d), or has died, or (ii) the benefit is distributable pursuant to Sec. 10.1(c) without the consent of the distributee, or (iii) the distributee consented in writing to receive a distribution, the benefit that cannot be distributed shall be forfeited. The Forfeiture shall occur as of the last day of the calendar quarter containing the fifth anniversary of the Plan Administrator's last known contact with the distributee (or as of the date the Plan Administrator determines the distributee cannot be located, if later), and shall be applied as provided in Sec. 6.5. In the event the distributee is located after a Forfeiture has occurred under this section, the individual's Accounts shall be restored to their value on the date the Forfeiture occurred, without any investment gains or losses, interest or other adjustments for the period following the Forfeiture and prior to the date the Accounts are restored.

## ARTICLE XI

## MANAGEMENT OF FUNDS

Sec. 11.1 **Trust Fund.** All sums of money and all securities and other property contributed by the Participating Employers and employees from time to time in support of the Plan, together with all investments made therewith, the proceeds thereof and all earnings and accumulations thereon, and the part thereof from time to time remaining, shall be held and administered, without distinction between principal and income, in one or more funds herein collectively referred to as the "Trust Fund," in trust, in accordance with the terms and provisions hereof.

Sec. 11.2 **Trustee and Trust Agreement.** The Trust Fund shall be held under a trust agreement between the Company and Wells Fargo Bank, National Association, as trustee, or any successor trustee duly appointed by the Human Resources Committee. It is anticipated that a co-trustee will be appointed to carry out certain duties in connection with Company Stock acquired or held by the Plan. Said duties shall be specified in a trust agreement between the Human Resources Committee and said co-trustee. The provisions of said trust agreements shall be such as may be determined from time to time by the Human Resources Committee; provided, however, that said provisions shall not be inconsistent with the provisions of the Plan.

Sec. 11.3 **Compensation and Expenses of Trustee.** The Trustee and any co-trustee shall be entitled to receive such reasonable compensation for services as may be agreed upon with the Plan Administrator. The Trustee and any co-trustee shall also be entitled to reimbursement for all reasonable and necessary costs, expenses, and disbursements incurred by it in the performance of its services. Such compensation and reimbursements shall be paid directly by the Participating Employers in such proportions as the Plan Administrator shall determine, except to the extent that any such item of compensation or reimbursement is included in an embedded fee which the Plan Administrator determines can be properly paid directly or indirectly by the Trust Fund.

Sec. 11.4 **Funding Policy.** The Employee Benefit Review Committee shall adopt a procedure, and revise it from time to time as it shall consider advisable, for establishing and carrying out a funding policy and method consistent with the objectives of the Plan and the requirements of ERISA. It shall advise the Trustee of the funding policy in effect from time to time.

Sec. 11.5 **No Diversion.** The Trust Fund shall be for the exclusive purpose of providing benefits to Participants under the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan. Such expenses may include premiums for the bonding of Plan officials required by ERISA. No part of the corpus or income of the Trust Fund may be used for, or diverted to, purposes other than for the exclusive benefit of employees of the Participating Employers or their beneficiaries. Notwithstanding the foregoing:

> (a)    If any contribution or portion thereof is made by a Participating Employer by a mistake of fact, the Trustee shall, upon written request of the Plan Administrator, return such contribution to the Participating Employer within one year after the payment of the contribution to the Trustee. However, earnings attributable to such contribution or portion thereof shall not be returned to the Participating Employer but shall remain in the Trust Fund, and the amount returned to the Participating Employer shall be reduced by any losses attributable to such contribution or portion thereof.

(b)    Contributions by a Participating Employer are conditioned upon initial qualification of the Plan as to such Participating Employer under Code section 401(a). If the Plan receives an adverse determination letter from the Internal Revenue Service with respect to such initial qualification in response to an application for determination that was filed by the due date of the tax return of the Participating Employer for the year in which the Plan was adopted by the Participating Employer, the Trustee shall, upon written request of the Plan Administrator, return the amount of such contribution to the Participating Employer within one year after the date of denial of qualification of the Plan. For this purpose, the amount to be so returned shall be the contributions actually made, adjusted for the investment experience of, and any expenses chargeable against, the portion of the Trust Fund attributable to the contributions actually made.

(c)    Contributions by a Participating Employer are conditioned upon the deductibility of each contribution under Code Section 404. To the extent the deduction is disallowed, the Trustee shall return such contribution (to the extent disallowed) to the Participating Employer within one year after the disallowance of the deduction. However, earnings attributable to such contribution (or disallowed portion thereof) shall not be returned to the Participating Employer but shall remain in the Trust Fund, and the amount returned to the Participating Employer shall be reduced by any losses attributable to such contribution (or disallowed portion thereof).

In the case of any such return of contribution the Plan Administrator shall cause such adjustment to be made to the Accounts of Participants as it considers fair and equitable under the circumstances resulting in the return of such contribution.

## ARTICLE XII

### ADMINISTRATION OF PLAN

**Sec. 12.1 Plan Administration.** Except as expressly otherwise provided herein, the Plan Administrator shall control and manage the operation and administration of the Plan and make all decisions and determinations incident thereto. The Plan Administrator shall have sole discretionary authority to interpret and construe the terms of the Plan, to determine all factual and legal questions under the Plan, and to make any determinations required in the administration of the Plan. Action on behalf of the Plan Administrator may be taken by:

(a)    The Director of Human Resources or the Director of Compensation and Benefits of the Company.

(b)    Any person or persons, natural or otherwise, or committee to whom responsibilities for the operation and administration of the Plan are allocated by either of the officers designated in subsection (a), but action of such person or persons or committee shall be within the scope of said allocation.

**Sec. 12.2 Certain Fiduciary Provisions.** For purposes of the Plan:

(a)    Any person or group of persons may serve in more than one fiduciary capacity with respect to the Plan.

(b)    A Named Fiduciary, or a fiduciary designated by a Named Fiduciary pursuant to the provisions of the Plan, may employ one or more persons to render advice with regard to any responsibility such fiduciary has under the Plan.

(c)    To the extent permitted by an applicable trust agreement or group annuity contract, the Employee Benefit Review Committee may appoint an investment manager or managers, as defined in ERISA, to manage (including the power to acquire and dispose of) any assets of the Plan.

(d)    A person who is a fiduciary with respect to the Plan, including a Named Fiduciary, shall be recognized and treated as a fiduciary only with respect to the particular fiduciary functions as to which such person has responsibility.

(e)    A Named Fiduciary may designate persons other than Named Fiduciaries to carry out any or all of their fiduciary responsibilities; provided, however, that such designation shall not include any responsibility, if any, in a trust agreement to manage or control the assets of the Plan other than a power under the trust agreement to appoint an investment manager as defined in ERISA. Such designation shall be in writing.

Each Named Fiduciary, each other fiduciary, each person employed pursuant to subsection (b) above, and each investment manager shall be entitled to receive reasonable compensation for services rendered, or for the reimbursement of expenses properly and actually incurred in the performance of their duties with the Plan and to payment therefor from the Trust Fund if not paid directly by the Participating Employers in such proportions as the Plan Administrator shall determine. Notwithstanding the foregoing, no person so serving may receive compensation from the Plan for fiduciary services if such person, natural or

otherwise, is affiliated with the Company, and no person so serving who already receives full-time pay from any Participating Employer shall receive compensation from the Plan, except for reimbursement of expenses properly and actually incurred.

Sec. 12.3 **Discrimination Prohibited.** No person or persons in exercising discretion in the operation and administration of the Plan shall discriminate in favor of shareholders, officers, or highly compensated employees of any Participating Employer.

Sec. 12.4 **Evidence.** Evidence required of anyone under this Plan may be by certificate, affidavit, document, or other instrument which the person acting in reliance thereon considers to be pertinent and reliable and to be signed, made, or presented to the proper party.

Sec. 12.5 **Correction of Errors.** It is recognized that in the operation and administration of the Plan certain mathematical and accounting errors may be made or mistakes may arise by reason of factual errors in information supplied to the Plan Administrator or Trustee. The Plan Administrator shall have power to cause such equitable adjustments to be made to correct for such errors as the Plan Administrator in its discretion considers appropriate, including but not limited to the power to recover any overpayment from the person who received it. Such adjustments shall be final and binding on all persons.

Sec. 12.6 **Records.** Each Participating Employer, each fiduciary with respect to the Plan, and each other person performing any functions in the operation or administration of the Plan or the management or control of the assets of the Plan shall keep such records as may be necessary or appropriate in the discharge of their respective functions hereunder, including records required by ERISA or any other applicable law. Records shall be retained as long as necessary for the proper administration of the Plan and at least for any period required by said Act or other applicable law.

Sec. 12.7 **General Fiduciary Standard.** Each fiduciary shall discharge his or her duties with respect to the Plan solely in the interests of Participants and their beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

Sec. 12.8 **Prohibited Transactions.** A fiduciary with respect to the Plan shall not cause the Plan to engage in any prohibited transaction within the meaning of ERISA.

Sec. 12.9 **Claims Procedure.** The Plan shall have a claims procedure consistent with the requirements of ERISA. Such claims procedure shall provide adequate notice in writing to any Participant or beneficiary whose claim for benefits under the Plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the claimant and shall afford a reasonable opportunity to a claimant whose claim for benefits has been denied for a full and fair review by the appropriate Named Fiduciary of the decision denying the claim. The claims procedure currently in effect is contained in Exhibit II. of this Plan. Exhibit II. can be amended at any time by written action of any of the officers listed in Sec. 13.1, or by written action of any other person to whom that responsibility has been delegated by such an officer.

Sec. 12.10 **Bonding.** Plan personnel shall be bonded to the extent required by ERISA. Premiums for such bonding may, in the sole discretion of the Plan Administrator, be paid in whole or in part from the Fund. Such premiums may also be paid in whole or in part by the Participating Employers

in such proportions as the Plan Administrator shall determine. The Plan Administrator may provide by agreement with any person that the premium for required bonding shall be paid by such person.

**Sec. 12.11  Waiver of Notice.**  Any notice required hereunder may be waived by the person entitled thereto.

**Sec. 12.12  Agent For Legal Process.**  The Plan Administrator shall be the agent for service of legal process with respect to any matter concerning the Plan, unless and until the Plan Administrator designates some other person as such agent.

**Sec. 12.13  Indemnification.**  In addition to any other applicable provisions for indemnification, the Participating Employers jointly and severally agree to indemnify and hold harmless, to the extent permitted by law, each member of the governing body, each officer, and each employee of the Participating Employers against any and all liabilities, losses, costs, or expenses (including legal fees) of whatsoever kind and nature which may be imposed on, incurred by, or asserted against such person at any time by reason of such person's services as a fiduciary in connection with the Plan, but only if such person did not act dishonestly, or in bad faith, or in willful violation of the law or regulations under which such liability, loss, cost, or expense arises.

## ARTICLE XIII

## AMENDMENT, TERMINATION, MERGER

**Sec. 13.1 Amendment.** Subject to the non-diversion provisions of Sec. 11.5, the Company, by action of the Board, by action of the Human Resources Committee of the Board, or by action of a person so authorized by resolution of the Board or the Human Resources Committee, may amend the Plan at any time and from time to time. In addition, the Director of Human Resources or Director of Compensation and Benefits of the Company may execute a written action amending the Plan in any of the following respects:

> (a)    To add Appendices pursuant to Sec. 14.8 relating to eligibility, vesting and benefits of persons formerly employed by entities whose stock, assets or operations have been acquired by the Company or any of its subsidiaries.

> (b)    To merge plans of any such acquired entities into this Plan (including any incidental amendments required to accomplish such a merger) or to permit any such plans to be invested through the Master Savings Trust maintained for this Plan.

> (c)    To make changes required by the Internal Revenue Service in order to obtain favorable determination letters for the Plan.

> (d)    To make changes in administration or operation of the Plan which do not materially increase the cost of the Plan to the Company.

All such amendments shall be binding on all Participating Employers. No amendment of the Plan shall have the effect of changing the rights, duties, and liabilities of the Trustee without its written consent. Also, no amendment shall divest a Participant or Beneficiary of Accounts accrued prior to the amendment. Promptly upon adoption of any amendment to the Plan the Plan Administrator shall furnish a copy of the amendment to the Trustee. If an amendment to the Plan changes the vesting schedule of the Plan, each Participant having not less than three years of service shall be permitted to elect to have his or her vested percentage computed under the Plan without regard to such amendment. However, no election need be provided for any Participant whose vested percentage under the Plan, as amended, cannot at any time be less than the vested percentage determined without regard to such amendment.

**Sec. 13.2 Discontinuance of Joint Participation in Plan by a Participating Employer.** The Company, by written action of the Director of Human Resources or Director of Compensation and Benefits of the Company, may discontinue the joint participation in the Plan by another Participating Employer. Discontinuance of joint participation in the Plan by a Participating Employer shall also be effected if it fails to make contributions required pursuant to the provisions of the Plan, if at any time it ceases to be affiliated with the Company, if substantially all of its assets are disposed of and it discontinues active business operations, if it is adjudicated a bankrupt, or if a trustee or receiver of all of substantially all of its assets is appointed.

> (a)    If the Plan Administrator determines in its sole discretion to spin off the portion of the Plan attributable to the withdrawing employer, the Plan Administrator shall cause a determination to be made of the equitable part of the Trust Fund assets held on account of Participants of the withdrawing employer and their Beneficiaries. The Plan Administrator shall direct the Trustee to transfer assets representing such equitable part to a separate fund

for the plan of the withdrawing employer. Such withdrawing employer may thereafter exercise, in respect of such separate fund, all the rights and powers reserved to the Company with respect to the Trust Fund. The plan of the withdrawing employer shall, until amended by the withdrawing employer, continue with the same terms as the Plan herein, except that with respect to the separate plan of the withdrawing employer the words "Participating Employer", "Participating Employers", and "Company" shall thereafter be considered to refer only to the withdrawing employer. If the foregoing provisions of this subsection (a) do not apply, the Accounts of Participants of the withdrawing employer and their Beneficiaries shall continue to be held in the Plan for distribution in accordance with the provisions hereof.

(b)    Any discontinuance of participation by a Participating Employer shall be effected in such manner that each Participant or Beneficiary would (if the Plan and the plan of the withdrawing employer then terminated) receive a benefit immediately after such discontinuance of participation which is equal to or greater than the benefit he or she would have been entitled to receive immediately before such discontinuance of participation if the Plan had then terminated. No transfer of assets pursuant to this section shall be effected until such statements with respect thereto, if any, required by ERISA to be filed in advance thereof have been filed.

(c)    The foregoing provisions of this Sec. 13.2 shall not apply to the following entities:

   (1)    Norwest Business Credit, Inc. and Norwest Leasing, Inc., which ceased to be Participating Employers effective as of January 1, 1984 and became Participating Employers again effective as of January 1, 1990.

   (2)    Norwest Mortgage, Inc., which ceased to be a Participating Employer effective as of January 1, 1987 and became a Participating Employer again effective as of January 1, 1990.

   (3)    Norwest Agencies, Inc., which ceased to be a Participating Employer effective as of January 1, 1985 and became a Participating Employer again as of January 1, 1988, and has since been renamed Norwest Insurance, Inc.

An employee of any of those entities shall not be treated as a Qualified Employee under this Plan during the period his or her employer was not a Participating Employer.

(d)    Subsection (c) shall also apply to any other Participating Employers so designated from time to time by the Plan Administrator.

Sec. 13.3 **Reorganizations of Participating Employers.** In the event two or more Participating Employers are consolidated or merged or in the event one or more Participating Employers acquires the assets of another Participating Employer, the Plan shall be deemed to have continued, without termination and without a complete discontinuance of contributions, as to all the Participating Employers involved in such reorganization and their employees. In such event, in administering the Plan the corporation resulting from the consolidation, the surviving corporation in the merger, or the employer acquiring the assets shall be considered as a continuation of all of the Participating Employers involved in the reorganization.

-73-

**Sec. 13.4  Permanent Discontinuance of Contributions.**  The Company, by action of the Board, may completely discontinue contributions in support of the Plan by all Participating Employers. In such event, notwithstanding any provisions of the Plan to the contrary, no employee shall become a Participant after such discontinuance, and the Accounts of each Participant in the employ of the Participating Employers at the time of such discontinuance shall be nonforfeitable.  Subject to the foregoing, all of the provisions of the Plan shall continue in effect, and upon entitlement thereto distributions shall be made in accordance with the provisions of Article X.

**Sec. 13.5  Termination.**  The Company, by action of the Board, may terminate the Plan as applicable to all Participating Employers and their employees.  After such termination no employee shall become a Participant, and no further contributions shall be made.  The Accounts of each Participant in the employ of the Participating Employers at the time of such termination shall be nonforfeitable, and the Participant shall be entitled to a benefit equal to the value of those Accounts determined as of the Valuation Date coincident with or next following the termination of the Plan.  Forfeitures shall be allocated as though said Valuation Date were the last day of a Plan Year.  Distributions shall be made to Participants and Beneficiaries promptly after the termination of the Plan, but not before the earliest date permitted under the Code and applicable regulations and subject to the Plan Administrator's right to delay distributions until receipt of a favorable determination letter from the Internal Revenue Service with respect to the termination.  The Plan and any related trust agreement or group annuity contract shall continue in force for the purpose of making such distributions.

**Sec. 13.6  Partial Termination.**  If there is a partial termination of the Plan, either by operation of law, by amendment of the Plan, or for any other reason, which partial termination shall be confirmed by the Company, by written action of the Director of Human Resources or Director of Compensation and Benefits, the Accounts of each Participant with respect to whom the partial termination applies shall be nonforfeitable.  Subject to the foregoing, all of the provisions of the Plan shall continue in effect as to each such Participant, and upon entitlement thereto distributions shall be made in accordance with the provisions of Article X.

**Sec. 13.7  Merger, Consolidation, or Transfer of Plan Assets.**  In the case of any merger or consolidation of the Plan with any other plan, or in the case of the transfer of assets or liabilities of the Plan to any other plan, provision shall be made so that each Participant and Beneficiary would (if such other plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the Plan had then terminated).

(a)    No such merger, consolidation, or transfer shall be effected until such statements with respect thereto, if any, required by ERISA to be filed in advance thereof have been filed.

(b)    Notwithstanding any provisions of this Plan to the contrary, to the extent that any optional form of benefit under this Plan permits a distribution prior to the Participant's retirement, death, disability, or severance from employment, and prior to Plan termination, the optional form of benefit is not available with respect to benefits attributable to assets (including the post-transfer earnings thereon) and liabilities that are transferred, within the meaning of Code section 414(l), to this Plan from a money purchase pension plan qualified under Code section 401(a) (other than any portion of those assets and liabilities attributable to voluntary employee contributions.)

**Sec. 13.8 Deferral of Distributions.** Notwithstanding any provisions of the Plan to the contrary, in the case of a complete discontinuance of contributions to the Plan by a Participating Employer or of a complete or partial termination of the Plan with respect to a Participating Employer, the Plan Administrator or the Trustee may defer any distribution of benefit payments to Participants and Beneficiaries with respect to which such discontinuance or termination applies until after the following have occurred:

      (a)    Receipt of a final determination from the Treasury Department or any court of competent jurisdiction regarding the effect of such discontinuance or termination on the qualified status of the Plan under Code Section 401(a).

      (b)    Appropriate adjustment of Accounts to reflect taxes, costs, and expenses, if any, incident to such discontinuance or termination.

      **Sec. 13.9 Transfer of Certain Accounts to RELS.** This section applies to Participants who ceased to be employed by a Participating Employer and immediately thereafter became employed by RELS LLC, RELS Title Services LLC, or any similar joint venture as a result of the closing of the transactions contemplated by the agreement between The First American Financial Corporation, First American Title Insurance Company, First American Real Estate Solutions LLC and Norwest Mortgage, Inc. dated June 10, 1998, as amended, modified or supplemented. As soon as reasonably possible after the date each group of Participants transfers as described in the previous sentence, the portion of the Plan consisting of the Accounts of such Participants (whether or not such Accounts are 100% vested under Sec. 9.2) shall be spun off to the RELS Savings Plan, and the assets held in those Accounts (including any shares of Norwest Stock held for any such Account) shall be transferred to a trust established under the RELS Savings Plan. Following said spin-off, such Participants shall have no further rights to benefits from this Plan with respect to the Accounts which were so transferred, and all such benefits shall be provided under the RELS Savings Plan. The transfer of employment described in this section shall not constitute a Termination of Employment under this Plan for purposes of entitling the Participant to distribution of benefits under this Plan.

## ARTICLE XIV

### MISCELLANEOUS PROVISIONS

**Sec. 14.1 Discontinuance of Employment.** The establishment and maintenance of this Plan shall not be construed to confer any right upon any person to a continuation of employment, nor shall it interfere with the right of a Participating Employer to dismiss any employee and to treat the employee without regard to the effect such treatment might have upon his or her status under the Plan.

**Sec. 14.2 Insurance Company Not Responsible for Validity of Plan.** No insurance company that issues a contract under the Plan shall have any responsibility for the validity of the Plan. An insurance company to which an application may be submitted hereunder may accept such application and shall have no duty to make any investigation or inquiry regarding the authority of the applicant to make such application or any amendment thereto or to inquire as to whether a person on whose life any contract is to be issued is entitled to such contract under the Plan.

**Sec. 14.3 Headings.** Headings at the beginning of articles and sections hereof are for convenience of reference, shall not be considered a part of the text of the Plan, and shall not influence its construction.

**Sec. 14.4 Capitalized Definitions.** Capitalized terms used in the Plan shall have their meaning as defined in the Plan unless the context clearly indicates to the contrary.

**Sec. 14.5 Gender.** Any references to the masculine gender include the feminine and vice versa.

**Sec. 14.6 Use of Compounds of Word "Here".** Use of the words "hereof", "herein", "hereunder", or similar compounds of the word "here" shall mean and refer to the entire Plan unless the context clearly indicates to the contrary.

**Sec. 14.7 Construed as a Whole.** The provisions of the Plan shall be construed as a whole in such manner as to carry out the provisions thereof and shall not be construed separately without relation to the context.

**Sec. 14.8 Benefits Under Certain Appendices.**  The benefit of a Participant previously employed by the employers listed below shall be subject to provisions applicable to the Participant under the Appendix to this Plan that applies to that employer.  A reference in an Appendix to a provision of the Plan means the provision in effect on the date the Appendix was effective unless the Appendix has subsequently been amended to revise such cross-reference.

| Name of Employer | Effective Date of Appendix | Page |
|---|---|---|
| Norwest Bank Ottumwa, N.A. (First National Bank of Ottumwa) | January 28, 1977 | A-1 |
| Northwest Growth Fund, Inc. and Cascade Capital Corporation | April 1, 1977 | A-3 |
| Norwest Bank Fort Dodge, N.A. (First National Bank, Fort Dodge) | January 1, 1978 | A-5 |
| Norwest Bank Sioux Falls, N.A. (Northwestern National Bank of Sioux Falls, Springfield Branch) | December 15, 1979 | A-7 |
| Norwest American Bank, S.A., London Representative Office (Canadian American Bank S.A.) | January 1, 1982 | A-9 |
| Bankshares of Nebraska, Inc. (and subsidiaries) | July 1, 1984 | A-10 |
| Toy National Bank | January 1, 1988 | A-11 |
| Norwest Bank Arizona, N.A. (Ranch National Bank) | July 1, 1988 | A-12 |
| Norwest Bank Cedar Rapids, N.A. (Peoples Bank and Trust Company) | July 29, 1988 | A-13 |
| The Bank Group, Inc. and subsidiaries | July 1, 1989 | A-14 |
| Norwest Equipment Finance, Inc. (Crestwood Capital Corp. and Crestwood Financial Corp.) | January 1, 1990 | A-15 |
| First National Bank of Bellevue | January 1, 1990 | A-16 |
| First Interstate Corporation of Wisconsin (and subsidiaries) | January 1, 1990 | A-17 |
| Crop Hail Management | July 1, 1990 | A-18 |
| First Interstate Bank of Northern Indiana, N.A. and subsidiaries | January 1, 1991 | A-19 |
| First Illini Bancorp, Inc. | January 1, 1991 | A-20 |
| First Minnesota Savings Bank, F.S.B. | January 1, 1991 | A-21 |
| United Banks of Colorado, Inc. and Subsidiaries | January 1, 1991 | A-22 |
| ANK Agency, Inc. | January 1, 1991 | A-23 |
| American Land Title Co. Inc. | January 1, 1991 | A-24 |
| First National Bank in Anoka and Chalfen Bankshares, Inc. | April 1, 1991 | A-25 |
| Yankton Savings and Loan Association | April 1, 1991 | A-26 |
| Wyoming National Bancorporation and Subsidiaries | April 1, 1991 | A-27 |
| Norwest Mortgage, Inc. | April 1, 1991 | A-28 |
| Peoples Bank and Trust Company of Waterloo | July 1, 1991 | A-29 |
| MIG Insurance Brokers, Inc. | January 1, 1992 | A-30 |
| Davenport Bank and Trust Company | February 1, 1992 | A-31 |
| Community Bank of Nebraska | April 1, 1992 | A-32 |
| U.S. Recognition, Inc. | July 1, 1992 | A-33 |
| Vistar Bank | January 1, 1993 | A-34 |
| Merchants and Miners State Bank of Hibbing | February 1, 1993 | A-35 |
| Bank of Aspen | April 1, 1993 | A-36 |
| Boris Systems, Inc. | April 1, 1993 | A-37 |

| | | |
|---|---|---|
| University Bank | April 1, 1993 | A-38 |
| Lincoln Financial Corporation | April 1, 1993 | A-39 |
| Citibank-Arizona, Citibank Investment Services, Inc., | | |
| and Citibank Investment Services, Inc.-Minnesota | September 1, 1993 | A-40 |
| First State Bank of Spring Lake Park | October 1, 1993 | A-41 |
| First Nationwide Bank and Columbia Investment Services, Inc. | October 1, 1993 | A-42 |
| FirstAmerican Bank, N.A. | November 1, 1993 | A-43 |
| Ralston Bank | January 1, 1994 | A-44 |
| Farmers State Bank | January 1, 1994 | A-45 |
| St. Cloud National Bank and Trust Company and | | |
| St. Cloud Metropolitan Agency, Inc. | January 1, 1994 | A-46 |
| Forest Lake State Bank | March 1, 1994 | A-47 |
| First National Bank of Arapahoe County, First National Bank | | |
| of Lakewood, and First National Bank of Southeast Denver | March 1, 1994 | A-48 |
| United New Mexico Financial Corporation and Subsidiaries | April 1, 1994 | A-49 |
| Ford Bank Group, Inc. and Subsidiaries | April 1, 1994 | A-50 |
| United Title Company of Arizona | May 1, 1994 | A-51 |
| First National Bank of Detroit Lakes | June 1, 1994 | A-52 |
| Bank of Montana Systems and Subsidiaries | July 1, 1994 | A-53 |
| First Nationwide Bank, a Federal Savings Bank | July 1, 1994 | A-54 |
| La Porte Bank and Trust Company | January 1, 1995 | A-55 |
| American National Bank of Silver City | January 1, 1995 | A-56 |
| Bank of Scottsdale | January 1, 1995 | A-57 |
| First National Bank of Kerrville | January 1, 1995 | A-58 |
| Texas National Bank of Midland | January 1, 1995 | A-59 |
| Community State Bank | January 1, 1995 | A-60 |
| American Republic Bankshares | February 1, 1995 | A-61 |
| Caliber Bank | April 1, 1995 | A-62 |
| Directors Mortgage Loan Corporation, Directors Insurance Company | | |
| and Stan Shaw Corporation | April 1, 1995 | A-63 |
| BarclaysAmerican/Mortgage Corporation | April 1, 1995 | A-64 |
| Fridley State Bank | May 1, 1995 | A-65 |
| Goldenbanks of Colorado | July 1 1995 | A-66 |
| New Braunfels Bancshares | July 1, 1995 | A-67 |
| Ryland Mortgage Company - Institutional Financial Services | July 1, 1995 | A-68 |
| First National Bank of Tulia | July 1, 1995 | A-69 |
| First American National Bank (Chandler, Arizona) | August 1, 1995 | A-70 |
| Comfort State Bank | September 1, 1995 | A-71 |
| Liberty Bank and Trust, N.A. (Dickinson, N.D.) | September 1, 1995 | A-72 |
| Beacon Business Credit, Inc. | December 1, 1995 | A-73 |
| State National Bank (El Paso, Texas) | January 1, 1996 | A-74 |
| The Foothill Group, Inc. | January 1, 1996 | A-75 |
| American Federal Savings Bank | February 1, 1996 | A-76 |
| Bank of Robstown (TX) | February 1, 1996 | A-78 |
| Canton State Bank (IL) | March 1, 1996 | A-79 |
| Farmers State Bank (Irene, SD) | March 1, 1996 | A-80 |
| Henrietta Bancshares and Subsidiaries (TX) | May 1, 1996 | A-81 |
| Prudential Home Mortgage Company | June 1, 1996 | A-82 |
| Victoria Bankshares, Inc. | July 1, 1996 | A-83 |

| | | |
|---|---|---|
| Benson Financial Corporation (San Antonio, TX) | July 1, 1996 | A-84 |
| AmeriBank (MN) | July 1, 1996 | A-85 |
| Regional Bank of Colorado, N.A. | July 1, 1996 | A-86 |
| First State Bank (Bandera, Texas) | August 1, 1996 | A-87 |
| PriMerit Bank, Federal Savings Bank | August 1, 1996 | A-88 |
| Union National Bank of Texas | October 1, 1996 | A-89 |
| National Business Finance, Inc. | October 1, 1996 | A-90 |
| American Bank Moorhead | November 1, 1996 | A-91 |
| Texas Bancorporation, Inc. (Odessa, Texas) | January 1, 1997 | A-92 |
| Franklin Federal Bankcorp | January 1, 1997 | A-93 |
| West Columbia National Bank | January 1, 1997 | A-94 |
| Central Bancorporation | April 1, 1997 | A-95 |
| Statewide Mortgage Company | April 1, 1997 | A-96 |
| Farmers National Bank of Geneseo | May 1, 1997 | A-97 |
| The First National Bankshares, Inc. | August 1, 1997 | A-98 |
| American Bank | December 16,1997 | A-99 |
| Continental State Bank | January 1, 1998 | A-100 |
| First Valley Bancorporation | January 1, 1998 | A-101 |
| Packers Bank | January 1, 1998 | A-102 |
| International Bancorporation | January 1, 1998 | A-103 |
| JLJ Financial Services Corporation | January 1, 1998 | A-104 |
| Heritage Trust Company | April 1, 1998 | A-105 |
| Founders Trust Company | April 1, 1998 | A-106 |
| Fidelity Bancshares, Inc. (and subsidiaries) | April 1, 1998 | A-107 |
| WMC Mortgage Company | May 1, 1998 | A-108 |
| Spring Mountain Escrow Company | June 1, 1998 | A-109 |
| First Bank Katy, N.A. | July 1, 1998 | A-110 |
| EMJAY Corporation | July 1, 1998 | A-111 |
| Maier/Hauswirth Investment Advisors, L.L.C. | July 1, 1998 | A-112 |
| First Bank of Grants, N.A. | July 1, 1998 | A-113 |
| The Bank of New Mexico Holding Company and Subsidiaries | July 2, 1998 | A-114 |
| Charter Bancorporation, Inc. and Subsidiary | July 2, 1998 | A-115 |
| MidAmerica Insurance Agency South, Inc. | July 2, 1998 | A-116 |
| Minnesota Bancshares, Inc. and Subsidiary | July 2, 1998 | A-117 |
| First Bancshares of Valley City and Subsidiaries | August 1, 1998 | A-118 |
| Bancdata Processing Corporation | August 1, 1998 | A-119 |
| MidAmerica Bancshares, Inc.and Subsidiaries | August 1, 1998 | A-120 |
| Mountain Bancshares, Inc. and Subsidiary | August 1, 1998 | A-121 |
| Wisconsin Bancshares, Inc. and Subsidiaries | August 1, 1998 | A-122 |
| First National Bank of Monticello | October 1, 1998 | A-123 |
| First State Bank, Austin, Texas | October 1, 1998 | A-124 |
| Franklin Bancshares Inc. | January 1,1999 | A-125 |
| First National Bank of Missouri City | January 1, 1999 | A-126 |
| Community Bank of Parker | March 1, 1999 | A-127 |
| Mercantile Bank | April 1, 1999 | A-128 |
| Riverton State Bank | April 1, 1999 | A-129 |
| Wells Fargo & Company (Tax Advantage and Retirement Plan) | July 1, 1999 | A-130 |

-79-

**EXHIBIT A PART 3**

| | | |
|---|---|---|
| Eastern Heights Bank | July 1, 1999 | A-134 |
| Century Business Credit Corporation | July 1, 1999 | A-135 |
| Goodson Insurance Agencies | August 1, 1999 | A-136 |
| Greater Midwest Leasing Company | August 1, 1999 | A-137 |
| Mustang Financial Corporation | September 1, 1999 | A-138 |
| Computer Resources, Inc. | September 1, 1999 | A-139 |
| Texas Bancshares, Inc. | January 1, 2000 | A-140 |
| Allied Leasing Company | January 1, 2000 | A-141 |
| First Place Financial Corporation | April 1, 2000 | A-142 |
| North County Bancorp | April 1, 2000 | A-143 |
| Prime Bancshares, Inc. | April 1, 2000 | A-144 |
| Ragen MacKenzie | April 1, 2000 | A-145 |
| Bryan, Pendelton, Swats & McAllister | April 1, 2000 | A-146 |
| Michigan Financial Corporation (and its subsidiaries) | July 1, 2000 | A-147 |
| Servus Financial Corporation | July 1, 2000 | A-148 |
| Napa National Bancorp | July 1, 2000 | A-149 |
| 1st Choice Financial Corporation | August 1, 2000 | A-150 |
| National Bancorp of Alaska | August 1, 2000 | A-151 |
| Eastdil Realty | September 1, 2000 | A-152 |
| GE Capital Mortgage Services, Inc. | September 10, 2000 | A-153 |
| Charter Financial, Inc. | October 1, 2000 | A-154 |
| Buffalo National Bancshares, Inc. and Subsidiaries | January 1, 2001 | A-155 |
| First Security Corporation and Subsidiaries | January 1, 2001 | A-156 |
| First Commerce Bancshares, Inc. and Subsidiaries | January 1, 2001 | A-157 |
| Brenton Banks, Inc. | January 1, 2001 | A-158 |
| Paragon Capital LLC | February 1, 2001 | A-159 |
| Chase Bank Of Texas and Midland Trust Company | March 1, 2001 | A-160 |
| SCI Financial Group, Inc. | April 1, 2001 | A-161 |
| Buffalo Insurance Agency Group, Inc. | April 1, 2001 | A-162 |
| Comstock Bank | May 1, 2001 | A-163 |
| Marine National Bank | May 1, 2001 | A-164 |
| Nevada Banking Company | May 1, 2001 | A-165 |
| American Commercial Capital | May 1, 2001 | A-166 |
| California State Bank | June 1, 2001 | A-167 |
| H.D. Vest, Inc. | August 1, 2001 | A-168 |
| ACO Brokerage Corporation and its Subsidiaries | January 1, 2002 | A-169 |
| H & R Phillips, Inc. | January 1, 2002 | A-170 |
| Risk Management Services, Inc. | January 1, 2002 | A-171 |
| Marquette Bancshares, Inc. and its Subsidiaries | February 1, 2002 | A-172 |
| SIFE | March 1, 2002 | A-173 |
| Alcalay, Cohen, Inc. dba General Insurance Consultants | April 1, 2002 | A-174 |
| Tejas Bancshares, Inc and Its Subsidiaries | June 1, 2002 | A-175 |
| JPMorgan Chase Bank | June 1, 2002 | A-176 |
| First Allied Securities, Inc. | September 1, 2002 | A-177 |
| Towle Financial Services/Midwest, Inc. | January 1, 2003 | A-178 |
| Nelson Capital Management, Inc. | January 1, 2003 | A-179 |
| Montgomery Asset Management, LLC | February 1, 2003 | A-180 |
| Trumbull Associates, LLC | September 1, 2003 | A-181 |
| Bank of Grand Junction (Two Rivers Corporation acquisition) | November 1, 2003 | A-182 |

| | | |
|---|---|---|
| Benson Associates, LLC | November 1, 2003 | A-183 |
| Wisenberg, Pozmantier & Co., Inc. | January 1, 2004 | A-184 |
| Pacific Northwest Bancorp | January 1, 2004 | A-185 |
| Feeney, Durler and West Insurance Services | January 16, 2004 | A-186 |
| Blade Insurance Services, Inc. d/b/a Disc Insurance Services and Speare & Company | August 1, 2004 | A-187 |
| Strong Financial Corporation | January 1, 2005 | A-188 |
| PlainsCapital Bank | July 23, 2005 | A-189 |
| Amended and restated Pacific Northwest Bancorp Employee Stock Ownership/Money Purchase Pension Plan | August 1, 2005 | A-190 |
| Van Kasper & Company Profit Sharing and Salary Deferral Plan | August 1, 2005 | A-191 |
| First Community Bank, N.A. | September 1, 2005 | A-192 |

**ARTICLE XV**

**TOP-HEAVY PLAN PROVISIONS**

Sec. 15.1 **Key Employee Defined.** "Key Employee" means any employee or former employee who at any time during the Plan Year or any of the preceding four Plan Years is an officer of a Participating Employer or is deemed to have an ownership interest in a Participating Employer and who is within the definition of key employee in Code Section 416(i) and the regulations thereunder in effect for the particular Plan Year. "Non-key Employee" means any Participant who is not a Key Employee.

Sec. 15.2 **Determination of Top-Heavy Status.** The top-heavy status of the Plan shall be determined according to the following standards and definitions:

(a)     The Plan is a Top-Heavy Plan if it is not part of a required aggregation group and the top-heavy ratio for this Plan exceeds 60 percent, or if this Plan is part of a required aggregation group of plans and the top-heavy ratio for the group of plans exceeds 60 percent. However, the Plan is not a Top-Heavy Plan with respect to a Plan Year if it is part of a permissive aggregation group of plans for which the top-heavy ratio does not exceed 60 percent.

(b)     The "top-heavy ratio" shall be determined as follows:

(1)     If the ratio is being determined only for this Plan or if the aggregation group only includes defined contribution plans, the top-heavy ratio is a fraction, the numerator of which is the sum of the present values of the account balances of all Key Employees under the Plan or plans as of the determination date (including any part of any account balance distributed in the five-year period ending on the determination date), and the denominator of which is the sum of the account balances (including any part of any account balance distributed in the five-year period ending on the determination date) of all employees under the Plan or plans as of the determination date. (The "plans" referred to in the preceding sentence are the plans in the required or permissive aggregation group.)

(2)     If the determination is being made for a required or permissive aggregation group which includes one or more defined benefit plans, the top-heavy ratio is a fraction, the numerator of which is the sum of account balances of all Key Employees under the defined contribution plans and the present value of accrued benefits under the defined benefit plans for all Key Employees as of the determination date (including any part of any account balance or accrued benefit distributed in the five-year period ending on the determination date), and the denominator of which is the sum of the account balances under the defined contribution plans for all employees and the present value of accrued benefits under the defined benefit plans for all employees as of the determination date (including any part of any account balance or accrued benefit distributed in the five-year period ending on the determination date). (The "plans" referred to in the preceding sentence are the plans in the required or permissive aggregation group.) Both the numerator and denominator of the top-heavy ratio shall be adjusted to reflect any contribution due but unpaid as of the determination date.

-82-

(3)     For purposes of paragraphs (1) and (2), the value of account balances and the present value of accrued benefits will be determined as of the most recent valuation date that falls within the 12-month period ending on the determination date. The account balances and accrued benefits of an employee who is not a Key Employee but who was a Key Employee in a prior year will be disregarded. The calculation of the top-heavy ratio and the extent to which distributions, rollovers, and transfers are taken into account will be made in accordance with Code Section 416 and the regulations thereunder. When aggregating plans, the value of account balances and accrued benefits will be calculated with reference to the determination dates that fall within the same calendar year.

(4)     Any distribution due to separation from service, death or disability which was made prior to the one-year period ending on the determination date shall be disregarded for purposes of applying this subsection (b). Paragraphs (1) and (2) of this subsection shall also apply to distributions under a terminated plan which, had it not been terminated, would have been aggregated with this Plan under Code section 416(a)(2)(A)(i).

(c)     "Required aggregation group" means (i) each qualified plan of a Participating Employer or an Affiliate in which at least one Key Employee participates, and (ii) any other qualified plan of such employers that enables a plan described in (i) to meet the requirements of Code Sections 401(a)(4) or 410.

(d)     "Permissive aggregation group" means the required aggregation group of plans plus any other plan or plans of such employers which, when consolidated as a group with the required aggregation group, would continue to satisfy the requirements of Code Sections 401(a)(4) and 410.

(e)     "Determination date" for any Plan Year means the last day of the preceding Plan Year.

(f)     The "determination period" for a Plan Year is the Plan Year in which the applicable determination date occurs and the four preceding Plan Years.

(g)     The "valuation date" is the last day of each Plan Year and is the date as of which account balances or accrued benefits are valued for purposes of calculating the top-heavy ratio.

(h)     For purposes of establishing the "present value" of benefits under a defined benefit plan to compute the top-heavy ratio, any benefit shall be discounted only for mortality and interest based on the interest rate and mortality table specified in the defined benefit plan for this purpose.

(i)     If an individual has not performed any services for the employer at any time during the five-year period ending on the determination date with respect to a Plan Year commencing prior to 2002, or during the one-year period ending on the determination date with respect to a Plan Year commencing in 2002 or later, any account balance or accrued benefit for such individual shall not be taken into account for such Plan Year.

**Sec. 15.3  Minimum Contribution Requirement.**  For any Plan Year with respect to which the Plan is a Top-Heavy Plan, the employer contributions allocated to each Non-Key Employee whose Termination of Employment has not occurred prior to the end of such Plan Year shall not be less than that percentage of the Participant's compensation (as defined in Sec. 6.4(d)) for the Plan Year which is the smaller of:

   (a)    3 percent.

   (b)    The percentage which is the largest percentage of compensation allocated to any Key Employee from employer contributions for such Plan Year.

However, this section shall not apply to any Participant who is covered under any other plan of the employer under which the minimum contribution or minimum benefit requirement applicable to Top-Heavy Plans will be satisfied.  For purposes of this section, any employer contribution attributable to a salary reduction or similar arrangement shall be taken into account.  Any employer contribution attributable to a salary reduction or similar arrangement (including Salary Deferral Contributions under this Plan) may not be used to satisfy the minimum amount of employer contributions which must be allocated under this section.  However, Employer Matching Contributions under this Plan (and employer matching contributions under any other plan whose contributions are to be used to satisfy the requirements of this section) may be used to satisfy the minimum amount of employer contributions which must be allocated under this section.  Employer Matching Contributions that are used to satisfy this section shall be treated as employer matching contributions for purposes of the actual contribution percentage test and other requirements of Code section 401(m).

**Sec. 15.4  Exception For Collective Bargaining Unit.**  Section 15.3 shall not apply with respect to any employee included in a unit of employees covered by an agreement which the Secretary of Labor finds to be a collective bargaining agreement between employee representatives and one or more employers if there is evidence that retirement benefits were the subject of good faith bargaining between such employee representative and such employer or employers.

# ARTICLE XVI

## EMPLOYEE STOCK OWNERSHIP PROVISIONS

### A. Acquisitions of Company Stock

**Sec. 16.1 Exempt Loan.** An "Exempt Loan" means a direct or indirect extension of credit to the Plan that is not prohibited by Code Section 4975, subject to the following:

(a)   An Exempt Loan may be made or guaranteed by either a party in interest (as defined in section 3(14) of ERISA) or a disqualified person (as defined in Code section 4975).

(b)   The proceeds of an Exempt Loan must be used solely, and within a reasonable time after their receipt, to acquire Company Stock for an Unallocated Reserve, or to repay such Exempt Loan, or to repay a prior Exempt Loan, or for any combination of the foregoing purposes.

(c)   An Exempt Loan must be without recourse against the Trust Fund except that:

    (1)   The Company Stock acquired with the proceeds of an Exempt Loan may be pledged or otherwise used to secure repayment of such Exempt Loan (but for no other purpose), and

    (2)   Any Company Stock which was acquired with the proceeds of a prior Exempt Loan which was repaid with the proceeds of an Exempt Loan may be pledged or otherwise used to secure repayment of another Exempt Loan, and

    (3)   Any employer contributions made to the Plan in cash that are made for the purpose of satisfying the Plan's obligations under an Exempt Loan may be pledged or otherwise used to secure repayment of such Exempt Loan, and

    (4)   The earnings of the Company Stock acquired with the proceeds of an Exempt Loan and which continue to be pledged or otherwise used as security for such Exempt Loan may be pledged or otherwise used as security for such Exempt Loan.

(d)   An Exempt Loan must provide for principal payments and interest to be payable over a specific term.

(e)   Except as provided below in subsection (f), shares of Company Stock held in an Unallocated Reserve shall be released from encumbrance (and from such Unallocated Reserve) as the principal and interest payments on an Exempt Loan are paid.  The number of shares which shall be so released from encumbrance (and from an Unallocated Reserve) shall be equal to the total number of shares of Company Stock held in that Unallocated Reserve multiplied by a fraction with a numerator equal to the principal and interest payments made on the applicable Exempt Loan from the total employer contribution for the calendar year (including any credits under Sec. 6.5 or Sec. 7.2(i)) and a denominator equal to the total principal and interest to be paid under the Exempt Loan for the current year and all subsequent years.  The number of future years for which principal and interest are payable under an Exempt Loan must be definitely ascertainable and must be determined without

taking into account any possible extensions or renewal periods. If the interest rate under the loan is variable, the amount of future interest payable shall be calculated by using the interest rate in effect on December 31 of the current year.

(f)    In lieu of the method described in subsection (e), shares of Company Stock held in an Unallocated Reserve may be released from encumbrance (and from an Unallocated Reserve) with reference to principal payments only, provided all of the following conditions are met.

(1)    Each Exempt Loan provides for principal and interest payments at a cumulative rate that is not less rapid at any time than level annual payments of such amounts for ten years.

(2)    If an Exempt Loan constitutes a renewal, extension or refinancing of a prior Exempt Loan, the sum of the expired duration of the prior Exempt Loan, the renewal period, the extension period, and the duration of the new Exempt Loan does not exceed ten years.

(3)    Shares of Company Stock held in an Unallocated Reserve shall be released from encumbrance (and from such Unallocated Reserve) as the principal amount of the Exempt Loan is paid. The number of shares to be released from encumbrance (and from an Unallocated Reserve) must equal the total number of shares of Company Stock held in that Unallocated Reserve multiplied by a fraction the numerator of which equals the amount of the principal payments made with respect to the applicable Exempt Loan for the current calendar year, and the denominator of which equals the total principal payments to be paid over the remaining term of the Exempt Loan (including the principal payments for the current year).

(4)    For the purposes of this subsection (f), the amount of interest included in any payment is disregarded only to the extent that it would be determined to be interest under standard loan amortization tables.

(g)    The rate of interest (which may be fixed or variable) on an Exempt Loan must not be in excess of a reasonable rate of interest considering all relevant factors including (but not limited to) the amount and duration of the loan, the security given, the guarantees involved, the credit standing of the Plan, the Company, and the guarantors, and the generally prevailing rates of interest.

(h)    In the event of default upon an Exempt Loan, the fair market value of Company Stock and other assets which can be transferred in satisfaction of the loan must not exceed the amount of the loan. If the lender is a party in interest (as defined in ERISA) or disqualified person (as defined in the Code), the loan must provide for a transfer of Plan assets upon default only upon and to the extent of the failure of the Plan to satisfy the payment schedule of an Exempt Loan.

Sec. 16.2  **Unallocated Reserve.** An "Unallocated Reserve" means that portion of the Trust Fund which consists of shares of Company Stock (and dividends thereon) acquired with the proceeds of an Exempt Loan and which are held in suspense pending allocation to Participants' Accounts pursuant to this Article XVI. Separate Unallocated Reserves may be maintained for Company Stock acquired with the proceeds of separate Exempt Loans.

**Sec. 16.3  Leveraged Acquisitions.** The Trustee, with the prior concurrence of the President, Vice Chairman, any Executive Vice President or any Senior Vice President of the Company (acting singly), is authorized to enter into Exempt Loans. The proceeds of any Exempt Loan shall be applied as provided in Sec. 16.1(b). All shares of Company Stock acquired with the proceeds of an Exempt Loan shall be credited to the applicable Unallocated Reserve until such time as they are released pursuant to subsections (e) or (f) of Sec. 16.1.

### B.  Repayment of Exempt Loan

**Sec. 16.4  Repayment of Exempt Loans.** The Trustee shall repay any outstanding Exempt Loan as provided in subsection (e) or (f) of Sec. 16.1 and may, in its discretion, determine the order in which the Exempt Loan(s) will be repaid and the portion of any payment which is applied to a particular Exempt Loan. Such payments shall be from the following sources in the order of priority determined by the Company for each Plan Year.

> (a)    Dividends (other than dividends in the form of shares of Company Stock or dividends which employees are to receive in cash pursuant to Sec. 10.18) on all shares of Company Stock held in the Unallocated Reserves and Matching Contribution Accounts to the extent allowed by Code section 404(k)(2)(A)(iii).

> (b)    Employer contributions not less than the amount, if any, by which any required payments of principal and interest exceed the amount of dividends available for such payments, subject to the provisions of Sec. 5.1(e).

Any such dividends or contributions in excess of the amount of required loan payments may be used to make additional principal payments on any outstanding Exempt Loan, as determined by the Company in its discretion. For purposes of this section, determinations by the Company may be made by the President, Vice Chairman, any Executive Vice President or any Senior Vice President of the Company (acting singly).

### C.  Allocation and Disposition of ESOP Stock

**Sec. 16.5  Allocation of Company Stock.** As payments on an Exempt Loan are made, Company Stock shall be released from the applicable Unallocated Reserve as provided in Sec. 16.1(e) or (f), as applicable. The released Company Stock shall be allocated among Participants' Accounts subject to the following:

> (a)    If dividends paid on Company Stock held in Participants' Matching Contribution Accounts are used to make payments on an Exempt Loan, there shall be allocated to each such Matching Contribution Account on the Valuation Date coincident with or next following the dividend payment date, an amount of Company Stock having a value on the dividend payment date equal to the amount of dividends so used.

> (b)    Any remaining Company Stock released from the Unallocated Reserves shall be allocated pursuant to Sec. 5.1 for each calendar quarter up to the limits specified in Sec. 5.1.

> (c)    If the amount of Company Stock released from Unallocated Reserves and available for allocation on a particular Valuation Date is less than the amount required to complete all

allocations required on that Valuation Date under subsections (a) and (b), the Participating Employers shall make an additional contribution of cash, Company Stock, or a combination thereof. The aggregate value of said additional contributions shall be sufficient to cover the remaining amount required to complete all allocations under subsections (a) and (b).

(d)    If the value of the Company Stock available for allocation as of any Valuation Date prior to the end of a calendar year exceeds the amount required for the allocations referred to in subsections (a) and (b), the remaining amount shall be held for allocations under subsections (a) or (b) as of subsequent Valuation Dates within that calendar year.

(e)    If at the end of a calendar year all allocations under subsections (a) and (b) have been completed and there is Company Stock which has been released from Unallocated Reserves and which remains unallocated, said Company Stock shall be allocated among the Matching Contribution Accounts of all individuals who are Active Participants on December 31 of said calendar year in the ratio that each such Participant's Salary Deferral Contributions for the year bears to the total Salary Deferral Contributions of all such Participants for the year, disregarding any Salary Deferral Contribution to the extent it exceeds 6% of the Participant's Certified Compensation and also disregarding any Salary Deferral Contributions that are attributable to Unmatched Certified Compensation as defined in Sec. 2.6(d).

WELLS FARGO - 401(k) Plan effective 1-1-06 + Apps.doc

**Amendment
to the
Wells Fargo & Company
401(k) Plan**

Pursuant to the authority delegated in Sec. 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), the undersigned hereby amends the Plan as follows, effective as of the dates indicated below:

I.

The fourth sentence of subsection (c) of Sec. 2.40 is amended effective January 1, 2007 to read as follows:

> If the Participant and domestic partner reside in an area where such a certificate is not available, or if the Participant and domestic partner elect not to register their domestic partnership, a person will not be considered a domestic partner unless the Participant and/or domestic partner provides sufficient evidence to the Plan Administrator that all of the following requirements are satisfied:

II.

Subsection (b) of Sec. 5.1 is amended effective July 1, 2007 by amending clause (ii) of the first sentence of that subsection, and by amending the third and fourth sentences of that subsection in their entirety, to read as follows:

> . . . (ii) must be employed by a Participating Employer or an Affiliate on the last business day (Monday through Friday) of the calendar quarter, and . . .
> . . . .
> A Participant will also be deemed to have satisfied clause (ii) of the first sentence of this subsection for a calendar quarter if the Participant began a leave of absence that is classified by his or her Participating Employer as a salary continuation leave of absence during that quarter and said leave has not ended prior to the last business day of that quarter. Except as provided in the preceding sentence, a Participant who is on a salary continuation leave of absence on the last business day of a calendar quarter is not eligible to receive Employer Matching Contributions for that quarter.

III.

Section 10.19 is amended in its entirety effective July 1, 2007 to read as follows:

> **Sec. 10.19 Uncashed Checks or Inability to Locate Distributee.** The following provisions apply if a Participant or Beneficiary fails to cash a distribution check or cannot be located after becoming entitled to a distribution from the Plan:
>
> (a)    If all or part of the benefit of a Participant or Beneficiary has been distributed pursuant to the provisions of the Plan to the individual entitled to the benefit but the distribution check remains uncashed on the first January 1 or July 1 occurring six or more months following the date the check was issued, after such steps to contact the distributee have been taken as the Plan Administrator determines to be reasonable under the circumstances, the uncashed benefit shall be disposed of as follows:

(1)   If the Participant or Beneficiary still has one or more fully or partially vested Accounts remaining in the Plan, the uncashed benefit shall be restored to an Account or Accounts established or maintained for such individual, without any adjustment for gains, losses or interest for the period between the date the distribution check was issued and the date the Plan Administrator causes the benefit to be restored. The amount restored shall be reinvested pursuant to the individual's most recent investment election in effect under Article VIII for new contributions, except that no such amounts shall be invested in the ESOP Fund. If the Participant or Beneficiary has been issued a Form 1099-R reporting the distribution as taxable income, the redeposit shall be made into a separate Account that shall be treated as an Employee After-Tax Contribution Account. Notwithstanding the foregoing provisions of this paragraph (1), if the distribution check is cashed after a restoration occurs under this paragraph, the benefit restored shall be cancelled and any earnings credited with respect to the restored benefit shall be treated as a Forfeiture and applied as provided in paragraph (2) of this subsection.

(2)   If the Participant or Beneficiary has no vested Accounts remaining in the Plan, the uncashed benefit shall become a Forfeiture as of a date the Plan Administrator selects that is on or after the applicable January 1 or July 1. The Forfeiture shall then be applied either to reinstate Accounts pursuant to Sec. 9.2(d)(2)(A), or else as a credit against Employer Matching Contributions for the year in which the Forfeiture occurred as provided in Sec. 6.5. In the event the distributee is located after a Forfeiture has occurred under this paragraph, the individual's forfeited benefit shall be restored to its value on the date the original distribution occurred, without any investment gains or losses, interest or other adjustments for the period following the distribution and prior to the date the benefit is restored.

(3)   This subsection (a) shall also apply commencing July 1, 2007 to any distribution which occurred prior to January 1, 2007 and which remained uncashed on June 30, 2007.

(b)   If all or any portion of the Accounts of a Participant or Beneficiary cannot be distributed because of the inability of the Plan Administrator to determine the whereabouts of the distributee following the Participant's Termination of Employment, after mailing a letter by first class mail to the last known address of the distributee, and after such further diligent efforts as the Plan Administrator determines are appropriate, and either (i) the Participant has attained age 62, has had a break in service of at least 60 months duration as described in Sec. 3.3(d), or has died, or (ii) the benefit is distributable pursuant to Sec. 10.1(c) without the consent of the distributee, the benefit that cannot be distributed shall be forfeited. The Forfeiture shall occur as of the first January 1 or July 1 occurring six or more months after the date the event described in clause (i) or (ii) of the previous sentence occurred (or as of the date the Plan Administrator determines the distributee cannot be located, if later). The Forfeiture shall then be applied either to reinstate Accounts pursuant to Sec. 9.2(d)(2)(A), or else as a credit against Employer Matching Contributions for the year in which the Forfeiture occurred as provided in Sec. 6.5. In the event the distributee is located after a Forfeiture has occurred under this subsection, the individual's Accounts shall be restored to their value on the date the Forfeiture occurred, without any investment gains or losses, interest or other

- 2 -

adjustments for the period following the Forfeiture and prior to the date the Accounts are restored.

Dated: _11/20_____, 2007          WELLS FARGO & COMPANY


By _____*Paula S. Roe*_____
Paula S. Roe
Senior Vice President and
Director of Compensation & Benefits

fb.us.2162370.02

- 3 -

# AMENDMENT
## TO
## WELLS FARGO & COMPANY 401(k) PLAN

Pursuant to the authority delegated in Section 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), and the authority delegated in various resolutions from acquired subsidiaries, the undersigned hereby amends the Plan by taking the following action:

A.   To amend the Plan by adding an Appendix applicable to the stock acquisition from Evergreen Funding Corporation, effective January 1, 2007, attached as Exhibit A.

B.   Save and except as herein expressly amended, the Plan shall continue in full force and effect.

Dated: _____1/9_____, 2007          WELLS FARGO & COMPANY

Paula S. Roe
Senior Vice President and
Director of Compensation and Benefits

# WELLS FARGO & COMPANY 401(k) PLAN

## Appendix Applicable to Evergreen Funding Corporation

Effective January 1, 2007, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons formerly employed by Evergreen Funding Corporation ("Evergreen") is modified as follows:

If an individual was an employee of Evergreen on December 15, 2006, and the individual became an employee of Wells Fargo & Company or a subsidiary of Wells Fargo & Company at 1:00 p.m. Central Standard Time on December 15, 2006, the individual's continuous service with Evergreen prior to 1:00 p.m. Central Standard Time December 15, 2006 shall be treated as if it were past service credit and in determining the individual's Vesting Service under this Plan. January 1, 2007 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.

**Amendment
to the
Wells Fargo & Company
401(k) Plan**

Pursuant to the authority delegated in Sec. 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), the undersigned hereby amends the Plan effective April 1, 2007 by amending the last paragraph of Sec. 2.6 of the Plan in its entirety to read as follows:

Notwithstanding anything in the foregoing provisions of this section to the contrary, Certified Compensation does not include any amount received by a Participant (i) which is related to the settlement of the litigation described as "Johanna Osinga, et al vs. Wells Fargo & Company, et al (Los Angeles Superior Court Case No: BC305453)," or (ii) which is related to the settlement of the litigation described as "Jasmin Gerlach vs. Wells Fargo & Company." This paragraph shall be repealed automatically following the receipt of all such settlement payments by Participants in this Plan.

Dated: ___1/9___, 2007                WELLS FARGO & COMPANY

                                      By _____
                                         Paula S. Roe
                                         Senior Vice President and
                                         Director of Compensation & Benefits

**Amendment
to the
Wells Fargo & Company
401(k) Plan**

Pursuant to the authority delegated in Sec. 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), the undersigned hereby amends the Plan as follows, effective as of the dates indicated below:

I.

Subsection (h) of Sec. 6.1 is amended in its entirety effective January 1, 2006 to read as follows:

(h)    The deferral percentage for any Participant who is a Highly Compensated Employee for the calendar year, and who is eligible to participate in two or more plans with cash or deferred arrangements described in Code section 401(k) to which any Participating Employer or Affiliate contributes, shall be determined pursuant to applicable Treasury regulations.

II.

Subsection (h) of Sec. 6.3 is amended in its entirety effective January 1, 2006 to read as follows:

(h)    The contribution percentage for any Participant who is a Highly Compensated Employee for the year, and who is eligible to make nondeductible employee contributions or to receive matching contributions under two or more plans described in Code section 401(a) that are maintained by the Participating Employers or any Affiliate, shall be determined pursuant to applicable Treasury regulations.

III.

Section 8.6 is amended in its entirety effective January 1, 2007 to read as follows:

**Sec. 8.6  ESOP Diversification.**  Participants may elect to change the investment of Company Stock held in their Matching Contribution Accounts and Wells Fargo Share Award Accounts pursuant to the following:

(a)    Each Participant may elect that all or a portion of the Company Stock held in the Participant's Matching Contribution Account shall instead be invested in Investment Funds other than the ESOP Fund, and/or that all or a portion of the Company Stock held in the Participant's Wells Fargo Share Award Account be invested in Investment Funds other than the Company Stock Fund. In the case of Company Stock held in the Participant's Wells Fargo Share Award Account on December 31, 2006, such an election may be effective as of a Valuation Date occurring as soon as administratively feasible after January 1, 2007, or any subsequent Valuation Date. In the case of Company Stock allocated to either type of Account on a date on or after January 1, 2007, such an election may be effective as of a Valuation Date that occurs as soon as administratively feasible after the date the Company Stock is allocated to or acquired by the Account or as of any subsequent Valuation Date. After any such

election has been implemented, the Participant may thereafter elect to change the investment of that portion of the Account to any other Investment Fund, including the Company Stock Fund, pursuant to Sec. 8.5 and such rules as the Plan Administrator may establish from time to time.

(b)    Elections under this section shall be made as provided in Sec. 8.5. However, a separate record of such elections by the Participant shall be made under procedures established by the Plan Administrator.

## IV.

Paragraph (4) of Sec. 9.2(a) is amended effective January 1, 2007 by deleting the first sentence of that paragraph and substituting in its place the following sentences:

(4)    If the Participant's Termination of Employment occurs on or after January 1, 2007, the vested portion of the Participant's Wells Fargo Share Award Account shall be determined under the schedule in the first paragraph of this subsection (a). If the Participant's Termination of Employment occurs prior to January 1, 2007, the vested portion of the Participant's Wells Fargo Share Award Account shall be the vested percentage determined according to the number of the Participant's years of Vesting Service prior to the Termination of Employment, as follows:

## V.

Subsection (b) of Sec. 10.18 is amended in its entirety effective January 1, 2006 to read as follows:

(b)    [Deleted]

## VI.

Article X is amended effective August 29, 2005 by adding a new Sec. 10.20 to the end of that Article, to read as follows:

**Sec. 10.20  Hurricane Relief Provisions.**  Notwithstanding anything to the contrary in Sec. 9.4 or the foregoing provisions of this Article X, distributions, hardship withdrawals and loans will be provided to Participants under this Plan to the extent the Plan Administrator determines in its discretion that such actions are permitted by the hurricane relief provisions listed in subsection (a), and the provisions of this Plan shall be deemed to have been modified accordingly to permit such actions.

(a)    The applicable hurricane provisions subject to this section are:

(1)    The Katrina Emergency Tax Relief Act of 2005, as construed by IRS Notice 2005-92.

(2)    IRS Announcement 2005-70.

(3)    Code sections 1400M and 1400Q, as added by the Gulf Opportunity Zone Act of 2005.

(b)  Prior to January 1, 2007, a Participant who satisfies the requirements of Code section 1400Q(a) may elect to receive a "qualified hurricane distribution" from the Participant's vested Accounts in this Plan, subject to such rules as the Plan Administrator may establish from time to time. The aggregate amount of such distributions to the Participant from all plans maintained by the Participating Employers or Affiliates may not exceed $100,000.

(c)  An Active Participant who has received a qualified hurricane distribution (as defined in Code section 1400Q(a)(4)(A)) in connection with Hurricane Katrina, Rita or Wilma from this Plan or from a qualified trust maintained by another employer may contribute an amount equal to all or a portion of such distribution to the Fund, provided the contribution is made within the three year period beginning on the day after the date of such qualified hurricane distribution, and provided the Plan Administrator determines that such contribution is permitted under Code section 1400Q. Further, a Participant who received a hardship distribution to purchase or construct a principal residence in the Hurricane Katrina, Rita or Wilma disaster areas, which principal residence was not purchased or constructed on account of Hurricane Katrina, Rita or Wilma, may contribute an amount equal to all or a portion of such distribution to the Fund, provided such contribution is made within the applicable period defined in Code section 1400Q(b)(3) and provided the Plan Administrator determines that such contribution is permitted under Code section 1400Q. Any contribution under this subsection (c) will be treated as a Rollover Contribution under Sec. 7.4.

(d)  If the Participant is a "qualified individual" under Code section 1400Q(c), in the case of any loan to such Participant made under Sec. 9.4 during the "applicable period" starting on the date specified for such Participant in Code section 1400Q(c)(4) and ending on December 31, 2006, "$100,000" shall be substituted for "$50,000" in Sec. 9.4(a)(1), and "100%" shall be substituted for "50%" in Sec. 9.4(a)(2). If such a Participant had a loan outstanding under Sec. 9.4 on or after the applicable "qualified beginning date" under Code section 1400Q(c)(4), upon the request of the Participant, the due date of the loan repayments may be extended and the repayment amount may be adjusted as permitted by Code section 1400Q(c)(2).

(e)  The Plan Administrator may require the Participant to provide such information, and make such attestations, as the Plan Administrator determines in its discretion to be necessary to administer this section. The Plan Administrator shall be entitled to rely on information provided by the Participant to the extent permitted by the applicable hurricane relief provisions in subsection (a).

VII.

Section 14.8 is amended by adding the following to the list of appendices:

| Name of Employer | Effective Date of Appendix |
| --- | --- |
| Reilly Mortgage Capital Corporation | August 1, 2006 |
| Washington Mutual Bank | September 6, 2006 |
| (Transfers Related to Purchase of Certain Assets) | |
| Barrington Associates | October 2, 2006 |

VIII.

The parenthetical clause at the end of the second sentence of the fourth paragraph of the Appendix Applicable to United Title Agency of Arizona, Inc. is amended effective January 1, 2006 to read as follows:

(subject, however, to Sec. 10.1(c) of this Plan)

IX.

The Plan is amended effective August 1, 2006 by adding an Appendix applicable to Reilly Mortgage Capital Corporation, to read as set forth in the attached Exhibit A

X.

The Plan is amended effective September 6, 2006 by adding an Appendix applicable to Washington Mutual Bank, to read as set forth in the attached Exhibit B.

XI.

The Plan is amended effective October 2, 2006 by adding an Appendix applicable to Barrington Associates, to read as set forth in the attached Exhibit C and to authorize the merger of the Barrington Associates 401(k) Profit Sharing Plan into this Plan effective December 1, 2006.

Dated:  December 2 0, 2006          WELLS FARGO & COMPANY

By _____
Paula S. Roe
Senior Vice President and
Director of Compensation & Benefits

fb.us.1720604.01

Exhibit A

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Reilly Mortgage Capital Corporation

Effective August 1, 2006, the Wells Fargo & Company 401(k) Plan (the "Plan"), as applicable to certain persons formerly employed by Reilly Mortgage Capital Corporation (hereinafter called "Reilly") is modified as follows:

If immediately prior to 12:01 a.m. on August 1, 2006, an individual was employed by Reilly and the individual became an employee of a subsidiary of Wells Fargo & Company immediately thereafter, the individual's continuous service with Reilly prior to August 1, 2006 shall be treated as if it were service with a Participating Employer for purposes of Sec. 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. August 1, 2006 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.



Exhibit B

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Washington Mutual Bank
### (Transfers Related to Purchase of Certain Assets)

Effective September 6, 2006, the Wells Fargo & Company 401(k) Plan (the "Plan"), as applicable to certain persons formerly employed by Washington Mutual Bank (hereinafter called "WaMu") is modified as follows:

This Appendix applies to any individual who was an employee of WaMu, who transfers directly from WaMu to employment with a Participating Employer on or after September 6, 2006 pursuant to the asset purchase agreement between Wells Fargo Bank, N.A. and WaMu dated July 17, 2006, and who accepted the offer of employment with the Participating Employer on or before March 31, 2007. In the case of any individual covered by this Appendix:

(a)  The individual's continuous service with WaMu prior to the date of the transfer (based on the employment date supplied by WaMu to the Plan Administrator) shall be treated as if it were service with a Participating Employer in determining the individual's Service with a Participating Employer for purposes of Sec. 4.1 of this Plan and in determining the individual's Vesting Service under this Plan.

(b)  The individual's date of transfer shall be the first Entry Date for such individual on which he or she may become a Participant in the Plan, and the individual shall be eligible to have Salary Deferral Contributions made on his or her behalf as soon as administratively feasible on or after that Entry Date provided the individual has submitted the proper applications to the Plan Administrator or its agent in accordance with Article IV.

(c)  For purposes of determining the individual's eligibility to receive a Matching Contribution under Sec. 5.1 for the calendar quarter in which the transfer occurs, the individual's service with WaMu recognized under subsection (a), above, will be included in determining whether the individual had at least one year of Vesting Service on the first day of the quarter. Any Matching Contribution for that quarter will be based only on Certified Compensation from Participating Employers and on Salary Deferral Contributions made to this Plan following the transfer.

Exhibit C

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Barrington Associates

Effective October 2, 2006, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons formerly employed by Barrington Associates ("Barrington") is modified as follows:

If immediately prior to 12:01 a.m. on October 2, 2006, an individual was employed by Barrington and the individual became an employee of a subsidiary of Wells Fargo & Company immediately thereafter, the individual's continuous service with Barrington prior to October 2, 2006 shall be treated as if it were service with a Participating Employer for purposes of Sec. 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. October 2, 2006 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.

One or more Frozen Transferred Accounts shall be established under Sec. 7.1 to hold any assets allocated to a Participant's accounts in the Barrington 401(k) Profit Sharing Plan that were transferred to this Plan as a result of the merger of the Barrington 401(k) Profit Sharing Plan into this Plan effective December 1, 2006. Each such Frozen Transferred Account shall be treated as though it were the corresponding type of account under this Plan, except that the Participant or Beneficiary shall always be 100% vested in any such Frozen Transferred Account.

**Amendment
to the
Wells Fargo & Company
401(k) Plan**

Pursuant to the authority delegated in Sec. 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), the undersigned hereby amends the Plan as follows, effective as of the dates indicated below:

I.

Section 3.4 is amended in its entirety effective July 1, 2006 to read as follows:

**Sec. 3.4  <u>Service With Wells Fargo Financial</u>.**  If an employee of Wells Fargo Financial, Inc. (formerly named Norwest Financial, Inc., and before that named Dial Corporation) is transferred to employment with a Participating Employer as a Qualified Employee prior to July 1, 2006, and if the employee's service with Wells Fargo Financial includes a period of service before Dial Corporation became an Affiliate hereunder, the employee shall be credited with service as a Qualified Employee as if Dial Corporation had been an Affiliate during that period.

II.

Section 14.8 is amended by adding the following to the list of appendices:

<u>Name of Employer</u>                                      <u>Effective Date of Appendix</u>
Wells Fargo Financial, Inc. and Subsidiaries      July 1, 2006
  (Merger of Thrift and Profit Sharing Plan)

III.

The Plan is amended effective July 1, 2006 by adding an Appendix related to the merger of the Wells Fargo Financial, Inc. Thrift and Profit Sharing Plan into this Plan, to read as set forth in the attached Exhibit A.

Dated: **6 - 30** , 2006                        WELLS FARGO & COMPANY

By _Paula S Roe_

Paula S. Roe
Senior Vice President and
Director of Compensation & Benefits

M1:1331962.01

Exhibit A.

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Wells Fargo Financial, Inc. and Subsidiaries
### (Merger of Thrift and Profit Sharing Plan)

Effective July 1, 2006, the Wells Fargo & Company 401(k) Plan, as applicable to employees of Wells Fargo Financial, Inc. and its subsidiaries that were "employers" participating in the Wells Fargo Financial Thrift and Profit Sharing Plan (the "TAPS Plan") on June 30, 2006 (collectively, "Financial"), is modified as follows:

I.

The TAPS Plan is hereby merged into this Plan effective July 1, 2006. Wells Fargo Financial, Inc. and each of its subsidiaries that were "employers" participating in the TAPS Plan on June 30, 2006 shall be Participating Employers in this Plan on July 1, 2006. Each individual who was a "participant" entitled to benefits under the TAPS Plan at 11:59 p.m. on June 30, 2006 shall be a Participant entitled to such benefit under this Plan at 12:01 a.m. on July 1, 2006, and any individual who was entitled to a benefit as a "beneficiary" of a deceased participant or as an "alternate payee" under the TAPS Plan at 11:59 p.m. on June 30, 2006 shall be entitled to such benefit in the same capacity under this Plan at 12:01 a.m. on July 1, 2006.

The accounts held under the TAPS Plan on June 30, 2006 shall become Accounts under this Plan on July 1, 2006. Each such transferred Account shall be treated as though it were the corresponding type of Account under this Plan, except as otherwise provided in this Appendix. To the extent the Plan Administrator determines to be necessary or appropriate, separate Accounts shall be established under Sec. 7.1 effective July 1, 2006 to hold some or all of the accounts allocated to an individual under the TAPS Plan that were transferred to this Plan as a result of the merger. The Plan Administrator may establish any rules and procedures which the Plan Administrator deems to be necessary or appropriate for the transitioning of the investment of the accounts held in the TAPS Plan to the investment of Accounts under this Plan pursuant to Articles VII and VIII hereof.

II.

If an individual who was an employee of Financial prior to July 1, 2006 is an employee of a Participating Employer in this Plan on or after July 1, 2006, the individual's "eligibility service" credited under the TAPS Plan on June 30, 2006 shall be treated as if it were service for a Participating Employer for purposes of Sec. 4.1 of this Plan; provided, however, that there shall be no duplicate credit for the same period of service. July 1, 2006 shall be the first Entry Date on which an individual who was employed by Financial on June 30, 2006 may become a Participant in this Plan.

III.

If an individual was an employee of Financial on June 30, 2006 and the individual continues to be employed by a Participating Employer in this Plan on July 1, 2006, the following rules shall apply in determining vesting in the individual's Accounts commencing July 1, 2006:

1.    The individual's Vesting Service under this Plan on and after July 1, 2006 shall be equal to the sum of (i) the individual's "vesting service" credited under the TAPS

Plan on June 30, 2006, and (ii) the individual's Vesting Service determined under Sec. 3.3 of this Plan for periods on or after July 1, 2006; provided, however, that if the individual has a break in service, Sec. 3.3(d) shall apply to the individual's entire period of service.

2. The vested percentage applicable to the portion of any transferred Account from the TAPS Plan containing employer contributions that were subject to the vesting schedule under the TAPS Plan on June 30, 2006 shall be the greater of (i) the percentage determined under the provisions of the TAPS Plan in effect on June 30, 2006, or (ii) the percentage determined under the first paragraph of Sec. 9.2(a)·

All individuals with transferred Accounts from the TAPS Plan who are not employed by a Participating Employer on July 1, 2006 shall be subject to the provisions of TAPS Plan regarding vesting in effect at the time of their termination of employment with Financial, except to the extent a provision of this Plan is required to apply to such an individual to maintain the qualified status of this Plan under the Code or applicable regulations. However, if such an individual is reemployed by a Participating Employer as a Qualified Employee after July 1, 2006 and before any non-vested portion of a transferred Account from the TAPS Plan has permanently become a Forfeiture, the vested percentage of the individual's transferred Accounts from the TAPS Plan shall thereafter be determined under paragraph 2 of this Section III.

IV.

Commencing July 1, 2006, Salary Deferral Contributions by Participants who are employed by Financial, and Employer Matching Contributions on behalf of such Participants under Sec. 5.1, shall be subject to the applicable provisions of this Plan, and the provisions of the TAPS Plan shall cease to apply in determining Plan contributions for periods on or after July 1, 2006. Any deferral election in effect for a participant under the TAPS Plan on June 30, 2006 shall continue to apply to the Participant for purposes of this Plan commencing July 1, 2006 until the Participant changes such election pursuant to the terms of this Plan. The adjustments provided under Sec. 5.1(c) shall apply to Participants who are employees of Financial during the third and fourth quarters of 2006. The limits on contributions under Article VI of this Plan for the 2006 Plan Year shall be applied by taking into account all contributions under the TAPS Plan for the period from January 1, 2006 to June 30, 2006.

For purposes of determining "employer contributions" under the TAPS Plan for the period from January 1 to June 30, 2006, June 30, 2006 shall be deemed to be the last day of a Plan Year.

M1:1331962.01

**Amendment
to the
Wells Fargo & Company
401(k) Plan**

Pursuant to the authority delegated in Sec. 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), the undersigned hereby amends the Plan as follows, effective as of the dates indicated below:

I.

Section 3.4 is amended in its entirety effective July 1, 2006 to read as follows:

**Sec. 3.4 <u>Service With Wells Fargo Financial</u>.** If an employee of Wells Fargo Financial, Inc. (formerly named Norwest Financial, Inc., and before that named Dial Corporation) is transferred to employment with a Participating Employer as a Qualified Employee prior to July 1, 2006, and if the employee's service with Wells Fargo Financial includes a period of service before Dial Corporation became an Affiliate hereunder, the employee shall be credited with service as a Qualified Employee as if Dial Corporation had been an Affiliate during that period.

II.

Section 14.8 is amended by adding the following to the list of appendices:

| <u>Name of Employer</u> | <u>Effective Date of Appendix</u> |
|---|---|
| Wells Fargo Financial, Inc. and Subsidiaries (Merger of Thrift and Profit Sharing Plan) | July 1, 2006 |

III.

The Plan is amended effective July 1, 2006 by adding an Appendix related to the merger of the Wells Fargo Financial, Inc. Thrift and Profit Sharing Plan into this Plan, to read as set forth in the attached Exhibit A.

Dated: **6/30** , 2006        WELLS FARGO & COMPANY

By _Paula S. Roe_
Paula S. Roe
Senior Vice President and
Director of Compensation & Benefits

M1:1331962.01

Exhibit A.

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Wells Fargo Financial, Inc. and Subsidiaries
### (Merger of Thrift and Profit Sharing Plan)

Effective July 1, 2006, the Wells Fargo & Company 401(k) Plan, as applicable to employees of Wells Fargo Financial, Inc. and its subsidiaries that were "employers" participating in the Wells Fargo Financial Thrift and Profit Sharing Plan (the "TAPS Plan") on June 30, 2006 (collectively, "Financial"), is modified as follows:

I.

The TAPS Plan is hereby merged into this Plan effective July 1, 2006. Wells Fargo Financial, Inc. and each of its subsidiaries that were "employers" participating in the TAPS Plan on June 30, 2006 shall be Participating Employers in this Plan on July 1, 2006. Each individual who was a "participant" entitled to benefits under the TAPS Plan at 11:59 p.m. on June 30, 2006 shall be a Participant entitled to such benefit under this Plan at 12:01 a.m. on July 1, 2006, and any individual who was entitled to a benefit as a "beneficiary" of a deceased participant or as an "alternate payee" under the TAPS Plan at 11:59 p.m. on June 30, 2006 shall be entitled to such benefit in the same capacity under this Plan at 12:01 a.m. on July 1, 2006.

The accounts held under the TAPS Plan on June 30, 2006 shall become Accounts under this Plan on July 1, 2006. Each such transferred Account shall be treated as though it were the corresponding type of Account under this Plan, except as otherwise provided in this Appendix. To the extent the Plan Administrator determines to be necessary or appropriate, separate Accounts shall be established under Sec. 7.1 effective July 1, 2006 to hold some or all of the accounts allocated to an individual under the TAPS Plan that were transferred to this Plan as a result of the merger. The Plan Administrator may establish any rules and procedures which the Plan Administrator deems to be necessary or appropriate for the transitioning of the investment of the accounts held in the TAPS Plan to the investment of Accounts under this Plan pursuant to Articles VII and VIII hereof.

II.

If an individual who was an employee of Financial prior to July 1, 2006 is an employee of a Participating Employer in this Plan on or after July 1, 2006, the individual's "eligibility service" credited under the TAPS Plan on June 30, 2006 shall be treated as if it were service for a Participating Employer for purposes of Sec. 4.1 of this Plan; provided, however, that there shall be no duplicate credit for the same period of service. July 1, 2006 shall be the first Entry Date on which an individual who was employed by Financial on June 30, 2006 may become a Participant in this Plan.

III.

If an individual was an employee of Financial on June 30, 2006 and the individual continues to be employed by a Participating Employer in this Plan on July 1, 2006, the following rules shall apply in determining vesting in the individual's Accounts commencing July 1, 2006:

1. The individual's Vesting Service under this Plan on and after July 1, 2006 shall be equal to the sum of (i) the individual's "vesting service" credited under the TAPS

Plan on June 30, 2006, and (ii) the individual's Vesting Service determined under Sec. 3.3 of this Plan for periods on or after July 1, 2006; provided, however, that if the individual has a break in service, Sec. 3.3(d) shall apply to the individual's entire period of service.

2.    The vested percentage applicable to the portion of any transferred Account from the TAPS Plan containing employer contributions that were subject to the vesting schedule under the TAPS Plan on June 30, 2006 shall be the greater of (i) the percentage determined under the provisions of the TAPS Plan in effect on June 30, 2006, or (ii) the percentage determined under the first paragraph of Sec. 9.2(a)

All individuals with transferred Accounts from the TAPS Plan who are not employed by a Participating Employer on July 1, 2006 shall be subject to the provisions of TAPS Plan regarding vesting in effect at the time of their termination of employment with Financial, except to the extent a provision of this Plan is required to apply to such an individual to maintain the qualified status of this Plan under the Code or applicable regulations. However, if such an individual is reemployed by a Participating Employer as a Qualified Employee after July 1, 2006 and before any non-vested portion of a transferred Account from the TAPS Plan has permanently become a Forfeiture, the vested percentage of the individual's transferred Accounts from the TAPS Plan shall thereafter be determined under paragraph 2 of this Section III.

IV.

Commencing July 1, 2006, Salary Deferral Contributions by Participants who are employed by Financial, and Employer Matching Contributions on behalf of such Participants under Sec. 5.1, shall be subject to the applicable provisions of this Plan, and the provisions of the TAPS Plan shall cease to apply in determining Plan contributions for periods on or after July 1, 2006. Any deferral election in effect for a participant under the TAPS Plan on June 30, 2006 shall continue to apply to the Participant for purposes of this Plan commencing July 1, 2006 until the Participant changes such election pursuant to the terms of this Plan. The adjustments provided under Sec. 5.1(c) shall apply to Participants who are employees of Financial during the third and fourth quarters of 2006. The limits on contributions under Article VI of this Plan for the 2006 Plan Year shall be applied by taking into account all contributions under the TAPS Plan for the period from January 1, 2006 to June 30, 2006.

For purposes of determining "employer contributions" under the TAPS Plan for the period from January 1 to June 30, 2006, June 30, 2006 shall be deemed to be the last day of a Plan Year.

M1:1331962.01

**AMENDMENT**
**TO**
**WELLS FARGO & COMPANY 401(k) PLAN**

Pursuant to the authority delegated in Section 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), and the authority delegated in various resolutions from acquired subsidiaries, the undersigned hereby amends the Plan by taking the following action:

A.    To amend the Plan by adding an:

1.    Appendix applicable to the asset acquisition from LaSalle Bank National Association, effective June 1, 2006, attached as Exhibit A.

2.    Appendix applicable to the acquisition of Fremont National Bank of Canon City, effective June 6, 2006, attached hereto as Exhibit B.

3.    Appendix applicable to the acquisition of Centennial Bank of Pueblo, effective June 6, 2006, attached hereto as Exhibit C.

B.    To amend the Plan, effective as of the date indicated, to add the following acquired employers to the end of the list of appendices in Section 14.8.

| Name of Employer | Effective Date of Appendix |
|---|---|
| Fremont National Bank of Canon City | June 6, 2006 |
| Centennial Bank of Pueblo | June 6, 2006 |

C.    Save and except as herein expressly amended, the Plan shall continue in full force and effect.

Dated: _____6/15_____, 2006

WELLS FARGO & COMPANY

*Paula S. Roe*

Paula S. Roe
Senior Vice President and
Director of Compensation and Benefits

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to LaSalle Bank National Association

Effective June 1, 2006, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons formerly employed by LaSalle Bank National Association ("LaSalle") is modified as follows:

If an individual was an employee of LaSalle on June 1, 2006, and the individual became an employee of Wells Fargo & Company or a subsidiary of Wells Fargo & Company immediately after 5:00 p.m., Central Standard Time, on June 1, 2006, the individual's continuous service with LaSalle prior to June 1, 2006 shall be treated as if it were service with a Participating Employer for purposes of Sec 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. June 1, 2006 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Fremont National Bank of Canon City

Effective June 6, 2006, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons formerly employed by Fremont National Bank of Canon City (the "Bank"), is modified as follows:

If immediately after 12:01 a.m. on June 6, 2006, an individual was an employee of the Bank, the individual's continuous service with the Bank prior to June 6, 2006 shall be treated as if it were service with a Participating Employer for purposes of Sec 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. July 1, 2006 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.

Exhibit C

# WELLS FARGO & COMPANY 401(k) PLAN

## Appendix Applicable to Centennial Bank of Pueblo

Effective June 6, 2006, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons formerly employed by Centennial Bank of Pueblo (the "Bank"), is modified as follows:

If immediately after 12:01 a.m. on June 6, 2006, an individual was an employee of the Bank, the individual's continuous service with the Bank prior to June 6, 2006 shall be treated as if it were service with a Participating Employer for purposes of Sec 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. July 1, 2006 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.

### AMENDMENT
### TO
### WELLS FARGO & COMPANY 401(k) PLAN


Pursuant to the authority delegated in Section 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), and the authority delegated in various resolutions from acquired subsidiaries, the undersigned hereby amends the Plan by taking the following action:

A.    To amend the Plan:

    1.    To authorize the merger of the Commerce Funding Corporation 401(k) Plan into the Wells Fargo & Company 401(k) Plan effective May 1, 2006.

B.    To amend the Plan by adding an:

    1.    Appendix applicable to Commerce Funding Corporation, effective May 1, 2006, attached as Exhibit A.

C.    To amend the Plan, effective as of the date indicated, to add the following acquired employers to the end of the list of appendices in Section 14.8.

| Name of Employer | Effective Date of Appendix |
|---|---|
| Commerce Funding Corporation | May 1, 2006 |

D.    Save and except as herein expressly amended, the Plan shall continue in full force and effect.


Dated: __**May 11**__, 2006

WELLS FARGO & COMPANY

_Paula S. Roe_

Paula S. Roe
Senior Vice President and
Director of Compensation and Benefits

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Commerce Funding Corporation

Effective May 1, 2006, the Wells Fargo & Company 401(k) Plan (the "Plan"), as applicable to persons formerly employed by Commerce Funding Corporation ("Commerce"), is modified as follows:

If immediately after 3:00 p.m. Eastern Standard Time on April 17, 2006 an individual was an employee of the Bank, the individual's continuous service with the Bank prior to April 17, 2006, shall be treated as if it were service with a Participating Employer in determining the individual's service with a Participating Employer for purposes of Section 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. May 1, 2006 shall be the first Entry Date on which an individual described in this paragraph may become a Participant in this Plan.

A separate Account or Accounts shall be established under Sec. 7.1 to hold any assets allocated to a Participant that were transferred to this Plan as a result of the merger of the Commerce Funding Corporation 401(k) Plan into this Plan effective May 1, 2006. Each such transferred Account shall be treated as though it were the corresponding type of Account under this Plan. The vesting schedule in Sec. 9.2(a) shall apply to the portion of the transferred Account containing employer contributions.

# AMENDMENT
## TO
### WELLS FARGO & COMPANY 401(k) PLAN

Pursuant to the authority delegated in Section 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), and the authority delegated in various resolutions from acquired subsidiaries, the undersigned hereby amends the Plan by taking the following action:

A.    To amend the Plan:

    1.    To authorize the merger of the State Bank of Rogers 401(k) Profit Sharing Plan into the Wells Fargo & Company 401(k) Plan effective May 1, 2006.

B.    To amend the Plan by adding an:

    1.    Appendix applicable to the State Bank of Rogers, effective May 1, 2006, attached as Exhibit A.

    2.    Appendix applicable to the asset acquisition from Marsh USA Inc., effective January 1, 2006, attached hereto as Exhibit B.

C.    To amend the Plan, effective as of the date indicated, to add the following acquired employers to the end of the list of appendices in Section 14.8.

| Name of Employer | Effective Date of Appendix |
|---|---|
| State Bank of Rogers | May 1, 2006 |

D.    Save and except as herein expressly amended, the Plan shall continue in full force and effect.

Dated: _____5/1_____, 2006

WELLS FARGO & COMPANY

_Paula S. Roe_

Paula S. Roe
Senior Vice President and
Director of Compensation and Benefits

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to the State Bank of Rogers

Effective May 1, 2006, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons formerly employed by the State Bank of Rogers (the "Bank"), is modified as follows:

If immediately after 12:01 a.m. on March 1, 2006 an individual was an employee of the Bank, the individual's continuous service with the Bank prior to March 1, 2006, shall be treated as if it were service with a Participating Employer in determining the individual's service with a Participating Employer for purposes of Section 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. April 1, 2006 shall be the first Entry Date on which an individual described in this paragraph may become a Participant in this Plan.

A separate Account or Accounts shall be established under Sec. 7.1 to hold any assets allocated to a Participant that were transferred to this Plan as a result of the merger of the State Bank of Rogers 401(k) Profit Sharing Plan into this Plan effective May 1, 2006. Each such transferred Account shall be treated as though it were the corresponding type of Account under this Plan, except that the Participant (or Beneficiary following the Participant's death) shall always be 100% vested in any such transferred Account.

**Exhibit B**

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Marsh USA Inc.

Effective December 31, 2005, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons formerly employed by Marsh USA Inc. ("Marsh") is modified as follows:

If immediately after 11:59 pm on December 31, 2005, an individual was an employee of Marsh and the individual became an employee of Wells Fargo & Company or a subsidiary of Wells Fargo & Company on December 31, 2005, the individual's continuous service with Marsh prior to January 1, 2006 shall be treated as if it were service with a Participating Employer for purposes of Sec 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. January 1, 2006 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.

**Amendment
to the
Wells Fargo & Company
401(k) Plan**

Pursuant to the authority delegated in Sec. 13.1 of the Wells Fargo & Company Cash Balance Plan (the "Plan"), the undersigned hereby amends the Plan as follows, effective as of the dates indicated below:

I.

Section 2.6 is amended effective January 1, 2006 by deleting the last sentence of subsection (a) of that section, and by amending the first sentence of that section and adding a new subsection (e) to that section, to read as follows:

Sec. 2.6 **Certified Compensation.** "Certified Compensation" of a Participant from a Participating Employer for a particular calendar quarter, Plan Year or other specified period means compensation paid to the Participant by the Participating Employer during that period for service as an Active Participant which is reportable on Form W-2, subject to the following:

. . .

(e)  For purposes of applying the foregoing provisions of this section:

(1)  Certified Compensation does not include any compensation paid to the Participant following the bi-weekly pay date for the pay period in which the Participant's Termination of Employment occurs. However, the preceding sentence ceases to apply on the date, if any, on which the individual again becomes an Active Participant and Salary Deferral Contributions commence again under paragraph (2), below.

(2)  For purposes of making Salary Deferral Contributions under Article IV, Certified Compensation includes only compensation not otherwise excluded under subsections (a) through (d) of this section which is paid on or after the Entry Date or other date specified in Sec. 4.1 on which the individual becomes an Active Participant eligible to make such contributions, subject to the following:

(A)  Certified Compensation includes any such compensation related to service performed during the entire pay period containing the date on which the individual became an Active Participant.

(B)  Any such compensation related to service performed during a pay period that ended prior to the date on which the individual became an Active Participant which is paid on the bi-weekly pay date for that pay period will not be treated as Certified Compensation for this purpose, even if the compensation for that pay period is paid on or after the date the individual became an Active Participant.

(3)  For purposes of determining contributions under Sections 5.1, 5.2 and 5.3, the Certified Compensation recognized for a particular calendar quarter or Plan

Year includes compensation not otherwise excluded under subsections (a) through (d) of this section which is paid on or after the first day of such period, including any such compensation related to service performed in a pay period or part of a pay period before the first day of that calendar quarter or Plan Year, and all Certified Compensation paid before the first day or after the last day of that calendar quarter or Plan Year will be disregarded. However, if a former Active Participant becomes an Active Participant again during a calendar quarter or Plan Year, any compensation that is excluded from Certified Compensation under paragraph (2), above, will also be disregarded in determining the contributions under Sections 5.1, 5.2 and 5.3.

II.

The second sentence of subsection (a) of Sec. 5.1 is amended effective January 1, 2006 to read as follows:

The amount so allocated to a particular Participant's Matching Contribution Account shall have a value, as of the Valuation Date at the end of the quarter on which the allocation occurs, equal to 100% of the Participant's Salary Deferral Contributions deducted from paychecks issued on dates occurring during that calendar quarter, disregarding (i) any Salary Deferral Contributions to the extent they exceed 6% of the Participant's Certified Compensation for the quarter, (ii) any Salary Deferral Contributions that are attributable to Unmatched Certified Compensation as defined in Sec. 2.6(d), and (iii) any Catch-up Contributions under Sec. 4.3(g).

III.

Subsection (d) of Sec. 10.18 is amended in its entirety effective April 1, 2006 to read as follows:

(d)    Notwithstanding anything in the foregoing provisions of this section to the contrary, any dividends on Company Stock held in the Plan which are allocated to the vested portion of the Accounts of the Participant during the six-month period described in Sec. 10.9(a)(2)(C) after the receipt of a hardship withdrawal, and which are not required to be reinvested in Company Stock pursuant to subsection (c), above, will be distributed in cash to the Participant.

Dated:  ___4/ 6___ , 2006            WELLS FARGO & COMPANY

By  _____
Paula S. Roe
Senior Vice President and
Director of Compensation & Benefits

M1:1295133.02

- 2 -

**Amendment**
**to the**
**Wells Fargo & Company**
**401(k) Plan**

Pursuant to the authority delegated in Sec. 13.1 of the Wells Fargo & Company ~~Cash~~ *401 (k)* ~~Balance~~ Plan (the "Plan"), the undersigned hereby amends the Plan as follows, effective as of the dates indicated below:

I.

Section 2.6 is amended effective January 1, 2006 by deleting the last sentence of subsection (a) of that section, and by amending the first sentence of that section and adding a new subsection (e) to that section, to read as follows:

Sec. 2.6 **Certified Compensation.** "Certified Compensation" of a Participant from a Participating Employer for a particular calendar quarter, Plan Year or other specified period means compensation paid to the Participant by the Participating Employer during that period for service as an Active Participant which is reportable on Form W-2, subject to the following:

. . .

(e)    For purposes of applying the foregoing provisions of this section:

(1)    Certified Compensation does not include any compensation paid to the Participant following the bi-weekly pay date for the pay period in which the Participant's Termination of Employment occurs. However, the preceding sentence ceases to apply on the date, if any, on which the individual again becomes an Active Participant and Salary Deferral Contributions commence again under paragraph (2), below.

(2)    For purposes of making Salary Deferral Contributions under Article IV, Certified Compensation includes only compensation not otherwise excluded under subsections (a) through (d) of this section which is paid on or after the Entry Date or other date specified in Sec. 4.1 on which the individual becomes an Active Participant eligible to make such contributions, subject to the following:

(A)    Certified Compensation includes any such compensation related to service performed during the entire pay period containing the date on which the individual became an Active Participant.

(B)    Any such compensation related to service performed during a pay period that ended prior to the date on which the individual became an Active Participant which is paid on the bi-weekly pay date for that pay period will not be treated as Certified Compensation for this purpose, even if the compensation for that pay period is paid on or after the date the individual became an Active Participant.

(3)    For purposes of determining contributions under Sections 5.1, 5.2 and 5.3, the Certified Compensation recognized for a particular calendar quarter or Plan

Year includes compensation not otherwise excluded under subsections (a) through (d) of this section which is paid on or after the first day of such period, including any such compensation related to service performed in a pay period or part of a pay period before the first day of that calendar quarter or Plan Year, and all Certified Compensation paid before the first day or after the last day of that calendar quarter or Plan Year will be disregarded. However, if a former Active Participant becomes an Active Participant again during a calendar quarter or Plan Year, any compensation that is excluded from Certified Compensation under paragraph (2), above, will also be disregarded in determining the contributions under Sections 5.1, 5.2 and 5.3.

II.

The second sentence of subsection (a) of Sec. 5.1 is amended effective January 1, 2006 to read as follows:

The amount so allocated to a particular Participant's Matching Contribution Account shall have a value, as of the Valuation Date at the end of the quarter on which the allocation occurs, equal to 100% of the Participant's Salary Deferral Contributions deducted from paychecks issued on dates occurring during that calendar quarter, disregarding (i) any Salary Deferral Contributions to the extent they exceed 6% of the Participant's Certified Compensation for the quarter, (ii) any Salary Deferral Contributions that are attributable to Unmatched Certified Compensation as defined in Sec. 2.6(d), and (iii) any Catch-up Contributions under Sec. 4.3(g).

III.

Subsection (d) of Sec. 10.18 is amended in its entirety effective April 1, 2006 to read as follows:

(d)     Notwithstanding anything in the foregoing provisions of this section to the contrary, any dividends on Company Stock held in the Plan which are allocated to the vested portion of the Accounts of the Participant during the six-month period described in Sec. 10.9(a)(2)(C) after the receipt of a hardship withdrawal, and which are not required to be reinvested in Company Stock pursuant to subsection (c), above, will be distributed in cash to the Participant.

Dated: _____4/6_____, 2006          WELLS FARGO & COMPANY

By _____
     Paula S. Roe
     Senior Vice President and
     Director of Compensation & Benefits

M1:1295133.02

- 2 -

# AMENDMENT
## TO
## WELLS FARGO & COMPANY 401(k) PLAN

Pursuant to the authority delegated in Section 13.1 of the Wells Fargo & Company 401(k) Plan (the "Plan"), the undersigned hereby amends the Plan by taking the following action:

To amend the Plan by adding an Appendix applicable to Secured Capital Corp effective February 1, 2006, attached hereto as Exhibit A.

Dated: ___2/8_____, 2006

WELLS FARGO & COMPANY

_Paula S. Roe_
Paula S. Roe
Senior Vice President and
Director of Compensation and Benefits

## WELLS FARGO & COMPANY 401(k) PLAN

### Appendix Applicable to Secured Capital Corp

Effective February 1, 2006, the Wells Fargo 401(k) Plan (the "Plan"), as applicable to persons employed by Secured Capital Corp ("Secured Capital") is modified as follows:

If an individual was an employee of Secured Capital on January 18, 2006 and the individual became an employee of Wells Fargo & Company or a subsidiary of Wells Fargo & Company on January 18, 2006, the individual's continuous service with Secured Capital prior to January 18, 2006 shall be treated as if it were service with a Participating Employer for purposes of Sec 4.1 of this Plan and in determining the individual's Vesting Service under this Plan. February 1, 2006 shall be the first Entry Date on which an individual described in this Appendix may become a Participant in this Plan.

**EXHIBIT B**



**WELLS FARGO**

# Wells Fargo & Company 401(k) Plan
## Summary Plan Description and Prospectus
*Effective January 1, 2007*



EXHIBIT B

# Wells Fargo & Company 401(k) Plan

Summary Plan Description/Prospectus January 1, 2007

## Table of Contents

The Basics ...................................................................................................................3

Who's Eligible ...........................................................................................................3

How to Enroll.............................................................................................................5

Contributions .............................................................................................................6

Limits on Contributions.........................................................................................11

Investment Options.................................................................................................12

Account Valuation ..................................................................................................20

Loans ..........................................................................................................................22

Withdrawals while Employed...............................................................................25

Distributions to You ...............................................................................................28

Distributions to Your Beneficiary .......................................................................29

Taxes ..........................................................................................................................32

Assignment of Accounts Prohibited ...................................................................34

Circumstances Affecting Plan Benefits ..............................................................34

Future of the Plan ...................................................................................................35

Your Duty to Review Information........................................................................36

Administrators..........................................................................................................36

Claims and Appeals ................................................................................................37

Appendices and Other Important Information ..................................................39

More Information about Wells Fargo & Company ...........................................40

ESOP Information ....................................................................................................41

Employee Rights under ERISA ............................................................................42

Appendix A ...............................................................................................................44

Appendix B.................................................................................................................45

Appendix C ...............................................................................................................46

Appendix D ...............................................................................................................47

1

## Contacts

| | |
|---|---|
| Enroll, obtain account information or request a withdrawal | *Teamworks, Your accounts* https://www.wellsretirement.com |
| Information about the plan | *Teamworks* |
| Enroll, obtain account information or request a withdrawal or distribution.<br><br>Have your Social Security number and PIN available when you call. | HR Service Center 1-877-HR WELLS 1-877-479-3557 TDD/TTY 1-800-988-0161<br><br>Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu. |

This Summary Plan Description/Prospectus (SPD/Prospectus) is part of a prospectus of Wells Fargo & Company covering securities that have been registered under the Securities Act of 1933. Specifically, this SPD/Prospectus is part of a prospectus covering securities offered under the Wells Fargo & Company 401(k) Plan (the "401(k) Plan").

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities offered under the 401(k) Plan or determined if this SPD/Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

This document summarizes the major features of the 401(k) Plan. It is only a summary and it does not describe every feature of the 401(k) Plan. The official terms of the 401(k) Plan are contained in a document entitled "Wells Fargo & Company 401(k) Plan (as Amended and Restated Effective January 1, 2006)" including all amendments since January 1, 2006.

This SPD/Prospectus incorporates important business and financial information about Wells Fargo & Company from documents that are not included in or delivered with this SPD/Prospectus. Refer to the "More Information About Wells Fargo & Company" section for instructions on how to get copies of these documents.

## The Basics

The 401(k) Plan is available to eligible employees of Wells Fargo & Company and its subsidiaries that have been approved by Wells Fargo & Company as participating employers in the 401(k) Plan. If you would like a complete list of participating employers, write to the Plan Administrator. The 401(k) Plan is a qualified defined contribution plan designed to encourage employees to save for retirement on a regular, long-term basis.

Before reading this summary, you should be aware that:

- Wells Fargo & Company reserves the right to amend, modify or terminate the 401(k) Plan at any time.

- The 401(k) Plan is provided as a benefit to you and other eligible employees. Participation in the 401(k) Plan does not guarantee employment. 401(k) Plan benefits depend on continued eligibility and employment.

- If there are any differences between this SPD/Prospectus and the official 401(k) Plan document, the official 401(k) Plan document governs participants' rights to benefits, benefit decisions, and Plan administration in all cases.

- The name "Wells Fargo," as used throughout this summary refers to Wells Fargo & Company and each of its subsidiaries that participate in the 401(k) Plan. "Wells Fargo" also means the legal entity that employs you.

- The 401(k) Plan is "tax qualified" under the Internal Revenue Code as both an employee stock ownership plan (ESOP) and as a 401(k) qualified cash or deferred arrangement. The portion of the 401(k) Plan invested in Wells Fargo & Company stock is the ESOP.

A copy of the official 401(k) Plan document is available for inspection during regular business hours by prior arrangement at:

> Compensation and Benefits Department
> Wells Fargo & Company
> MAC N9311-170
> 625 Marquette Avenue
> Minneapolis, Minnesota 55479

## Who's Eligible

### Employment Classification

Each employee who satisfies the 401(k) Plan's eligibility requirements may be a participant. Your employment classification determines eligibility to participate in the 401(k) Plan. Regular employees are regularly scheduled to work 30 hours or more per week. Part-time employees are regularly scheduled to work 17.5 to 29 hours per week. Regular and part-time employees are eligible for the 401(k) Plan.

Flexible employees work on a flexible schedule. For example, flexible employees may work any number of hours on given projects, fill in when needed regardless of hours, remain on call, or work only certain times of the month or year. Flexible employees are not eligible to participate in the 401(k) Plan.

**Eligible Employees**

As a general rule, you are eligible to actively participate in and make Salary Deferral Contributions to the 401(k) Plan if you:

- Complete one full calendar month of service;

- Are classified as a regular or part-time employee by Wells Fargo;

- Have certified compensation; and

- Are employed by a participating employer.

**Ineligible Employees**

You are not eligible to actively participate in and make Salary Deferral Contributions to the 401(k) Plan if you are:

- Employed by a Wells Fargo & Company subsidiary or affiliate that is not a participating employer in the 401(k) Plan;

- Employed in a position that is classified as a flexible employee by Wells Fargo;

- On a salary continuation leave of absence;

- Treated as a leased employee employed by some other entity;

- A nonresident alien who is not receiving earned income from sources within the United States;

- A U.S. citizen performing services outside of the United States unless permitted by Wells Fargo;

- Covered by a collective bargaining agreement, unless the agreement states that the employees covered by the agreement are eligible to participate; or

- An individual classified by Wells Fargo as an independent contractor or other similar classification.

If you have a question regarding eligibility to participate, contact the Plan Administrator for additional information.

Once you are a participant in the 401(k) Plan, you are eligible to make Salary Deferral Contributions to the 401(k) Plan only as long as you are employed by Wells Fargo or a participating employer as an eligible employee and meet the 401(k) Plan's eligibility requirements described above. If you transfer from an eligible employee status to an ineligible employee status, you will no longer be eligible to make Salary Deferral Contributions. For example, if you transfer from a regular employee classification to a flexible employee classification, you will no longer be eligible to make salary deferral contributions.

4

## How to Enroll

If you meet the eligibility requirements and are an eligible employee, you may enroll in the 401(k) Plan effective the first day of the month following one full calendar month of service. If you do not enroll when you are first eligible, you can enroll at another time as long as you are an eligible employee. Your enrollment will be effective on the next available payroll cycle.

To enroll go to:

- Teamworks, Your Accounts, 401(k) Plan; or

- https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

Contribution rate changes will be effective within two pay periods.

Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

### Employee of an Acquired Company

Certain transition rules may apply to 401(k) Plan eligibility, matching contributions and vesting if you were an employee of a company that was acquired by Wells Fargo or merged with a Wells Fargo affiliate.

If you have questions regarding your eligibility to participate in the 401(k) Plan, call the HR Service Center and speak with a 401(k) Plan specialist. Plan specialists are available 7 a.m. to 8 p.m. Central time by selecting Option 1 at the main menu.

### Rehired Employee

If you were formerly employed by Wells Fargo and have been rehired, participation in the 401(k) Plan depends on whether you had previously satisfied the one full calendar month of service before your termination and were a participant in the 401(k) Plan before your termination.

- If you were eligible to participate in the 401(k) Plan upon termination, you will become eligible to participate immediately upon rehire by Wells Fargo or another participating employer, as long as you are an eligible employee and meet the eligibility requirements described above.

- If you were not eligible to participate in the 401(k) Plan before termination and had not previously satisfied the one calendar month of service, you may enter the 401(k) Plan the first day of the month following one calendar month of service with Wells Fargo as long as you are an eligible employee and meet the eligibility requirements described above.

- If you were not eligible to participate in the 401(k) Plan before termination because you were an ineligible employee as described above but you had completed one full calendar month of service before your termination, you may enter the 401(k) Plan as soon as administratively feasible upon rehire by Wells Fargo as long as you are an eligible employee and meet the eligibility retirements above.

If you are a participant upon rehire, you may start contributing to the 401(k) Plan as soon as you enroll for Salary Deferral Contributions. Contributions will begin with the next available payroll cycle. Depending on the circumstances, your service before leaving Wells Fargo employment may count toward eligibility and vesting in the employer matching contribution.

If you were fully vested in the employer matching contribution when you previously terminated, upon your return your new employer matching contributions will be fully vested.

In addition, if you were not vested in the employer matching contributions when you previously terminated and you return before you have had a 60-month break in service, the nonvested portion of your employer matching contributions (or other nonvested employer contributions) will be restored. You will then have the opportunity to become further vested.

If you are receiving installments from the 401(k) Plan at the time you are rehired, your installments will be stopped unless you are age 59 ½ or older and rehired in a flexible employee classification.

### Transferred Employee

If you transfer employment from a nonparticipating to a participating Wells Fargo subsidiary, prior service with that subsidiary is credited toward the service requirement for 401(k) Plan eligibility, vesting and company match. The date you can enter the 401(k) Plan depends on whether you meet the 401(k) Plan's service requirement at the time of the transfer.

- If you have met the 401(k) Plan's service requirement at the time of transfer, you will become eligible to participate immediately. You may begin to make Salary Deferral Contributions as soon as administratively possible.

- If you have not met the 401(k) Plan's service requirement at the time of transfer, you will be eligible to participate the first of the month following one full calendar month of service.

- You will be eligible for the employer match the first calendar quarter following completion of one year of service, which includes service with any Wells Fargo nonparticipating subsidiary.

## Contributions

### Certified Compensation

Your salary deferral and employer matching contributions for a Plan Year are calculated on the basis of "certified compensation." Certified compensation is all compensation you receive from a participating employer during the Plan Year while you are an eligible employee that is reportable on Form W-2 with a few exceptions. Certified compensation includes any salary deferrals made under this 401(k) Plan and salary reductions made to an Internal Revenue Code Section 125 Plan or qualified transportation program.

Generally, certified compensation does not include payments such as:

- Relocation expenses;

- Perquisites;

- Lump sum severance payments;

- Salary continuation pay;

- Gross-ups;

- Amounts paid in lieu of vacation;

- Stock Option gains or equity or equity-like gains; and

- Compensation paid to you after the pay date immediately following the two-week pay period in which you terminate employment.

The amount of certified compensation that can be taken into account on an annual basis is also subject to an annual IRS limitation. For 2007, the IRS limitation is $225,000. In addition, if you are employed in certain job categories such as various mortgage consultant categories and other job categories which Wells Fargo Home Mortgage classifies as a comparable job, your certified compensation is capped at the first $50,000 of certified compensation for purposes of the employer matching contribution, but not for purposes of your own Salary Deferral Contribution. Contact the Plan Administrator if you want to verify if your certified compensation is capped at $50,000.

Note that all certified compensation counts toward the IRS limit of $225,000 even if you elect not to contribute. Thus, if you waited to contribute until you became match eligible and your certified compensation had already exceeded $225,000, you would not be eligible to contribute to the 401(k) Plan for that year and you would not receive any match.

A "Plan Year" is the 12-month period beginning on any January 1 and ending on the following December 31.

**Salary Deferral Contributions**

You may contribute between 1 and 25% of certified compensation to the 401(k) Plan for a Plan Year up to an annual maximum determined by the IRS each year. For 2007, the maximum is $15,500. If you are considered a highly compensated employee, you may be limited to a lower contribution percentage. You will be informed if the lower contribution limit applies to you. These contributions are deducted before federal or state income taxes are calculated. The Salary Deferral Contributions are subject to Social Security tax, so contributing to the 401(k) Plan does not reduce your future Social Security benefits.

Salary Deferral Contributions are deposited in the 401(k) Plan Trust and allocated to your Salary Deferral Contribution Account under the 401(k) Plan each pay date and generally are invested at the end of that day. You may increase, decrease or stop your Salary Deferral Contributions at any time.

**Quick Enrollment Feature**

Quick enrollment is an enrollment feature that provides a preset contribution rate of 2%, with an automatic 1% increase to the contribution rate annually in March of each year. Contributions using this feature are automatically invested in the Moderate Balanced Fund. You can change your contribution rate, the automatic 1% increase, and the investment of your account at any time.

**1% Contribution Rate Increase**

If your contribution rate is less than 6%, you have the ability to elect an automatic 1% increase to your contribution rate. The automatic 1% increase occurs in March of each year, and can continue up to a

maximum of 6%. You can start or stop the annual automatic 1% increase at any time, provided you are contributing at a rate less than 6%.

**Catch-Up Contributions**

Participants who are age 50 or older or will turn age 50 in 2007 may contribute an additional $5,000 on a before-tax basis. The catch up contribution is not eligible for the employer match.

To enroll or change your contribution elections, go to:

- Teamworks, Your Accounts, 401(k) Plan; or

- https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

Contribution elections will be effective within two pay periods.

**Investing Your Salary Deferral Contribution**

You may direct the investment of your Salary Deferral Contributions into one or more of the investment funds listed in this SPD/Prospectus, in increments of 1%. You may make changes in your investment elections daily, either for your future contributions or for your existing account balance.

Salary Deferral Contributions and associated earnings reinvested in the 401(k) Plan are tax-deferred. You will not pay income taxes on these dollars until they are distributed to you from the 401(k) Plan. You are always 100% vested in your Salary Deferral Contributions and associated earnings.

**Company Matching Contributions**

If you are a participant in the 401(k) Plan, you are eligible for the quarterly company matching contributions as of the first day of the calendar quarter following completion of 12 months of employment. Wells Fargo matches your Salary Deferral Contributions, dollar for dollar, up to 6% of your certified compensation. In order to receive a matching contribution for a particular calendar quarter, you must have made Salary Deferral Contributions during that quarter and have been employed by Wells Fargo on the last business day of that quarter.

If you retire after satisfying the 401(k) Plan definition of "Retirement," become disabled or die before the end of a quarter, you or your designated beneficiary will be entitled to that quarter's matching contribution based on your Salary Deferral Contributions made during that quarter.

Retirement means termination of employment on or after the earliest of (i) attainment of age 55 with 10 years of service, (ii) age 65, (iii) the date the sum of your attained age plus completed years of vesting service equals 80.

If you are eligible to receive matching contributions effective on January 1 of any Plan Year and reach the maximum annual IRS salary deferral limit, your match may continue in quarters after the Salary Deferral Contributions have stopped up to the annual match limit.

8

In the following example, a participant receives annual certified compensation of $80,000 and contributes at 25%.

| Match Allocation Example | | | |
|---|---|---|---|
| | Certified Compensation | Salary Deferral | Employer Match (Maximum 6%) |
| Quarter 1 | $20,000 | $5,000 | $1,200 |
| Quarter 2 | $20,000 | $5,000 | $1,200 |
| Quarter 3 | $20,000 | $5,000 | $1,200 |
| Quarter 4 | $20,000 | $500 | $1,200 |
| Totals | $80,000 | $15,500 | $4,800 |

If you will not be eligible for the company match until later in the Plan Year, you need to carefully consider the contribution rate that you select. You will not receive a company match on salary deferrals in a quarter in which you are not eligible for the match. That means if you reach the IRS salary deferral limit ($15,500 for 2007) prior to becoming match eligible, you will not receive a match. Note that all certified compensation counts toward the IRS maximum compensation limit of $225,000, even if you elect not to contribute. Thus, if you waited to contribute until you became match eligible and your certified compensation had already exceeded $225,000, you will not be eligible to contribute to the 401(k) Plan for that year and you would not receive any match.

Employer matching contributions are allocated to your Employer Matching Contribution Account under the 401(k) Plan.

Employer matching contributions are invested in Wells Fargo & Company common stock automatically (the "ESOP Fund"). You may elect to transfer your employer matching contributions into other investment funds offered under the 401(k) Plan. Before electing to diversify out of Wells Fargo & Company stock, you should consult with your tax advisor regarding the special tax treatment that might be available to you if you were to receive Wells Fargo & Company stock as part of a lump sum distribution from the 401(k) Plan. For more information regarding the tax treatment of distributions from the 401(k) Plan, refer to the "Taxes" section of this SPD/Prospectus and the Special Tax Notice located on Teamworks, Your Accounts, 401(k) Plan; or at https://www.wellsretirement,com. You may also request a copy of the Special Tax Notice by contacting the HR Service Center at 1-877-479-3557. For more information on diversifying your employer matching contributions see Appendix D - Notice of Your Rights Concerning Employer Securities.

To transfer all or a portion of your ESOP Fund go to:

- Teamworks, Your Accounts, 401(k) Plan; or

- https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

Employer matching contributions are also tax-deferred. You do not pay taxes on these contributions or earnings until these dollars are distributed to you from the 401(k) Plan.

**Vesting in Company Match**

Employer matching contributions and associated earnings are subject to a vesting schedule. This means that you earn ownership rights to a greater percentage of the employer matching contributions the longer you are employed with Wells Fargo. The vesting schedule is described below:

| Vesting Schedule | |
| --- | --- |
| **Years of Vesting Service** | **Vested Percentage** |
| Less than one year | 0% |
| 1 but less than 2 years | 25% |
| 2 but less than 3 years | 50% |
| 3 but less than 4 years | 75% |
| 4 or more years | 100% |

There are exceptions to this vesting schedule:

- You will become 100% vested upon attainment of normal retirement age if you were employed by Wells Fargo on that date.  Normal retirement age is age 65.

- You will become 100% vested if you incur a disability while employed by Wells Fargo. For purposes of the 401(k) Plan, you have incurred a "disability" if Wells Fargo determines, based on medical evidence satisfactory to Wells Fargo, that you have become unable due to injury or illness to perform the duties of any occupation for which you are qualified and such condition is expected to last for at least a year or will result in death. If you are eligible for Social Security disability benefits, you will be deemed to have incurred a disability for purposes of the 401(k) Plan.

- If you die while actively employed at Wells Fargo, you will become 100% vested in the employer matching contributions.

- If you were previously employed by a company that was acquired by or merged with Wells Fargo, you may have certain transition rules that apply to the calculation of vesting service.  If you have any questions, contact the Plan Administrator.

Any portion of your employer matching contributions, that is not vested when your employment ends, will be permanently forfeited unless you return to employment before incurring a break in service. A "break in service" means a period of at least 60 months in which you are not employed by Wells Fargo.

If you return to employment before incurring a break in service, the nonvested portion of your employer matching contributions will be restored to your Employer Matching Contribution Account. You will then have the opportunity to become further vested in those employer matching contributions.

**Share Award Contributions**

Wells Fargo may provide a discretionary profit sharing contribution called a "Share Award". To be eligible for the contribution, you must have certified compensation during the Plan Year and be actively employed on the last business day of the year. You will not be eligible for the Share Award contribution if you are on a Salary Continuation leave of absence as of December 31st of the Plan Year for which the contribution is made. Share Award contributions are allocated to your Share Award Account. The Share Award Account is automatically invested in Wells Fargo Stock. You may elect to transfer your Share Award Account into other investment funds offered under the 401(k) Plan. For more information on diversifying your employer matching contributions see Appendix D - Notice of Your Rights Concerning Employer Securities.

Effective January 1, 2007, the Share Award vesting changed to a four-year graded vesting schedule. If you terminated employment prior to January 1, 2007, your Share Award account remains subject to the five-year vesting schedule.

**Rollover Contributions**

If you are an eligible employee, you may be able to roll over a distribution from your former employer's qualified retirement plan to this 401(k) Plan. Making a rollover contribution allows for continuing tax deferral and growth in retirement savings. You do not have to be making Salary Deferral Contributions in order to make rollover contributions. Rollover contributions may require approval prior to being deposited in the 401(k) Plan.

To initiate the process, call the HR Service Center and speak with a 401(k) Plan specialist. Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

You are always 100% vested in your rollover contributions. Rollover contributions will be allocated to a Rollover Account set up under the 401(k) Plan for you. You can elect to invest your rollover contribution in one or more of the investment funds offered under the 401(k) Plan. Rollover contributions are not eligible for employer match.

**After-Tax Contributions**

You cannot make after-tax contributions to the 401(k) Plan. A number of years ago, however, the 401(k) Plan did allow participants to make after-tax contributions. In addition, some of the plans that have merged into this 401(k) Plan did allow participants to make after-tax contributions. Therefore, the 401(k) Plan will maintain an After-Tax Contribution Account for you if you had made after-tax contributions in the past.

**Contributions Made under Merged Plans**

Employer contributions made under merged plans may continue to follow the original vesting schedule provided in the merged plan or the employer contributions may be subject to the four-year graded vesting schedule.

## Limits on Contributions

The 401(k) Plan must comply with certain statutory limits and IRS regulations on contributions to maintain its tax-qualified (tax-exempt) status. You may be notified if you exceed some of these limits.

Section 415 of the Internal Revenue Code sets a limit on the total amount of Salary Deferral Contributions and matching contributions that can be made to your 401(k) Plan account in a calendar year. The limit is the lesser of $45,000 or 100% of your compensation. You will be notified if your contributions exceed or approach this limit.

**Annual Compensation Limit**

The IRS limits compensation that may be considered for calculating your Salary Deferral Contributions and matching contributions. For 2007, the compensation limit is increased to $225,000. This limit will be adjusted for inflation in the future by the IRS.

**Annual Maximum Salary Deferral Contribution**

Your Salary Deferral Contributions to the 401(k) Plan plus any amount deferred under any other employer's 401(k) plan cannot exceed a maximum set by the Internal Revenue Service for each calendar year. For 2007, the maximum deferral limit is $15,500. You may, however, be eligible to make age 50 catch-up contributions. For 2007, the age 50 catch up contribution limit is $5,000. If you reach the IRS's annual limit in this 401(k) Plan only during the calendar year, no further deferrals will be taken from your remaining pay checks for the calendar year. If the limit is exceeded due to deferrals in another employer's plan, you must request a refund of contributions plus associated earnings from one of the plans you contributed to. If the refund is received by April 15 of the following calendar year, it is included in income for the year deferred. If you do not take appropriate steps to receive a refund, tax penalties may apply.

Before April 1 of the following calendar year, request a refund by calling the HR Service Center and speaking with a 401(k) Plan specialist. Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

**Annual Maximum for Highly Compensated Employees**

Additional IRS limits apply to the Salary Deferral Contributions and matching contributions of participants who are considered "highly compensated" under the Internal Revenue Code. Wells Fargo compares the Salary Deferral Contributions of all highly compensated employees with the Salary Deferral Contributions of all nonhighly compensated employees. The difference between the contribution percentages of each group cannot exceed legal maximums. If the maximum is exceeded, some Salary Deferral Contributions may need to be refunded to certain highly compensated employees. A similar comparison is made for matching contributions. Wells Fargo may limit Salary Deferral

Contributions for highly compensated employees in order to avoid refunds. If you are subject to a limit on Salary Deferral Contributions, you will be notified.

**Military Leave**

If you are on a qualified military leave, you may be eligible for special rights under the Uniformed Service Employment and Re-Employment Rights Act (USERRA) with respect to the 401(k) Plan. Upon your return to active employment with Wells Fargo, contact the Plan Administrator for more information.

## Investment Options

Your Salary Deferrals Contributions, employer contributions and rollover contributions may be invested in one or more of the following investment funds. See Appendices A-D for information on

12

investment fund performance, investment management fees and your diversification rights. In addition, all accounts transferred into the 401(k) Plan from a plan that merged into the 401(k) Plan generally can be invested in one or more of the following investment funds. Before electing to transfer your employer matching contributions out of the ESOP Fund into one or more of the other investment funds, you should consult with your tax advisor regarding the special tax treatment that might be available to you if you were to receive Wells Fargo & Company stock as part of a lump sum distribution from the 401(k) Plan. For more information regarding the tax treatment of distributions from the 401(k) Plan, refer to the "Taxes" section of this SPD/Prospectus and the Special Tax Notice located on Teamworks, Your Accounts, 401(k) Plan; or at https://www.wellsretirement.com. You may also request a copy of the Special Tax Notice by contacting the HR Service Center at 1-877-479-3557.

- Stable Value Fund;

- Bond Index Fund;

- Conservative Allocation Fund;

- Moderate Balanced Fund;

- Growth Balanced Fund;

- Aggressive Allocation Fund;

- Asset Allocation Fund;

- Dodge & Cox Fund;

- S&P 500 Index Fund;

- Diversified Equity Fund;

- Capital Growth Fund;

- Large Company Growth Fund;

- S&P MidCap Index Fund;

- Diversified Small Cap Fund;

- EuroPacific Growth Fund;

- Nasdaq-100 Index® Fund; and/or

- Wells Fargo Stock Fund.

**Participant-Directed Accounts**

The 401(k) Plan is intended to constitute a plan described in §404(c) of the Employee Retirement Income Security Act and Title 29 of the Code of Federal Regulations section 2550.404c-1. As a result, the trust fund has been divided into the investment funds listed above that you must choose among for the investment of your account. You or your beneficiary, and not any 401(k) Plan fiduciary, will be

responsible for any investment losses that result from you or your beneficiary's investment selections. As a participant or beneficiary who has elected to invest in the specific investment funds listed above, you will be given in addition to the information contained in this SPD/Prospectus:

- A general description of the investment objectives and risk and return characteristics of each investment fund including information relating to the type and diversification of assets comprising the investment fund;

- Information identifying the investment manager of each investment fund;

- An explanation of how you or your beneficiary may give investment instructions and the limitations on the investment instructions that you or your beneficiary may give; and

- The name, address and phone number of the Plan Administrator (and any person designated to act on behalf of the Plan Administrator) responsible for providing additional information, which the Plan is required to furnish on request.

Upon request to the HR Service Center, 1-877-HR WELLS (1-877-479-3557) or logging on to www.wellsretirement.com, the following additional information will be provided to you or your beneficiary about the investment funds:

- Information concerning the current value of the investment funds as well as their past and current investment performance; and

- Information concerning the value of the shares or units of the investment funds held in your account.

**Investment Changes**

You may direct all contributions into one investment fund, or a mix of investment funds in multiples of 1%. If you do not choose an investment fund, your contributions will be invested in the Moderate Balanced Fund. Employer matching contributions are automatically invested in Wells Fargo & Company common stock in the ESOP Fund. You may, however, elect to transfer the matching contributions from the ESOP Fund to any of the other investment funds available in the 401(k) Plan at any time.

The following changes can be made:

- The investment mix for future salary deferral contributions;

- The investment mix for an existing account balance including matching contributions allocated each quarter to the ESOP Fund; or

- The investment mix for both future contributions and your existing account balance.

To make an investment election change go to:

- Teamworks, Your Accounts, 401(k) Plan; or

- https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

If the request is received prior to 3:00 p.m. Central Time on a business day, the transaction will be processed within two business days. A request received after 3:00 p.m. will be processed as if it were received on the next business day.

The 401(k) Plan allows Wells Fargo to establish whatever rules and procedures it determines to be necessary or appropriate from time to time for processing investment elections and other transactions (such as loans or withdrawals). This specifically includes rules prohibiting or limiting "market timing" activities or anything else that Wells Fargo decides could have an adverse impact on other participants or on the Plan. The possible rules could involve delaying the implementation of elections, establishing deadlines for receiving elections in order for them to be processed by a certain date, limiting the number of elections that can be made in a particular period or the dollar amount of transactions that can be made, or any other measure that Wells Fargo decides is called for under the circumstances. The rules could apply to investments in a particular investment fund, or to all of the investment funds. At the time any such rules or procedures are implemented, you will be notified about them.

**Investment Risks**

Performance information contained in Appendices A and B reflects change in share price and reinvestment of all distributions. Individual returns may differ due to the level and timing of activity in your account. Past returns are not necessarily an indication of future results. Shares of the funds are not obligations, deposits or accounts of or endorsed or guaranteed by Wells Fargo & Company or any of its bank or nonbank affiliates, and are not insured or guaranteed by the U.S. Government, the Federal Deposit Insurance Corporation (FDIC), the Federal Reserve System or any other agency and are subject to investment risk, including the possible loss of principal. Performance information is provided by Galliard Capital Management, Inc., the Investment Manager for the Stable Value Fund; Wells Fargo Funds, the Investment Manager for the Wells Fargo Mutual Funds and Common Collective Funds; the American Funds Group, the Investment Manager for the EuroPacific Growth Fund; and Dodge & Cox, the Investment Manager for the Dodge & Cox Fund, and is supplemental to the fund Prospectus. Prior to investing, refer to the fund Prospectus or your company representative for complete information regarding management fees, expenses and other special risks and investment considerations.

15

**Investment Fund Overview**

A brief description of each investment fund follows. The investment funds are listed in order of perceived investment risk – from lowest to highest. Wells Fargo makes no representation about the actual risk of any fund. This SPD/Prospectus is accompanied by the 401(k) Plan Appendices A -D, which is updated from time to time. Appendices A-D contain information about the investment funds and gives information about the historical investment return (earnings and losses) for each investment fund, the investment management fees for each of the funds, and provides notification of your rights to diversification. You may receive additional information about the investment funds including fund descriptions and prospectuses. Additional information regarding investment fees and costs are located in the investment fund prospectuses and descriptions.

To request investment fund information:

- Teamworks, Your Accounts, 401(k) Plan; or

- https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

For assistance in obtaining investment fund information, call the HR Service Center. Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

**Stable Value Fund**

Contributions to the Stable Value Fund are invested in a variety of investment contracts and instruments which are not expected to experience price fluctuation in most economic or interest rate environments. Examples of these include guaranteed investment contracts (GICs), bank investment contracts (BICs), and security backed contracts (or GIC Alternatives). The fund's key investment objective is preservation of principal. Diversification and credit quality are also of primary importance in determining investments held in the fund. Like any investment, there is risk involved in the Stable Value Fund. However, it carries the lowest risk of the investment options offered. The Stable Value Fund is appropriate for investors seeking more income than money market funds without the price fluctuation of stock or bond funds.

**Bond Index Fund**

Contributions to the Bond Index Fund are invested in a large number of bonds considered to be representative of the U.S. bond market. The Bond Index Fund seeks to achieve a total rate of return equal to Lehman Brothers Government/Corporate Bond Index, which is comprised of virtually all out-standing debt securities with remaining maturities greater than one year and issued by the U.S. Treasury, U.S. Government Agencies and investment-grade Corporations. Therefore, the Index and the fund, include bonds of many issuers and maturity dates. The fund does not include bonds rated below investment grade (junk bonds) or mortgage-backed securities. Unlike stable value investments, which are carried at book value (resulting in little share price movement), bond investments have interest rate sensitivity that may cause the value of the Bond Index Fund to move up or down. Because of the interest rate risk, the Bond Index Fund carries more risk than the Stable Value Fund, but less risk than the balanced funds or stocks funds.

**Conservative Allocation Fund**

Contributions to the Conservative Allocation Fund, formerly known as the Strategic Income Fund, are invested in a diversified portfolio with a target allocation of 80% fixed income securities and 20% stocks. While typically within 5% of its target allocation, the fund employs tactical asset allocation which may overweight either fixed income or stocks by 5% when it is compelling to do as defined by a disciplined valuation process. The fixed-income portion includes four different bond portfolios and a money market portfolio. The stock portion invests in a diversified portfolio of in come-oriented stocks, large company value stocks, large company growth stocks, small company stocks, international stocks and an S&P (Standard & Poor's) 500 Index portfolio. Diversifying between different styles limits the impact if any one of the styles is not performing well. The Conservative Allocation Fund seeks to provide current income and capital appreciation with an emphasis on principal protection through limited stock exposure. In general, investments in stocks are more risky than investments in bonds. The Conservative Allocation Fund, therefore, carries more risk than the Stable Value Fund, but less risk than the balanced funds that hold more stocks, or the stock funds.

**Moderate Balanced Fund**

Contributions to the Moderate Balanced Fund are invested in a diversified portfolio with a target allocation of 60% fixed income securities and 40% stocks. While typically within 5% of its target allocation, the fund employs tactical asset allocation which may overweight either fixed income or stocks by 10% when it is compelling to do so as defined by a disciplined valuation process. The fixed-income portion includes a variety of different bond portfolios. The stock portion invests in a diversified portfolio of in come-oriented stocks, large company value stocks, large company growth stocks, small company stocks, international stocks and an S&P 500 Index portfolio. Diversifying between different styles limits the impact if any one of the styles is not performing well. The Moderate Balanced Fund seeks to provide current income and capital appreciation by investing in a blend of bond and stock investments. In general, investments in stocks are more risky than investments in bonds. The Moderate Balanced Fund, therefore, carries more risk than the Stable Value Fund, Bond Index Fund or Conservative Allocation Fund, but less risk than the balanced funds that hold more stocks, or the stock funds.

**Growth Balanced Fund**

Contributions to the Growth Balanced Fund are invested in a diversified portfolio with a target allocation of 35% fixed income securities and 65% stocks. While typically within 5% of its target allocation, the fund employs tactical asset allocation which may overweight either fixed income or stocks by 15% when it is compelling to do so as defined by a disciplined valuation process. The fixed-income portion of this balanced fund includes three different bond strategies. The stock portion invests in a diversified portfolio of income-oriented stocks, large company value stocks, large company growth stocks, small company stocks, international stocks and an S&P 500 Index portfolio. The Growth Balanced Fund seeks to provide long-term growth through an emphasis on stock investments while moderating risk and producing income with bonds. In general, investments in stocks are more risky than investments in bonds. The Growth Balanced Fund, therefore, carries more risk than the Stable Value Fund, Bond Index Fund, Conservative Allocation Fund or Moderate Balanced Fund, but less risk than the Aggressive Allocation Fund (formerly known as the Strategic Growth Allocation Fund) which holds more stocks, or the stock funds.

**Aggressive Allocation Fund**

Contributions to the Aggressive Allocation Fund, formerly known as the Strategic Growth Allocation Fund, are invested in a diversified portfolio with a target allocation of 20% fixed-income securities and

80% stocks. While typically within 5% of its target allocation, the fund employs tactical asset allocation which may overweight either fixed income or stocks by 15% when it is compelling to do so as defined by a disciplined valuation process. The fixed-income portion of this balanced fund includes three different bond strategies. The stock portion invests in a diversified portfolio of income-oriented stocks, large company value stocks, large company growth stocks, small company stocks, international stocks and an S&P 500 Index portfolio. The Aggressive Allocation Fund seeks to provide long-term growth through a heavy emphasis on stock investments while moderating risk and producing income with a small exposure to bonds. In general, investments in stocks are more risky than investments in bonds. The Aggressive Allocation Fund, therefore, carries more risk than the Stable Value Fund, Bond Index Fund or Conservative Allocation Fund, Moderate Balanced Fund or Growth Balanced Fund, but less risk than the stock funds.

**Asset Allocation Fund**

Contributions to the Asset Allocation Fund are invested in a diversified portfolio of 40% bonds and 60% stocks. While typically within 5% of its target allocation, the fund employs tactical asset allocation which may overweight either fixed income or stocks by as much as 25% when it is compelling to do so as defined by a disciplined valuation process. This high level of flexibility relative to the other balanced funds reflects the fund's increased emphasis on capturing incremental returns by shifting more of the portfolio toward the undervalued asset class. The stock portion of the fund invests in stocks which track the S&P 500 Index. The bond portion of the fund invests in U.S. Treasury bonds with maturities ranging from 20 to 30 years. The Asset Allocation Fund invests in stocks and bonds and, therefore, carries more risk than the Stable Value Fund, or the Bond Index Fund and less risk than the stock funds.

**Dodge & Cox Stock Fund**

Contributions to the Dodge & Cox Stock Fund are primarily invested in a broadly diversified portfolio of common stocks. In selecting investments, the fund invests in companies that, in Dodge & Cox's opinion, appear to be temporarily undervalued by the stock market but have a favorable outlook for long-term growth. The Fund focuses on the underlying financial condition and prospects of individual companies, including future earnings, cash flow and dividends. Companies are also selected with an emphasis on financial strength and sound economic condition. The Dodge & Cox Stock Fund is an all equity portfolio and therefore will typically carry more investment risk than the Stable Value, Bond Index or balanced fund options.

**S&P 500 Index Fund**

Contributions to the S&P 500 Index Fund are invested in essentially the same stocks in the same proportion as the S&P 500 Index. These stocks represent approximately 75% of the market value of all publicly-traded common stocks in the United States. The stocks included in the fund represent those held by the index and do not reflect subjective opinions concerning individual companies or industries. The S&P 500 Index Fund seeks to provide investors with long-term capital growth and income by approximating the total return of the S&P 500 Index.

**Diversified Equity Fund**

Contributions to the Diversified Equity Fund are invested in a diversified portfolio of stocks. The portfolio invests in five different equity investment styles. The Index component is designed to perform similarly to the S&P 500 Index. The Large Company Value component, invests in stocks with above average dividend income or those that the management believes to be undervalued relative to the broader market. The Large Company Growth component, invests in stocks of large companies where

18

appreciation of the share prices is the primary objective. The International component invests in foreign stocks, providing for increased diversification and global growth opportunities. The Diversified Small Cap component invests in stock of small companies with the potential for dramatic growth. The Diversified Equity Fund seeks to provide long-term capital appreciation. Annual return volatility is moderated through diversifying among five unique and complimentary equity styles. The Diversified Equity Fund is an all equity portfolio and, therefore, carries more risk than the Stable Value Fund, Bond Index Fund or balanced funds.

**Capital Growth Fund**

Contributions to the Capital Growth Fund are invested in a diversified portfolio of stocks. The Capital Growth Fund seeks long-term capital appreciation through investment principally in the common stocks of large, domestically traded companies with market capitalizations (number of shares outstanding times the current stock price) of $3 billion or more, that the management team believes have the potential for above average earnings growth. The investment process is based on rigorous bottom-up fundamental research. The team looks for stocks that have attractive growth prospects, accelerating sales and earnings, and positive fundamentals. The fundamental research process employed by the investment manager is designed to "surround the company" to develop unique fundamental insights. The team conducts a thorough analysis of current balance sheet information to understand future earnings and applies a disciplined approach to establishing valuation targets for the stocks invested and constructs the portfolio to obtain a balance of return versus risk. The Capital Growth Fund is an all equity portfolio and therefore will typically carry more investment risk than the Stable Value, Bond Index or balanced fund options.

**Large Company Growth Fund**

Contributions to the Large Company Growth Fund are invested in the stocks of large companies with superior growth potential. The Fund invests in high quality, dynamic growth companies whose earnings are expected to grow at least 50% faster than the market, as measured by the earnings of the S&P 500 Index stocks. Generally, the Large Company Growth Fund seeks to provide long-term capital appreciation through investment primarily in large, high quality domestic companies. The Large Company Growth Fund carries more risk than the Diversified Equity Fund or the S&P 500 Index Fund because it invests in one specific style of equity management and because it invests in fewer companies (30 to 50 companies), but less risk than the small company or international funds.

**S&P MidCap Index Fund**

Contributions to the S&P MidCap Index Fund are invested in a diversified portfolio of stocks that seeks to approximate, before fees and expenses, the total return of the Standard & Poor's 400 MidCap Index by investing in the same stocks in approximately the same percentages as the stocks that make up this Index. As an index strategy, the Fund's decisions to buy and sell securities are not based upon analysis of the fundamentals of particular companies and financial or market factors. The Standard & Poor's 400 MidCap Index is designed to reflect the aggregate performance of the stocks of mid-sized U.S. Companies. The S&P MidCap Index Fund is an all equity portfolio of primarily medium sized companies and therefore will typically carry more investment risk than the Stable Value, Bond Index, balanced fund options, and similar to or slightly higher risk levels than the Plan's larger capitalization oriented funds such as the S&P 500 Index, Dodge & Cox Stock, Large Company Growth and Capital Growth funds.

**Diversified Small Cap Fund**

Contributions to the Diversified Small Cap Fund are invested in the stocks of smaller companies. The fund combines multiple small company portfolios: a small cap index style, small company growth styles, and small company value styles. The Diversified Small Cap Fund seeks to provide long-term capital appreciation while moderating annual return volatility by diversifying its investments across different small capitalization equity investment styles. Investments in smaller companies generally carry greater risk than is associated with larger companies. Therefore, the Diversified Small Cap Fund carries more risk than the Large Company Growth Fund.

**EuroPacific Growth Fund**

Contributions to the EuroPacific Growth Fund are invested in the stocks of non-U.S. companies that appear to offer above-average growth potential. The size of companies in which the fund invests range from small firms to multinational corporations located in major world markets as well as in smaller, developing countries. The EuroPacific Growth Fund seeks to provide long-term growth of capital by investing in companies based outside the United States. In general, investments outside the United States involve special risks, such as currency fluctuations, political instability, differing securities regulations and periods of illiquidity. Therefore, the EuroPacific Growth Fund carries some risks not found in domestic equity funds.

**Nasdaq-100 Index® Fund**

Contributions to the Nasdaq-100 Index Fund are invested in essentially the same stocks in the same proportion as the Nasdaq-100 Index. The Nasdaq-100 Index reflects Nasdaq's 100 largest non-financial companies across major industry groups. The stocks included in the fund represent those held by the index and do not reflect subjective opinions concerning individual companies or industries. The Nasdaq-100 Index Fund seeks to provide investors with long-term capital growth by approximating the return of the Nasdaq-100 Index. The risk level for this Nasdaq-100 Index Fund is high as securities currently held in the Nasdaq-100 Index are concentrated in specific industries such as computer hardware and software, telecommunications, retail/wholesale trade and bio technology. Historically, these industries have experienced higher volatility than the equity market as a whole.

**Wells Fargo Stock Fund**

Contributions to the Wells Fargo Stock Fund and Wells Fargo ESOP Fund are invested primarily in common stock of Wells Fargo & Company. Wells Fargo & Company common stock is traded on the New York Stock Exchange and the price per share of the stock is subject to substantial variation. Because the Wells Fargo Stock Fund and the Wells Fargo ESOP Fund maintain cash balances to meet distribution and withdrawal requests, a unit in the Wells Fargo Stock Fund or Wells Fargo ESOP Fund does not represent a share of Wells Fargo & Company common stock. Dividends paid on Wells Fargo & Company common stock held in the Wells Fargo Stock Fund or the Wells Fargo ESOP Fund are allocated according to each participant's relative number of units in the Wells Fargo Stock Fund or Wells Fargo ESOP Fund. Due to lack of diversification, an investment in the Wells Fargo Stock Fund or Wells Fargo ESOP Fund involves more risk than the other funds.

## Account Valuation

When you choose an investment fund, you are adding your contributions to those of other 401(k) Plan participants who have made the same investment fund choice. The value of each investment fund is calculated daily. Each day, the amount of investment gain or loss is calculated for each of the investment funds, as follows:

- The beginning value of the investment fund is adjusted for cash flow of all participants – for example, contributions, distributions and investment fund transfers;

- The amount of investment gain or loss is expressed as a percentage. This percentage is then multiplied against the beginning value of each participant's account, taking into consideration certain activities like distributions and loans, to determine the amount of gain or loss that will be allocated to each account; and

- The return for each investment fund is calculated as of the end of the business day (each day is a "valuation date").

### Administrative and Investment Expenses

In general, administrative expenses and investment management fees are paid by participants and may be paid out of the Trust Fund. Expenses related to external administrative fees, including external recordkeeping expenses, and legal and communication costs, are paid by Plan participants and are reflected in a reduction of the investment return. Where permitted, investment management fees are also paid by participants for most of the funds. The investment management fees may be net of any negotiated rebates. Wells Fargo & Company pays all fees charged by departments or groups within Wells Fargo & Company, as well as any investment management fees which are not permitted to be paid by participants. Detailed information regarding the investment management fees and other fund fees may be found in the investment fund prospectuses. In addition, refer to Appendix C for Disclosure of 2007 Investment Management Fees.

To request investment fund prospectuses:

- Teamworks, Your Accounts, 401(k) Plan; or

- https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

For assistance in obtaining investment fund prospectuses, call the HR Service Center. Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

### Dividend Information

Dividends on shares of Wells Fargo & Company common stock are paid if declared by the Wells Fargo & Company Board of Directors. If the Board of Directors declares a dividend, the board will determine the amount of the dividend and the record and payment dates for the dividend. Historically, Wells Fargo & Company has paid cash dividends on March 1, June 1, September 1 and December 1 to holders of record as of the fourth Friday prior to the respective payment date. Dividends are paid to participants in the 401(k) Plan based on the number of units, if any, held by a participant in the Wells Fargo Stock Fund and ESOP Fund held in your vested account on the record date. You have three options with respect to the vested portion of your 401(k) Plan account. You can have cash dividends (1) reinvested in the Wells Fargo Stock Fund or ESOP Fund, as the case may be, (2) paid out to you in cash, or (3) invested in the Wells Fargo Stock Purchase Plan. A dividend will be paid according to your election on file as of 3:00 p.m. Central Time on the record date for the dividend. If no election is on file, the dividend will be reinvested in the Wells Fargo Stock Fund or ESOP Fund. Dividends paid with respect to the unvested portion of your 401(k) Plan account will be reinvested automatically in the Wells Fargo Stock Fund or ESOP Fund, as the case may be. Shares of Wells Fargo & Company

21

common stock distributed as a result of a stock dividend will be deposited automatically into your 401(k) Plan account on the dividend payment date.

To make your election for dividend payment, use:

- Teamworks, Your Accounts, 401(k) Plan; or

- https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

For dividend questions, Plan specialists are available 7 a.m. to 8 p.m. CST by selecting *Option 1* at the main menu.

In any given year, the Board of Directors of Wells Fargo & Company determines whether dividends will be declared and the amounts of the dividends. There is no guarantee that dividends will be paid in the future.

If you choose to receive dividend payments in cash, those payments will be included in your gross taxable income and are not eligible for rollover into an Individual Retirement Account (IRA). Although taxes will not be withheld from the dividend payments, you will need to include the amount of the

dividends you receive in a year as dividend income when filing your income taxes. You will receive a Form 1099-DIV each year, reporting the total amount of dividends paid to you in a calendar year.

## Loans

While the purpose of the 401(k) Plan is to help you save for retirement, its loan feature allows you to borrow from your 401(k) Plan Account while actively employed. The loan is repaid with interest to your 401(k) Plan account through payroll deductions.

### Eligibility

If you participate in the 401(k) Plan and are actively employed by Wells Fargo, you may take out loans from the 401(k) Plan. Only two loans may be outstanding at a time and only one loan can be a principal residence loan. In addition, only two loans may be requested per year. Your Spouse must consent to the receipt of a loan from the 401(k) Plan if you were a participant in a previous employer's plan with joint and survivor annuity options that merged with the 401(k) Plan.

### Types of Loans

There are two types of loans: general purpose and principal residence. A general purpose loan is available for any reason. The maximum term of a general purpose loan is five years. A principal residence loan is available only for the purchase of your principal residence. It cannot be used to remodel or refinance your existing home, or to pay off an existing mortgage. The maximum term for a principal residence loan is 20 years.

### Interest Rates

The loan must be paid back with interest. The interest rate is determined quarterly and is set at 2% above the prime rate charged by Wells Fargo Bank, N.A., the Plan Trustee.

The interest rate remains the same throughout the entire term of the loan. Both general purpose loans and principal residence loans bear the same rate of interest. Interest begins to accrue on the loan effective date.

Under current tax laws loan interest is not tax deductible. Interest payments will be considered investment earnings to your 401(k) Plan accounts, so they will be taxed as income upon future distribution or withdrawal.

**Amounts Available and Security for Loan**

The amount available for a 401(k) Plan loan is determined based on the most current valuation of your 401(k) Plan accounts.

The minimum amount for any loan is $500. The maximum amount for any loan is set by law. The maximum available amount for a loan is the lesser of (a) $50,000, less the highest outstanding balance of all loans in the past one-year period (including any defaulted loan plus accrued interest); or (b) 50% of your vested 401(k) Plan accounts. Plan loans will be secured by the balance of your 401(k) Plan accounts. No additional collateral is required.

**Sources of Loan Funds**

Loans will be made from your 401(k) Plan accounts in this order:

- Salary Deferral Account;

- Rollover Account;

- Matching Contribution Account;

- Share Award Account;

- Pre-1987 Employee After-Tax Contribution Account including earnings;

- Post-1986 Employee After-Tax Contribution Account including earnings;

- Transferred Account (except the portion of the Transferred Account that comprises the TAP Retirement Account and Company Plus Account).

The account balance in each category will be depleted before moving to the next category. Within each category, account balances will be drawn, pro rata, from the investment funds in which those balances are invested.

**Requesting a Loan**

If you already have the maximum number of loans outstanding, you must pay off one of the existing loans before initiating a request for a new loan.

After completing the loan transaction, you will be sent a promissory note and a check for the loan proceeds. Your endorsement of the loan check constitutes acceptance of the terms of the promissory note. If you decide not to accept the terms, the note and check must be returned to the Plan

Administrator. The returned loan check will then be deposited and invested at the current net asset value into your 401(k) Plan accounts.

**Repaying a Loan**

Loan payments will be made by payroll deduction each pay period. Upon requesting a loan, you will receive loan documents describing the terms of the loan and a loan reamortization schedule that details the repayment schedule.

Each loan repayment will be deposited to your 401(k) Plan accounts on the payday it is deducted, and will be invested according to your current investment election. If no investment election is on file, your loan repayments will be invested in the Moderate Balanced Fund. Each loan repayment will be returned, pro rata, to the contribution sources from which the loan proceeds were taken.

If at any time while you are employed by Wells Fargo you do not make a loan payment, the total outstanding loan balance (principal and accrued interest) will be considered a defaulted loan after 90 days from the date of the first missed payment. A defaulted loan will be considered a taxable distribution to you and may also be subject to a 10% early distribution tax penalty. Once your loan is considered in default, the loan will remain as part of your account and will continue to accrue interest. The defaulted loan may limit your ability to take a new loan, as it will be considered an existing loan and the amount of the defaulted loan plus interest that accrues on the defaulted loan will reduce the maximum statutory loan amount available. Repayment of a defaulted loan will be allowed, but only a complete payoff of the principal and accrued interest will be accepted. The defaulted loan will be offset upon termination of employment or attainment of age 59 ½.

If you terminate employment from Wells Fargo for any reason, or you die, all outstanding loans will be immediately due and payable. You (or your designated beneficiary in the case of your death) have two choices:

- Repay the loan in full within 90 days of your termination by certified check; or

- Request a final distribution of your 401(k) Plan accounts, with the note for the loan distributed in kind. In other words, your total 401(k) Plan accounts will be reduced by the amount outstanding on the loan, and the note will be canceled. The outstanding loan balance will be considered taxable income and may be subject to early distribution tax penalties.

If you do not choose one of these options, the outstanding loan will be declared in default and a partial distribution of the outstanding loan will be made automatically. This distribution is taxable and may be subject to early distribution tax penalties.

If you have loans outstanding that were issued before January 1, 1996 or were transferred to the 401(k) Plan from plans that were merged into the 401(k) Plan, you may have other terms and conditions applicable to the loan. If you have one of these loans and you terminate employment with Wells Fargo, you should make arrangements with the Plan Administrator for loan payoff.

**Early Loan Payoff**

You may prepay a loan in part or in full at any time. The loan payoff and due date will be calculated for you.

To prepay a loan, call the HR Service Center and speak with a 401(k) Plan specialist.

24

**Military Leave and Loans**

If you are on a qualified military leave, special rules may apply to your loans. In addition, you may be eligible for other special rights under the Uniformed Service Employment and Reemployment Rights Act with respect to the 401(k) Plan upon your return to active employment with Wells Fargo.

For more information about military leaves and loans, contact the HR Service Center and speak with a 401(k) Plan specialist.

## Withdrawals while Employed

You may be entitled to request a withdrawal of all or a portion of your vested 401(k) Plan accounts while actively employed. Some legal restrictions apply, however, to withdrawals of certain 401(k) Plan contributions. Employer contribution accounts must be vested before they can be withdrawn. There are four types of in-service withdrawals available from the 401(k) Plan:

- Nontaxable Withdrawals – Pre-1987 Employee After-Tax Contribution Account (excludes earnings);

- Regular Withdrawals – All vested accounts except the Salary Deferral Account and certain Transferred Accounts. There is also a limit on the amount you can withdraw if you have not been a participant in the 401(k) Plan for five years.  Contributions for the last 24 months may not be withdrawn from the Matching Contribution Account  unless you have five years of participation;

- Age 59½ Withdrawals – All vested account balances except certain Transferred Accounts; and

- Hardship Withdrawals – All vested accounts except certain Transferred Accounts and the earnings on the Salary Deferral Account after December 31, 1988 are available as a source of funds in certain financial hardship situations.

The following chart describes who is eligible for withdrawals and which Accounts are available. Special rules apply for withdrawals from the former Wells Fargo Tax Advantage and Retirement Plan (TAP) that merged into the Wells Fargo & Company 401(k) Plan on July 1, 1999. (See the footnote on chart.) There is no limit on the number of hardship withdrawals you can request each calendar year.

| Withdrawals While Employed | | |
|---|---|---|
| Type | Accounts Available | Eligibility |
| Nontaxable Withdrawal | All after-tax contributions made to the 401(k) Plan before 1987 (excluding earnings).  Note:  Special rules apply in the case of plans that had after-tax contributions after 1986 and merged into this 401(k) Plan. | You must have made after-tax contributions before 1987. |
| Regular Withdrawal | All vested accounts except the Salary Deferral Account and certain portions of the Transferred Account.[1] | |
| Age 59½ Withdrawal | All vested accounts except certain portions of the Transferred Account.[1] | You must be 59½ to take this type of withdrawal. |

| Withdrawals While Employed | | |
|---|---|---|
| Type | Accounts Available | Eligibility |
| Hardship Withdrawal | All vested accounts except certain portions of the Transferred Account and earnings on the Salary Deferral Account after December 31,1988.[2] | You must take all in-service withdrawals and loans available in the 401(k) Plan prior to taking this type of withdrawal. You may apply for and receive a hardship withdrawal any time, as long as funds are available in the account and proper documentation is provided. |

[1] The portion of a Transferred Account that comprises the TAP Retirement Account is not available for a regular or an age 59½ withdrawal.

[2] The portion of a Transferred Account that comprises the TAP Retirement Account and the Company Plus Account and any earnings on any portion of a Transferred Account attributed to Salary Deferral Contributions after December 31, 1988 is not available for a hardship withdrawal.

**Sources of Withdrawal Funds**

The funds in each category of account will be exhausted before proceeding to the next category. Withdrawals are taken, pro rata, from each investment fund in which an account is invested. Withdrawals are paid in cash, unless you elect to take all or part of the withdrawal that is invested in the Wells Fargo Stock Fund or ESOP Fund in the form of Wells Fargo & Company common stock. In any event, withdrawals of the value of partial shares of Wells Fargo & Company common stock will be paid in cash. Your vested Share Award account balance can also be paid in Wells Fargo & Company common stock.

As of the date any withdrawal request is processed, funds will come from these accounts in the following order (if available):

- Pre-1987 Employee After-Tax Contribution;

- Post-1986 Employee After-Tax Contribution plus earnings on all after-tax contributions;

- Pre-1987 Employee After-Tax Contribution Earnings;

- Rollover Account;

- Matching Contribution Account;

- Share Award Account;

- Salary Deferral Account (applies only to Age 59½ and Hardship Withdrawals); and

- Transferred Account.

**After-Tax Contribution Withdrawal**

You may receive a withdrawal of all or a part of any pre-1987 employee after-tax contributions held in your Employee After-Tax Contribution Account while you are employed with Wells Fargo.

26

**Regular In-Service Withdrawal**

If you are employed by Wells Fargo, you may receive a regular in-service withdrawal from the vested portion of your 401(k) Plan accounts except your Salary Deferral Account and earnings, and certain portions of your Transferred Account (if applicable). If you have not been an active participant in the 401(k) Plan (or a plan that merged into the 401(k) Plan) for at least five years, the amount you may receive in a regular in-service withdrawal from your Matching Contribution Account and Share Award Account is limited. Immediately after the withdrawal, the value of such accounts cannot be less than the amount allocated to those accounts from employer contributions received during the 24 months prior to the regular in-service withdrawal.

**Age 59 1/2 Withdrawal**

If you are age 59½ or older and employed by Wells Fargo, you may request to receive a withdrawal of all or a part of your vested 401(k) Plan accounts except certain Transferred Accounts.

**Hardship Withdrawal**

You may receive a hardship withdrawal while you are employed with Wells Fargo from your vested 401(k) Plan accounts (excluding earnings on your Salary Deferral Contributions after December 31, 1988 and certain Transferred Accounts). Hardship withdrawals will be made only if the payment is to:

- Prevent eviction from or foreclosure on your principal residence;

- Cover medical expenses incurred by you, your Spouse or eligible dependents that are not paid through health insurance;

- Pay tuition, room and board for the next year of post-secondary education for you, your Spouse, children or eligible dependents;

- Cover costs directly related to the purchase (excluding mortgage payments) of your principal residence, including closing costs and down payment;

- Pay for funeral or burial expenses for your Spouse, parent, child or eligible dependents; or

- Pay for the repair of damages to your principal residence that would qualify for the casualty deduction on your federal tax return and are not paid through homeowners insurance or other insurance of federal or state reimbursement programs.

The hardship withdrawal cannot exceed the amount of the immediate and heavy financial need created by the hardship, but it may include amounts necessary to pay any reasonably anticipated federal, state or local income taxes or penalties as a result of the hardship withdrawal. Before receiving a hardship withdrawal, you must receive all other in-service withdrawals and nontaxable loans available under all plans maintained by Wells Fargo or any subsidiary of Wells Fargo.

If you are requesting a hardship withdrawal, you will need to speak with a Plan Specialist who will give you instructions about the documentation needed to demonstrate the hardship and the amount necessary to meet the need.

If you receive a hardship withdrawal, all Salary Deferral Contributions under this 401(k) Plan, Wells Fargo stock dividend reinvestment into this 401(k) Plan and any other salary deferral contributions (including catch up contributions) to any retirement plans (both qualified retirement plans and nonqualified deferred compensation plans) maintained by Wells Fargo & Company or a subsidiary of Wells Fargo & Company will be suspended for six months, beginning with the next available payroll cycle.

### Taxation of Withdrawals

For information regarding the tax treatment of withdrawals and distributions from the 401(k) Plan, refer to the "Taxes" section of this SPD/Prospectus and the Special Tax Notice located on Teamworks, Your Accounts, 401(k) Plan; or at https://www.wellsretirement,com. You may also request a copy of the Special Tax Notice by contacting the HR Service Center at 1-877-479-3557. You should also consult with your tax advisor before making a withdrawal request.

### How to Request an In-Service Withdrawal

To request a withdrawal, call the HR Service Center or you may request a withdrawal online. In general, after you have requested the withdrawal, a Special Tax Notice will be provided to you. Once you have received the Special Tax Notice, you must call the HR Service Center to complete your request for withdrawal. Your withdrawal will be processed as soon as administratively feasible after the request has been completed. When requesting a withdrawal online, you have the option of reading and waiving the 30 day waiting period online, or requesting to have a Special Tax Notice mailed to you.

If the withdrawal is one that requires a spousal consent, the proper forms will also be sent. If your withdrawal is subject to spousal consent, withdrawal will not be made until after Wells Fargo receives your Spouse's written, notarized consent.

## Distributions to You

When you terminate employment with Wells Fargo and all subsidiaries of Wells Fargo, or if you incur a disability, you are eligible to receive a distribution of your vested 401(k) Plan accounts.

### Distribution Options

You may receive a distribution as a lump sum, partial lump sum or as a series of annual, semi-annual, quarterly or monthly installments. If, however, your total vested 401(k) Plan accounts are $1,000 or less, distribution will be made to you in a single lump sum.

Participants with money purchase pension plan contributions from a plan that merged with the 401(k) Plan may require spousal consent for a distribution in a form that is other than a qualified joint and survivor annuity option. If your account is subject to the qualified joint and survivor annuity rules, you will receive special forms when requesting a distribution, and if you are married, your spouse must consent to the distribution. Contact the Plan Administrator if you have any questions.

### Distribution in Cash or Stock

All distributions will be made in cash, unless you elect to receive the part of the distribution that is invested in the Wells Fargo Stock Fund or ESOP Fund in the form of Wells Fargo & Company common stock. In any event, the value of fractional shares of Wells Fargo & Company common stock will be paid in cash. If you don't make an election, the distribution will be made in cash.

**Timing of Distributions**

You may request a distribution at any time after you have terminated employment or become disabled.

If your total vested 401(k) Plan accounts are $1,000 or less, you will automatically receive a distribution in a lump sum within 12 months of the date that you terminate employment unless you request an earlier distribution date.

If your vested 401(k) Plan accounts are over $1,000, distribution must commence to you no later than April 1 of the calendar year following the date you attain age 70½ or, if later, the date you terminate employment.

When you obtain age 70 ½, you will receive information regarding your Required Minimum Distribution (RMD).  If you elect a partial lump sum or a full lump sum as a Direct Rollover prior to receiving your RMD for the Plan year, your RMD will be paid to you from your distribution proceeds.

**Requesting a Distribution**

To request a distribution, call the HR Service Center. In general, after you have requested the distribution, a Special Tax Notice will be provided to you. If the distribution is one that requires a spousal consent, the proper forms will also be sent. Once you have received the Special Tax Notice, you must call the HR Service Center again to complete your request for distribution. Your distribution will be processed as soon as administratively feasible after the request has been completed. If your distribution is subject to spousal consent, distribution will not be made until after Wells Fargo receives your Spouse's written, notarized consent.

## Distributions to Your Beneficiary

If you die before receiving all of your 401(k) Plan accounts, your vested Accounts will be paid to your designated beneficiary or beneficiaries.

**Naming a Beneficiary**

Your beneficiary may be a person, trust, charitable institution or estate. If you did not designate a beneficiary by completing and returning a properly executed 401(k) and Cash Balance Designation of Beneficiary form to the Plan Administrator prior to your death, or if your beneficiary designation is not effective for any reason, the 401(k) Plan provides for the following automatic beneficiaries. The person or persons surviving in the first of the following classes in which there is a survivor share and share alike:

- Your surviving Spouse;

- Your Same Sex Spouse;

- Your Domestic Partner;

- Your children, except that if any of your children predeceases you but leaves descendants surviving, the descendants shall take, by right of representation, the share their parent would have taken if living;

- Your surviving parents;

29

- Your surviving brothers and sisters; or

- Your estate.

To request a different order of beneficiaries or to change a previous designation, complete a 401(k) and Cash Balance Designation of Beneficiary form.

**Definitions Relating to Marital Status**

For all purposes under this Plan, the following terms have the meanings assigned to them below:

- Except to the extent a specific provision of this Plan imposes additional requirements, the term "Spouse" means a person of the opposite gender from the Participant who is legally married to the Participant at the relevant time under the laws of the state in which they reside and who satisfies the requirements under 1 U.S. Code Section 7 (defines "marriage" and "Spouse" for purposes of federal law).

- The term "Same-Sex Spouse" means a person of the same gender as the Participant who at the relevant time either (i) is recognized as being legally married to the Participant under the laws of the state or country in which the relationship was created, or (ii) is a person who has joined with the Participant in a civil union that is recognized as creating some or all of the rights of marriage under the laws of the state or country in which the relationship was created.

- The term "Domestic Partner" means a person who is not the Spouse or Same-Sex Spouse of the Participant as defined above, but who at the relevant time is the Participant's significant other (together referred to as "partners") with whom the Participant lives and shares financial responsibility. A Domestic Partner may be the same gender or opposite gender. A person will be considered a Domestic Partner of the Participant if the Participant or other person can provide a Domestic Partnership certificate to the Company from a city, county or state which offers the ability to register a Domestic Partnership. Otherwise, a person will be considered a Domestic Partner if the Participant and/or Domestic Partner provide sufficient evidence to the Company that all of the following requirements are satisfied:

  - The partners have had a single, dedicated relationship for at least six months and intend to remain in the relationship indefinitely.

  - The partners share the same permanent residence and have done so for at least six months.

  - The partners are not related by blood or a degree of closeness which would prohibit marriage under the law of the state in which they reside.

  - Neither partner is married to another person under either statutory or common law, and neither has a Same-Sex Spouse or is a member of another Domestic Partnership.

  - Each partner is mentally competent to consent or contract.

  - Both partners are at least 18 years of age.

  - The partners are financially interdependent, are jointly responsible for each other's basic living expenses, and are able to provide documents proving at least three of the following situations to demonstrate such financial interdependence:

30

- Joint ownership of real property or a common leasehold interest in real property.

- Common ownership of an automobile.

- Joint bank or credit accounts.

- A will which designates the other as primary beneficiary.

- A beneficiary designation form for a retirement plan or life insurance policy signed and completed to the effect that one partner is a beneficiary of the other.

- Designation of one partner as holding power of attorney for health care needs of the other.

To obtain a 401(k) and Cash Balance Designation of Beneficiary form, use:

- Teamworks, Forms Online, https://www.wellsretirement.com; or

- HR Service Center, 1-877-HRWELLS (1-877-479-3557).

**Married Employees**

If you are married and you want to designate someone other than your Spouse (does not apply to Domestic Partner or Same-Sex Spouse) as your sole primary beneficiary, the law requires that your Spouse consent to this designation in writing. The Spouse's consent must also be notarized. The 401(k) and Cash Balance Designation of Beneficiary form provides a space for spousal consent. If you do not receive spousal consent, your vested 401(k) Plan accounts will be paid to your surviving Spouse and not to the other beneficiary designated on your 401(k) and Cash Balance Designation of Beneficiary form as your primary beneficiary.

**Unmarried Employees**

If you are not married, you may select any person, charitable institution, trust or your estate to be your beneficiary without anyone consenting to that designation.

**Distribution Payments**

Death after Required Distributions
Minimum Required Distributions are required to begin by April 1 of the year following the year you attain age 70½ or terminate employment, whichever is later. If you die after you had begun to receive minimum required distributions, your beneficiary may elect to continue receiving the payments over the remainder of the time you had selected. Your beneficiary may, however, choose to receive payments earlier than the remaining time or receive a lump sum distribution of your remaining vested 401(k) Plan accounts.

Death before Required Distributions
If you die before you started to receive payments from the 401(k) Plan, your beneficiary may elect to receive payment in a single lump sum or a series of annual, semiannual, quarterly or monthly installments. If, however, the fair market value of your total vested 401(k) Plan account at the time of your death is $1,000 or less, distribution will be made in a single lump sum as soon as administratively feasible after your death. If the fair market value of your total vested 401(k) Plan account at the time of your death is greater than $1,000, distribution to your beneficiary must commence as follows:

31

- Spouse Beneficiary – If your beneficiary is your surviving Spouse, distribution to your surviving Spouse must be made of your entire vested 401(k) Plan account no later than December 31 of the year containing the fifth anniversary of your death, unless your surviving Spouse elects to receive installment payments over a period not exceeding your surviving Spouse's life expectancy and the payments begin not later than December 31 of the year in which you would have reached age 70½ (or the year in which your death occurred, if later).

- Domestic Partner or Same Sex Spouse Beneficiary – If your beneficiary is your Domestic Partner or Same Sex Spouse, distribution to your Domestic Partner or Same Sex Spouse must be made of your entire vested 401(k) Plan account no later than December 31 of the year containing the fifth anniversary of your death, unless your Domestic Partner or Same Sex Spouse elects to receive installment payments over a period certain that does not exceed your Domestic Partner's or Same Sex Spouse's life expectancy and the installments begin within one year of your death.

- Non-Spouse Beneficiary – If your beneficiary is not your surviving spouse, distribution must be made to your beneficiary of your entire vested 401(k) Plan account no later than December 31 of the year containing the fifth anniversary of your death.

Special rules may apply that allow your beneficiary to take distribution as a Direct Rollover to an IRA. For more information, contact the HR Service Center and speak with a 401(k) Specialist.

**Beneficiary's Death**

If a beneficiary dies before receiving all of your vested 401(k) Plan accounts, the remaining balance that the beneficiary was entitled to receive will be paid to the beneficiary's estate.

**Requesting a Distribution**

To request a distribution, your beneficiary should call the HR Service Center. A Special Tax Notice will be sent to your beneficiary after the request for distribution has been made.

## Taxes

The following is general information about taxes upon distribution or withdrawal. It is not intended to be tax advice. You should consult a tax advisor before making a decision on the timing and method of distribution or withdrawals, including any special tax treatment that might apply with respect to lump sum distributions which include shares of Wells Fargo & Company common stock.

All 401(k) Plan accounts, except contributions from After-tax Contribution Accounts, are taxed as ordinary income to you in the year they are distributed unless the distribution is rolled over as discussed below.

**Wells Fargo & Company Stock**

You may be able to take advantage of a special tax treatment on the distribution of Wells Fargo & Company stock from the 401(k) Plan if you receive the stock as part of a lump sum distribution from the 401(k) Plan. Prior to requesting a withdrawal or distribution from the 401(k) Plan or electing to diversify out of Wells Fargo & Company stock, you should consult with your tax advisor. In addition, you should review the Special Tax Notice located on Teamworks, Your Accounts, 401(k) Plan; https://www.wellsretirement.com. You may also request a copy of the Special Tax Notice by contacting the HR Service Center at 1-877-479-3557.

32

**Eligible Rollover Distributions**

Amounts distributed or withdrawn from the 401(k) Plan may be considered an "eligible rollover distribution" and may be rolled over to an IRA or another qualified plan as directed by you. A distribution to a surviving spouse beneficiary may also be considered an eligible rollover distribution and rolled over to an IRA or another qualified retirement plan. A distribution to a non-spouse beneficiary may be rolled over to an IRA. Amounts distributed to you that are considered eligible rollover distributions are:

- Regular withdrawals while employed;

- Age 59½ withdrawals while employed;

- Lump sum distributions or partial lump sum distributions; and

- Installment distributions lasting less than 10 years.

The following are not eligible rollover distributions:

- Hardship withdrawals;

- Required minimum distributions after age 70½;

- Installment payments spread over the life expectancy of you or your beneficiary, or installments paid over 10 years or more; and

- Dividends on Wells Fargo & Company common stock paid out in the form of cash.

**Income Tax Withholding**

If you or a surviving spouse beneficiary receive an eligible rollover distribution, it is subject to mandatory 20% federal income tax withholding unless it is directly rolled to an IRA or another qualified retirement plan. A distribution or withdrawal that is not considered an eligible rollover distribution is subject to optional federal income tax withholding. A distribution made to a non-spouse beneficiary is subject to optional federal income tax withholding unless it is directly rolled to an IRA. State income tax withholding may also apply depending on the state where the distribution or withdrawal is received.

**Early Distribution Penalty**

If you receive a withdrawal or distribution prior to attaining age 59½ and it is not (or cannot be) rolled over to an IRA or another qualified plan, an additional early distribution excise tax of 10% may apply. There are certain exceptions to the 10% excise tax. Generally the excise tax does not apply to the following if the distribution is:

- Taken due to disability or death;

- Taken after termination of employment in installments over your life expectancy or joint life expectancy of you and your beneficiary;

- Taken after termination of employment after reaching age 55;

- Used to pay certain medical expenses; or

- Attributed to dividend payments on Wells Fargo common stock.

Prior to requesting the withdrawal or distribution, consult your tax advisor for specific information regarding whether the 10% excise tax will apply.

### Special Tax Notice and Tax Reporting

You will receive a Special Tax Notice after you request a withdrawal or distribution from the Plan. In each case, there is a 30-day waiting period between the time of the request and the date the request is processed, unless you waive the waiting period as outlined in the instructions received. The Special Tax Notice will provide general tax and rollover information including the special tax treatment for certain distributions of employer stock. On or about January 31 of the year following the year in which the distribution or withdrawal was processed, you or your beneficiary will receive a tax form 1099-R, which contains the specific tax information relating to the distribution or withdrawal. This information is also reported to the IRS.  Even though the Special Tax Notice will automatically be given to you when you request a withdrawal or distribution, you may review or request a copy of the Special Tax Notice before you decide to request a withdrawal or distribution by going to Teamworks, Your Accounts, 401(k) Plan; https://www.wellsretirement.com or by contacting the HR Service Center at 1-877-479-3557.

## Assignment of Accounts Prohibited

As required by federal law, your 401(k) Plan accounts cannot be reached by creditors either by garnishment or any other process. Also, you may not pledge or assign your accounts to anyone else. Your accounts will, however, be used as collateral for any loan to you from the 401(k) Plan and may be used to satisfy a federal tax lien. In addition, marriage dissolution or other domestic relations court order can assign part or all of your accounts to your former Spouse and/or dependents. To be effective, however, the court order must be a "Qualified Domestic Relations Order" as defined in the 401(k) Plan and determined by the Plan Administrator. You may obtain a copy of the 401(k) Plan's Qualified Domestic Relations Orders Procedures without charge. To request a copy, call HR Service Center and speak with a 401(k) Plan specialist. Plan specialists are available 7 a.m. to 8 p.m. CST by selecting Option 1 at the main menu.

## Circumstances Affecting Plan Benefits

- If you terminate employment with Wells Fargo before becoming eligible to enroll in the 401(k) Plan, you will not receive any benefits from the 401(k) Plan.

- You may have contributions limited under maximums established by federal laws or 401(k) Plan design.

- If you do not request distributions or withdrawals from the 401(k) Plan, or you do not complete the required paperwork, including any necessary spousal consent, you will not receive payments (unless required by law or the 401(k) Plan's terms) or you may have those payments delayed.

34

- If the address shown for you or your beneficiary in the 401(k) Plan's records is incorrect, payments from the 401(k) Plan may be delayed. It is your responsibility (and your beneficiary's in the case of your death) to provide the Plan Administrator with a current address.

- Once you have received all of your vested 401(k) Plan accounts, no other payments will be made from the 401(k) Plan unless you are rehired by Wells Fargo, re-enroll in the 401(k) Plan and make Salary Deferral Contributions.

- Federal law requires that the Plan contain certain provisions that would take effect if it became a "top-heavy" Plan. A top-heavy Plan is one where the value of the current benefits for key employees (as defined in the Internal Revenue Code) exceeds 60% of the current value of the benefits for all participants. It is very unlikely that the 401(k) Plan would ever become a top-heavy Plan because it has so many participants. However, if the 401(k) Plan did become top-heavy, you would be informed about the effect of the top-heavy provisions.

- Errors may sometimes occur in determining benefits provided by the 401(k) Plan. This may be due to incorrect or incomplete data or other reasons. If such an error is discovered, it will be corrected. Overpayments resulting from an error may be deducted from future payments, if any. If you receive an overpayment, you will be required to repay the 401(k) Plan.

## Future of the Plan

Wells Fargo & Company has reserved the right to amend or discontinue the 401(k) Plan at any time.

### Plan Amendments

Wells Fargo & Company, by action of its Board of Directors, by action of the Human Resources Committee of the Board of Directors, or by action of a person so authorized by resolution of the Board of Directors or the Human Resources Committee, may amend the 401(k) Plan at any time. In addition, the Director of Human Resources or Director of Compensation and Benefits of Wells Fargo may amend the 401(k) Plan as required by the IRS or ERISA and to make changes in the administration or operation of the 401(k) Plans including authorizing plan mergers. All amendments are binding on all Participating Employers.

### Plan Termination

Wells Fargo & Company by action of the Board of Directors may terminate the 401(k) Plan at any time. Wells Fargo & Company may terminate participation of a Participating Employer by written action of Wells Fargo & Company's Director of Human Resources or Director of Compensation and Benefits.

In the event the 401(k) Plan is terminated and you are still employed at Wells Fargo, you will automatically become 100% vested in all of your 401(k) Plan accounts. If the 401(k) Plan is terminated, Wells Fargo may decide to pay your vested accounts to you on any date after the termination or to follow the payment rules in the 401(k) Plan for termination of employment. If the 401(k) Plan is merged or consolidated with another plan, or its assets are transferred to another plan, the value of your accounts will be equal to the value of the accounts immediately before the merger, consolidation or transfer.

## Your Duty to Review Information

You will receive periodic information regarding your 401(k) Plan benefits (benefit statements, etc.). After your employment ends, you will receive information about your account and the time and manner in which it can be paid to you.

You are responsible for promptly reviewing any information you receive regarding the 401(k) Plan. If you have any questions, or if you believe the information is incorrect in any way, you must notify the Plan Administrator within 60 days after you receive the information. Wells Fargo will not be responsible for any mistakes or losses unless you bring it to the attention of the Plan Administrator within the 60 day time period.  Most inquiries will be resolved informally, and your initial inquiry is not considered to be a formal claim under the terms of the 401(k) Plan. If the response to your inquiry does not resolve the matter to your satisfaction, however, you must -- within 60 days of the decision on your inquiry -- file a formal, written claim for benefits in accordance with the claims procedures.

## Administrators

### Plan Sponsor

Wells Fargo & Company sponsors the 401(k) Plan. The address and federal taxpayer identification number of the Plan Sponsor is:

> Wells Fargo & Company
> MAC A0101-121
> 420 Montgomery Street. 4th Floor
> San Francisco, CA 94104
> Employer Identification Number: 41-0449260

### Plan Administrator

The Plan Administrator has full discretionary authority to administer and interpret the 401(k) Plan. The Plan Administrator is the Director of Human Resources and the Director of Compensation and Benefits.  The Plan Administrator may delegate its duties and discretionary authority to accomplish those duties to others.  Communications to the Plan Administrator should be addressed to:

> Wells Fargo & Company
> 401(k) Plan Administrator
> MAC N9311-170
> 625 Marquette Avenue
> Minneapolis, MN 55479

To speak to the Plan Administrator or if you have questions about the 401(k) Plan, you may also call the HR Service Center at 1-877-HRWELLS (1-877-479-3557).

**Agent for Service**

The Corporate Secretary of Wells Fargo & Company (at the address below) is the designated agent for service of legal process. Also, service for legal process may be made upon the 401(k) Plan Administrator or the 401(k) Plan Trustee.

> Corporate Secretary
> Wells Fargo & Company
> MAC N9305-173
> Sixth and Marquette
> Minneapolis, Minnesota 55479

**401(k) Plan Trustee**

> Wells Fargo Bank, N. A.
> MAC N9303-09A
> 608 Second Avenue South
> Minneapolis, Minnesota 55479

**Plan Year**

The Plan Year is the 12 month period beginning on January 1 and ending on the following December 31.

**Participating Employers**

The 401(k) Plan generally covers employees of Wells Fargo & Company and those subsidiaries and affiliates of Wells Fargo & Company that have been authorized to participate in the 401(k) Plan. These participating Wells Fargo companies are called Participating Employers. Participants and beneficiaries in the 401(k) Plan may receive on written request, information as to whether a particular subsidiary or affiliate is a Participating Employer, and if it is, the Participating Employer's address. To request a complete list of Participating Employers in the 401(k) Plan, write the Plan Administrator at the address above.

**Employer Identification Number**

The Internal Revenue Service has assigned employer identification number (EIN) 41-0449260 to Wells Fargo & Company. Employees should use this number if they correspond with the government about the 401(k) Plan. In addition, Wells Fargo has assigned a 3-digit plan identification number of 002 to the 401(k) Plan.

**Normal Retirement Age**

Normal retirement age is age 65.

## Claims and Appeals

If you believe there is an error in your account or in a distribution, you believe you are entitled to different benefits from the 401(k) Plan, you disagree with any determination that has been made reflecting your benefits under the 401(k) Plan, or you have a complaint regarding the 401(k) Plan, you (or your authorized representative) may present a claim in writing for a review by the Plan Administrator. Your claim must be filed within 60 days after you first receive the information on which

the claim is based. Your written claim should explain, as best you can, what you want and why you believe you are entitled to it, and should include copies of any relevant documents. You should specifically designate your claim as "claim for benefits." You should sign and submit the claim by mail or in person to the following address:

> 401(k) Plan Administrator
> Wells Fargo & Company
> MAC N9311-170
> 625 Marquette Avenue
> Minneapolis, MN 55479

**Initial Review**

Ordinarily, the Plan Administrator will respond to your claim within 90 days after receiving it. You will receive either:

- A decision; or

- A notice describing special circumstances requiring a specified amount of additional time (but no more than 180 days from the day you delivered your claim) to reach a decision.

If your claim is fully or partially denied, you will receive a written notice specifying:

- The reasons for the denial;

- The 401(k) Plan provisions on which the denial is based; and

- Any additional information needed from you in connection with the claim and the reason such information is needed. You will also receive information about your right to request a review.

**Appealing a Decision**

If you do not agree with the Plan Administrator's decision, and you want to pursue the matter further, you (or your authorized representative) must request that the decision be reviewed by filing a written request for review within 60 days after receiving the notice that the claim has been denied. Your written appeal should describe all reasons why you believe your claim denial was in error, and should include copies of any documents you want considered in support of your appeal. Your appeal will be decided based on information in the file, so you should make sure that your submission is complete. You may request copies of (or reasonable access to) all pertinent 401(k) Plan documents and other information relevant to your claim for benefits free of charge. You (or your authorized representative) may also present written statements explaining why you believe you are entitled to the benefits claimed and any other information that supports your claim.

Generally, appeals will be reviewed within 60 days of receipt. However, if special circumstances require a delay, the review may take up to 120 days. You will receive written notice of any delay. A decision regarding the appeal will be in writing and will specify the 401(k) Plan provisions on which the decision is based.

All decisions of the Plan Administrator are binding and conclusive on all parties. You do, however, have the right to bring a civil action under Section 502(a) of ERISA following an adverse decision on your appeal. If you do not receive a decision within the specified time, you should assume that your

claim or appeal was denied on the date the specified time expired. You may, at your own expense, have an attorney or other representative act on your behalf, but the Plan Administrator reserves the right to require a written authorization. The Plan Administrator reserves the right to delegate its authority to make decisions.

## Claims Based on Disability

In general, the foregoing rules that apply to claims for benefits and review of claims also apply to claims for benefits and the review of claims for benefits based on disability. There are, however, certain different time frames and rules that apply to claims for benefits based on disability (other than disability determinations that have been made by the Social Security Administration):

- The time period for responding to your claim is shortened from 90 days to 45 days. The time to respond may be extended by 30 days and then an additional 30 days.

- You must file your request for review within 180 days after the date you received notice that your claim had been denied. The time period for responding to your claim is shortened from 60 to 45 days. The time to respond may be extended by 45 days.

- If a claim decision involving disability is based on medical judgment, when an appeal is filed, the Plan will consult with a health care professional who was not involved in the original decision and is not subordinate to the original decision maker.

## Deadline for Legal Action

Any lawsuit challenging a claim denial must be commenced within six months after the date on the denial letter. In addition to that six month deadline, there is an additional "catch-all" limitation that applies to all lawsuits involving Plan benefits. Any such lawsuit must be commenced no later than two years after you first receive information that constitutes a clear repudiation of the rights you are seeking to assert. This two-year limitation period will not run during the period of time, if any, when your claim is in the claims procedure process. Once that process is completed, however, the two year period will continue running where it left off.

## Appendices and Other Important Information

Wells Fargo & Company may update the information contained in this SPD/Prospectus by means of an appendix. Appendices typically provide historical information concerning the sale prices of Wells Fargo & Company common stock, as well as historical rates of return on the investment options. Wells Fargo & Company will provide additional copies of this SPD/Prospectus and the current appendix upon request.

Wells Fargo & Company may also update the information contained in this SPD/Prospectus through other written communication to eligible individuals. Also, Wells Fargo & Company will provide participants with copies of all future reports, proxy statements and other communication distributed to its stockholders generally.

## Special Requirements for Officers

If you are an officer of Wells Fargo & Company and request account transactions that involve Wells Fargo & Company common stock, special reporting and timing rules may apply. These rules are established under Section 16 of the Securities Exchange Act of 1934.

**Wells Fargo & Company Stock Transactions**

All trades of Wells Fargo & Company common stock by Wells Fargo employees, including transactions in the 401(k) Plan, are subject to laws governing trading on inside or nonpublic information and the Wells Fargo & Company Code of Ethics and Business Conduct. The Code of Ethics and Business Conduct is published in the Handbook for Wells Fargo Team Members.

## More Information about Wells Fargo & Company

### Registration Statement

Wells Fargo & Company has filed a registration statement on Form S-8 to register with the Securities and Exchange Commission (SEC) shares of its common stock that may be offered under the 401(k) Plan. The registration statement, including the exhibits to the registration statement, contains additional relevant information about Wells Fargo & Company and its common stock. As allowed by SEC rules, this SPD/Prospectus does not contain all of the information you can find in the registration statement including exhibits.

### SEC Filings

Wells Fargo & Company files annual, quarterly and special reports, proxy statements and other information with the SEC. Its SEC filings are available to the public on the SEC's website at http://www.sec.gov. You can also read and copy reports, statements and other information filed by Wells Fargo & Company with the SEC at the SEC's Public Reference Room, 100 F Street, N.E., Washington, D.C., 20549.  Please call the SEC at 1-800-SEC-0330 for further information on the operation of the Public Reference Room.  You can also obtain copies of these documents at prescribed rates by writing to the Public Reference Section of the SEC at 100 F Street, N.E., Washington, D.C. 20549.

### Documents Incorporated by Reference

The SEC allows Wells Fargo & Company to "incorporate by reference" into this SPD/Prospectus information it files with the SEC, which means that Wells Fargo & Company can disclose important information to you by referring you to those documents.  Information incorporated by reference is an important part of this SPD/Prospectus, and information subsequently filed by Wells Fargo & Company with the SEC automatically updates this information as well as the information included in this SPD/Prospectus.

This SPD/Prospectus incorporates by reference the documents (or portions thereof) set forth below. All Wells Fargo & Company documents were filed with the SEC under File No. 001-02979.

- The 401(k) Plan's Annual Report on Form 11-K for the year ended December 31, 2005;

- Wells Fargo & Company's Annual Report on Form 10-K for the year ended December 31, 2005, including information specifically incorporated by reference into the Form 10-K from Wells Fargo's 2005 Annual Report to Stockholders and Wells Fargo's definitive Notice and Proxy Statement for its 2006 Annual Meeting of Stockholders;

- Wells Fargo & Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2006, June 30, 2006 and September 30, 2006;

- Wells Fargo & Company's Current Reports on Form 8-K filed January 17, 2006, January 30, 2006, February 7, 2006, March 6, 2006, March 21, 2006, March 23, 2006, April 18, 2006, May 1, 2006, May 17, 2006, June 30, 2006, July 6, 2006, July 18, 2006, August 10, 2006, August 29, 2006, September 28, 2006, October 17, 2006, November 2, 2006, November 3, 2006, November 9, 2006, November 28, 2006, December 4, 2006, December 5, 2006 and December 20, 2006.

- Exhibit 99(e) to Wells Fargo & Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2003, which contains a description of Wells Fargo & Company common stock, including any amendment or report filed to update such description.

All documents filed by Wells Fargo & Company and the 401(k) Plan with the SEC pursuant to Sections 13(a), 13(c), 14, or 15(d) of the Securities Exchange Act of 1934, other than any portions of any such documents that are not deemed "filed" under the Exchange Act, in accordance with the Exchange Act and applicable SEC rules, after the date of this SPD/Prospectus and prior to the filing of a post-effective amendment that indicates all securities offered have been sold or that deregisters all securities then remaining unsold are incorporated by reference into this SPD/Prospectus and are part of this SPD/Prospectus from the date of filing.

Any statement contained in a document incorporated or deemed to be incorporated by reference herein shall be deemed to be modified or superseded for purposes hereof to the extent that a statement contained herein or in any other subsequently filed document that also is, or is deemed to be, incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part hereof.

**Documents Available Without Charge**

Wells Fargo & Company will provide, without charge, copies of any report or other document incorporated by reference into this SPD/Prospectus, excluding exhibits other than those that are specifically incorporated by reference in this SPD/Prospectus. You may obtain a copy of any report or other document incorporated by reference by writing or calling:

> Corporate Secretary
> Wells Fargo & Company
> MAC N9305-173
> Sixth and Marquette
> Minneapolis, MN 55479
> 1-612-667-8655

In deciding whether and how to participate in the 401(k) Plan, you should rely only on information contained in or identified as part of this SPD/Prospectus and information that is incorporated by reference into this SPD/Prospectus and the official 401(k) Plan document. Wells Fargo & Company has not authorized any person to provide you with any information that is different from what is contained in or identified as part of this SPD/Prospectus. This SPD/Prospectus does not constitute an offer to sell or a solicitation of any offer to buy any securities in any jurisdiction in which, or to any person to whom, it is unlawful to make any such offer or solicitation.

## ESOP Information

The 401(k) Plan is "tax qualified" under the Internal Revenue Code as an employee stock ownership plan (ESOP) and a 401(k) qualified cash or deferred arrangement. This means the 401(k) Plan has

certain special characteristics, and you as a participant in the 401(k) Plan have certain rights and opportunities in regard to your 401(k) Plan accounts. The special features of the 401(k) Plan as an ESOP are:

- You have the right to vote the proxies for the Wells Fargo & Company common stock held in your 401(k) Plan accounts. Each time a shareholder meeting or proxy vote is held, you will receive information on the items being presented and have the opportunity to vote, confidentially, on the issues presented. Wells Fargo has retained an independent third party fiduciary to tabulate your vote in order to maintain the confidentiality of your vote.

- Employer matching contributions are allocated to your Employer Matching Contribution Account under the 401(k) Plan. Employer matching contributions are invested in Wells Fargo & Company common stock automatically (the "ESOP Fund"). You may, however, elect to transfer your 401(k) Plan employer matching contributions into other investment funds offered in the 401(k) Plan.

- You have the right to diversify your Share Award that is invested in the ESOP Fund. You can direct that all or any portion of your Share Award be invested in any other investment option available under the 401(k) Plan.

- When you request an in-service withdrawal or a termination distribution, you may request that all or any portion of your 401(k) Plan accounts invested in Wells Fargo & Company common stock be distributed to you in the form of shares of Wells Fargo & Company common stock.

Under the terms of the 401(k) Plan, Wells Fargo & Company may borrow money to purchase Wells Fargo & Company preferred stock that will be converted to Wells Fargo & Company common stock when needed to meet its matching contribution obligations in the future. Wells Fargo has utilized this funding opportunity in the past and may do so in the future.

## Employee Rights under ERISA

### Receive Information about Your Plan

You are entitled to certain rights and protection under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all 401(k) Plan participants are entitled to:

- Examine without charge at the Plan Administrator's office and at other specified locations such as work sites, all documents governing the Plan, including a copy of the latest Annual Report (Form 5500 Series) filed by the Plan with the U. S. Department of Labor and available at the Public Disclosure Room of the Employee Benefits Security Administration of the U. S. Department of Labor.

- Obtain by written request to the 401(k) Plan Administrator copies of documents governing the operation of the 401(k) Plan, including copies of the latest Annual Report (Form 5500 Series) and an updated Summary Plan Description. The Plan Administrator may make a reasonable charge for copying the documents.

- Receive a summary of the Plan's annual financial report. The Plan Administrator is required by law to furnish each participant with a copy of the Summary Annual Report.

- A statement telling you the current value of your 401(k) Plan accounts and whether you have a vested right to receive the 401(k) Plan accounts at normal retirement age. If you do not have a vested right to all of your 401(k) Plan accounts, the statement will show how many more years you

have to work to get a vested right to all of the accounts. This statement must be requested in writing and is not required to be given more than once every twelve (12) months. The 401(k) Plan must provide the statement free of charge.

**Prudent Actions by Plan Fiduciaries**

In addition to creating rights for Plan participants, ERISA imposes duties upon people who are responsible for the operation of the employee benefits plan. The people who operate the 401(k) Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. No one, including the employer or any other person, may terminate your employment or otherwise discriminate against you in any way to prevent you from obtaining a benefit or exercising rights under ERISA.

**Enforcing Your Rights**

If your claim for a benefit is denied or ignored in whole or in part, you have a right to know why this was done, to obtain copies of documents relating to the decision without charge, and to appeal any denial, all within certain time schedules.

Under ERISA, you may take certain steps to enforce your rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan Administrator to provide the materials and pay you up to $110 a day until the materials are received, unless the materials were not sent because of reasons beyond the control of the Plan Administrator. If you have a claim for benefits that is denied or ignored, in whole or in part, you may file suit in a state or federal court. In addition, if you disagree with the Plan's decision or lack thereof concerning the qualified status of a domestic relations order or a medical child support order, you may file suit in federal court.

If it should happen that Plan fiduciaries misuse the Plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor or file suit in federal court. The court will decide who should pay these costs and fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous.

**Assistance with Your Questions**

Questions about this Plan should be directed to the Plan Administrator. If you have any questions about this statement or about rights under ERISA, or if you need assistance in obtaining documents from the Plan Administrator, you should con tact the nearest area office of the Employee Benefits Security Administration, U. S. Department of Labor, listed in your telephone directory or write to:

> Division of Technical Assistance and Inquiries
> Employee Benefits Security Administration
> U. S. Department of Labor
> 200 Constitution Avenue, N. W.
> Washington, D. C. 20210

You may also obtain certain publications about your rights and responsibilities under ERISA by calling the publications hotline of the Employee Benefits Security Administration.

## Appendix A

Dated January 1, 2007.

The Wells Fargo & Company 401(k) Plan

The following table sets forth, for each quarter indicated, the reported high, low and closing sale prices per share of Wells Fargo & Company common stock on the New York Stock Exchange and the cash dividend paid per share of Wells Fargo & Company common stock, as adjusted for the two-for-one stock split in the form of a 100% stock dividend distributed on August 11, 2006.

| Historical Stock Price Information | | | | |
|---|---|---|---|---|
| Calendar Year | High | Low | Close | Dividends Per Share |
| **2002** | | | | |
| First Quarter | $25.38 | $21.45 | $24.70 | $.13 |
| Second Quarter | $26.72 | $24.06 | $25.03 | $.14 |
| Third Quarter | $26.50 | $20.75 | $24.08 | $.14 |
| Fourth Quarter | $25.80 | $21.65 | $23.43 | $.14 |
| **2003** | | | | |
| First Quarter | $24.57 | $21.64 | $22.50 | $.15 |
| Second Quarter | $26.40 | $22.50 | $25.20 | $.15 |
| Third Quarter | $26.86 | $24.45 | $25.75 | $.23 |
| Fourth Quarter | $29.59 | $25.84 | $29.45 | $.23 |
| **2004** | | | | |
| First Quarter | $29.49 | $27.98 | $28.34 | $.23 |
| Second Quarter | $29.86 | $27.16 | $28.61 | $.23 |
| Third Quarter | $29.93 | $28.06 | $29.82 | $.24 |
| Fourth Quarter | $32.02 | $28.77 | $31.07 | $.24 |
| **2005** | | | | |
| First Quarter | $31.38 | $29.07 | $29.90 | $.24 |
| Second Quarter | $30.79 | $29.89 | $30.79 | $.24 |
| Third Quarter | $31.43 | $29.00 | $29.29 | $.26 |
| Fourth Quarter | $32.35 | $28.81 | $31.41 | $.26 |
| **2006** | | | | |
| First Quarter | $32.76 | $30.31 | $31.94 | $.26 |
| Second Quarter | $34.86 | $31.90 | $33.54 | $.26 |
| Third Quarter | $36.89 | $33.36 | $36.18 | $.28 |
| Fourth Quarter | $36.99 | $34.90 | $35.56 | $.28 |

**Appendix B**

## Annual Rate of Return

The following return information does not comply with SEC standards for fund prospectuses. Unless otherwise indicated, returns reflect changes in unit value and do not include the reinvestment of dividends and capital gains. Past performance is no guarantee of future results.

| Investment funds | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| Stable Value Fund | 6.62% | 5.43% | 4.75% | 4.69% | 4.92% |
| Bond Index Fund | 10.96% | 4.67% | 4.20% | 2.37% | 3.90% |
| Conservative Allocation Fund | -1.48% | 9.31% | 4.24% | 3.08% | 6.58% |
| Moderate Balanced Fund | -7.97% | 15.66% | 5.99% | 3.83% | 9.28% |
| Growth Balanced Fund | -15.74% | 23.54% | 8.07% | 4.79% | 12.43% |
| Aggressive Allocation Fund | -19.44% | 27.05% | 9.21% | 5.27% | 14.02% |
| Asset Allocation Fund | -12.38% | 24.79% | 10.44% | 5.88% | 13.25% |
| Dodge & Cox Fund | -10.52% | 32.35% | 19.16% | 9.36% | 18.54% |
| S&P 500 Index Fund | -22.05% | 28.63% | 10.86% | 4.96% | 15.88% |
| Diversified Equity Fund | -21.96% | 29.43% | 10.76% | 6.52% | 14.21% |
| Capital Growth Fund | -18.09% | 25.79% | 18.06% | 10.00% | 4.90% |
| Large Company Growth Fund | -28.11% | 26.77% | 3.26% | 5.73% | 2.23% |
| S&P MidCap Index Fund[1] | -14.61% | 35.65% | 16.67% | 12.62% | 10.54% |
| Diversified Small Cap Fund | -14.55% | 43.93% | 19.11% | 6.74% | 13.20% |
| EuroPacific Growth Fund | -13.37% | 33.25% | 19.98% | 21.38% | 22.17% |
| Nasdaq-100 Index Fund | -37.31% | 48.88% | 10.40% | 1.70% | 7.14% |
| Wells Fargo Stock Fund | | | | | |
|  - Without Dividend Reinvestment | 7.82% | 25.65% | 5.54% | 1.09% | 13.19% |
|  - With Dividend Reinvestment | 10.25% | 29.41% | 8.89% | 4.47% | 16.85% |

| Investment benchmarks | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| 50% 90-day T-Bills/50% Merrill Lynch 1-3 year Treasury Index | 3.72% | 1.49% | 1.29% | 2.60% | 4.45% |
| Lehman Brothers Gov't/ Credit Bond Index | 11.02% | 4.68% | 4.21% | 2.34% | 3.80% |
| S&P 500 Index | -22.10% | 28.68% | 10.88% | 4.91% | 15.79% |
| Russell 1000 Value Index | -15.52% | 30.03% | 16.49% | 7.05% | 22.25% |
| Russell 1000 Growth Index | -27.88% | 29.75% | 6.30% | 5.26% | 9.07% |
| S&P MidCap 400 Index | -14.51% | 35.62% | 16.48% | 12.56% | 10.32% |
| Russell 2000 Index | -20.48% | 47.25% | 18.33% | 4.55% | 18.37% |
| MSCI EAFE Index | -15.94% | 38.59% | 20.25% | 13.54% | 26.34% |
| Nasdaq-100 Index [®2] | 37.58% | 49.12% | 10.44% | 1.49% | 6.79% |

[1] The Annual Rate of Return is shown before investment management fees.
[2] The Annual Rate of Return for this Index is representative of the price only return for the NASDAQ-100 Index and excludes the effect of dividends.

## Appendix C

| Disclosure of 2007 Investment Management Fees | | | | |
|---|---|---|---|---|
| Investment Fund | Investment Type | Investment Management Fees | Net Rebate Paid to Plan | Net Investment Management Fee Paid by Plan |
| Stable Value Fund[1] | Separately Managed Portfolio | 0.00% | | 0.00% |
| Bond Index fund | Collective Fund | 0.028% | | 0.028% |
| Conservative Allocation Fund[2] | Mutual Fund | 0.85% | 0.17% | 0.68% |
| Moderate Balanced Fund[2] | Mutual Fund | 0.90% | 0.18% | 0.72% |
| Growth Balance Fund[2] | Mutual Fund | 0.95% | 0.20% | 0.75% |
| Aggressive Allocation Fund[2] | Mutual Fund | 1.00% | 0.21% | 0.79% |
| Asset Allocation Fund[1] | Collective Fund | 0.00% | | 0.00% |
| Dodge & Cox Fund[3] | Mutual Fund | 0.52% | | 0.52% |
| S&P Index Fund | Collective Fund | 0.014% | | 0.014% |
| Diversified Equity Fund[2] | Mutual Fund | 1.00% | 0.21% | 0.79% |
| Capital Growth Fund[2] | Mutual Fund | 0.94% | 0.20% | 0.74% |
| Large Co. Growth Fund[2] | Mutual Fund | 0.95% | 0.21% | 0.74% |
| S&P MidCap Index Fund | Collective Fund | 0.032% | | 0.032% |
| Diversified Small Cap Fund[2] | Mutual Fund | 1.20% | 0.30% | 0.90% |
| EuroPacific Growth Fund[4] | Mutual Fund | 0.57% | | 0.57% |
| Nasdaq-100 Index Fund | Collective Fund | 0.078% | | 0.078% |
| Wells Fargo Stock Fund | Separately Managed Portfolio | 0.00% | | 0.00% |

[1] Investment management fees are paid by Wells Fargo & Company.

[2] Participants who invest in the Wells Fargo Mutual Funds will receive a rebate from Wells Fargo of a portion of the fees paid for investing in the funds. The rebate will vary from fund to fund from 17 to 30 basis points, which is approximately 20% to 25% of the management fees shown above.

[3] The Dodge & Cox Stock Fund rebates 0.10% to help offset Plan Administrative expenses.

[4] The EuroPacific Growth Fund rebates 0.05% to help offset Plan Administrative expenses. The EuroPacific Growth Fund is waiving a portion of the investment management fee. The gross expense ratio shown does not reflect the waiver; the net expense ratio for the Fund in 2007 after the waiver is 0.52%. This waiver of a portion of the management fee may be discontinued at any time.

## Appendix D

**Notice of Your Rights Concerning Employer Securities**
**IRS Model Notice**

This notice informs you of an important change in Federal law that provides specific rights concerning investments in employer securities (company stock). Because you may now or in the future have investments in company stock under the Wells Fargo & Company 401(k) Plan, you should take the time to read this notice carefully.

### Your Rights Concerning Employer Securities

Beginning January 1, 2007, the 401(k) Plan must allow you to move any portion of your account that is invested in company stock from that investment into other investment alternatives under the 401(k) Plan. This right extends to all the company stock held under the 401(k) Plan. You may contact the HR Service Center for specific information regarding this new right, including how to make this election. In deciding whether to exercise this right, you will want to give careful consideration to the information below that describes the importance of diversification. All the investment choices in the 401(k) Plan are available to you if you decide to diversify out of company stock.

### The Importance of Diversifying Your Retirement Savings

To help achieve long-term retirement security, you should give careful consideration to the benefits of a wellbalanced and diversified investment portfolio. Spreading your assets among different types of investments can help you achieve a favorable rate of return, while minimizing your overall risk of losing money. This is because market or other economic conditions that cause one category of assets, or one particular security, to perform very well often cause another asset category, or another particular security, to perform poorly. If you invest more than 20% of your retirement savings in any one company or industry, your savings may not be properly diversified. Although diversification is not a guarantee against loss, it is an effective strategy to help you manage investment risk.

In deciding how to invest your retirement savings, you should take into account all your assets, including any retirement savings outside of the Plan. No single approach is right for everyone because, among other factors, individuals have different financial goals, different time horizons for meeting their goals, and different tolerances for risk. Therefore you should carefully consider the rights described in this notice and how these rights affect the amount of money that you invest in company stock through the Plan.

It's also important to periodically review your investment portfolio, your investment objectives, and the investment options under the 401(k) Plan to help ensure that your retirement savings will meet your retirement goals.

### For More Information

If you have any questions about your rights under this new law, including how to make an investment election, you may call the HR Service Center at 1-877-HRWELLS (877-479-3557), option 1, then 1.

To review 401(k) Plan fund details or to make a fund transfer, go to:

- At work: Teamworks > Your Accounts > 401(k)/Cash Balance

- At home: https://www.wellsretirement.com/

To access your account, you must use your personal identification number (PIN). Unless you've changed your PIN, it is your six-digit date of birth (for example, 040551). You may be asked to change your PIN before accessing your account.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**Yvonne Gipson**
**1404 Chesapeake Avenue**
**Annapolis, MD 21403,**
**and all others similarly situated,**

                     **CASE NUMBER 1:07-CV-01970-JDB**

            **Plaintiffs,**

**v.**                                **[PROPOSED] ORDER**

**Wells Fargo & Company, Wells Fargo**
**Bank, N.A., Employee Benefit Review**
**Committee, and John Does 1 - 20, et al.,**

            **Defendants.**

---

This matter came before the Court on Defendants Wells Fargo & Company ("Wells Fargo"), Wells Fargo Bank, N.A. ("Wells Fargo Bank"), and the Employee Benefit Review Committee (the "Review Committee") (collectively the "Wells Fargo Defendants") motion to dismiss the Complaint for improper venue under Fed. R. Civ. P. 12(b)(3) or, in the alternative, to transfer this case to the District of Minnesota pursuant to 28 U.S.C. § 1404(a).

Based upon the arguments presented by counsel, as well as the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The Wells Fargo Defendants Motion to Dismiss, Or in the Alternative, To Transfer is **GRANTED**; and

2.      The above-captioned case is **DISMISSED [TRANSFERRED** to the District of Minnesota.]

Dated: _____, 2008

                             _____

                             John D. Bates
                             United States District Court Judge

COPIES TO:

Creighton R. Magid, Esq.
Dorsey & Whitney LLP
1050 Connecticut Avenue, N.W.
Suite 1250
Washington, DC 20004-2505

Andrew J. Holly
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55401

Stephen P. Lucke
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55401

J. Brian McTigue, Esq.
Gregory Y. Porter, Esq.
MCTIGUE & PORTER
5301 Wisconsin Avenue, N.W.
Suite 350
Washington, D.C. 20015